UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

WELLINGTON GARCIA,

                          Plaintiff,

v.                                                                          9:21-cv-0135
                                                                            (DNH/TWD)

M. MCINTOSH, et al.,

                          Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

WELLINGTON GARCIA
*Plaintiff, pro se*
1537 Darien Street
Reading, PA 19601

HON. LETITIA JAMES                              NOAH C. ENGELHART, ESQ.
New York State Attorney General                 Ass't Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

       This matter has been referred for a report and recommendation by the Hon. David N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Wellington Garcia ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 alleging

wrongdoing which occurred during his confinement at Bare Hill Correctional Facility.[1]  *See* Dkt.

_____

[1] Although Plaintiff's first name is spelled "Welington" in previous filings, the Court uses the
spelling provided in his complaint.  Dkt. No. 1; Dkt. No. 12.  The Clerk is directed to correct the
spelling to Wellington on the docket.

No. 12.[2]  Currently before the Court is Defendant Lawrence LaBarge's motion for summary

judgment.  Dkt. No. 75.  For the reasons set forth below, the Court recommends the Defendant's

motion be granted and Plaintiff's claims against John Doe #1, John Doe #2, John Doe #3, John

Doe #4, John Doe #5, John Doe #6 be dismissed.

## II.    BACKGROUND

### A. Factual Background

Plaintiff was in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS") in March of 2019 when he was transferred to Bare Hill

Correctional Facility.  Dkt. No. 75-14, Transcript of Plaintiff's Deposition, at 21-22.  On October

21, 2020, Plaintiff received a misbehavior report and was taken to the facility's Special Housing

Unit ("SHU").  *See id*. at 36-38; *see also*, Dkt. No. 12 at 4.  Plaintiff avers:

> Upon entering SHU I was knocked down and beaten by corrections
> officers John Doe #1, John Doe #2, and John Doe #3.  I was beaten
> and kicked in my rib cage and leg area numerous times by all of
> the officers.  Then officer John Doe #1, threaten me by telling me
> "that you are lucky we do not kill your ass, you spick bastard". . . .
> After the beaten, officer John Doe #2, removed the handcuffs and
> officer John Doe #1, ordered me to take off my socks.  As soon as
> I did he stepped on my foot and toes and twist his boots on my
> feet.  Officers John Doe #2 and #3 just stood idly by without saying
> anything.

Dkt. No. 12 at 4.[3]  He also testified John Doe #1 attacked him first, then John Doe #2 and John

Doe #3 joined John Doe #1.  Dkt. No. 75-14 at 58.

Plaintiff denied having any conversation with the officers prior to the attack, but recalled

they threatened him, "screaming and saying horrible things."  *Id*. at 49.  He explained the three

---

[2] Citations to docket entries will refer to the pagination generated by CM/ECF, the Court's
electronic filing system, unless otherwise noted.

[3] Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in
the original and errors in spelling, punctuation, and grammar have not been corrected.

officers kicked him numerous times in the ribs, stomach, and legs as he used his arms to protect his face. *Id*. at 52-53. The incident lasted more than a few minutes. *Id*. at 52.

On October 22, 2020, Plaintiff was removed from his SHU cell by John Doe #4 and John Doe #5 for a disciplinary hearing. Dkt. No. 12 at 5.[4] Plaintiff was searched directly outside of his SHU cell prior to the hearing. Dkt. No. 75-14 at 70. Plaintiff testified John Doe #4 ordered him to place his hands on the wall and conducted a pat down, during which he grabbed Plaintiff's penis and "swiped his fingers" through Plaintiff's buttocks. *Id*. at 71; *see also* Dkt. No. 12 at 5. The other officer, John Doe #5, stood quietly on Plaintiff's left side and watched. *Id*. at 73-74. Additionally, John Doe #4 threatened Plaintiff, warning "if he said anything about what happened to anyone, that he will wish he did not." Dkt. No. 12 at 5.

The same day, Plaintiff was removed from SHU Cell #31 and relocated to SHU Cell #27 which was "very cold" due to a broken window. *Id*.; *see also* Dkt. No. 75-14 at 77-78. He requested a blanket from John Doe #5 and John Doe #6, but was told to "stop asking for things, . . . and just deal with it, you know." Dkt. No. 75-14 at 77. Plaintiff alleged the officers told him "to deal with it and suffer, and to stop asking for things that he knew that he was not going to get, or he will not be leaving this building alive." Dkt. No. 12 at 5. At his deposition, he could not recall which of the officers specifically made each statement, as they were speaking "in conjunction." Dkt. No. 75-14 at 78.

Plaintiff alleges he "was not given any food from the time period of October 21, 2020, to October 28, 2020, by any of the SHU Officers or Staff member at Bare Hill Correctional Facility." Dkt. No. 12 at 7. Plaintiff testified, at a hearing which occurred on October 27, 2020,

---

[4] The disciplinary hearing was related to a misbehavior report issued on October 9, 2020, by Officer Rief, who is not a party in the instant matter. *See* Dkt. No. 75-14 at 36-37, 65-66, 82.

he was starving, beat up, weak, and had high blood pressure.  Dkt. No. 75-14 at 85.  He told the hearing officer, who is not a party to this action, about "the abuse, sexual assault, and beatings by the SHU officers . . . ."  Dkt. No. 12 at 6; *see also* Dkt. No. 75-14 at 86-87.

Finally, on October 28, 2020, Sergeant LaBarge and another officer came to Plaintiff's SHU cell to take him to the infirmary.[5]  Dkt. No. 75-14 at 96-97.  Defendant LaBarge ordered Plaintiff to get dressed, then placed handcuffs on his hands and ankles and, as he did so, approached Plaintiff and "said, listen, don't you say anything about what happened over here especially with the being sexually harassed, the . . . not eating, you know, the . . . food that we're not delivering to your or being . . . assaulted right here."  *Id*. at 98.  Defendant LaBarge warned Plaintiff, "Don't say anything, or when you come back . . ." then gestured to a "can" and asked Plaintiff if he knew what the item was.  *Id*.  Plaintiff responded he knew the item was pepper spray, LaBarge agreed and stated, "When you come back, I'm going to pepper you and then you're going to get beat again.  We're going to beat you again.  So don't you say anything to any nurse when you go to the infirmary."  *Id*.; *see also* Dkt. No. 12 at 6 ("Plaintiff was threaten by sergeant Lagarde, to not say anything about being beaten, denied food or sexually assaulted4 by officers in SHU to the medical staff.  And if he Plaintiff did that Plaintiff would be peppered-sprayed and receive an ass beaten upon his return to SHU.").

When Plaintiff arrived at the facility doctor's office, he remained handcuffed and Defendant LaBarge remained in the room.  Dkt. No. 12 at 6; Dkt. No. 75-14 at 102-03.  LaBarge did not say anything to Plaintiff, rather, "He just stood there watching me."  Dkt. No. 75-14 at 103.  Plaintiff told Dr. Connolly he was experiencing bleeding gums and stomach pain and the

---

[5] Plaintiff testified he requested treatment for leg pain he suffered as a result of a previously suffered ankle/leg injury which was merely aggravated by the alleged October 21, 2020, assault. *See* Dkt. No. 75-14 at 58, 96-97.

doctor send Plaintiff to Alice Hyde Medical Center due to concerns of dehydration and high blood pressure.  *Id*. at 106.

Plaintiff was escorted to the medical center by non-party officers.  *Id*. at 109.  He told the treating doctor "the truth."  *Id*. at 111.  Specifically, he testified "I explained to her, and listen, they are not feeding me.  I'm in the SHU unit."  *Id*.  Plaintiff was discharged from the medical center later the same day and underwent a twenty-four to forty-eight hour observation period at Franklin Correctional Facility.  *Id*. at 113.  Plaintiff testified he was never pepper sprayed or beaten after reporting what had happened to him.  *Id*. at 118-19, 143.

Plaintiff testified he was aware of how the facility's grievance procedure worked by October of 2020.  *See* Dkt. No. 75-14 at 24-25.  He filed two grievances while he was housed at Bare Hill, the first in October of 2019, and the second in November of 2020.  *See id*. at 26; *see also* Dkt. No. 76-16 at 3.  In Grievance No. BRL-0185-20, dated November 17, 2020, Plaintiff reported:

> From 10/21/20 to 10/28/20 while at the SHU-unit I was not fed any food.  Officers walked by me with the food cart and not open my meal slot.  They told me I was going to starve to death.  On 10/22 a tall skinny officer wearing a mask inserted his hand inside my underwear and toch my rear private area (butt) without my consent, while doing a frisk/body search.  On 10/24 I complained about a sharp stomach pain & dizziness, on 10/28 I was taken to the hospital with highblood pressure and spent 48 hours in observation in Franklyn C.  I feel this treatment were unnecessary and are not part of my sentence.  I wish for this incidents to be documented so it won't never happen to me in the future.

Dkt. No. 75-2 at 12 (capitalization omitted); *see also* Dkt. No. 75-8.  As explained below, because Plaintiff's grievance reported alleged sexual harassment/abuse by staff, that allegation was separated per DOCCS directive and assigned a second grievance number.[6]

In his deposition, Plaintiff admitted the grievance did not contain details about the alleged assault by John Doe #1, John Doe #2, or John Doe #3 on October 21, 2020, nor did the grievance allege he was denied a blanket in a cell with the window open the following day.  Dkt. No. 75-14 at 125.  Plaintiff stated:

> I just wanted to actually touch on the main things especially was this, the sexual harassment.  That's what really traumatized me.  You understand?  So that's -- I wanted to put the important thing right here that really affected me emotionally.  So I didn't even have a space.  That's why I wrote the most important facts over here.

*Id*. at 126.  He repeatedly insisted there was not enough space on the grievance form for all of his allegations, explained he did not know how to annex the second page with additional details, and then suggested he did not want to write about the officers who assaulted him "because if the officers take it to [sic] the office and sees this, then they would just retaliate against me too."  *See id*. at 126-27.

On November 14, 2020, the facility Superintendent denied Plaintiff's grievance.  Dkt. No. 75-9 at 1.  The Superintendent noted Plaintiff "was interviewed on 11/23/20 by the Security Supervisor assigned to investigate his grievance.  During the interview, the grievant's written complaint was reviewed.  The grievant added no new information and did not identify any

---

[6] *See generally*, Dkt. No. 75-10 (advising Plaintiff "grievance # BRL 0184-20, dated 11/17/20, has been forwarded to the Watch Commander in accordance with Directive # 4040 § 701.3 (i) and the Department's Sexual Abuse and Sexual Harassment Reporting and Investigation Policies).

witnesses to substantiate his claims." *Id.*[7]  The Superintendent concluded, "Upon review of his emergency room notes and his infirmary record from Franklin C.F., there is nothing indicating that the grievant was not being fed.  There is no evidence to suggest that medical treatment was unnecessary or that there was any malfeasance by staff." *Id.*

Plaintiff appealed the Superintendent's denial of his grievance to the Central Office Review Committee ("CORC").  *See id.* at 1-2.  In his appeal statement, dated December 24, 2020, Plaintiff asserted:

> I requested medical care the night of October 24, 2020 and it was denied . . . . Luckily I was called to the infirmary on 10/28/20. Before being escorted out I was told by a sergent named Lagarde or Langardi (to the best of my knowledge/memory) he was tall with broad shoulders, heavy set, caucasian with dark blonde hair. He said to me not to talk about the food punishment I experienced in the SHU-unit, otherwise I was going to get pepper-sprayed when I get back from the infirmary.  It never happened because I didn't say anything to the infirmary staff out of fear, as the sergent was present with me in the examination room.

*Id.* at 2 (capitalization omitted).  Following a hearing on March 25, 2021, the CORC noted:

> [Corrections officers] deny being unprofessional, refusing the grievant his meals or witnessing same.  CORC also notes that he was seen by his provider on 10/28/20 for left ankle pain and his blood pressure and pulse were elevated at that time.  He advised the provider he had been having palpitations for one week, however, he did not report that he was not being fed.  It is also noted that sick call is offered in the SHU daily and he did not request to be seen at sick call.  CORC has not been presented with sufficient evidence of malfeasance by staff . . . .

Dkt. No. 75-17 at 3.  Accordingly, CORC upheld the Superintendent's determination.  *Id.*

---

[7] Plaintiff testified the conclusion that he provided "no new information" was "incorrect" because he was never given the opportunity to identify any officers or other witnesses, but was not able to provide any such information at his deposition.  *See* Dkt. No. 75-14 at 133-34.

**B.  Procedural History**

Plaintiff commenced this action by filing his complaint on February 5, 2021.  Dkt. No. 1.

In a Decision and Order dated March 29, 2021, Judge Hurd granted Plaintiff's application to

proceed *in forma pauperis* ("IFP") and found various claims against John Doe #1, John Doe #2,

John Doe #3, John Doe #4, John Doe #5, John Doe #6, and Lawrence LaBarge survived *sua*

*sponte* review.  Dkt. No. 8 at 18.  Judge Hurd further ordered "Plaintiff must take reasonable

steps to ascertain the identity of the 'Doe' defendants remaining in this action through discovery,

and when identified, seek to amend the complaint to add these individuals as defendants in this

action pursuant to Federal Rule of Civil Procedure 15(a).  Plaintiff's failure to timely serve these

defendants will result in their termination from the action and dismissal of the claims asserted

against them[.]"  *Id*. at 19-20.

Plaintiff subsequently filed an amended complaint on April 30, 2021.  Dkt. No. 12.  On

June 10, 2021, this Court found the aforementioned claims again survived initial review, as well

as additional claims against John Doe #1, John Doe #2, and John Doe #3.  Dkt. No. 16 at 7.  The

undersigned advised Plaintiff "his failure to timely name and serve the officials currently

identified as 'Doe' defendants will result in their termination from the action and dismissal of the

claims asserted against them."  *Id*. at 6; *see also id*. at 7-8.

Defendant LaBarge filed a motion to dismiss the amended complaint for failure to state a

claim.  Dkt. No. 18.  Plaintiff opposed Defendant's motion and the Defendant submitted a reply.

Dkt. No. 21; Dkt. No. 24.

On November 1, 2021, this Court recommended Defendant LaBarge's motion to dismiss

the claims in Plaintiff's amended complaint against him be granted.  Dkt. No. 28 at 10.  The

undersigned further directed the Attorney General to produce information regarding the identity

of the "Doe" defendants.  *Id*.  Defendant's attorney complied with the Court's order, producing

documents related to the incidents alleged in the amended complaint.  Dkt. No. 33; *see also* Dkt.

Nos. 32, 34.  Accordingly, the undersigned ordered Plaintiff shall have thirty days from the

District Court's decision on the Report-Recommendation to file an amended complaint

identifying the "Doe" defendants and again advised him "if he is unable to identify one or more

of the 'Doe' defendants . . . this action may be dismissed against the unidentified official(s) . . . ."

Dkt. No. 34.

On December 15, 2021, Judge Hurd rejected the Report-Recommendation, ordered

Defendant LaBarge's motion to dismiss be denied, and directed him to file a response to the

amended complaint.  Dkt. No. 36 at 3.  Defendant LaBarge subsequently filed an answer.  Dkt.

No. 37.  On January 7, 2022, this Court issued its Mandatory Pretrial Discovery and Scheduling

Order requiring the parties to exchange certain disclosures.  Dkt. No. 38.  In response to a letter

filed by Plaintiff advising the Court he was not able to identify "Doe" defendants, the Court

directed Plaintiff to conduct additional discovery in accordance with the terms of the scheduling

order.  Dkt. No. 40.

Thereafter, Plaintiff filed a motion to compel seeking photographs of corrections officials

which he believed would help him identify "Doe" defendants.  Dkt. No. 41.  Defendant LaBarge

opposed Plaintiff's motion.  Dkt. No. 42.  On June 2, 2022, the Court denied Plaintiff's motion,

reset the amended pleadings deadline, and advised Plaintiff to serve a proper discovery demand

for additional disclosures.  Dkt. No. 45.

Plaintiff subsequently filed a second motion to compel, again requesting photographs and

other materials relevant to the identification of the "Doe" defendants.  Dkt. No. 52.  Defendant

LaBarge opposed Plaintiff's motion.  Dkt. No. 53.  On August 8, 2022, the Court granted

Plaintiff's motion in part, directing Defendant LaBarge to respond to the Plaintiff's request for a hearing tape, and again reset the amended pleadings deadline. Dkt. No. 55.

The amended pleadings deadline was extended for a final time to September 16, 2022. Dkt. No. 57. Plaintiff submitted a motion to amend and proposed second amended complaint for filing, dated September 16, 2022. Dkt. No. 58; Dkt. No. 58-1. Defendant LaBarge opposed Plaintiff's motion. Dkt. No. 62.

Plaintiff's proposed second amended complaint named seven individuals, in addition to LaBarge, as defendants in place of the six "Doe" defendants named in the amended complaint. *Compare* Dkt. No. 12, Amended Complaint, *with* Dkt. No. 58-1, Proposed Second Amended Complaint. However, the proposed second amended complaint did not properly identify any of the prior "Doe" defendants, rather, it listed multiple individuals as potential intended defendants for each of the claims concerning the incidents. *See generally*, Dkt. No. 58-1. For a more complete recitation of the pleadings, reference is made to Plaintiff's submissions.[8]

On December 5, 2022, the Court denied Plaintiff's motion to amend. Dkt. No. 67 at 13. The undersigned observed, ordinarily, the "Doe" defendants would be dismissed without prejudice, however, out of concern for judicial economy, the Court declined to dismiss the "Doe" defendants and re-opened discovery

> [F]or the limited purpose of allowing (1) plaintiff to serve counsel for defendant LaBarge with interrogatories asking defendant LaBarge to provide the name of each Doe defendant, to the extent he is able to do so, based on a physical description of that person, and (2) counsel to produce, if he has not already, copies of log book entries that identify the names of officials who made rounds in the SHU at Bare Hill C.F. on October 21 and 22, 2020.

---

[8] By Text Order dated November 15, 2022, the Court stayed the dispositive motion filing deadline pending a decision on the motion to amend. Dkt. No. 66.

*Id*. at 12.  The Court directed Plaintiff to serve the interrogatories within 20 days asking Defendant LaBarge to provide the name of each "Doe" defendant based on a description in the interrogatories.  *Id*.  The Court allowed Plaintiff 90 days to file a motion to amend and proposed amended pleading.  *Id*.  Finally, Plaintiff was advised if he failed to serve interrogatories as directed or file a proper motion to amend and proposed amended pleading, his claims against the "Doe" defendants may be dismissed pursuant to Federal Rules of Civil Procedure 4(m) and 41(b), as well as Local Rule 41.2(a).  *Id*.

On January 9, 2023, Defendant notified the Court that the log books had been produced and Plaintiff had not served interrogatories as directed.  Dkt. No. 69.  On January 10, 2023, since Plaintiff's deadline to serve interrogatories expired, the Court ordered discovery closed and permitted Plaintiff 30 days to file a motion to amend the complaint.  Dkt. No. 71.  On May 31, 2023, due to Plaintiff's failure to timely file a motion to amend and proposed amended pleading, the Court ordered the amended complaint remained the operative pleading and lifted the stay of the dispositive motion deadline.  Dkt. No. 72.

On July 27, 2023, Defendant LaBarge filed a motion for summary judgment.  Dkt. No. 75.  Plaintiff was advised of the August 17, 2023, deadline to file a response.  Dkt. No. 76.  Plaintiff failed to timely file a response, therefore, on August 22, 2023, the Court *sua sponte* extended Plaintiff's response deadline until September 19, 2023.  Dkt. No. 78.  Plaintiff did not file a response.

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

"When the opposing party fails to respond to the moving party's Rule 56.1 statement, the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Antwi v. Health & Human Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-0835, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014); *see also Genova v. County of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021). However, "a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true." *United States v. Abady*, No. 03-CV-1683, 2004 WL 444081, at *3 (S.D.N.Y. Mar. 11, 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140-43 (2d Cir. 2003)). Moreover, a *pro se* plaintiff must be notified of the consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

In this case, Plaintiff was sent a specific warning by the Court of the consequences of a failure to respond:

> **WARNING**: If you do not submit a proper response to the defendants' statement of material facts, **the Court may deem you to have admitted the defendants' factual statements**. If you do not submit copies of record evidence in support of your denials, **the Court may deem defendants' factual statements to be true**. If you do not submit a proper response memorandum of law, **the Court may deem you to have conceded the defendants' arguments**. If you do not respond to this motion properly (or at all), summary judgment may be entered against you, meaning that **SOME OR ALL OF YOUR CLAIMS MAY BE DISMISSED**.

Dkt. No. 76 at 2. Accordingly, the facts set forth in Defendants' statement pursuant to Local Rule 56.1, Dkt. No. 75-21, that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified pleading and sworn testimony will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v.*

*Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts . . . supplemented by Plaintiff's verified complaint . . . as true.").

## III.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this burden by demonstrating the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are

insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Jeffreys*, 426 F.3d at 554 (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted).

In applying the summary judgment standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility

and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

## IV. DISCUSSION

### A. Defendant LaBarge's Motion for Summary Judgment

Plaintiff's sole allegation against Defendant LaBarge is that, on October 28, 2020, the sergeant threatened him "to not say anything about being beaten, denied food or sexually assaulted4 by officers in SHU to the medical staff" because, if he did so, "Plaintiff would be peppered-sprayed and receive an ass beaten upon his return to SHU." Dkt. No. 12 at 6 (emphasis omitted); *see also* Dkt. No. 75-14 at 141 (in his deposition, Plaintiff was asked, "Is there any other way other than the threats that you contend that Sergeant LaBarge violated your Eighth Amendment rights?" and answered, "No, sir."). The sergeant also allegedly "intimidated" Plaintiff by remaining in the facility's examination room throughout Plaintiff's "entire examination . . . ." *Id*.[9] Defendant contends summary judgment should be granted because Plaintiff failed to exhaust his administrative remedies; Plaintiff failed to establish LaBarge's personal involvement in the alleged constitutional violations; and LaBarge's alleged threats, without more, do not amount to a deprivation of Plaintiff's constitutional rights. *See generally*, Dkt. No. 75-22 at 8-23.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all inmate suits about prison life,

---

[9] Plaintiff's surviving claims against Defendant LaBarge are excessive force and conditions of confinement claims under the Eighth Amendment. *See* Dkt. No. 8 at 18; Dkt. No. 16 at 7.

whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds*, *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id*. at 675.

In order to properly exhaust his administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). DOCCS has a well-established inmate grievance process, set forth in 7 N.Y.C.R.R. § 701 *et seq.*

First, a grievance is submitted by the grievant to the Inmate Grievance Resolution Committee within twenty-one days of the incident. 7 N.Y.C.R.R. §§ 701.5(a)(1), 701.3(b), 701.5(b). The policy provides for a period to informally resolve the grievance, and thereafter to proceed through the various steps in the appeal process. *Id*. § 701.5(b)-(d). However, as relevant here, a more expedited procedure applies to "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate." *Id*. § 701.2(e); *see id*. § 701.58. Such a grievance is given a calendar number and recorded with all other grievances but is forwarded directly to the facility superintendent. *Id*. § 701.8(b). The superintendent then has twenty-five days to investigate and render a written response. *Id*. § 701.8(f). If the superintendent fails to render a decision within said time period, or rules against the incarcerated individual, the grievant may appeal to CORC. *Id*. § 701.8(g). CORC has thirty days to review

each appeal and render a decision. *Id*. § 701.5(d)(3). Exhaustion of the grievance procedure only occurs after CORC has rendered its decision.[10]

The PLRA requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 93 (2006). Moreover, exhaustion is an affirmative defense and the burden of proof, at all times, remains on the defendant. *Coley v. Garland*, No. 9:19-CV-0382 (LEK/ATB), 2023 WL 346242, at *4 (N.D.N.Y. Jan. 20, 2023).

Here, Plaintiff failed to properly exhaust his claims concerning Defendant LaBarge's alleged threat. Significantly, Grievance No. BRL-0185-20 made no mention of any threats or warnings not to disclose abuse by staff members, nor did it identify Sergeant LaBarge. *See* Dkt. No. 75-2 at 12. In his deposition, Plaintiff admitted Defendant LaBarge was not named in his November, 2020, grievance. Dkt. No. 75-14 at 128.

While the grievance did contain allegations about the October 22, 2020, search incident and the officers' refusal to provide Plaintiff meals from October 21-28, 2020, Plaintiff testified Defendant LaBarge was not present for the October 22, 2020, incident involving John Doe #4 and John Doe #5, *id*. at 70, 122, nor was he one of the individuals who distributed meal trays to SHU inmates during the relevant period, *id*. at 116, 121.[11] Indeed, Plaintiff testified he never

---

[10] Additionally, "for complaints regarding sexual abuse or sexual harassment, DOCCS has established a different procedure." *Clark v. Gardner*, No. 9:17-CV-0366 (DNH/TWD), 2021 WL 1200328, at *19 (N.D.N.Y. Mar. 8, 2021) (citing DOCCS Directive 4040 § 701.3(i); 7 N.Y.C.R.R. § 701.3(i)), *report and recommendation adopted*, 2021 WL 1198199 (N.D.N.Y. Mar. 30, 2021). Under the relevant authority, "[a]ny inmate grievance filed regarding a complaint of sexual abuse or sexual harassment . . . shall be deemed exhausted upon filing for PLRA purposes." 7 N.Y.C.R.R. § 701.3(i).

[11] While Plaintiff also alleged in his grievance that he "complained about a sharp stomach pain & dizziness" on October 24, 2020, Dkt. No. 75-2 at 12, he clarified the complaint was not made to LaBarge, but "to a night officer." Dkt. No. 75-14 at 123.

saw Defendant LaBarge in the SHU from the time of his October 21, 2020, arrival until the Defendant removed him from the cell and allegedly threatened him on October 28, 2020.  *Id*. at 100-01.[12]

"Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard," *Wright v. Potter*, No. 9:14-CV-1041 (DNH/TWD), 2016 WL 5219997, at *5 (N.D.N.Y. June 28, 2016) (citing *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006)), *report and recommendation adopted*, 2016 WL 5173283 (N.D.N.Y. Sept. 21, 2016), "a prisoner must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures."  *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (citing *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)) (internal quotations and citations omitted); *see also*, *e.g.*, *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (to exhaust his claims against the defendants, the plaintiff "only had to provide a specific description of the problem.") (citing 7 N.Y.C.R.R. § 701.7(a)(1)).  Applying this standard, it is clear Plaintiff's November 2020, grievance did not exhaust any claim against Defendant LaBarge.  *See*, *e.g.*, *Wright*, 2016 WL 5219997, at *5 (explaining the plaintiff's grievance, which alleged a corrections officer physically assaulted him but "failed to mention [a facility nurse] by name or profession, failed to reference any medical personnel, and failed to reference receiving inadequate medical treatment" did not exhaust plaintiff's Eighth Amendment medical indifference claim against that nurse).

---

[12] While such incidents were not addressed in his grievance, to be sure, Plaintiff testified Defendant LaBarge was not present for: the October 21, 2020, incident involving John Doe #1, John Doe #2, and John Doe #3, Dkt. No. 75-14 at 58, or the October 22, 2020, incident involving John Doe #5 and John Doe #6, Dkt. No. 75-14 at 80.  Additionally, LaBarge did not attend the October 27, 2020, disciplinary hearing conducted by Lieutenant Dumas, where Plaintiff claims he attempted to report the prior sexual harassment incident.  Dkt. No. 75-14 at 86.

The first time Plaintiff alleged Defendant LaBarge threatened him was in his appeal to CORC. *See* Dkt. No. 75-9 at 2. However, "allegations brought up for the first time in an appeal to the CORC are not properly exhausted." *Gonzalez v. Morris*, No. 9:14-CV-1438 (GLS/DEP), 2018 WL 1353101, at *3 (N.D.N.Y. Mar. 15, 2018) (citations omitted), *aff'd*, 824 F. App'x 72 (2d Cir. 2020); *see also Crichlow v. Fischer*, No. 9:17-CV-0194 (TJM/TWD), 2017 WL 6466556, at *15 n.10 (N.D.N.Y. Sept. 5, 2017) ("The Court finds that inasmuch as Plaintiff claimed he was deprived of recreation and showers for the first time in his appeal statement to CORC, such claims are also unexhausted."), *report and recommendation adopted*, 2017 WL 6459512 (N.D.N.Y. Dec. 18, 2017); *Fox v. Labatte*, No. 9:15-CV-0144 (LEK/DJS), 2016 WL 8716662, at *4 (N.D.N.Y. Mar. 11, 2016) ("Plaintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time . . . .") (citing *Woodford v. NGO*, 548 U.S. at 88), *report and recommendation adopted as modified*, 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016).

Finally, from Plaintiff's filing and appeal of Grievance No. BRL-0185-20, it necessarily follows that the IGP was "available" to Plaintiff with respect to Defendant LaBarge's alleged October 28, 2020, threat.[13] Therefore, this Court has no reason to believe the IGP could be

---

[13] While, in his deposition, Plaintiff suggested he did not include more details in his grievance because "If I start talking about the officers about who beat me, about the John Does right here . . . then they could just retaliate against me too." Dkt. No. 75-14 at 127. Thus, to the extent Plaintiff could argue his fear of retaliation by the "Doe" Defendants rendered the grievance process "unavailable" to him, any such argument would be unpersuasive, especially as to Defendant LaBarge. *See, e.g.*, *Lapierre v. LaValley*, No. 9:15-CV-1499 (MAD/DJS), 2019 WL 4015689, at *6 (N.D.N.Y. Aug. 26, 2019) ("Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. . . . However, on this record such a contention is inconsistent with Plaintiff's assertions that he did properly grieve the assault, and with Plaintiff's filing of grievances after that time.") (citations omitted), *report and recommendation adopted*, 2019 WL 4686415 (N.D.N.Y. Sept. 26, 2019), *aff'd*, 847 F. App'x 47 (2d Cir. 2021); *Gough v. Morris*, No. 9:16-CV-1107 (GTS/DJS), 2018 WL 7199494, at *5

deemed unavailable so as to excuse Plaintiff's failure to properly exhaust his claims against LaBarge here. *See generally*, *Ross*, 578 U.S. at 643-44.

In any event, Plaintiff has failed to establish Defendant LaBarge's personal involvement in the alleged constitutional violations. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations and citations omitted). "A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

With respect to the allegations contained in Plaintiff's grievance concerning the October 22, 2020, frisk/body search incident, Plaintiff admitted Defendant LaBarge was not present. Dkt. No. 75-14 at 122. Similarly, his grievance alleged officers walked past his SHU cell without distributing meals from October 21-28, 2020, but Plaintiff testified LaBarge was not one of those officers. *Id*. at 121. Turning to the allegations which were not included in his grievance, Plaintiff's deposition testimony confirmed Defendant LaBarge was not one of the officers who kicked and stepped on him on October 21, 2020, nor was he present at the time of the incident. *Id*. at 58. His testimony also confirmed LaBarge was not involved in moving Plaintiff from SHU cell #31 to cell #27 or the subsequent refusal to provide him a blanket. *Id*. at 80.

Accordingly, Plaintiff has not demonstrated Defendant LaBarge's personal involvement with the allegedly unconstitutional use of force or conditions of confinement. *See, e.g.*, *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *4 (N.D.N.Y. Dec. 29, 2021) (recommending dismissal of the plaintiff's claim against a corrections officer where the plaintiff

---

(N.D.N.Y. Dec. 14, 2018) (same), *report and recommendation adopted*, 2019 WL 416150 (N.D.N.Y. Feb. 1, 2019).

testified the officer was not involved in the incident because it was "undisputed" the officer "was not present, or otherwise involved, in the events surrounding plaintiff's allegations of excessive force . . . ."), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Burton v. Abraham*, No. 5:18-CV-0150 (ATB), 2020 WL 1169295, at *12 (N.D.N.Y. Mar. 11, 2020) (granting the defendant's motion for summary judgment where the plaintiff's own testimony established, even assuming a constitutional violation occurred, the defendant was not involved). Nor can Plaintiff rely on Defendant LaBarge's role as a sergeant at the correctional facility to establish his personal involvement. *See*, *e.g.*, *Rasheen v. Adner*, 356 F. Supp. 3d 222, 233 (N.D.N.Y. 2019) ("Where, as here, the defendants are supervisory officials, a mere 'linkage' to the unlawful conduct through 'the prison chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.").

Moreover, while courts in this circuit have found corrections officials to be personally involved in underlying unconstitutional activity where officials have attempted to cover up an unconstitutional incident,[14] as the Defendant avers, this case is factually distinguishable. Significantly, in those cases which have found an alleged cover up sufficient to demonstrate personal involvement, the plaintiffs alleged the defendant officers drafted and submitted false reports to cover up unconstitutional activity. *See Lewis*, 2020 WL 1812556, at *7; *Edwards*, 2019 WL 1284295, at *7; *Randle*, 960 F. Supp. 2d at 478; *Gillard*, 2010 WL 4905240, at *13. By contrast, here, Plaintiff does not allege Defendant LaBarge *submitted materials to an*

---

[14] *See generally*, *Lewis v. Hanson*, No. 9:18-CV-0012 (LEK/DJS), 2020 WL 1812556 (N.D.N.Y. Apr. 9, 2020); *Edwards v. Annucci*, No. 7:17-CV-5018, 2019 WL 1284295 (S.D.N.Y. Mar. 20, 2019); *Randle v. Alexander*, 960 F. Supp. 2d 457 (S.D.N.Y. 2013); *Gillard v. Rovelli*, No. 9:09-CV-0860 (NAM/GHL), 2010 WL 4905240 (N.D.N.Y. Sept. 29, 2010), *report and recommendation adopted*, 2010 WL 4945770 (N.D.N.Y. Nov. 24, 2010).

*authority figure* which would have undermined Plaintiff's disclosure of abuse; rather, LaBarge made *verbal statements to the Plaintiff himself* to prevent him from reporting that misconduct occurred in the first place.  *See, e.g.*, Dkt. No. 75-14 at 141-43.

Finally, if the Court were to consider the alleged threatening statements as a separate instance of unconstitutional conduct, such activity would not give rise to an actionable § 1983 claim.  "Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983."  *Montero v. Crusie*, 153 F. Supp. 2d 368, 376 (S.D.N.Y. 2001) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)) (additional citations omitted); *see also*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 365 (N.D.N.Y. 2010) ("Absent physical injury, verbal threats and abuse are insufficient to support a constitutional violation.") (citing *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)).  Plaintiff's deposition testimony established Defendant LaBarge never beat, pepper sprayed, or made any other bodily contact with Plaintiff, even after his disclosure of the "Doe" defendants' alleged actions.

In sum, Plaintiff failed to properly exhaust his administrative remedies with respect to his claims against Defendant LaBarge as required by the PLRA; he failed to establish LaBarge's personal involvement in the alleged unconstitutional use of force and conditions of confinement; *and* he failed to assert facts which amount to an actionable § 1983 claim.  Accordingly, the Court recommends the Defendant's motion for summary judgment be granted and the Plaintiff's claims against LaBarge be dismissed.

**B.    Remaining Claims Against Doe Defendants**

As explained above, in both Judge Hurd's initial review of Plaintiff's complaint and this Court's review of Plaintiff's amended complaint, Plaintiff was ordered to take reasonable steps

to ascertain the identity of the "Doe" defendants.  *See* Dkt. No. 8 at 18; Dkt. No. 16 at 7-8.

Plaintiff was also repeatedly advised his failure to timely identify and serve the "Doe"

defendants would result in dismissal of the claims against them.  *See* Dkt. No. 8 at 19-20; Dkt.

No. 16 at 6; Dkt. No. 28 at 10.  Defendant LaBarge's attorney was directed to produce, and did

so produce, documents related to the incidents which are the subject of this matter.  *See* Dkt. No.

28; Dkt. No. 33.  Finally, despite Plaintiff's failure to properly identify the "Doe" defendants

during the initial discovery period, discovery was re-opened for the purpose of allowing Plaintiff

to take certain actions to ascertain the identity of the "Doe" defendants.  *See* Dkt. No. 67 at 12.

       Upon review of the docket maintained by the Clerk's Office, Plaintiff never identified the

"Doe" Defendants as directed by the District Court.  Accordingly, the Court recommends

dismissing Plaintiff's claims against the "Doe" Defendants without prejudice in light of

Plaintiff's failure to identify and serve them following discovery.  *See*, *e.g.*, *Sawyer v. Prack*, No.

9:14-CV-1198 (DNH/DEP), 2016 WL 5440596, at *16 (N.D.N.Y. July 29, 2016)

(recommending claims against "Doe" defendants be dismissed *sua sponte* where the plaintiff was

warned his failure to ascertain the identity of said defendants would result in dismissal of the

claims against them, yet plaintiff did not appear to have taken steps to identify the unnamed

defendants following the expiration of the extended deadlines for joinder and discovery), *report-*

*recommendation adopted*, 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016); *Burns v. Trombly*, 624

F. Supp. 2d 185, 198 (N.D.N.Y. 2008) (dismissing claims against "Doe" defendants where the

plaintiff failed to identify and submit forms permitting service of process on those unidentified

defendants, for nearly two years, despite the court's reminders and the extension of discovery);

*Epps v. City of Schenectady*, No. 1:10-CV-1101 (MAD/CFH), 2013 WL 717915, at *4

(N.D.N.Y. Feb. 27, 2013) ("All discovery is complete and thus, plaintiff's failure to identify the

'John Doe' defendant mandates dismissal.") (citations omitted); *Johnson v. Owens*, No. 9:20-CV-0982 (AMN/CFH), 2023 WL 5351017, at *10 n.18 (N.D.N.Y. Aug. 21, 2023) ("Plaintiff's failure to identify and serve the John Does when the [second amended complaint] was filed approximately two years ago is in and of itself grounds for this Court to *sua sponte* dismiss the Joe Does.") (citations omitted).

## V.    CONCLUSION

After carefully reviewing the record, the Defendant's submissions on this motion, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 75) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment conditions of confinement and excessive force claims against Defendant LaBarge be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED** that Plaintiff's Fourth Amendment unlawful search claim against Defendant John Doe #4, Eighth Amendment conditions of confinement claims against John Doe #1, John Doe #5, and John Doe #6, Eighth Amendment excessive force claims against John Doe #1, John Doe #2, John Doe #3, and John Doe #4, Fourteenth Amendment equal protection claim against John Doe #1, and Eighth Amendment failure to intervene claims against John Doe #2 and John Doe #3 be **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: February 12, 2024
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[15] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 26 of 238

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2014 WL 4548619

2014 WL 4548619
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Beverly Diane ANTWI, Plaintiff,

v.

HEALTH AND HUMAN SYSTEMS
(CENTERS) F.E.G.S., Defendant.

No. 13 Civ. 835(ER)(FM).
|
Signed Sept. 15, 2014.

*AMENDED OPINION AND ORDER*

RAMOS, District Judge.

**\*1** This action arises from claims by Plaintiff Beverly
Diane Antwi ("Plaintiff" or "Antwi"), a *pro se* litigant, that
Defendant Health and Human Systems (Centers) F.E.G.S.
("FEGS" or "Defendant"), a private non-profit organization,
unlawfully hospitalized her against her will, denied her
benefits from government programs and misappropriated her
money. Following a series of involuntary hospitalizations,
Antwi received residential and counseling services from
FEGS. Liberally construed, the Complaint asserts claims
against FEGS for gross negligence, "psychological abuse"
and violations of her human and constitutional rights,
pursuant to 42 U.S.C. § 1983. *See* Doc. 1. In order to address
the limited arguments set forth in Plaintiff's late-filed reply
brief, Doc. 42, the Court issues the instant Amended Opinion
and Order, which modifies the Court's previous Opinion and
Order denying summary judgment, Doc. 41.

Presently before the Court is Plaintiff's motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. Pl.'s Mot., Doc. 27. Defendant principally asserts
that Plaintiff has failed to carry her burden of demonstrating
that judgment as a matter of law is warranted. Def.'s Opp.,
Doc. 37. Defendant claims that Antwi agreed to pay FEGS
a monthly fee for her residence at its facility, which would
be deducted from funds she was entitled to pursuant to
government programs; that FEGS had no role in forcing her
to undergo court-ordered involuntary treatment; and that, as
a private entity, FEGS cannot be sued under 42 U.S.C. §

1983. *Id.* For the reasons discussed below, Plaintiff's motion
is DENIED.

**I. Background**

Plaintiff's hefty submission to the Court begins with a one-
page "notice of motion" and a one-page "affirmation in
support of motion," both of which state little more than
that Plaintiff is entitled to summary judgment under Rule
56 because "supporting affidavits" and "court transcripts"
prove that "the defense has no defense." Pl.'s Mot. 2.
Rather than supporting affidavits, however, the balance of
the motion papers filed by Plaintiff consist of more than 600
pages of "exhibits," including what appear to be notes from
doctor's visits, Social Security Income ("SSI") statements,
bills, credit reports, Supplemental Nutrition Assistance
Program ("SNAP") recertification paperwork, hundreds of
pages of FEGS "progress notes" written by social workers,
and miscellaneous pleadings from the instant proceeding.
The documents do not appear to have been organized in
chronological or any obvious order. On certain of these pages
Plaintiff has handwritten remarks and/or argument over, or
alongside, the statements by the original authors of the
documents. Plaintiff's annotations are generally inscrutable.

For example, immediately following the "affirmation in
support of motion," Plaintiff attaches Magistrate Judge
Maas's September 6, 2013 Order, Doc. 21, on which she
writes: *"Respond* Mislead the Court served Adronaid Medina
with all motions. Mov [sic] that at deposition attorneys
for defense can't use any of my info[rmation] because I
served them with [a] whole 'pile of papers' because you
granted me a waiver of affidavit of service." Doc. 27 at 3
(emphasis in original). [1] The next document, "Exhibit 1,"
contains handwritten statements that "[t]heirs [sic] 2 numbers
FEGS collected under, XXX–XX–XXXX–Mine, XXX–XX–
XXXX–Illegal. Both are on my credit report (provided)
comes up to 1.45 million dollars in Social Security money and
I haven't seen even½ of it. Please take into consideration the
debt. It's 1.45 million per social security number." Doc. 27–1
at 2. Plaintiff next attaches what appears to be a credit report
from a company called TransUnion, issued on December
12, 2012, which states, *inter alia,* that the names reported,
"Beverly D. Antwi and Beverly Antwy," owe $319 to "Sprint
PCS (Cable/Cellular)." The document also lists "SSN XXX–
XX–XXXX," which Plaintiff circled in pen. Regarding that
number, Plaintiff writes: "Now, XXXX is my correct # but,
now all of a sudden they're collecting under *XX* XX. But, my
name HIPPA [sic], and former addresses. My social security

2016 WL 4548619

# is untrue. Born in Abilene Kansas! Trailer park." Doc. 27–1 at 3 (emphasis in original). On the next document, an Experian credit report dated January 24, 2013, Plaintiff circled the number "XXX–XX–XXXX" in pen, but did not write additional notes. Doc. 27–1 at 9.

1    For clarity, the Court refers to the attachments to Plaintiff's motion by their ECF document and page numbers.

**\*2** On what appears to be a printed expenditure report dated March 25, 2011, which includes various itemized payment amounts and codes, including "EMRG IND," Doc. 27–4 at 70, Antwi writes, "notice it says emergency individual? They're stealing my food stamps every month!" The following page contains statements by Antwi that "Juanita Robinson had my food stamps taken for a 3–week hosp[italization]—I want reimbursement," "there was no collateral contract so I was probably hospitalized for somebody else's issue," and "when I complained to the 47th precinct (because I wasn't informed that my food stamps were taken until I went to the food stamp office), they had me readmitted for supposed delusionality [sic]. Not the police; FEGS." *Id.* at 71. The following page, an undated note by FEGS "To Whom It May Concern," states, *inter alia,* that police escorted Antwi to an ambulance to go to the hospital on December 18, 2010. Next to that entry, Antwi writes, "not true wasn't me." *Id.* at 72. Progress notes written by a FEGS caseworker, *id.* at 77, state that on November 1, 2010, "911 was called for B[e]verly Antwi. Beverly claimed that someone stole her food stamp card and used it, she stated that she also reported the matter to the 47th pct. Beverly exhibited bizarre behavior, calling names and accusing other staff of stealing her personal belongings. Beverly was taken to Montefiore North after being evaluated by EMS personnel."

The balance of the papers follow a similar format—copies of correspondence or FEGS progress notes accompanied by Plaintiff's disjointed and incomprehensible commentary. In short, a statement of facts is markedly absent from Plaintiff's motion. Nor does her reply brief contain a statement of facts.

## II. Procedural History
Plaintiff initiated this action in New York State Supreme Court, Bronx County, on or about January 4, 2013. Notice of Removal, Doc. 1. Defendant served its verified answer to the Complaint on January 31, 2013, and soon thereafter removed the case to federal court, on February 4, 2013. *Id.* Discovery, which included Plaintiff's deposition, has been concluded.

Plaintiff filed the instant motion on December 20, 2013. On June 13, 2014, Defendant filed under seal a cross-motion for summary judgment in its favor, pursuant to Rule 56, and to dismiss Plaintiff's complaint in its entirety, pursuant to Rule 12. Def.'s Opp. 3. On July 2, 2014, the Court approved a briefing schedule whereby Plaintiff's opposition to Defendant's motion and Defendant's opposition to Plaintiff's motion were due by July 30, 2014; and Defendant's reply in support of its motion and Plaintiff's reply in support of her motion were due by August 15, 2014. Doc. 33. On July 29, 2014, Defendant timely filed its opposition to Plaintiff's instant motion. *See* Docs. 37–39. Plaintiff's reply in support of the instant motion, and opposition to Defendant's motion, were due by July 30, 2014. On August 27, 2014, the Court issued an Order directing Antwi to file her reply and respond to Defendant's motion for summary judgment by no later than September 12, 2014. Doc. 40. On September 11, 2014, Plaintiff filed a reply brief in the form of a "notice of motion" and "affirmation in support of motion" requesting that the Court "please grant summary judgment" because "the facts in this case aren't disputable." Reply Br. 1–2, 4. [2] As of the date of the instant Amended Opinion and Order, the Court has yet to receive Plaintiff's opposition to Defendant's motion for summary judgment. Plaintiff is reminded that failure to comply with the Court's orders may result in dismissal of her case pursuant to Rule 41 of the Federal Rules of Civil Procedure.

2    The Court refers to the ECF page numbers for Plaintiff's reply brief, Doc. 42, as it lacks pagination.

## III. Legal Standard on Motion for Summary Judgment

### A. General Summary Judgment Standard
**\*3** Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden,

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 28 of 238

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2014 WL 4548619

"the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**B. Special Consideration Afforded to *Pro Se* Litigants**

The Court holds submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers," *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993) (quoting *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)), and is obligated to liberally construe their pleadings "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citations omitted). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**C. Law of the Claims**

**i. 42 U.S.C. § 1983**

To prevail on a cause of action under 42 U.S.C. § 1983, a plaintiff must establish, by a preponderance of the evidence, that (1) the defendant deprived her of a right secured by the Constitution or the laws of the United States and (2) in doing so, the defendant acted under color of state law. *See, e.g., Byng v. Delta Recovery Servs. LLC,* No. 13 Civ. 2958, 2014 WL 2493779, at *1 (2d Cir. June 4, 2014) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

**ii. Gross Negligence Under New York Law**

**\*4** Under New York law, a *prima facie* case of gross negligence requires the plaintiff to show: (1) a duty to the plaintiff; (b) a breach of duty; (c) "a reasonably close causal connection between the contact and the resulting injury;" and (d) "actual loss, harm or damage." *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 495 (S.D.N.Y.2001) (citation omitted). To constitute gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care," as gross negligence "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Id.* (citations and internal quotation marks omitted).

**IV. Plaintiff Fails to Establish That She Is Entitled to Judgment As A Matter of Law.**

Neither party has submitted a Rule 56.1 statement in connection with the instant motion. Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment under Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). Each statement must be accompanied by a citation to admissible evidence. Local R. 56.1(d); *see also* Fed.R.Civ.P. 56(c) (requiring reliance on admissible evidence in the record to support or controvert a purported material fact). When the opposing party fails to respond to the moving party's Rule 56.1 Statement, "the material facts contained in the moving party's statement are deemed admitted as a matter of law." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 177–78 (S.D.N.Y.2009) (citing *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); Local R. 56.1(c)).

The failure to file a Rule 56.1 Statement is, on its own, grounds for denial of a motion for summary judgment. *See* Local R. 56.1(a); *Purisima v. Tiffany Entm't,* No. 09 Civ. 3502(NGG)(LB), 2014 WL 3828291, at *1 (E.D.N.Y. June 20, 2014), *report and recommendation adopted,* No. 09 Civ. 3502(NGG)(LB), 2014 WL 3828376 (E.D.N.Y. Aug. 4, 2014) ("As courts in this district have observed repeatedly, the failure to file a Rule 56.1 Statement is grounds for dismissal of a motion for summary judgment."); *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l,* 435 F.Supp.2d 285, 304–05 (S.D.N.Y.2006) (denying summary judgment motion where movant failed to submit required 56.1 statement). Yet,

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 29 of 238

Antwi v. Health and Human Systems (Centers) F.E.G.S., Not Reported in F.Supp.3d...

2014 WL 4548619

district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001). As an alternative to ruling against the movant, "[w]here parties fail to file Rule 56.1 statements of fact, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion ..., or may alternately 'opt to conduct an assiduous review of the record.' " *Osuna v. Gov't Employees Ins. Co.,* No. 11 Civ. 3631(JFB)(AKT), 2014 WL 1515563, at *2 (E.D.N.Y. Apr. 17, 2014) (citations omitted).

 **\*5** Here, the Court finds that, due to her failure to submit a clear description of the relevant facts, either through a Rule 56.1 statement or otherwise, a review of the record imposes a significant burden upon the Court. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz,* 258 F.3d at 74. Accordingly, notwithstanding her status as a *pro se* litigant, the Court DENIES Plaintiff's motion based on her failure to comply with Local Rule 56.1. *Triestman,* 470 F.3d at 477 (*pro se* status does not excuse non-compliance with procedural rules); *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (holding that the trial court "is not required to consider what the parties fail to point out" in 56.1 statements); *see also Searight v. Doherty Enterprises, Inc.,* No. 02 Civ. 0604(SJF) (JO), 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005) (denying defendants' motion for summary judgment where they failed to submit the required 56.1 statement, as the Court could not "adequately assess" whether any genuine issues of material fact existed); *cf. Osuna,* 2014 WL 1515563, at *2 (overlooking failure to file Rule 56.1 statements where record "contain[ed] sufficient evidence that is easily reviewable").

Indeed, Plaintiff's failure to submit a Rule 56.1 statement compounds the more fundamental problem with her motion: her failure to establish the absence of any genuine factual disputes. Moreover, to the extent that the Court can comprehend them, Plaintiff's annotations almost exclusively highlight, rather than resolve, factual disputes regarding her claims that FEGS (1) inappropriately used her social security number, (2) stole or retained her money from federal benefits

programs or (3) forced her to be hospitalized against her will. *See generally* Pl.'s Mot. Thus, Plaintiff's assertions in her reply brief that "all evidence submitted ... couldn't be in dispute because [it] was all legal court documentation submitted from my chart ...," that she entered "non-disputable" Social Security documentation into evidence, and that "all points ... are one-sided for [her] win" fail to provide a basis on which to find in her favor. Reply Br. 3–4. [3]

[3]      The Court also notes that Plaintiff's reply brief appears to advance arguments about undisputed issues that do not have a bearing on summary judgment—for example, she notes that jurisdiction is not in dispute. Reply Br. 3–5. The lack of any dispute concerning jurisdiction does not establish a lack of genuine *factual* disputes, however.

It is well-established that, "where the movant 'fail[s] to fulfill [her] initial burden' of providing admissible evidence of the material facts entitling [her] to summary judgment, summary judgment must be denied,' 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo,* 322 F.3d at 140–41 (citations omitted). Given that Plaintiff has failed to adequately identify undisputed facts in the record, and because she only offers unverified and conclusory assertions in support of her claims, she has failed to carry her burden at this juncture, leaving the Court no choice but to rule against her. Accordingly, the Court DENIES her motion for summary judgment.

**V. Conclusion**
 **\*6** For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to mail a copy of the instant Amended Opinion and Order to Plaintiff and terminate the pending motion (Docs.27, 42).

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4548619

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Abady, Not Reported in Fed. Supp. (2004)
2004 WL 444081

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 30 of 238

2004 WL 444081
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF AMERICA, Plaintiff

v.

Samuel A. ABADY, Defendant.

No. 03 Civ. 1683(SHS).
|
March 11, 2004.

**Synopsis**
**Background:** Government brought suit to recover amount owed by former student on student loan. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Stein, J., held that:

[1] government was entitled to recover amount remaining due on student loan;

[2] discontinuance of earlier collection action pursuant to settlement did not present res judicata bar to recovery;

[3] previous litigation did not present collateral estoppel bar to issues in new proceeding; and

[4] government did not materially breach settlement agreement by failing to provide invoices and mailing envelopes for installment payments.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (7)

**[1]    Summary Judgment** 🔑 Statement of facts
**Summary Judgment** 🔑 Determination
Court would exercise its discretion not to deny motion for summary judgment based on movant's failure to file statement of material facts as to which the moving party contended there

was no genuine issue. Fed.Rules Civ.Proc.Rule 56.1, 28 U.S.C.A.

19 Cases that cite this headnote

**[2]    Summary Judgment** 🔑 Statement of facts
Statement of material facts as to which the moving party contended there was no genuine issue was to be deemed admitted where there was support in record for statement, in form of promissory note and payment record on which action was based, and party opposing motion filed no statement in opposition. Fed.Rules Civ.Proc.Rule 56.1(c), 28 U.S.C.A.

10 Cases that cite this headnote

**[3]    Education** 🔑 Collection of loan debt in general
Government was entitled to recover amount remaining due on student loan absent dispute as to validity of original promissory note or as to amount actually paid.

**[4]    Judgment** 🔑 Dismissal and nonsuit
**Judgment** 🔑 Matters which were not or could not have been adjudicated
Discontinuance with prejudice of earlier state court action to collect sums then due on student loan, pursuant to stipulation that restored "status quo under loan instruments," did not present res judicata bar to subsequent action for sums coming due after stipulation; claims were not, and could not have been, brought at time of earlier action.

**[5]    Judgment** 🔑 Issues or Questions Presented
Previous state court proceeding for sums then due on promissory notes executed in connection with student loan, which resulted in stipulation of settlement as to those sums, did not present collateral estoppel bar to subsequent action to collect sums coming due after first action settled, as issues in proceedings were different.

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 31 of 238

U.S. v. Abady, Not Reported in Fed. Supp. (2004)

2004 WL 444081

**[6]**　**Education**　👉　Collection of loan debt in general

There was no evidence, as necessary to support defense to action to collect amounts due on student loan, that government forgave interest on amounts due at time of earlier collection action or that government accepted former student's partial payment at that time as payment in full.

**[7]**　**Education**　👉　Collection of loan debt in general

Government's breach, if any, in failing to provide invoices and mailing envelopes for payment of student loan installments was not material breach of stipulation of settlement in earlier collection action, and thus could not excuse student's failure to comply with obligation to repay remainder of loan.

3 Cases that cite this headnote

*OPINION & ORDER*

STEIN, J.

**\*1** The United States of America has brought this action to recover $21,287.61 loaned to defendant Samuel A. Abady while he was a student and which, according to the government, he has failed to repay. The parties have now each moved for summary judgment in their respective favors. For the reasons set forth below, plaintiff has shown that there is no triable issue of fact and that it is entitled to summary judgment as a matter of law.

**I. Background**

Samuel Abady received loans from the State of Virginia to attend the University of Pennsylvania law school from 1978 to 1981. (Def.'s Decl. Supp. Not. Mot. ("Def.'s Decl."), ¶ 2; Plt.'s Statement Pursuant to Local Rule 56.1 ("Plt.'s 56.1 Statement"), ¶ 1; Zebrowski Decl., Exh. B). Virginia Education Loan Authority ("VELA") was the original lender, and the loans were backed by, and then assumed by, the Virgina State Education Assistance Administration

("VSEAA"). (Plt's 56.1 Statement, ¶ 3; Zebrowski Decl., Exh. B). They were then in turn reinsured by the United States Department of Education, and the United States of America now seeks to recover on behalf of the Department of Education. (*Id.*). Those loans, for a total sum of $14,300, became due nine months after the borrower's estimated date of graduation, with an annual interest rate of seven percent. (Plt.'s 56.1 Statement, ¶¶ 1, 2).

In April 1985—sometime subsequent to Abady's graduation from law school—the VSEAA filed a lawsuit in the Civil Court of the City of New York, based on unpaid promissory notes, to recover $17,875.00, which was comprised of principal plus interest and attorneys' fees. Abady raised several defenses, including lack of personal jurisdiction and the wrongful rejection of payment by him to VELA, which he claimed to have tendered in 1981. (Def's Decl., ¶¶ 18, 30). Abady also claimed that the sum of the loan was improperly calculated.

The state court action was resolved by a written stipulation and agreement that provided that the state court action was "hereby discontinued and settled with prejudice" on certain terms. (Def.'s Decl., Exh. 12). In that stipulation, in relevant part, Abady agreed to "bring[ ] the arrearages current, as if the loan had been paid to the date according to the terms of its instruments" by February 24, 1986 and that the "defendant shall continue to pay out the loan according to the periodic payment schedules set forth in the loan instruments." (Def's Decl., Exh. 12, ¶¶ 4, 5). VSEAA agreed to supply Abady with "mailing envelopes and notices" for him to make periodic payment. (Def's Decl., Exh. 12 ¶ 3). The stipulation also provided that the purpose of the stipulation was to "restore the status quo under the loan instruments as if no lawsuit had been started" and that "[it] shall not operate to or be construed as in any way altering the terms of the loan instruments between the parties." (*Id.*).

Abady paid the amount of $7,471.80 to bring the arrears current as of the date of the stipulation. (Def's Decl., ¶ 41, Exh. 13). He subsequently paid $166.04, bringing the total paid to $7,637.84. (Def.'s Decl., ¶ 41). Abady claims that VSEAA and its assignees are in breach of the settlement agreement because they did not mail him the appropriate "mailing envelopes and notices." (Def's Decl., Exh. 12). Abady moves for summary judgment on those grounds, because "the Government's assignor was paid all it was entitled to for the loan at issue" in February of 1986, and because this suit is barred by collateral estoppel and res

2004 WL 444081

judicata based on the state court adjudication. (Def.'s Not. Mot., p. 1). When Abady moved for summary judgment on September 10, 2003 he neither served nor filed the required Rule 56.1 statement of disputed facts with that motion. The United States claims that Abady owes the sum of $21,287.61 on the original promissory note, and $1.35 per day after October 31, 2003. (Plt.'s 56.1 Statement, ¶ 9). Plaintiff cross-moves for summary judgment in that amount.

**\*2** On January 12, 2004, oral argument was held on these motions. At the commencement of the argument, Abady presented to the Court and plaintiff for the first time a document entitled "Defendant's Statement Made Pursuant to Local Rule 56.1." That Rule 56.1 statement was submitted four months after defendant's motion was made. Moreover, Abady was aware of his obligation to file such a statement because 1) he is an attorney and is presumed to be familiar with the local rules of this district and 2) opposing counsel notified him of his failure to file such a statement on the first page of the government's "Memorandum of Law in Opposition to the Defendant's Motion to Dismiss," dated October 31, 2003. Therefore, Abady's untimely Rule 56.1 statement will not be accepted in support of his motion and in opposition to the government's cross-motion.

At the time of the oral argument on January 12, 2004, this Court represented that no decision would issue on these motions for one week, in order to give the parties an opportunity to resolve the action consensually. Defendant requested additional time, and the Court agreed to reserve disposition on the motions until February 6, 2004. On February 4, 2004, Abady requested a further thirty days in order to attempt to resolve this action, and the Court granted the parties until March 5, 2004 to submit a stipulation of settlement; the parties were informed that a decision would issue thereafter if no stipulation of settlement were submitted for signature. To date, no consensual resolution has been submitted to the Court.

## II. Analysis

### A. *Motions To Be Treated as Summary Judgment Motions*
Although Abady styles his motion one "to dismiss this action and for summary judgment," he has filed an affidavit containing extrinsic materials outside the pleadings and has annexed almost a score of exhibits to that affidavit. Many of the exhibits Abady atttaches and refers to—such as handwritten phone messages and letters from non-parties to Abady—cannot be presented in a motion to dismiss because

they fall outside the pleadings. Because the Court cannot consider those materials in a motion to dismiss, this motion is converted to a motion for summary judgment. Fed.R.Civ.P. 12(b). Fed.R.Civ.P 56; see also *Barksdale v. Robinson* 211 F.R.D. 240, 242 (S.D.N.Y.2002); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (quoting *Fonte v. Bd. of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

### B. *Defendant's Failure to File a Rule 56.1 Statement in Support of His Motion for Summary Judgment, and in Opposition to Plaintiff's Cross–Motion for Summary Judgment*
**[1]** Defendant failed to serve "a separate, short and concise statement of material facts as to which the moving party contends there is no genuine issue to be tried" until four months after his motion was served. Local Rules of the United States District Courts for the Southern and Eastern District of New York, 56.1. When a moving party fails to file such a Rule 56.1 statement, it is within the discretion of the court to either overlook the failure or to deny the motion. *See Stone v. 866 3rd Next Generation Hotel, L .L.C.,* No. 00 Civ. 9005, 2002 WL 482558, at \*1 n. 2 (S.D.N.Y. Mar.29, 2002); *see also Holtz v. Rockefeller & Co., Inc.,* 258 F.2d 62, 73 (2d Cir.2001); *AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.,* 2003 WL 21203503, at \*11 (S.D.N.Y. May, 22 2003). Defendant's motion will not be denied simply for failure to file a Rule 56.1 statement.

**\*3** **[2]** Abady has also failed to file the required Rule 56.1(c) statement in opposition to the plaintiff's cross-motion for summary judgment. Rule 56.1(c) requires a party opposing summary judgment to file a Rule 56.1 statement. (*Id.*). The consequence of this failure is that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." (*Id.*); *see e.g. Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998); *Versace v. Versace,* 2003 WL 22023946, at \*1 (S.D.N.Y. Aug.27, 2003). However, a district court must ensure that there is support in the record for facts contained in unopposed Rule 56.1 statements before accepting those facts as true. *Giannullo v. City of New York,* 322 F.3d 139, 140–43 (2d Cir.2003). Because plaintiff has supported its Rule 56.1 statement with the promissory notes signed by Abady, and with the calculation of Abady's present indebtedness, the statement is supported by the record and the facts therein will be deemed admitted. [1]

**U.S. v. Abady, Not Reported in Fed. Supp. (2004)**

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 33 of 238

2004 WL 444081

1    Moreover, if the Court were to accept Abady's belated Rule 56.1 statement, none of his factual assertions set forth in that document would alter the outcome of these motions.

C. *Defendant Has No Valid Defenses to His Proven Indebtedness*

**[3]**    The government has provided proof of Abady's indebtedness in the amount of $21,287.61 on the loans underlying this action. (Plt.'s 56 .1 Statement, Exh. A, B). This sum represents the payments due subsequent to his payment of $7,637.84 in 1986. Defendant does not claim to have paid any amount due on the promissory note after the two 1986 payments. The government's proof of indebtedness is sufficient to show defendant's obligation to pay. *Hannah v. Kittay,* 589 F.Supp. 1042, 1046 (S.D.N.Y.1984) (granting summary judgment on promissory notes showing indebtedness, notwithstanding defendant's attempts to "frolic and detour" in moving papers). Here, as in *Kittay,* there is no dispute as to the validity of the original promissory note, nor is there any dispute as to the amount actually paid by defendant. 2 The government has thereby shown execution and default, and summary judgment is appropriate. *See Nutmeg Fin. Serv., Inc. v. Cowden,* 524 F.Supp. 620, 621 (E.D.N.Y.1981) ( "[S]ummary judgment is appropriate upon a showing of execution and default.").

2    Abady's moving papers and affidavits clearly represent that he has tendered only two payments, totaling $7,637.84, on this loan. (Def's Decl., ¶¶ 41–54, Exh. 13). Therefore this fact is not in dispute.

Abady has presented a number of defenses and justifications for his failure to pay this student loan. However, none of those defenses are legally sufficient to defeat the government's motion for summary judgment. The Court will address each of defendant's arguments in turn.

1. *VELA's Failure to Accept Payment or Adjust the Sums Due*

In his moving papers, Abady discusses at length the history of this loan, reciting his struggle to pay the loan in 1981, VELA's rejection of that payment and subsequent refusal to correct the sum due. (Def's Decl., ¶¶ 18–27). None of these statements concerning the history of Abady's interactions with VELA is relevant to the present action. In 1986, when defendant

entered into a settlement of the state court action with VSEAA, he agreed to continue paying the sums due on his loans. (Def.'s Decl., Exh. 12, p. 1). Moreover, the stipulation specifically reaffirms the operation of the promissory notes to govern Abady's duty to repay the loans. (*Id.*). Additionally, Abady does not claim that he actually paid the sums due at any time. Therefore, he does not contest the allegation that he owed the money at that time, and states that he has only paid $7637.84 to date. (Def's Decl., ¶ 53).

2. *Res Judicata and Collateral Estoppel Do Not Bar This Action*

**\*4**    Abady believes that because the promissory notes formed the underlying basis for New York state court litigation in 1986 (*Virginia State Education Assistance Authority v. Abady,* Index No. 2648/81; Def.'s Decl., Exh. 9), the government cannot now use those loans to bring this lawsuit because it is barred by the doctrines of res judicata and collateral estoppel. Defendant's arguments fail because the present lawsuit does not raise the same issues as the 1986 lawsuit.

a. *Res Judicata Does Not Bar this Action*

**[4]**    Pursuant to the doctrine of res judicata, also known as "claim preclusion," " '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." ' *Storey v. Cello Holdings, L.L.C.* 347 F.3d 370, at 380 (2d Cir.2003); 3 (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000)); *see also Israel v. Carpenter,* 120 F.3d 361, 365 (2d Cir.1997) (preclusive effect given to claims resolved in a stipulation). The New York state court action in 1986 was discontinued with prejudice as to the claims asserted in that action. The claims asserted in that action related to the principal and interest past due on the loan at that time. In resolving that action, the parties agreed that the stipulation restored the "status quo under the loan instruments." (Def.'s Decl. ¶ 6). The stipulation was not a waiver of the debt. Currently, plaintiff seeks repayment on the loan of sums due subsequent to the stipulation. Those claims were not, and could not have been, brought at the time of the 1986 state court lawsuit; therefore, res judicata does not operate to bar those new claims. *See Storey,* 347 F.3d at 380.

3    The *Storey* court points out that the word "issues," frequently used by the Court of Appeals for the Second Circuit, is misleading in the context of this oft-quoted definition of res judiciata. To clarify, the

**U.S. v. Abady, Not Reported in Fed. Supp. (2004)**
2004 WL 444081

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 34 of 238

court emphasized that res judicata bars relitigation of "claims" not "issues" that were or could have been raised in a prior action. 347 F.3d at 380 n. 7.

### b. Collateral Estoppel Does Not Bar This Action

**[5]** As set forth above, the present lawsuit was brought because Abady failed to pay the sums due on the promissory notes subsequent to the 1986 lawsuit. The doctrine of collateral estoppel, or "issue preclusion," applies to bar the relitigation of issues of fact or law already fully litigated and determined between the same parties in a previous action. *Schiro v. Farley,* 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *Santini v. Conn. Hazardous Waste Mgm't,* 342 F.3d 118, 127 (2d Cir.2003). Collateral estoppel will only apply to bar relitigation of an issue already decided if (1) the issues in both proceedings are identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there was a full and fair opportunity for litigation, and (4) the issues were necessary to a valid judgment on the merits. *See Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999); *Vega v. State Univ. of N .Y. Bd. of Trustees,* 67 F.Supp.2d 324, 335 (S.D.N.Y.1999). In this case, the issues in the prior proceeding are not identical to the issues now underlying plaintiff's claims. Therefore, collateral estoppel does not apply to bar this action.

### 3. Abady's Payments in 1986 Did Not Repay the Loans

**\*5** Defendant states that he paid over $7000 in 1986, and that sum exceeded the principal he owed. He believes his payment exceeded the principal based on notices he received in 1994 for principal amounts of $2,472.44, $2,126.29, and 2,472.43. (Def.'s Decl. ¶ 44). He indicates a belief that the total of those notices, $7071.16, represents the total amount of his original indebtedness. (*Id.*). Based on those promissory notes, he believes the debt should be considered discharged, and he should be granted summary judgment. The 1994 promissory notes, however, represent the principal still due on his loans after the deduction of the 1986 payment of $7,471.80 from the principal.

**[6]** Abady also seems to argue that VELA decided, in 1986, to forgive the interest on the loans and accept the $7000 as payment in full, but he offers no support for that surmise. (Def's Decl. ¶¶ 43, 54). Moreover, the government has provided three promissory notes for the original sum of $14,300. (Plt.'s 56.1 Statement, Exh. A). Therefore, defendant's contention that he owed only $7000, unsupported by any other proof, is wholly inadequate to raise a reasonable

doubt as to the sufficiency of the government's proof of indebtedness. [4] At the summary judgment phase, the non-moving party must offer sufficient evidence on a factual dispute to allow a reasonable finder of fact to find in its favor. *Mandell v. The County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2002). Abady has not offered any evidence at all that he owed less than $14,300 in 1981, nor has he offered any evidence to support his contention that VELA did forgive or should have forgiven the interest on that sum.

[4]    Defendant's unsupported contentions about the size of his debt may be a misunderstanding following from the fact that the government only sought to recover the sums past-due in 1986, not the entire principal of the loan. The past due sum, as calculated by the government and paid by Abady, was $7471.80.

### 4. *VSEAA's Failure to Provide Invoices and Mailing Envelopes Is Not a Material Breach of the 1986 Stipulation*

**[7]** Abady asserts that he does not need to repay his educational loans because VSEAA is in material breach of the settlement agreement. First, he states that it failed to change his loan status from "default to active" pursuant to clause two of that agreement. Second, he claims that it failed to send him any notices, as it was bound to do by paragraph three of the stipulation. Abady offers no proof of either contention. In fact, he states that he was sent notices in 1994, which indicates that he was made aware of his continuing indebtedness. (Def.'s Decl. ¶ 44). Even if VSEAA did breach the agreement by failing to send invoices to Abady, that breach would not excuse Abady's obligation to repay the loan. Although there is a general rule that a party who first breaches a contract cannot demand performance from the other party, "a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." *Restatement (Second) of Contracts* § 229. The non-performance of a contractual condition should be excused where "the condition would cause a disproportionate forfeiture" as long as the non-performance is not a material breach. *Williston on Contracts, § 43:13* (4 [th] ed.2003).

**\*6** VSEAA would suffer a disproportionate forfeiture if Abady is not required to repay his loans simply because he did not receive notices and the loan status was not reset. Therefore, as long as VSEAA's breach is not material, it will not excuse Abady's non-performance of his obligation

**U.S. v. Abady, Not Reported in Fed. Supp. (2004)**

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 35 of 238

2004 WL 444081

to repay those loans. *Publicker Chemical Corp. v. Belcher Oil Co.,* 792 F.2d 482 (5th Cir.1986). *Williston on Contracts § 43:5* (4th ed.2003). VSEAA's breach was not material. "Materiality goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected." ' *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 421 (S.D.N.Y.1999) (quoting E. Allen Farnsworth, *Farnsworth on Contracts § 8.16* (3d ed.1999)); *see also Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 103 F.Supp.2d 711, 731 (S.D.N.Y.2000). VSEAA's breach, if any, did not deprive Abady of any benefit of the original loan contract, nor of the settlement stipulation. First, he received the full amount of the loans VSEAA seeks repayment on some twenty years ago. Second, in 1986, he reaped the benefit of entering a settlement agreement to repay the loans instead of being subjected to a court judgment. Abady suffered little, if any, loss when VSEAA failed to mail him notices and invoices for a debt that Abady had already acknowledged.

Finally, even if those failures could be construed as material breaches of the settlement agreement, those breaches would not relieve Abady of his obligation to repay the sums owed on the original promissory notes. The terms of the settlement clearly state that the purpose of the settlement was to restore the status quo between the parties, and that payments in the future should be governed by the original instruments. (Def.'s Decl., Exh. 12, ¶ 6–7). Therefore, no breach of the settlement would relieve Abady of his obligation to continue to repay his loans, based on the original promissory notes, after the date of the settlement.

## III. Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is granted. Defendant's motion to dismiss and for summary judgment is denied. The Clerk of Court is directed to enter judgment in the sum of $21,287.61 plus $1.35 per day since October 31, 2003 against defendant.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 444081

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

McAllister v. Call, Not Reported in F.Supp.3d (2014)

2014 WL 5475293

KeyCite Yellow Flag - Negative Treatment

Distinguished by  McDonald v. Zerniak,  N.D.N.Y.,  November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,

v.

Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

 **\*1**  Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiffs objections thereto, *see*
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. *See* Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. *See* Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. *See* Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. *See* Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. *See* Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–
458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his *pro se* status, the Court has conducted
a *de novo* review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

 **\*2  ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

2014 WL 5475293

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant —hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2]     McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

2014 WL 5475293

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra*. At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]  SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]  Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]  Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4**  McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister v. Call, Not Reported in F.Supp.3d (2014)

2014 WL 5475293

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

## III. Discussion [6]

[6] All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

*\*6* Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvement with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.


## F. **Fourteenth Amendment**


### 1. **Due Process**

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).


### a. **Denial of Liberty Interest**

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz, 323* F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

#### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

#### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

#### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

2014 WL 5475293

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based on some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my

paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18**  First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19**  1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Calf, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 5437617

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.;
Whittier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

**Douglas v. Ferrara, Not Reported in F.Supp.2d (2013)**

2013 WL 5437617

---

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

---

[1]   Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

---

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

## I. DISCUSSION

### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

2013 WL 5437617

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

## B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]     Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how

his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

2013 WL 5437617

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

2023 WL 346242
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Khari Devon COLEY, Plaintiff,

v.

W. GARLAND, et al., Defendants.

9:19-CV-00382 (LEK/ATB)
|
Signed January 20, 2023

**Attorneys and Law Firms**

Michael H. Sussman, Sussman, Watkins Law Firm, Goshen, NY, Jonathan R. Goldman, Sussman and Goldman, Goshen, NY, for Plaintiff.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants W. Garland, Nathan T. Locke, William Hoffnagle, Joseph R. Granger, Randy Russell.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff Khari Coley commenced this action pro se on April 1, 2019, alleging violations of his Eighth Amendment rights arising out of his confinement at Upstate Correctional Facility. Dkt. No. 1 ("Complaint"). [1] On May 8, 2019, the Court issued a Decision and Order granting Plaintiff's IFP application and directing Plaintiff to file an amended complaint to "properly name [the unidentified] individuals as parties" to the action. Dkt. No. 7 ("May Order") at 6. In response to the May Order, Plaintiff filed an amended complaint, Dkt. No. 28 ("First Amended Complaint"), but failed to include his signature. Plaintiff later signed the Amended Complaint, Dkt. No. 31, and shortly thereafter, filed another Amended Complaint, Dkt. No. 34 ("Second Amended Complaint" or "Amended Complaint"), alleging violations of his Eighth Amendment rights including: (1) deliberate indifference to serious medical needs; (2) excessive force; and (3) failure to intervene, against defendants W. Garland, Nathan T. Locke, William Hoffnagle, Joseph R. Ranger, and Randy Russell (collectively, "Defendants"). [2]

[1]     Plaintiff is now represented by counsel. Dkt. Nos. 77, 81.

[2]     Plaintiff also filed a motion to appoint counsel, Dkt. No. 30, which the Court denied. Dkt. No. 38.

On January 21, 2020, Defendants filed a motion to dismiss Plaintiff's medical indifference claim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 57. In a Decision and Order dated September 16, 2020, the Court granted Defendants' motion to dismiss. [3] Dkt. No. 80 ("September Order").

[3]     In its Decision and Order, the Court also denied Plaintiff's motion to amend, Dkt. No. 68, and denied Plaintiff's letter motion for injunctive relief, Dkt. No. 70.

Now before the Court is Defendants' motion for summary judgment, Dkt. No. 93 ("Motion") regarding Plaintiff's two remaining Eighth Amendment claims alleging excessive force and failure to intervene. Defendants have also submitted a statement of material facts. Dkt. No. 93-9 ("Defendants' Statement of Material Facts"). Plaintiff has filed a response to Defendants' statement of material facts, Dkt. No. 100 ("Plaintiff's Response to Defendants' Statement of Material Facts") and a memorandum of law, Dkt. No. 100-1 ("Plaintiff's Memorandum"). Defendants filed a reply. Dkt. No. 101 ("Defendants' Reply"). For the reasons that follow, Defendants' Motion is granted.

**II. BACKGROUND**

**A. Factual Background**
The following facts are taken from Defendants' statement of material facts, Dkt. No. 93-2, and are undisputed unless otherwise noted. Facts unrelated to the current motion are detailed in the Court's September Order. Dkt. No. 80 at 3–5.

At all times relevant to this action, Plaintiff was confined at Upstate Correctional Facility ("Upstate C.F."). Defs.' SMF ¶ 2. At approximately 6:00 PM on October 31, 2016, Correction Officer ("C.O.") Russell was completing security rounds and passed by Plaintiff's cell. Id. ¶ 3. As Russell passed by Plaintiff's cell, he observed that a bed sheet was tied around Plaintiff's neck and that the sheet was secured to the inside of the cell door. Id. ¶ 4. Plaintiff, however, maintains that he never tied anything around his neck during this incident. Pl.'s Resp. to Defs.' SMF ¶ 4.

**\*2** According to Defendants, Russell then ordered Plaintiff to untie "the noose," but Plaintiff did not comply. Defs.' SMF ¶ 5. In response, Russell immediately called for assistance. Id. ¶ 6. Plaintiff contests these facts and denies that this conversation occurred because he asserts that he did not have anything around his neck. Pl.'s Resp. to Defs.' SMF ¶ 5.

Sergeant William Hoffnagle and other security staff responded to Russell's call for assistance. Id. ¶7. Hoffnagle ordered staff to enter the cell and free Plaintiff of the bed sheet around his neck. Id. ¶ 8. According to Defendants, after Garland and Locke entered Plaintiff's cell, they assisted Plaintiff to his feet and Garland removed the sheet from Plaintiff's neck. Id. ¶¶ 9–10. Plaintiff, however, disputes that anything was around his neck during this incident. See generally Pl.'s Resp. to Defs.' SMF.

Prison staff applied mechanical restraints to Plaintiff, id. ¶ 11, and Russell retrieved a gurney that the prison staff placed Plaintiff on to transport him to the infirmary. Id. ¶¶ 12–13. Plaintiff was examined in the infirmary and later transported by ambulance to an outside hospital. Id. ¶ 15. Plaintiff did not lose consciousness "during the incident." Id. ¶ 16.

Defendants state that Plaintiff told a mental health professional at Upstate C.F. that his purpose in his attempt to "hang up" was to "avoid a double cell." Id. ¶ 17. According to Defendants, when the prison staff opened the cell to stop Plaintiff from "hang[ing] up," the cell gate pulled the makeshift-noose on Plaintiff's neck and strangulated Plaintiff for a moment. Id. ¶ 18. Plaintiff again disputes that he placed anything around his neck and also denies stating that he admitted that he tried to hang himself. Pl.'s Resp. to Defs.' SMF ¶¶ 17–18.

Rachel Seguin is the Assistant Director of the Inmate Grievance Program ("IGP") of the New York State Department of Corrections and Community Supervision ("DOCCS"). Id. ¶ 20. In her capacity as Assistant Director of IGP, Seguin is the custodian of the records maintained by the Central Office Review Committee ("CORC"), the body that renders final administrative decisions under DOCCS's three-step grievance program. Id. ¶ 21. Seguin searched CORC records and determined that Plaintiff did not file a grievance appeal with CORC related to any issue connected to Plaintiff's claims in this action. Id. ¶ 22. [4]

[4]    Plaintiff disputes that these searches occurred but fails to provide any evidence to the contrary. See Pl.'s Resp. to Defs.' SMF ¶¶ 21–22.

Similarly, Sherri Debyah is an Inmate Grievance Program Supervisor at Upstate C.F. and is responsible for keeping records of grievances filed by inmates at that facility. Id. ¶ 23. At all times relevant to this action, Upstate C.F. had a fully functioning inmate grievance process available. Id. ¶ 24. [5] Based upon her search of the Inmate Grievance Program files, Debyah concluded that the Upstate C.F. Inmate Grievance Program did not contain records of any grievance filed by Plaintiff relating to the issues in the present action. Id. ¶ 25. Additionally, Plaintiff was familiar with the different steps of the inmate grievance process, id. ¶ 26, and had filed grievances at Upstate C.F. about other incidents. Id. ¶ 27.

[5]    Plaintiff disputes that Upstate C.F.'s grievance process functioned properly but fails to specifically point to any issues associated with Upstate C.F.'s grievance process beyond a general citation to Plaintiff's deposition. See Pl.'s Resp. to Defs.' SMF ¶ 24.

### III. STANDARD OF REVIEW

**\*3** Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Coley v. Garland, Slip Copy (2023)

2023 WL 346242

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on mere conclusory allegations, speculation or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S 133, 150 (2000), and "eschew credibility assessments[,]" Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

Defendants argue there are no genuine disputes of material fact regarding Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"); (2) Plaintiff's assertions are contradicted by the record and thus raise no constitutional violations; and alternatively (3) Defendants are entitled to qualified immunity. Mot. at 5–15.

The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). "[T]he PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). In other words, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." Killian, 680 F.3d at 238 (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

*4 Nevertheless, the PLRA "contains its own textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the availab[ility] of administrative remedies." Ross v. Blake, 578 U.S. 632, 642 (2016) (quotations omitted). The Supreme Court has identified three scenarios in which an administrative procedure may be deemed unavailable for purposes of PLRA exhaustion. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 643 (citations omitted). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. at 643–644. Finally, "the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

In New York State:

DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. Id. § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. Id. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. Id. §§ 701.5(b)(2), (3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. Id. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Id. § 701.5(c)(3) (ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. Id. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. Id. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. Id. § 701.5(d)(3)(ii).

Bryant v. Whitmore, No. 14-CV-1042, 2016 WL 7188127, at *4 (N.D.N.Y. Nov. 4, 2016), report and recommendation adopted, Bryant v. Thomas, 2016 WL 7187349 (N.D.N.Y. Dec. 9, 2016).

In the case of "harassment grievances," which are "grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," New York State regulations establish an expedited procedure by which the grievance clerk forwards the grievance directly to the facility superintendent for action. 7 N.Y.C.R.R. §§ 701.2(e), 701.8(d). The inmate, however, must still initially file the grievance with the prison's grievance clerk in accordance with ordinary procedure. Id. §§ 701.8(a)–(c). The grievance supervisor will then determine whether the grievance raises a bona fide issue of harassment meriting an expedited process. Id. § 701.5(a)(2). Once a grievance is designated a "harassment grievance," the superintendent must respond within a set time frame, and the inmate may appeal directly to the next step if he receives no response within that time frame. Id. §§ 701.8(f)–(g).

Moreover, the Second Circuit has held that factual disputes concerning exhaustion under the PLRA must be determined by courts rather than juries. Messa v. Goord, 652 F.3d 305, 308–09 (2d Cir. 2011) ("[Plaintiff] argues that, unlike other aspects of exhaustion, which he concedes are properly resolved by the court, determining whether an inmate asserts a valid excuse for non-exhaustion is a task for the jury. We are not persuaded."). Likewise, exhaustion is an affirmative defense, and the burden of proof at all times, remains on the defendant. See Ferguson v. Mason, No. 19-CV-927, 2021 WL 862070, at *3 (N.D.N.Y. Jan. 7, 2021), report and recommendation adopted, 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021).

*5 Here, the Court concludes that Defendants have satisfied their burden of proof. Defendants provide testimony from Seguin and accompanying records demonstrating that Plaintiff did not file the required grievance appeal with CORC. Dkt. No. 93-3. Additionally, Defendants also submit testimony from Debyah, the inmate supervisor at Upstate C.F., stating that the prison has no record of grievances filed by Plaintiff related to his claims in this action. Dkt. No. 93-4.

She also supported this testimony by providing a copy of Plaintiff's grievance list from Upstate C.F. Id. at 4.

Furthermore, the Court is unpersuaded that administrative remedies were unavailable to Plaintiff under Ross's first two exceptions. Indeed, Plaintiff testified that he had successfully filed and appealed grievances in the past at Upstate C.F., Dkt. No. 93-2 ("Plaintiff's Deposition") at 102–04, which suggests that the DOCCS grievance process was not a "dead end" or "incapable of use." Lurch v. Bui, No. 19-CV-895, 2020 WL 8450543, at *5 (N.D.N.Y. Dec. 8, 2020), report and recommendation adopted Lurch v. Jones, 2021 WL 392486 (N.D.N.Y. Feb. 4, 2021) ("[T]he Court notes that the record establishes that Plaintiff has filed other grievances and appealed at least one prior grievance denial to CORC. This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such the first two exceptions identified under Ross are not applicable here") (internal citations and quotations omitted); Gonzalez v. Coburn, No. 16-CV-6174, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end or so opaque that Plaintiff could not avail himself of it.").

Similarly, the PLRA's third textual exception is also inapplicable here. Plaintiff argues that his grievances against Defendants never received a response, which is evidence that Defendants "destroyed his grievances and disallowed him from filing grievances." Pl.'s Mem. at 11. Because of this absence of response and presence of alleged interference, Plaintiff argues he should be excused from the PLRA's exhaustion requirement. However, Plaintiff does not provide evidence of Garland or any other Defendant meddling with his grievances that suggests the presence of interference. Id. at 10–13.

The Second Circuit's decision in Cicio v. Wenderlich is instructive. 714 Fed. App'x 96 (2d Cir. 2018). There, the plaintiff argued that the PLRA's exhaustion requirement should be waived because he never received a response to the grievance he purportedly filed. Id. at 97. The Second Circuit noted, "When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal. Because [the plaintiff] did not exercise his right of appeal, he did not exhaust his available administrative remedies.

Coley v. Garland, Slip Copy (2023)

2023 WL 346242

Accordingly, the PLRA bars the instant action." Id. at 97–98. The Second Circuit further reasoned, "We also reject Cicio's argument that the non-response to his grievance constituted manipulation, so as to excuse the exhaustion requirement." Id. at 98. Here, like Cicio, it is undisputed that Plaintiff did not file an appeal after his grievances allegedly went unheard by prison staff. And because Plaintiff did not "exercise his right of appeal, he did not exhaust his available administrative remedies," and accordingly, the Court "rejects [Plaintiff's] argument that the non-response to his grievance constituted manipulation, so as to excuse the exhaustion requirement." Cicio, 714 Fed. App'x at 97–98. As a result, because Plaintiff did not comply with DOCCS's grievance process and because he failed to provide evidence that Defendants interfered with his grievances, he has not demonstrated that the Court should waive the exhaustion requirement pursuant to the PLRA's third textual exception.

*6  As a final matter, Plaintiff argues that the exhaustion requirement should be waived because he mailed letters and appealed to other officials outside DOCCS's formal grievance process. Pl.'s Mem. at 12. However, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." Timmons v. Schriro, No. 14-CV-6606, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); Simons v. Campos, No. 09-CV-6231, 2010 WL 1946871, at *6 (S.D.N.Y. May 10, 2010) ("Assuming the truth of the Complaint, the plaintiff's oral statements to various officials and his letter to the superintendent fail to satisfy the ...

exhaustion requirement."). Consequently, Plaintiff's informal letters outside DOCCS's grievance process are insufficient under the PLRA's exhaustion regime.

As a result, the Court grants Defendants' motion for summary judgment because Plaintiff has failed to exhaust his administrative remedies under the PLRA. Because the Court grants summary judgment on the basis of failure to exhaust, the Court declines to address Defendants' alternative arguments.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 93) is **GRANTED** because of Plaintiff's failure to exhaust administrative remedies; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2023 WL 346242

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Stroman v. Ranze,  N.D.N.Y.,  December 13, 2019

2016 WL 5219997

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,

v.

Rowland POTTER, Michael Barkman,

James Thomsen, C.O. John Doe #1, C.O.

John Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-01041 (DNH/TWD)

|

Signed 06/28/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor, Schenectady, NY 12304, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: RYAN E. MANLEY, ESQ., Assistant Attorney General, Albany, NY 12224, Counsel for Defendants.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

*1 This matter was referred to the undersigned for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. *Pro se* Plaintiff Shamel Wright, a former inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS"), has commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights while confined at Greene Correctional Facility ("Greene").

Specifically, Plaintiff claims that on August 30, 2013, Defendants Sergeant Rowland Potter ("Potter"), Sergeant Michael Barkman ("Barkman"), Sergeant John Doe ("Sergeant Doe"), Correction Officer John Doe #1 ("Officer Doe #1"), and Correction Officer John Doe #2 ("Officer Doe #2") subjected him to excessive force as well as failed to intervene or to protect Plaintiff. (*See generally* Dkt. No. 1.) Plaintiff also alleges an Eighth Amendment violation arising out of medical indifference against Defendant James Thomsen ("Thomsen"). *Id.* Currently pending before the Court is Defendant Thomsen's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has not opposed the motion. For the following reasons, I recommend that the Court grant Defendant Thomsen's motion for summary judgment.

**I. BACKGROUND AND PROCEDURAL HISTORY**

The following facts are set forth as alleged in Plaintiff's verified complaint. [1] On August 30, 2013, at approximately 8:55pm, Plaintiff was restrained and transported by Officer Doe #1 and Potter following a physical altercation between Plaintiff and another inmate. (Dkt. No. 1 at ¶ 18.) Plaintiff was initially placed in a holding room before he was moved to an office. *Id.* at ¶ 21. Potter ordered Plaintiff to sit in a metal folding chair situated to the left of the door. *Id.* Barkman asked Plaintiff several questions about the cause of the physical altercation with the other inmate. *Id.* at ¶ 23. When Plaintiff's answers proved unsatisfactory, Officer Doe #2 pulled the chair from underneath him, resulting in Plaintiff falling to the ground. *Id.* at 25. Officer Doe #2 then proceeded to hit Plaintiff over the head with the metal chair. *Id.* Plaintiff began bleeding immediately. *Id.* at ¶ 26. Plaintiff then demanded that pictures of his injury be taken and that the entire incident be reported. *Id.* at ¶ 28. Plaintiff also requested that he be sent to an outside hospital. *Id.* According to Plaintiff, Barkman, Potter, Sergeant Doe, and Officer Doe #1 were present and observed the assault. *Id.* at ¶¶ 21-26.

[1]  A verified complaint, such as Plaintiff's (Dkt. No. 1), is to be treated as an affidavit. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit...and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

At approximately 9:30pm, Plaintiff was brought to the nurse's office by Barkman and non-party Correction Officer Castillo ("Castillo"). [2] *Id.* at ¶ 28. Defendant Thomsen attempted to wipe the blood off of Plaintiff's head and chest. *Id.* at ¶ 29. Plaintiff expressed his desire to have photographs taken of the injury before it was cleaned. *Id.* Barkman refused to photograph the injury sustained by Plaintiff. *Id.* Potter

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 62 of 238

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

came into the room and asked Plaintiff if he was refusing medical treatment. *Id.* Plaintiff informed Potter that he was not refusing medical care but that he wished for pictures to be taken before the examination. *Id.* Potter informed Plaintiff that he was refusing medical care and Potter, Defendant Thomsen, and Castillo signed a refusal form stating that Plaintiff had refused medical care. *Id.*

[2]   Castillo was originally named as a defendant in Plaintiff's complaint, however he was subsequently terminated from the suit upon initial review. (Dkt. No. 11 at 10-16.)

**\*2** Plaintiff was taken to a cell and approximately forty-five minutes later, Potter returned to Plaintiff's cell with two nurses who examined and cleaned Plaintiff's forehead. *Id.* at ¶ 30. Plaintiff was later taken to Albany Medical Center for treatment where he received two staples. *Id.* at ¶ 34.

Plaintiff alleges that Defendant Thomsen exercised deliberate indifference by failing to provide adequate medical care in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶ 54.) Specifically, Plaintiff alleges that Defendant Thomsen signed a form falsely indicating that Plaintiff had refused medical care for a laceration on Plaintiff's forehead instead of properly treating the injury. *Id.*

On September 12, 2013, Plaintiff filed an Inmate Grievance Complaint alleging that he had been struck on the head with a chair wielded by Officer Doe #2 on August 30, 2013. (Dkt. No. 30-8.) Plaintiff indicated that Potter, Barkman, and Officer Doe #1 were present for the alleged altercation. *Id.* Plaintiff titled his grievance "CO Assaulted Me With Chair." *Id.* Plaintiff did not fill out any other grievances associated with the incident. (Dkt. No. 30-5 at ¶¶10-18.)

The grievance was filed with Greene's inmate grievance resolution committee ("IGRC") office on September 12, 2013. (Dkt. No. 1 at ¶ 41.) On October 15, 2013, Plaintiff's grievance was denied. *Id.* at ¶ 42. Plaintiff's appeal was received by the IGRC office on October 21, 2013. *Id.* at ¶ 22. Plaintiff appealed the IGRC decision through the Central Office Review Committee ("CORC") and the appeal was received by CORC on November 15, 2013. *Id.* at ¶ 44. On March 26, 2014, CORC subsequently denied the appeal citing insufficient evidence to substantiate Plaintiff's claim. *Id.* at ¶ 45; *see also* Dkt. No. 1 at 12. [3]

[3]   Citations to page numbers in Court documents refer to the page numbers assigned by the Court's electronic filing system.

Plaintiff commenced this action on August 22, 2014. *Id.* Defendant Thomsen now moves for summary judgment on the grounds that Plaintiff failed to properly exhaust his available administrative remedies with respect to his medical indifference claim. (Dkt. No. 30-2 at 3-6.) In the alternative, Defendant moves for summary judgement on the merits and also argues that he is entitled to qualified immunity. (Dkt. No. 30-2 at 3-6.) Plaintiff has not opposed the motion. The Court addresses only the exhaustion argument, as it is dispositive.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

**\*3** A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit and "therefore will be considered in determining whether material

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 63 of 238

issues of fact exist[.]" *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) [4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

4      The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the defendants. *See Id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

**\*4** Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

Plaintiff was sent a notice of motion (Dkt. No. 30) by Defendant's counsel as well as an attached notification of the consequences of failing to respond to a summary judgment motion. (Dkt. No. 30-1.) Plaintiff failed to submit any papers in opposition to summary judgment as noted above.

### III. ANALYSIS

Defendant Thomsen argues that Plaintiff's Eighth Amendment claim of medical indifference should be dismissed because Plaintiff failed to properly exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), prior to filing this federal civil rights action. (Dkt. No. 30-2 at 3-6.) Defendant is correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

Case 9:21-cv-00135-DNH-TWD Document 79 Filed 02/12/24 Page 64 of 238

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at § 701.5(d)(3)(ii).

**\*5** If a prisoner has failed to properly follow each of the applicable steps and complete the process prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) CORC issued its decision on March 26, 2013. (Dkt. No. 1 at 12.) However, the grievance at no point mentioned Defendant Thomsen or medical personnel at Greene, nor did the grievance mention receiving inadequate medical care after the incident. (*See* Dkt. No. 30-8.)

Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). Even though "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies," the inmate is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (citing NYCRR § 701.7(a)(1)(i)).

While Plaintiff is not required to specifically name Defendant Thomsen in his grievance, Plaintiff's failure to specifically describe *any* problem in his grievance concerning medical treatment after the incident did not give the facility enough information to investigate allegations against Defendant Thomsen. *See Hemby v. Ferrari*, No. 9:13–CV–613, 2014 WL 1584160, at \*26 (N.D.N.Y. Apr. 21, 2014) (holding that Plaintiff had failed to exhaust medical indifference claim alleging denial of medication for an ulcer where Plaintiff had filed a grievance only alleging improper wound care of the ulcer.)

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) In the grievance, Plaintiff stated that he was hit in the head with a chair while handcuffed and subsequently taken to Albany Medical Center where he received staples before being released. (Dkt. No. 30-8.) Plaintiff described the assault as occurring in a sergeant's office with three sergeants and two correction officers present. *Id.* Plaintiff admitted he did not know the names of the correction officers but would be able to identify them in a picture. *Id.* Plaintiff did identify Sergeant Barkman and Sergeant Potter in the grievance. *Id.* Yet, in that same grievance, Plaintiff failed to mention Defendant Thomsen by name or profession, failed to reference any medical personnel, and failed to reference receiving inadequate medical treatment. *Id.* Because Plaintiff's grievance contained no mention of

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 65 of 238

Wright v. Potter, Not Reported in Fed. Supp. (2016)
2016 WL 5219997

inadequate medical care after the incident, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen has not been exhausted.

**\*6** Plaintiff's failure to exhaust, however, does not end the review. For more than ten years, courts in this district have been guided by the Second Circuit's decision in *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill,* the Second Circuit established a three-part inquiry to determine whether, *inter alia,* a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances." *Id.* [5]

[5]     Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir. 2004).

However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake,* 578 U.S. ____ (2016) *available at* 2016 WL 3128839, at \*11 (June 6, 2016). In *Ross,* the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement. 2016 WL 3128839, at \*3. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> The [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id.* (internal citation omitted).

The Supreme Court's rejection of the "special circumstances" exception, however, still does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion." *Id.* at \*7. Under the PLRA, "the

exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id.*

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at \*8. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In light of the above, the Court must now consider whether Plaintiff exhausted his *available* administrative remedies regarding his Eighth Amendment medical indifference claim before commencing this action.

Here, Plaintiff has not claimed that the administrative procedure was unavailable to him. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the August 30, 2013, incident. [6] (Dkt. No. 30-5 at ¶¶14-18.) Yet, Plaintiff still failed to file any grievance alleging inadequate medical care or calling into question his treatment at the hands of Greene's medical staff. Thus, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen is not exhausted. Accordingly, the Court recommends that said Defendant's motion for summary judgment (Dkt. No. 30) be granted.

[6]     While Plaintiff testified during his deposition that one of the unidentified correction officers "threatened" him at a later date, Plaintiff does not allege that the threat prevented him from filing any additional grievances. In fact, Plaintiff subsequently filed an additional grievance based on that alleged threat. (Dkt. No. 30-5 at ¶¶ 10-20.)

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 66 of 238

Wright v. Potter, Not Reported in Fed. Supp. (2016)

2016 WL 5219997

*7 Since the Court is recommending that summary judgement be granted for failure to exhaust administrative remedies, the Court need not reach Defendant Thomsen's remaining arguments.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the Court **GRANT** Defendant James Thomsen's motion for summary judgment (Dkt. No. 30); and it is further

**RECOMMENDED** that the Court dismiss all claims against Defendant James Thomsen and terminate him from this action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5219997

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5173283

2016 WL 5173283
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,

v.

Rowland POTTER, Michael Barkman,
James Thomsen, C.O. John Doe #1, C.O.
John Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-1041 (DNH/TWD)
|
Signed 09/21/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor,
Schenectady, NY 12304, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL: RYAN
E. MANLEY, ESQ., Ass't Attorney General, Albany, NY
12224, Attorneys for Defendant James Thomsen.

### <u>AMENDED DECISION and ORDER</u>

DAVID N. HURD, United States District Judge

 **\*1**  *Pro se* plaintiff Shamel Wright brought this civil rights
action pursuant to 42 U.S.C. § 1983. On June 28, 2016, the
Honorable Thérèse Wiley Dancks, United States Magistrate

Judge, advised by Report-Recommendation that defendant
James Thomsen's motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be granted, and that he be
dismissed from this action. See ECF No. 33. Plaintiff has not
filed timely objections.

Based upon a de novo review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendant James Thomsen's motion for summary
judgment (ECF No. 30) is **GRANTED;**

2. All claims against defendant James Thomsen are
**DISMISSED** and he is terminated from this action. The
causes of action against the remaining defendants will
continue; and

3. The Clerk serve a copy of this Decision and Order upon
plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this
case.

IT IS SO ORDERED.

Dated: September 21, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173283

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 68 of 238

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

2018 WL 1353101
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael GONZALEZ, Plaintiff,

v.

Cheryl MORRIS et al., Defendants.

9:14-cv-1438 (GLS/DEP)
|
Signed 03/15/2018

**Attorneys and Law Firms**

Office of Noah A. Kinigstein, OF COUNSEL: NOAH A.
KINIGSTEIN, ESQ., 315 Broadway, Suite 200, New York,
NY 10007, FOR THE PLAINTIFF.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: LOUIS
JIM, ESQ., Assistant Attorney General, New York State
Attorney General, The Capitol, Albany, NY 12224, FOR THE
DEFENDANTS.

## MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, U.S. District Judge

## I. Introduction

*1 Plaintiff Michael Gonzalez commenced this action
pursuant to 42 U.S.C. § 1983, alleging violations of
the First and Fourteenth Amendments against Cheryl
Morris, New York State Department of Corrections and
Community Supervision (DOCCS) Director of Ministerial,
Family and Volunteer Services, and Stanley Barton, Deputy
Superintendent of Programs at Adirondack Correctional
Facility. (*See generally* Compl., Dkt. No. 1; Dkt. No.
30, Attach. 7 at 1.)[1] Pending is defendants' motion for
summary judgment. (Dkt. No. 30.) For the reasons that follow,
defendants' motion is granted in part and denied in part.

[1]    Gonzalez's complaint included additional claims
and defendants, but the court's Decision and Order
dated January 27, 2015 dismissed them. (Dkt. No.
9.)

## II. Background

### A. Facts[2]

[2]    Unless otherwise noted, the facts are undisputed.

Gonzalez was a New York State prisoner at the time of the
events referred to in his complaint and when he filed the
complaint.[3] (Defs.' Statement of Material Facts (SMF) ¶ 1,
Dkt. No. 30, Attach. 1.) Gonzalez alleges that as a practitioner
of the religion Santeria,[4] he must wear five strands of colored
beads. (Dkt. No. 30, Attach. 5 at 8; Dkt. No. 34 at 1-2.)
While incarcerated in the Special Housing Unit (SHU) at
Upstate Correctional Facility in 2013, he filed a grievance
because he was only allowed to wear one bead strand.[5] (Dkt.
No. 30, Attach. 5 at 8-9; Defs.' SMF ¶¶ 3, 7.)[6] The Inmate
Grievance Resolution Committee (IGRC) found that it was
"beyond the capacity of the IGRC to change the policy" of
allowing only one bead strand to be worn in SHU. (Dkt. No.
30, Attach. 5 at 11; Defs.' SMF ¶¶ 5, 9.) Gonzalez appealed
to the superintendent, (Dkt. No. 30, Attach. 5 at 11), who
agreed with the IGRC's denial, (*id.* at 12; Defs.' SMF ¶
10). Gonzalez then appealed to the Central Office Review
Committee (CORC), which affirmed. (Dkt. No. 30, Attach. 3
at 6; Defs.' SMF ¶¶ 11-12.)

[3]    Gonzalez filed a *pro se* complaint, (Compl.), but he
obtained representation prior to defendants' motion
for summary judgment. (Dkt. Nos. 25, 30).

[4]    Gonzalez's complaint and opposition to summary
judgment give background information about
Santeria, including the importance of bead strands.
(Compl. ¶¶ 15-22; Dkt. No. 34 at 1-2.)

[5]    Although Gonzalez referred to "one bead," he
meant one bead strand. (Defs.' SMF ¶ 7.) The
limitation of allowing only one bead strand while
in SHU was included in the DOCCS Religious
Calendars for 2013 and 2014. (*Id.* ¶ 27.)

[6]    Gonzalez's complaint also alleges that he was
limited to wearing three bead strands while in
general population. (Compl. ¶ 37.) But Gonzalez
did not contest that he was never in general
population at Upstate Correctional Facility because
he was always housed in SHU. (Defs.' SMF ¶ 6.)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 69 of 238

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

After being transferred to Adirondack Correctional Facility, (Defs.' SMF ¶ 13), Gonzalez filed another grievance because he was denied matches or a lighter to burn offerings [7] as part of his practice of Santeria, (Dkt. No. 30, Attach. 2 at 7). [8] In the same grievance, Gonzalez also complained that he could not build a shrine, [9] another element of Santeria. (*Id.*) The IGRC denied the grievance, noting that "[Gonzalez] has been given options of how to conduct his religious observances[ ] within the confines of th[e] facility's policy and procedures." (*Id.* at 9.) Gonzalez appealed to the superintendent. (*Id.*) An investigative report to Joseph Payton, Deputy Superintendent of Programs at Adirondack Correctional Facility at the time, noted that matches and lighters "are considered contraband at this facility," and that Gonzalez could have a shrine under certain conditions. (*Id.* at 12; Compl. ¶ 7; Dkt. No. 30, Attach. 7 at 5.) The report also stated that Gonzalez could "approach the coordinating [c]haplain about ordering electric candles" and that "[t]he facility is willing to work with [Gonzalez] concerning his religious requirements." (Dkt. No. 30, Attach. 2 at 12.)

[7]   Such offerings include incense and cigars. (Dkt. No. 30, Attach. 2 at 7; Compl. ¶ 20.)

[8]   Gonzalez disputes defendants' characterization of the Adirondack grievance, (Dkt. No. 38 ¶¶ 4, 14), and refers to the grievance itself, (Dkt. No. 30, Attach. 2 at 7); the court also refers to the grievance itself.

[9]   In his complaint, Gonzalez uses the terms "shrine" and "altar" interchangeably. (*See generally* Compl.) For consistency, the court uses the term shrine.

**\*2** Upon appeal, the superintendent also denied Gonzalez's grievance. (*Id.* at 10.) In his appeal statement to the CORC, Gonzalez wrote, among other things, "[I]f Native Americans are accom[m]odated why can [sic] Santeria too? ?" (*Id.*) The CORC upheld the denial and clarified the limitations on shrines. [10] (Dkt. No. 30, Attach. 3 at 8.) The CORC's decision also noted the availability of electric candles and that "the facility administration has been granted waivers prohibiting inmates from possessing matches or lighters." (*Id.*)

[10]   The superintendent stated that possessing a shrine requires a permit, (Dkt. No. 30, Attach. 2 at 10), but the CORC noted that "the need for a shrine permit was discontinued in 2010," (Dkt. No. 30, Attach.

3 at 8). The CORC also explained that "a shrine shall not exceed 1' x 1' and 1' in height," "[t]he material from which the shrine is constructed may consist of normally allowable items ... excluding any food which is subject to spoilage," a shrine "shall not include any items which are contraband, can be used as a weapon[,] or constitute a threat to the safety and security of the facility," and a shrine "may not be placed on top of cell furnishings." (*Id.*; Defs.' SMF ¶ 22.)

Gonzalez claims that he filed six or seven grievances. (Dkt. No. 38 ¶ 2.) However, the only other grievance in the record before the court that proceeded to a CORC decision is one concerning religious meals. (Dkt. No. 35, Attachs. 8, 19.) [11] Gonzalez grieved that "[t]he State only has 2 special meals for Santeria" and requested that nine additional religious dates be added to the special food calendar. (Dkt. No. 35, Attach. 8.) The CORC denied the grievance, noting that it "has not been presented with any compelling reason to revise the current calendar," which provided for two holiday meals for Santeria. (Dkt. No. 35, Attach. 19.)

[11]   The decisions of the IGRC and the superintendent for this grievance are not in the record.

### B. Procedural History

Gonzalez filed the instant action *pro se* in November 2014. (Compl.) About a month later, while this action was pending, Gonzalez was discharged from DOCCS' custody. (Dkt. No. 9 at 2.) Under 42 U.S.C. § 1983, Gonzalez asserted (1) a First Amendment free exercise claim, (Compl. ¶¶ 36-38); (2) an Eighth Amendment claim, (*id.* ¶ 40); (3) an equal protection claim under the Fourteenth Amendment, (*id.* ¶¶ 42-45); and (4) a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), (*id.* ¶¶ 30, 45(B),(H)). In a prior Decision and Order, the court dismissed Gonzalez's Eighth Amendment claim, RLUIPA claim, and all claims against defendants besides Morris and Barton. (Dkt. No. 9 at 15-16.)

Counsel appeared on behalf of Gonzalez in October 2015, (Dkt. No. 25), and discovery was reopened, (Dkt. Nos. 26-29). Pending is the remaining defendants' motion for summary judgment. (Dkt. No. 30.)

### III. Standard of Review

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

The standard of review pursuant to Federal Rule of Civil Procedure 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 Fed.Appx. 500 (2d Cir. 2012).

## IV. Discussion

Defendants make three arguments for summary judgment: (1) Gonzalez failed to exhaust administrative remedies for his equal protection claim, (Dkt. No. 30, Attach. 7 at 2-6; Dkt. No. 40 at 1-3); (2) Gonzalez's First Amendment free exercise claim fails as a matter of law, (Dkt. No. 30, Attach. 7 at 7-14); and (3) defendants are entitled to qualified immunity, (*id.* at 14-15). The court addresses each of these in turn.

### A. Exhaustion of Gonzalez's Equal Protection Claim

**\*3** The Prison Litigation Reform Act (PLRA) states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). [12] This PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "[P]risoners must complete the administrative review process in accordance with the applicable procedural rules ... that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted). This exhaustion requirement is mandatory. *See Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016). [13] New York "has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the [IGRC], (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the [CORC]." *Espinal v. Goord*, 558 F.3d 119, 125 & n.3 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5).

[12]   § 1997e(a) is applicable because Gonzalez was a confined prisoner at the time he filed his lawsuit. *See Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) (collecting cases).

[13]   *Ross* sets forth situations in which administrative remedies are not "available" such that the bar in § 1997e(a) would not apply. *See Ross*, 136 S. Ct. at 1859-60. But that is not at issue here. (*See generally* Dkt. No. 34.)

Here, defendants concede that Gonzalez exhausted his claim regarding the limit of one bead strand in SHU, his shrine claim, and his claim regarding the denial of matches or a lighter with respect to the First Amendment. (Dkt. No. 30, Attach. 7 at 6.) Defendants argue that Gonzalez's equal protection claim regarding matches or a lighter is barred as unexhausted because he did not allege that Native American prisoners receive preferential treatment until his appeal statement to the CORC. (*Id.*; Dkt. No. 40 at 1-3.) Gonzalez contends that equal protection is a legal theory that did not need to be explicitly stated in his grievance. (Dkt. No. 34 at 12-14.)

"In order to exhaust [a grievance] ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Id.* (internal quotation marks and citation omitted). Although the Second Circuit "has found it appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). [14]

[14]   In their summary judgment memorandum, defendants emphasize that this is a "represented prisoner [Section] 1983 action." (Dkt. No. 30, Attach. 7 at 1.) But Gonzalez filed the grievance at issue *pro se*. (Defs.' SMF ¶ 1.) As far as reviewing the sufficiency of that grievance in the context of exhaustion, it does not matter that Gonzalez is now represented by counsel. *See Coleman v. B.G. Sulzle, Inc.*, 402 F. Supp. 2d 403, 415 n.4 (N.D.N.Y. 2005).

Here, Gonzalez filed a grievance that he was denied matches or a lighter to burn offerings. (Dkt. No. 30, Attach. 2 at 7.) He did not articulate that Native Americans are accommodated in such a manner until his appeal statement to the CORC, (*id.* at 7, 9-10), and allegations brought up for the first time

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 71 of 238

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

in an appeal to the CORC are not properly exhausted.[15] However, equal protection is a legal theory that Gonzalez did not need to articulate in his grievance. *Cf. Gomez v. United States*, Case No. 13-cv-946, 2016 WL 3458216, at *4 (S.D. Ill. June 24, 2016) (holding equal protection claim exhausted where prisoner grieved denial of medical care but did not mention race, because equal protection is a legal theory). Gonzalez needed only to object intelligibly to some asserted shortcoming, which he did when he grieved that he was denied matches or a lighter for religious purposes. *See Johnson*, 380 F.3d at 697; *Simmons v. Robinson*, No. 07 Civ. 7383, 2011 WL 31066, at *4 (S.D.N.Y. Jan. 4, 2011) ("[A] claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance.") (citing *Espinal*, 558 F.3d at 128). Moreover, Gonzalez's grievance was not so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.[16] *Cf. Brownell*, 446 F.3d at 310-11.

[15]    *See, e.g., Crichlow v. Fischer*, 9:17-cv-00194, 2017 WL 6466556, at *15 n.10 (N.D.N.Y. Sept. 5, 2017), *report and recommendation adopted by* 2017 WL 6459512 (N.D.N.Y. Dec. 18, 2017); *Holmes v. LeClair*, No. 9:09–CV–0437, 2012 WL 5880360, at *8 (N.D.N.Y. Oct. 11, 2012), *report and recommendation adopted by* 2012 WL 5880690 (N.D.N.Y. Nov. 21, 2012).

[16]    This is borne out by the fact that Adirondack Correctional Facility investigated Gonzalez's grievance regarding the denial of matches or a lighter. (Dkt. No. 30, Attach. 2 at 12.) Although the investigator was not explicitly tipped off to the allegation that Native Americans were accommodated, such an official investigating the grievance could reasonably be expected to explore such matters. *Cf. Turner v. Goord*, 376 F. Supp. 2d 321, 325 (W.D.N.Y. 2005). The court would be less inclined to find as such if defendants had set forth facts that rebutted Gonzalez's assertion that Native Americans were treated more favorably, but defendants did not do so. In fact, Barton testified at his deposition that Native Americans were given a special accommodation with regard to lighting herbs. (Dkt. No. 35, Attach. 5 at 3-5.) As such, it is difficult to believe that the investigator did not have the opportunity to learn about the

alleged accommodation for Native Americans. *See Espinal*, 558 F.3d at 127.

*4  Courts in the Second Circuit have noted that the claim brought in federal court and the grievance filed in prison "must be predicated on the same injury." *Crichlow v. Fischer*, 9:17-cv-00194, 2017 WL 6466556, at *14 (N.D.N.Y. Sept. 5, 2017), *report and recommendation adopted by* 2017 WL 6459512 (N.D.N.Y. Dec. 18, 2017); *Johnson v. Annucci*, No. 15-cv-3754, 2016 WL 3847745, at *4 (S.D.N.Y. July 7, 2016); *see Rentas v. Nason*, No. 09 Civ. 5528, 2010 WL 3734086, at *1 (S.D.N.Y. Sept. 22, 2010). That is true here; whether tied to equal protection or some other legal theory, the underlying injury—that Gonzalez could not use matches or a lighter for religious purposes—is the same in both the instant lawsuit and his exhausted grievance.

Accordingly, in light of the parties' arguments, the factual record, and the governing law, Gonzalez exhausted his equal protection claim.[17]

[17]    Defendants did not move for summary judgment based on the merits of Gonzalez's equal protection claim. (*See generally* Dkt. No. 30, Attach. 7; Dkt. No. 40.)

**B. Gonzalez's First Amendment Claim**

Gonzalez exhausted the following First Amendment free exercise claims: his inability to build a shrine, (Dkt. No. 30, Attach. 3 at 8), the denial of matches or a lighter to burn offerings, (*id.*), the limit on the number of bead strands that he was allowed to wear, (*id.* at 6), and his request for additional religious meals for Santeria, (Dkt. No. 35, Attach. 19 at 2). Although Gonzalez references other requests and grievances, (Dkt. No. 34 at 2-5), those four are the only grievances in the record that he exhausted by appealing to the CORC. *See supra* Part II.A.[18]

[18]    This is consistent with Gonzalez's articulation of his claims in his opposition to summary judgment: "Gonzalez grieved about his beads, the meals, and permission to build a shrine, as well as possess candles, lighters[,] or matches." (Dkt. No. 34 at 5.) To the extent that Magistrate Judge David E. Peebles suggested that failure to train was at issue in this case, (Dkt. No. 23 at 3), Gonzalez did not exhaust such a claim, (Dkt. No. 34 at 5). This is consistent with the fact that Gonzalez did not mention a failure to train anywhere in his

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 72 of 238

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

opposition, (*see generally* Dkt. No. 34), or in his statement of contested facts, (*see generally* Dkt. No. 39). Thus, to the extent that Gonzalez raised a failure to train claim in his complaint, the court grants summary judgment in favor of defendants on that claim as well. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (holding defendant entitled to summary judgment where plaintiff fails to come forth with evidence on an essential element of a claim for which plaintiff bears burden of proof).

*1. Request for Additional Religious Meals*

Defendants argue that despite filing a grievance requesting additional religious meals, Gonzalez never raised such a claim in his complaint. (Dkt. No. 30, Attach. 7 at 2 n.2.) Gonzalez did not respond to this argument in his opposition. (*See generally* Dkt. No. 34.) As defendants' argument is facially meritorious, Gonzalez's failure to respond is deemed as consent to summary judgment on this claim.[19] *See* N.D.N.Y. L.R. 7.1(b)(3); *Jackson v. Onondaga County*, 549 F. Supp. 2d 204, 222 (N.D.N.Y. 2008). Indeed, defendants' argument not only meets the modest burden of being facially meritorious, *see Jackson*, 549 F. Supp. 2d at 222, but it is also persuasive.[20]

[19]    Technically, defendants argue that because a claim regarding meals was never raised in the complaint, "[it] is not part of the lawsuit." (Dkt. No. 30, Attach. 7 at 2 n.2.) To the extent that such a claim is part of the lawsuit, the court construes defendants' argument as one for summary judgment.

[20]    It is seemingly an open question whether a *pro se* complaint should be treated liberally when a litigant subsequently becomes represented by counsel. *See Braphman-Bines v. N.Y.C. Police Dep't*, No. 03 Civ. 10207, 2005 WL 22843, at *2 (S.D.N.Y. Jan. 3, 2005). But the complaint never mentions meals, (Compl.), so even if construed "to raise the strongest claims that [it] suggest[s]," *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted), it is difficult to see how such a claim was raised. Moreover, Gonzalez's opposition—filed well after he obtained counsel—only briefly mentions his grievance regarding meals and makes no argument whatsoever regarding such a claim. (Dkt. No. 34 at 3, 5.) Gonzalez also failed to

set forth any facts regarding meals in either his response to defendants' statement of material facts, (Dkt. No. 38), or his own statement of contested facts, (Dkt. No. 39).

*2. Bead Strand Limitations*

**\*5**  "[A]lthough prisoners do not abandon their constitutional rights at the prison door, [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system[.]" *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks and citation omitted). Thus, "a challenged prison regulation is judged under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Id.* (internal quotation marks and citation omitted).[21]

> Courts must evaluate four factors in making the reasonableness determination: [1] whether the challenged regulation ... has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Id.* (internal footnote omitted).

[21]    An official action such as "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise." *Salahuddin*, 467 F.3d at 274 n.4.

"The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* at 274-75. "The defendants then bear the relatively limited burden of identifying the legitimate

2018 WL 1353101

penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these [articulated] concerns were irrational." *Id.* at 275 (internal quotation marks and citation omitted).

Although the Second Circuit has not decided whether the substantial burden test remains viable, *see Holland v. Goord, 758 F.3d 215, 220-21 (2d Cir. 2014),* here defendants do not contest that Gonzalez satisfies that threshold element. (Dkt. No. 30, Attach. 7 at 8-14.) Even assuming a substantial burden exists, however, limiting inmates in SHU to one bead strand is reasonably related to legitimate penological interests of security and safety by preventing possible suicides or other serious self-harm by inmates left alone under periodic observation twenty-three hours a day. (*Id.* at 9-10, 12-13.) The court accords defendants "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish, 441 U.S. 520, 547 (1979),* even in the context of claimed infringement on sincere religious belief, *see Jolly v. Coughlin, 76 F.3d 468, 475-76 (2d Cir. 1996).*

The second factor—whether prisoners have alternative means of exercising the burdened right—supports this reasonableness determination. Allowing one bead strand to be worn demonstrates that not all means of expression are denied. (Dkt. No. 30, Attach. 7 at 12); *see Williams v. Fisher, No. 9:11–CV–379, 2015 WL 1137644, at *27 (N.D.N.Y. Mar. 11, 2015)* (citing *O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987)*). The third factor also weighs in defendants' favor; a prisoner in SHU allowed to have multiple bead strands who committed suicide or self-harm would have serious consequences on prisoners (their health and safety), guards (increased tensions between guards and prisoners), and resources (increased burden on medical staff). (Dkt. No. 30, Attach. 7 at 12-13.) Finally, as for the fourth factor, "[t]he burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Hamilton v. Smith, No. 9:06–CV–0805, 2009 WL 3199520, at *6 (N.D.N.Y. Sept. 30, 2009)* (internal quotation marks and citation omitted). Gonzalez has not met that burden because he did not offer any alternatives, let alone any obvious, easy ones. (Dkt. No. 34 at 14-17.)

**\*6** Gonzalez does not provide any analysis of how the relevant factors show that the limitation is unreasonable. (*Id.*) Instead, he argues that defendants do not "explain the

difference in potential self-harm between permitting one strand of beads, as they do, and several strands of beads." (*Id.* at 17.) But this argument does not suffice to meet Gonzalez's burden to show that defendants' articulated concerns are irrational. *See Salahuddin, 467 F.3d at 275.* As explained above, defendants' safety and security concerns are rational, and one can readily imagine strands of beads tied together posing a higher risk than one strand of beads. Gonzalez's only other argument is that "a prisoner bent on self-harm and suicide already has more than what he needs to kill himself in the form of prison linens, such as bed sheets." (Dkt. No. 34 at 17.) Not only is this argument made out of whole cloth because it has no support in the factual record, but it is also unpersuasive because it fails to rebut defendants' analysis of the relevant factors.

As for the limitation of three bead strands in general population, Gonzalez did not contest the fact that he "was never in general population at Upstate [Correctional Facility] since he was always housed in SHU." (Defs.' SMF ¶ 6.) Gonzalez was not affected by the limitation and thus has no standing to claim that it violated his rights. *See Bordell v. Gen. Elec. Co., 922 F.2d 1057, 1059-61 (2d Cir. 1991); Smith v. Marchewka, 519 F. Supp. 897, 899 (N.D.N.Y. 1981).* [22]

[22]     Even if Gonzalez had standing, "the security concern ... that when an inmate wears more than three strands of beads, they cannot be concealed and a display of color[ed] beads may signal gang activity," (Dkt. No. 30, Attach. 7 at 9-10), is reasonably related to legitimate penological interests. *See Salahuddin, 467 F.3d at 274.* Contrary to Gonzalez's argument that three is an arbitrary number, (Dkt. No. 34 at 15-16), a religious review committee arrived at the limitation after discussion and a demonstration of how many bead strands could be concealed, (Dkt. No. 30, Attach. 6 at 24-27, 31). In any event, Gonzalez would not meet his burden of showing that defendants' articulated concerns are irrational, even if he had standing. *See Salahuddin, 467 F.3d at 275.*

*3. Shrine Restrictions and Matches/Lighter Grievance*
There is no dispute that Gonzalez was authorized to build a shrine under certain restrictions. (Defs.' SMF ¶¶ 17-19, 22, 29.) Those restrictions included that any shrine had to be limited in size, could not consist of food subject to spoilage, and could "not include any items which are contraband, can be used as a weapon[,] or constitute a threat to the safety and

Gonzalez v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 1353101

security of the facility." (Dkt. No. 30, Attach. 3 at 8.) Such restrictions are reasonably related to legitimate penological interests. *See Salahuddin,* 467 F.3d at 274. Defendants' analysis of the relevant factors is persuasive, (Dkt. No. 30, Attach. 7 at 13), especially in light of the court's mandate that it should not "substitute [its] judgment on ... difficult and sensitive matters of institutional administration ... for the determinations of those charged with the formidable task of running a prison." *O'Lone,* 482 U.S. at 353 (internal quotation marks and citation omitted). In opposition, Gonzalez fails to provide a counterargument or any analysis of the relevant factors and barely mentions his shrine claim. (Dkt. No. 34 at 5, 15.)

The court also agrees with defendants that prohibiting inmates from possessing matches or lighters is reasonably related to legitimate penological interests. *See Salahuddin,* 467 F.3d at 274. Again, the court finds defendants' analysis of the relevant factors persuasive. (Dkt. No. 30, Attach. 7 at 13-14.) And, as with his shrine claim, Gonzalez [23] offers no counterargument or analysis of the relevant factors. (*See generally* Dkt. No. 34.) Moreover, Gonzalez did not contest the fact that Adirondack Correctional Facility was granted waivers to prohibit matches and lighters. (Defs.' SMF ¶¶ 23, 30.) Despite that, Gonzalez confusingly argues that defendants "did not allege an affirmative defense regarding the waiver of the rules at [Adirondack Correctional Facility] ... because of the safety considerations of the facility" and thus this argument cannot be considered. (Dkt. No. 34 at 7 n.3.) But Gonzalez offers zero support for this proposition and does not explain why such a fact had to be alleged as an affirmative defense in order to be considered. [24]

[23]    The court reiterates that Gonzalez was represented when his opposition was filed and continues to have the benefit of counsel. (Dkt. Nos. 25, 34.)

[24]    Gonzalez also argues that the first time he learned of the waivers was in defendants' summary judgment memorandum. (Dkt. No. 34 at 15 n.7.) As an initial matter, that is incorrect, as the CORC decision explicitly informed Gonzalez that "the facility administration has been granted waivers prohibiting inmates from possessing matches or lighters." (Dkt. No. 30, Attach. 3 at 8.) Second, Gonzalez did not contest that fact or the fact that such waivers had been granted. (Defs.' SMF ¶¶ 23,

30.) In any event, the court fails to see the relevance of when Gonzalez learned of the waiver.

**\*7**  The court thus grants summary judgment on Gonzalez's First Amendment claims in defendants' favor.

## C. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. (Dkt. No. 30, Attach. 7 at 14-15.) However, their argument is generalized and conclusory. (*Id.*) With no explanation, defendants state that they "followed DOCCS['s] constitutional policies and acted reasonably at all times." (*Id.* at 15.) This is insufficient to demonstrate that it was reasonable for defendants to believe that their conduct did not violate Gonzalez's constitutional rights and that no rational jury could conclude otherwise. *See LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir. 1998). Even when officials follow an established prison policy, their entitlement to qualified immunity depends on whether a reasonable official might have believed that the challenged regulation was lawful in light of the legitimate penological interests supporting the regulation, which is something defendants fail to address. *See Barnes v. Furman,* 629 Fed.Appx. 52, 57 (2d Cir. 2015).

Moreover, regarding Gonzalez's equal protection claim— the only claim that survives the instant summary judgment motion—the court cannot say as a matter of law that it was objectively reasonable for defendants to believe that denying Gonzalez an accommodation afforded to Native Americans was constitutional. *See id.* at 56-57. And the equal protection rights of prisoners are clearly established. *See, e.g., Barnes v. Ross,* 926 F. Supp. 2d 499, 509-10 (S.D.N.Y. 2013); *Tavares v. Amato,* 954 F. Supp. 2d 79, 101 (N.D.N.Y. 2013). Defendants bear the burden of proof for their qualified immunity defense, *see Lore v. City of Syracuse,* 670 F.3d 127, 149 (2d Cir. 2012), a burden that their lip-service argument fails to meet.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   **DENIED** as to Gonzalez's equal protection claim (Compl. ¶¶ 42-45); and

   **GRANTED** in all other respects; and it is further

2018 WL 1353101

**ORDERED** that this case is now deemed trial ready and a trial scheduling order will be issued in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1353101

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 76 of 238

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

2017 WL 6466556
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

9:17-cv-00194 (TJM/TWD)
|
Signed 09/05/2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

Attorney General, Dept. of Law, The Capital, Albany, New York, pro se.

## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Kevin Damon Crichlow, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action by filing a complaint pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October 16, 2012. (Dkt. No. 2.) Plaintiff filed an amended complaint, the operative pleading, on June 17, 2013, seeking relief against more than 100 defendants. (Dkt. No. 12.) Plaintiff alleges violations of the First, Eighth, and Fourteenth Amendments, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), while confined at Downstate Correctional Facility ("Downstate"), Eastern New York Correctional Facility ("Eastern"), Auburn Correctional Facility ("Auburn") and Wende Correctional Facility ("Wende"). On April 28, 2015, the action was transferred to the Western District of New York. (Dkt. No. 168.) Thereafter, on February 21, 2017, Plaintiff's claims arising from his incarceration at Auburn and Eastern were transferred to this District. (Dkt. No. 225.) The Honorable Thomas J. McAvoy, Senior United States District Judge, has referred the matter to this Court for Report and

Recommendation pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c).

Presently before the Court is Defendants' motion for summary judgment in lieu of an answer pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 177.) Plaintiff has opposed the motion. (Dkt. No. 209.) Also before the Court is Plaintiff's motion for substitution of a party pursuant to Rule 25(a) of the Federal Rules of Civil Procedure. (Dkt. No. 231.) For the reasons explained below, it is recommended that the District Court grant summary judgment to all Defendants, including those who have not been named and/or served, and that Plaintiff's Rule 25(a) motion be denied as moot.

## I. PROCEDURAL HISTORY

Plaintiff's original complaint, comprising of 163 pages, was filed in the Southern District on October 16, 2012, against more than 100 defendants arising from his incarceration at four DOCCS facilities from 2008 through 2012. (Dkt. No. 2.) On March 19, 2013, Plaintiff was ordered to file an amended complaint that complied with Rules 8 and 10 of the Federal Rules of Civil Procedure. (Dkt. No. 6.) On June 17, 2013, Plaintiff filed an amended complaint seeking relief against 136 defendants, namely DOCCS employees and medical providers, arising from his confinement at Downstate, Auburn, Eastern, and Wende. (Dkt. No. 12.) On February 13, 2015, the Southern District Court *sua sponte* dismissed numerous defendants and ordered Plaintiff to show cause why the case should not be transferred to the Western District of New York. (Dkt. No. 164.) On April 28, 2015, the action was transferred to the Western District. (Dkt. No. 168.)

On November 20, 2015, Defendants filed a motion for summary judgment in lieu of an answer, arguing all claims were time-barred, unexhausted, vague, or due process claims that did not implicate a liberty interest. (Dkt. No. 177-5.) Plaintiff initially responded with an opposition totaling more than 900 pages with exhibits, and Defendants filed a reply. (Dkt Nos. 188 and 189.) Thereafter, Plaintiff was granted permission to file an amended opposition to Defendants' motion. (Dkt. Nos. 192 and 198.) Plaintiff filed his amended opposition, totaling more than 200 pages with exhibits. (Dkt. No. 209.) Defendants filed a reply to Plaintiff's amended opposition. (Dkt. No. 210.) Without obtaining permission from the Court, Plaintiff filed a sur-reply, along with numerous exhibits that it appears Plaintiff inadvertently failed to file with his amended opposition. (Dkt. No. 211.)

2017 WL 6466556

**\*2** On February 10, 2017, Western District Judge Elizabeth A. Wolford severed the action into three separate actions based upon the location where each claim allegedly arose, transferred those claims arising in the Southern and Northern Districts, and retained the claims arising in the Western District. (Dkt. No. 223. [1]) On February 21, 2017, Plaintiff's claims arising during his confinement at Auburn and Eastern were transferred to this District. (Dkt. No. 225.) On April 26, 2017, Senior Judge McAvoy severed and transferred all claims arising at Wende that were mistakenly transferred to this District back to the Western District, Case Number 6:15-CV-6252. (Dkt. No. 228.)

[1]     At the time of the severance and transfer, Judge Wolford noted that there were a number of pending motions, including Defendants' fully brief motion for summary judgment. (Dkt. No. 223 at 7-8.) Judge Wolford left the transferee courts in the Northern and Southern District to decide whether to grant the pending motions vis-à-vis those Defendants and claims transferred to each of them. *Id.*

Remaining Defendants in this action are Corrections Officer ("C.O.") Daniel Bauer, C.O. Christopher Clarke, Dr. Mikhail Gusman, RN Denise Falzon, Nurse II Ellenjane Aversano, Dr. Ann L. Andola, Lieutenant ("Lt.") Karl Simmons, Senior Counselor Thomas Briggs, C.O. Donielle Allison, C.O. Kevin Rosa, Counselor Ariel Escobar, C.O. Jill Friedman, C.O. Kelly Jamil, Captain Anthony Russo, Acting Superintendent Rosemarie Wendland, C.O. Jeffrey Brewer, C.O. Merrill Conner, Sergeant ("Sgt.") Daniel Parkhurst, C.O. Scott Navitsky, Lt. Edward Madison, D.M.D. Marlon K. Moore, C.O. Nathan Vevone, Sgt. Berndt J. Leifeld, Nurse LaPenna, and Dr. Jeffrey Arliss. (Dkt. No. 227.)

## II. BACKGROUND

### A. Plaintiff's Allegations

At all times relevant to this action, Plaintiff was incarcerated at Auburn and Eastern. (Dkt. Nos. 12, 223, and 225. [2]) Generally, Plaintiff alleges violations of his constitutional and statutory rights under the First, Eighth, and Fourteenth Amendments, the ADA, and Rehabilitation Act while confined at Auburn and Eastern from November 16, 2010, through February 16, 2012. (*See generally* Dkt. No. 12.) For a complete statement of Plaintiff's claims related to Auburn and Eastern, reference is made to Plaintiff's amended complaint.

[2]     Plaintiff's amended complaint spans 137 pages. (Dkt. No. 12.) Plaintiff's claims relating to Auburn and Eastern are set forth in Dkt. No. 12-1 at ¶¶ 71-147 and Dkt. No. 21-2 at ¶¶ 148-202.

#### 1. Auburn

On November 16, 2010, Plaintiff was transferred from Wende to Eastern. (Dkt. No. 12-1 at ¶ 71.) Plaintiff's transfer route stopped at Auburn for 72 hours. *Id.* While confined at Auburn, Plaintiff alleges he was verbally threatened and denied medical care. *Id.* Specifically, on November 19, 2010, at 8:00 a.m., while in the first floor transfer area Plaintiff was threatened by C.O. Clarke to "give up" his medical wrist brace "or get beat up." *Id.* C.O. Clark took Plaintiff's wrist brace, causing "more damages" to Plaintiff's wrist. *Id.* Plaintiff was without a wrist brace for approximately six weeks. *Id.*

#### 2. Eastern

##### a. Medical Indifference Claims

Plaintiff alleges inadequate or nonexistent medical care, and claims he was treated "unprofessionally" because of his race, ethnicity, weakened immune system, and hearing disability. *Id.* at ¶¶ 75-76. Specifically, in December 2010, Plaintiff alleges he was denied dental care, pain medication, and batteries for his hearing aid. *Id.* at ¶¶ 76-77. On December 13, 2010, Plaintiff was denied pain medication and emergency dental treatment. *Id.* at ¶ 77. Although x-rays revealed Plaintiff has two cavities in February 2011, and he was in extreme pain, Plaintiff was denied emergency extraction and was forced to wait several months for dental extractions. *Id.* at ¶ 101, 105. Plaintiff was also denied a "soft food diet or Ensure" even though he had difficulty eating. *Id.* at ¶ 103.

**\*3** On April 18, 2011, Dr. Arliss operated on Plaintiff's wrist at Foxhall Ambulatory Surgery Center, which took much longer than planned. *Id.* at ¶ 124. Thereafter, on August 3, 2011, "a pin came out of the bottom" of Plaintiff's right wrist. *Id.* at ¶ 152. Although Plaintiff was taken to the facility's hospital, Plaintiff claims he should have been transported immediately to Dr. Arliss. *Id.* Plaintiff alleges he was in extreme pain for over thirty-one hours and received inadequate and negligent medical care at the facility's hospital before he was transported to an outside facility to have Dr. Arliss remove the broken pin. *Id.*

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

On October 21, 2011, Plaintiff was denied medical treatment after a use of force incident. *Id.* at ¶ 194.

### b. Conditions of Confinement Claims

Plaintiff also brings conditions of confinement claims while confined to keeplock on the S.D.U. Block and in the Segregated Housing Unit ("SHU"). Plaintiff claims he was denied showers and recreation, laundry services and clean linen, special religious meals, personal hygiene products, fresh drinking and bathing water, commissary, and legal supplies. Plaintiff alleges senior officials were all aware and tolerated these unconstitutional practices by subordinate employees. *Id.* at ¶ 91.

Specifically, Plaintiff claims from January 12, 2011, through January 31, 2011, and from February 3, 2011, through February 5, 2011, while on keeplock, he was denied medical care, batteries for his hearing aids, recreation, showers, medical sick calls, and religious meals in retaliation for filing grievances against C.O. Jamil, C.O. Friedman, and C.O. Brewer. *Id.* at ¶¶ 81-84, 90-91, 140. On January 14, 2012, C.O. Friedman denied Plaintiff toilet paper and soap. *Id.* at ¶ 84. On January 24, 2011, and January 25, 2011, C.O. Allison denied Plaintiff outside exercise and fresh air because it was "to [sic] cold." *Id.* at ¶ 87. C.O. Friedman and C.O. Jamil routinely denied Plaintiff recreation if he attended a "medical call out" in retaliation for filing grievances against them. *Id.* at ¶¶ 113, 114.

On March 6, 2011, Plaintiff claims he was discriminated against due to his disability and was subject to inhumane conditions of keeplock confinement for fifty-eight days. *Id.* at ¶ 106. While keeplocked, Plaintiff claims he was denied laundry and clean linens "at least once a week" in violation of DOCCS Directives. *Id.* Plaintiff also was denied a "commissary buy sheet." *Id.* Plaintiff claims he was denied soap, shampoo, deodorant, stationary supplies, adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety. *Id.* at ¶ 107.

On March 3, 2011, C.O. Friedman told Plaintiff "if you go to a call out that would be considered your keeplock rec." *Id.* at ¶ 113. On March 7, 2011, C.O. Friedman refused to let Plaintiff wash his laundry or change his sheets on his "meds run." *Id.* at ¶ 108. On March 25, 2011, after attending a medical call out, C.O. Friedman denied Plaintiff recreation and told Plaintiff

that his "medical call out" was his "keeplock rec." *Id.* at ¶ 114. Plaintiff claims he was denied recreation in retaliation for filing grievances. *Id.* Plaintiff also claims he was "always" denied outdoor exercise and fresh air. *Id.* at ¶ 113.

On April 14, 2011, Plaintiff claims Defendant C.O. Brewer threatened to extend his keeplock because he requested to speak to the block sergeant about his housing conditions. *Id.* at 123. Plaintiff claims he was denied packages on May 16, 2011. *Id.* at ¶¶ 133-34. On July 27, 2011, Plaintiff claims he was deprived of fresh drinking water. *Id.* at ¶ 141.

From July 28, 2011, through November 13, 2011, Plaintiff was subjected to excessive noise from other inmates yelling and "banging" in their cells. *Id.* at ¶ 147. Throughout September 2011, Plaintiff alleges he was exposed to "infectious diseases" and forced to live in unsanitary and unhygienic conditions with rusty brown water. *Id.* at 175. Due to a maintenance error, Plaintiff's cell flooded on October 6, 2011. *Id.* at ¶ 184.

**\*4** Regarding his food, Plaintiff alleges C.O. Jamil and C.O. Friedman "tampered" with his religious meals and deprived Plaintiff of adequate nutrition by failing to provide Plaintiff with the carton of milk included with his meals. *Id.* at ¶ 114. Further, while confined to keeplock, C.O. Friedman and C.O. Jamil would often delay his first meal by over two hours. *Id.* at ¶ 85. On May 24, 2011, C.O. Friedman and C.O. Jamil deprived Plaintiff of his "Jewish kosher breakfast." *Id.* at ¶ 131. That same day, Plaintiff was deprived commissary and was not provided with toothpaste, deodorant, soap, shampoo, and legal postage. *Id.* at ¶ 132. Throughout September and October of 2011, Plaintiff also claims he was given the "wrong food" on numerous occasions and therefore was deprived of his religious meals. *Id.* at ¶¶ 177, 178, 180. Plaintiff was denied Jewish food and commissary on October 4, 2011 and October 5, 2011. *Id.* at ¶ 183.

### c. Excessive Force Claims

Plaintiff alleges he was subjected to excessive force on October 21, 2011. *Id.* at ¶¶ 188-91. At approximately 3:30 p.m., on the way to the evening "meds run," C.O. Navitsky asked Plaintiff for his identification care and medical card. *Id.* at ¶¶ 187-88. Plaintiff explained that he did not have a medical card because he had only been released from the SHU a few hours prior. *Id.* at ¶ 188. C.O. Navitsky instructed Plaintiff to "sit the fuck down." *Id.* Plaintiff waited for approximately

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

fifteen minutes and then requested to return to his housing unit. *Id.* C.O. Navitsky stated in a very loud voice, "what are you fucking dumb or are you deaf too[?]" *Id.* Plaintiff sat back down. *Id.* Ten minutes later, Plaintiff told C.O. Navitsky he was going to miss evening chow. *Id.* C.O. Navitsky stated, "I'm going to fucking kill you." *Id.* at ¶ 189. C.O. Navitsky left the area and returned with a "black hammer mallet." *Id.* at ¶¶ 189-90. Thereafter, C.O. Navitsky struck Plaintiff with a "black hammer mallet" and C.O. Wilson punched Plaintiff on the right side of his head. *Id.* at ¶ 190; Dkt. No. 12 at ¶ 5. Plaintiff states he was hit on the right side of his head, body, hand, and hip (Dkt. No. 12-1 at ¶ 190.) After the assault, C.O. Navitsky and C.O. Wilson started screaming, ran into the control room, and pressed a button. *Id.* A response team arrived and Plaintiff was escorted to his cell, and approximately two hours later, to the SHU. *Id.* at ¶ 191. The next day, Plaintiff was issued an inmate misbehavior report, charging Plaintiff with violet conduct, harassment, refusing a direct order, threat, being out of place, and noncompliance. *Id.*

### d. Due Process Claims

Plaintiff also raises Fourteenth Amendment due process claims. *Id.* at ¶¶ 77-80, 86, 89, 100, 117, 119, 120, 161-66, 193. Plaintiff claims his due process rights were violated when he was denied witnesses during disciplinary hearings and sentenced to keeplock and subjected inhumane conditions of confinement. *Id.* at ¶¶ 77-80. On January 12, 2011, Plaintiff alleges he was denied witnesses that would have proven his innocence. *Id.* at ¶ 86. On February 11, 2011, during a Tier II disciplinary hearing, Lt. Simmons sentenced Plaintiff to 60 days of keeplock for refusing his programs even though the maximum penalty was 30 days under DOCCS directive. *Id.* at ¶ 89.

On February 24, 2011, Plaintiff was sentenced to "30 more days" without due process after being found guilty of "obstruction." *Id.* On April 1, 2011, Lt. Simmons denied Plaintiff an inmate witness, and sentenced Plaintiff to an additional 30 days of keeplock for contraband. *Id.* at ¶ 117. During the April 1, 2011, disciplinary hearing, Plaintiff told Lt. Simmons he was being denied packages and was "not getting" showers, commissary, and recreation. *Id.* On April 2, 2011, Lt. Simmons found Plaintiff guilty of refusing a direct order, and added 30 days of keeplock. *Id.* at ¶ 120. Lt. Simmons told Plaintiff that DOCCS was getting "rich" from

all of the $5.00 surcharges related to Plaintiff's misbehavior reports. *Id.*

**\*5** On August 6, 2011, while housed in the medical clinic following his wrist surgery, Plaintiff was summoned to a disciplinary hearing even though he had not been issued an inmate misbehavior report twenty-four hours in advance. *Id.* at ¶ 161. At the hearing, Lt. Madison provided Plaintiff with a copy of a false July 27, 2011, inmate misbehavior report. *Id.* at ¶¶ 161-62. Lt. Madison threatened Plaintiff with physical harm for objecting to the late notice. *Id.* at ¶¶ 163-64. During the hearing, Plaintiff was denied a witnesses and was found guilty of DOCCS violation 102.10 (threats). *Id.* at ¶ 164. Plaintiff was sentenced to 120 days in the SHU with a corresponding loss of privileges. *Id.* at ¶ 165.

On November 12, 2011, at the disciplinary hearing related to the October 22, 2011, use of force incident, Plaintiff was found guilty of "being out of place." *Id.* at ¶ 193. Plaintiff alleges the involved parties conspired to cover up the use of force incident, thereby depriving Plaintiff of his due process rights. *Id.*

### e. Access to Courts

Plaintiff also claims he was denied the opportunity to access the courts. On March 29, 2011, C.O. Vevone searched Plaintiff's cell for over three hours, while making sexual and derogatory comments to Plaintiff. *Id.* at ¶ 110. During this search, C.O. Vevone found a *blueprint* of Eastern, which was an exhibit to Plaintiff's *coram nobis* petition. *Id.* at ¶¶ 110-11. Plaintiff was charged with "contraband" and denied his exhibit. *Id.*

On or about November 10, 2011, while confined in the SHU, Plaintiff gave unknown officers legal mail to be sent to the Southern District, in Action No. 11 Civ. 833. *Id.* at ¶ 197. Instead of mailing Plaintiff's legal documents to the Southern District, DOCCS destroyed his amended pleading. *Id.* at ¶ 198.

### f. Reasonable Accommodation Claims

Plaintiff argues Defendants failed to provide reasonable accommodations for his hearing disability. Plaintiff alleges on December 13, 2010, Nurse Aversano denied Plaintiff batteries for his hearing aids, thereby forcing Plaintiff to "get

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 80 of 238

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

batteries from other inmates." *Id.* at ¶ 77. From April 18, 2011, through April 25, 2011, C.O. Jamil, C.O. Brewer, and C.O. Friedman refused to escort Plaintiff to the package room, thereby denying Plaintiff two packages containing reading material for his "reasonable accommodation" to learn sign language. *Id.* at ¶ 127. On August 8, 2011, Plaintiff was deprived of a typewriter, even though he was issued a permit. *Id.* at ¶ 135. Plaintiff also alleges he was denied his "shake awake" alarm and batteries for his hearing aid while he was recovering from his second wrist surgery. *Id.* at ¶ 159.

### g. Retaliation and Conspiracy Claims

Plaintiff alleges all of the above conduct was in retaliation for filing grievances and lawsuits. *Id.* at ¶ 166. Plaintiff also alleges Defendants conspired to cover up evidence of the above conduct. *Id.* at ¶ 112. Lastly, Plaintiff alleges he was transferred from Eastern to Wende on February 16, 2012, in retaliation for filing grievances. *Id.* at ¶ 166.

### B. Parties' Briefing on Defendants' Motion for Summary Judgment

In their pre-answer motion for summary judgment, Defendants maintain that Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 177-5 at 4-6. [3]) In that regard, Defendants argue Plaintiff only exhausted a single grievance relevant to this action. *Id.* In that grievance, Plaintiff complained of the conditions of his keeplock confinement at Eastern, stating he was being denied laundry, soap, shampoo, deodorant, and writing papers. *Id.* at 6-7. Defendants contend such claims do not give rise to an Eighth Amendment conditions of confinement claim. *Id.* Defendants also contend Plaintiff's generalized allegations in that grievance, to the effect that he faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care, and security while keeplocked, failed to provide Defendants with enough information to rectify the problem at the administrative level, and therefore, is also unexhausted. *Id.* at 7.

[3]   Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

**\*6**  In his opposition to Defendants' motion, Plaintiff claims, among other things, that he exhausted his administrative remedies by filing over 300 grievances and by complaining

to supervisory prison officials and Commissioner Fischer. (Dkt. Nos. 209-3 at 7 and 211 at 1.) Plaintiff further argues his grievances and appeals were lost, destroyed, or ignored by prison officials and DOCCS. *Id.* As to his conditions of confinement claim, Plaintiff explains he had been keeplocked for fifty-eight days and was deprived of his "basic human needs," such as showers and recreation. (Dkt. No. 209-2 at 21.)

### III. LEGAL STANDARD

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred." *Crichlow v. Goord*, No. 6:15-cv-06252 EAW, 2017 WL 920753, at \*3 (W.D.N.Y. Mar. 7, 2017 [4]) (citing *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 206 (2d Cir. 2003)).

[4]   Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

2017 WL 6466556

"To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard

**\*7** Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This rule applies to an inmate's constitutional claims, as well as claims under the ADA and Rehabilitation Act. *Carlson v. Parry*, No. 06-CV-6621P, 2012 WL 1067866, at \*12 (W.D.N.Y. Mar. 29, 2012) (ADA and Rehabilitation Act claims "must be exhausted administratively prior to raising them in federal court"); *Carrasquillo v. City of N.Y.*, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004) (ADA and Rehabilitation Act claims "fall within the rubric of 'any other federal law.' ").

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent.[5] *Id.* § 701.8. The superintendent is required to initiate an in-house

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d). A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id.* § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

5      Section 701.8 has been found applicable to claims of excessive force. *See, e.g.*, *Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

**\*8** If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 U.S. at 93.

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at \*4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at \*6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

Whether a plaintiff has exhausted his administrative remedies is a question of law. *Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999). Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer. *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at \*5 (W.D.N.Y. Mar. 7, 2017) (citing *Mckinney v. Prack*, 170 F. Supp. 3d 510, 514 (W.D.N.Y. 2016) (granting a motion for summary judgment made in lieu of an answer where inmate failed to exhaust administrative remedies)); *see also Crichlow v. Crowley*, No. 13-CV-6624 CJS, 2015 WL 1808626, at \*6-7 (W.D.N.Y. Apr. 21, 2015) (same); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (same).

### 2. Analysis

Defendants contend summary judgment should be granted because Plaintiff failed to comply with the administrative exhaustion requirement of the PLRA. (Dkt. No. 177-5 at 4-7.) In support of their motion, Defendants have submitted the declaration of Jeffery Hale, Assistant Director of DOCCS IGP. (Dkt. No. 177-3.) In that capacity, Hale is a custodian of the records maintained by CORC. *Id.* at ¶ 1. The CORC computer database contains records of all appeals received from the facility IGP offices and which were heard and decided by CORC since 1990. *Id.* at 2. These grievances are referred to as "exhausted." *Id.*

Hale declares that he has reviewed the records for all grievances appealed to CORC by Plaintiff from his incarceration in 2008, through commencement of this action in October 2012. *Id.* at ¶¶ 3-4. In total, Plaintiff exhausted twenty-seven grievances to CORC, only one of which is relevant to this action. *See id.* at 5-7.

On March 14, 2011, Plaintiff filed a six-page grievance dated March 6, 2011, assigned Grievance No. ECF-24381-11:

I'VE BEEN ON KEEPLOCK FOR 58 DAYS I'M BEING DISCRIMINATED AGAINST CAUSE OF MY HARD HEARING HL20 HEARING LOSS DEPRIVED OF THE OPPORTUNTIY FOR LAUNDRY SERVICES ALSO TO PROVIDE CLEAN CHANGE OF CLOTHING OR SHEETS AT LEAST ONCE A WEEK IN ACCORDANCE WITH ITS OWN DOCS ALSO COMMISARY BUYSHEET FOR KEEP LOCK INMATES NO SOAP SHAMPOO OR DEODORANT OR LEGAL PAD OR PENS TO DO LAW WORK ALSO STAMPS, AND HAD INSUFFICIENT HEALTH & HYGIENE SUPPLIES, I CRICHLOW WAS DEPRIVED OF THESE BASIC HUMAN NECESSITIES. AND ITS EFFECTS INCLUDING INADQEUATE NUTRITION, CLOTHING, SHELTER, SANITATION, MEDICAL CARE, AND PERSONAL SAFETY, AND CAUSE GENUINE DEPRATION AND HARDSHIP OVER AN EXTENDED PERIORD OF TIME. FOR I, CRICHLOW, SUCH HARSH CONDITIONS & RESTRICTIONS ARE INCOMPATIBLE WITH CONTEMPROARY STANDARDS OF DECENCY, CAUSE WANTON AND UNNECESSARY INFLICTION OF PAIN, AND ARE NOT REASONABLY RELATED TO ANY LEGITIMATE PENOLOGICAL OBJECTIVES. AS A

RESULT OF THE FORGOING, I, CRICHLOW OF B-3-32-25 S.D.U., WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT IN VIOALTION OF THE EIGHTH AMENDMENT AND FORTHEENTH AMDNENDMNT. ALSO IN VIOLATION OF THE F.R.A. 1973 & A.D.A. OF 1990.

**\*9** ALSO TODAY OFFICER FREEMAN REFUSED TO LET ME WASH CLOTHING 3,7,2011 OR CHANGE MY SHEET THIS BEEN GOING ON FOR OVER 2 WEEKS BY OFFICERS WORKING 7 TO 3 TOUR IN S.D.U., THE EFFECT OF ALL ABOVE THESE DEPRIVATIONS WAS ONLY COMPOUNDED, BY THE UNSANITARY LIVING CONDITIONS ALSO VERY UNHEALTHY TO ME WITH MY FRAGILE HEALTH CONDITION.

I KNOW NEXT 7 TO 3 FEMALE OFFICERS ARE GOING TO SAY I TRY TO BRUTAL ATTACKS THEM OR PUT A GUN IN MY CELL OR SET ME UP. ALSO MIGHT SAY I'LL THREATING HER SO I BE PUT IN S.H.U. ALSO ON 3,8,2011 I TALK TO DEPUTY ABOUT NOT GETTING NONE OF THE ABOVE TIME 10:00 AM ALSO ABOUT OFFICER FREEMAN.

(Dkt. No. 177-4 at 12-17 (original unaltered text).)

On April 8, 2011, the Superintendent found "no merit" to Plaintiff's grievance:

> Grievant alleges harassment by security staff regarding his clothing, laundry, medical, and toiletries. The involved staff have taken the appropriate steps to explain how keeplocked inmates receive services including recreation, medical, laundry, etc. The grievant has failed to follow staff direction. As a result, the grievant has misbehavior reports pending resolution. Grievant must follow staff direction. Staff direction should not be viewed as harassment. Grievance has no merit."

*Id.* at 18.

In his appeal statement to CORC, Plaintiff alleged: "OFFICER FREEMAN & OFFICER JAHMEL ARE NOT LET ME OUT FOR SHOWER OR RECRECATION AND WHEN I GO TO MEDS RUN THEY SAYING THAT MY REC AND SHOWER." *Id.* (original unaltered text).

On June 15, 2011, CORC upheld the Superintendent's decision for the reasons stated. *Id.* at 9. In addition:

> CORC notes that that the facility administration has conducted a proper investigation, and that sufficient evidence has not been presented to substantiate that the grievant was denied appropriate hygiene items, medical treatment, meals, or laundry services. CORC notes that keeplock inmates are permitted to purchase soap, shampoo, deodorant and stamps from the commissary. Further, CO F ... indicates that she observed the grievant several times attempting to wash his clothing in the slop sink on the way to medication. CORC notes that in accordance with facility P&P 639 Section VI.B.1. laundry services for B/3 are conducted on Wednesday mornings. CORC advises him to follow facility P&P regarding laundry procedures in order to avoid future similar difficulties. ... With respect to the grievant's appeal, CORC asserts that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level.

*Id.*

As such, Defendants seek summary judgment on all claims that were not raised in Grievance No. ECF-24381-11. (Dkt. No. 177-5 at 4-6.)

In his opposition, Plaintiff claims he has filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (Dkt. No. 209-3 at 8.) Plaintiff misunderstands the exhaustion requirement. The

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 84 of 238

2017 WL 6466556

filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. *See Woodford, 548 U.S. at 93.* "Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under the PLRA." *See Crichlow v. Fischer,* 2017 WL 920753, at 5.

Plaintiff has also suggested alternative means to exhaust administrative remedies, all of which have been previously rejected by the Western District. *Crichlow v. Crowley,* 2015 WL 1808626, at \*5-6 (granting summary judgment and dismissing Plaintiff's First, Eighth, and Fourteenth Amendment claims, and ADA and Rehabilitation Act claims without prejudice for failure to exhaust administrative remedies). For example, Plaintiff argues that his claims should be deemed exhausted when the Inspector General "takes over" and investigates a claim. (Dkt. No. 209-3 at 9.) Plaintiff also claims he exhausted his administrative remedies by "filing outside grievances" and complaining to Commissioner Fischer, wardens, and senior staff. *Id.* at 7. Lastly, Plaintiff contends inmates do not have to exhaust "favorable" determinations to CORC. *Id.* at 44. The Court also finds Plaintiff's contentions to be meritless.

**\*10** Indeed, "the law is clear that prisoners 'cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints to prison staff.' " *Khudan v. Lee,* No. 12-cv-8147 (RJS), 2016 WL 4735364, at \*5 (S.D.N.Y. Sept. 8, 2016) (quoting *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir. 2007)); *see also Rodriguez v. Cross,* No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at \*4 (N.D.N.Y. May 9, 2017) ("such correspondence does not satisfy exhaustion and falls outside of the grievance procedures."). Furthermore, contrary to Plaintiff's contention, an investigation conducted by the Inspector General regarding an inmate's claim does not exhaust nor excuse the inmate from exhausting his grievance to CORC. *See Dabney v. Pegano,* 604 Fed.Appx. 1, 4 (2d Cir. 2015) ("The [Inspector General's] of [the inmate's] claims does not constitute such a special circumstance [excusing exhaustion].").

Based upon the foregoing, the Court finds Defendants have adequately supported the affirmative defense of non-exhaustion as to all claims not addressed in Grievance No. ECF-24381-11. However, as recognized by the Supreme Court in *Ross v. Blake,* a finding of failure to exhaust does not end a court's exhaustion review because "the PLRA contains its own, textual exception to mandatory exhaustion." *Ross v. Blake,* 136 S. Ct. 1850, 1588 (2016). [6]

6    Not long after the parties filed their briefs, the Supreme Court rejected the "special circumstances" exception to mandatory exhaustion applied by many circuits and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross,* 136 S. Ct. 1850, 1862 ("mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion"); *see also Williams v. Priatno,* 829 F.3d 118, 123 (2d Cir. 2016) (*Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004) and *Giano v. Goord,* 380 F.3d 670 (2d Cir. 2004) have been abrogated by *Ross* to the extent those decisions established the "special circumstances" exception from the exhaustion of administrative remedies requirement in the PLRA). As the Second Circuit explained in *Williams,* "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams,* 829 F.3d at 123.

Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Thus, courts are tasked with determining whether or not a prisoner's administrative remedies are, in fact, "available." The Supreme Court found the ordinary meaning of the word "available" to be " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " *Id.* (quoting *Booth v. Churner,* 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.' " *Id.* at 1859 (citation omitted).

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." [7] *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, an administrative remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

7        In a footnote in *Williams*, the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of the case." 829 F.3d 118, 123 n.2. Because the same three circumstances were relevant to the PLRA exhaustion issue in *Williams*, the Second Circuit did not "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Id.*

**\*11** In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for all claims not addressed in Grievance No. ECF-24381-11, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. No. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); *see also* Dkt. No. 211 at 1.) Western District Judge Wolford rejected this argument in Case No. 6:15-CV-06252, finding that "Plaintiff's wholly conclusory and unsupported allegation that grievances are tampered with at Wende do not create a material issue of fact in this case." *Crichlow v. Fischer*, 2017 WL 920753, at \*6 (quoting *Mims v. Yehl*, Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at \*4 (W.D.N.Y. Sept. 22, 2014)). This Court also finds that Plaintiff's general claim of grievance tampering at Eastern fails to create a material issue of fact in this action.

Indeed, "[c]ourts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriguez v. Cross*, 2017 WL 2791063, at \*7 (citing *Khudan*, 2016 WL 4735364, at \*6 (citations omitted) (holding under *Ross*, mere "stand alone" accusations that prison officials routinely interfered with his attempts to file grievances are "insufficient" to withstand summary judgment)); *see also Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where the plaintiff claimed prison officers misplaced his grievances but offered no evidence to support his contention) (citing *Nunez v. Goord*, 172 F. Supp. 2d 417, 428 (S.D.N.Y. 2001) (inmate's unsupported claims that his grievances were lost or destroyed

by officers thereby rendering his attempts to grieve futile, fails to excuse inmate from fully grieving remedies)); *Rosado v. Fessetto*, No. 9:09-cv-67 (DNH)(ATB), 2010 WL 3808813, at \*7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010).

In his sur-reply, Plaintiff claims in conclusory fashion that Captain Russo and Acting Superintendent Wendland "conspired" with other staff at Eastern to "destroy" Grievance Nos. ECF-242710-10, ECF-24275-10, ECF-24281-10, and ECF-24287-10, so as to "cover-up their own misconduct." (Dkt. No. 211 at 19.) Plaintiff speculates that because only one grievance was appealed to CORC while he was confined at Eastern (ECF-24381-11), all of his grievances must have been destroyed by DOCCS. However, as set forth above, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer*, 156 F.3d at 400.

Plaintiff has also challenged the veracity of Hale's declaration. (Dkt. No. 209-3 at 8, 16-17.) Specifically, Plaintiff contends Hale's declaration is "inadequate" because several grievances are "missing" from CORC's records and thus omitted from Hale's declaration and attached exhibits, including Grievance Nos. ECF-24713-11, ECF-24515-11, ECF-24607-11, ECF-24622-11 and ECF-24782-11. (Dkt. No. 209-3 at 8.) However, as set forth in Hale's declaration, "[t]he CORC computer database contains records of all appeals received from the facility Inmate Grievance Program Officers *and* which were heard and decided by CORC since 1990. (Dkt. No. 177-3 at ¶ 2 (emphasis added).) The five grievances Plaintiff claims were omitted from Hale's declaration do not bear the Grievance Clerk's Signature. (*See* Dkt. No. 211-1 at 18, 27, 28, 29, 30.)

Lastly, to the extent Plaintiff relies on *Hemphill* and *Giano* to argue "special circumstances" justify and excuse his failure to comply with the exhaustion requirement (*see* Dkt. No. 211 at 4), "that avenue has been foreclosed." *Riles v. Buchanan*, 656 Fed.Appx. 577, 581 (2d Cir. 2016).

**\*12** Based upon the forgoing, the Court finds Plaintiff exhausted a single grievance before commencing this action. Therefore, the Court recommends granting Defendants' motion for summary judgment on all claims not addressed in ECF-24381-11 for failure to exhaust administrative remedies.

2017 WL 6466556

**B. Grievance No. ECF-24381-11**

Defendants also seek summary judgment on Plaintiff's claims addressed in ECF-2431-11, which pertain to the conditions of Plaintiff's keeplock confinement. (Dkt. No. 177-55 at 6-7.) As an initial matter, Defendants contend that Plaintiff's exhausted claims of being denied laundry, soap, shampoo, deodorant, and writing paper while in keeplock do not give rise to an Eighth Amendment claim. *Id.* Defendants further argue that Plaintiff's generalized allegations, to the effect that he faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care, and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted those claims associated with Plaintiff's keeplock confinement. *Id.* In response to Defendants' motion, Plaintiff claims he was "deprived of basic human necessities." (Dkt. No. 210-2 at 21.)

**1. Conditions of Confinement**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

The required culpable state of mind of the prison official is one of deliberate indifference. *Farmer*, 511 U.S. at 834; *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The prison official must know that the inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847).

The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal citation and quotation omitted). However, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

**2. Analysis**

**\*13** Plaintiff alleges while keeplocked for fifty-eight days, he was subjected to conditions in violation of the Eighth Amendment. (Dkt. No. 12-1 at ¶ 106-07. [8] ) Specifically, Plaintiff claims he was denied laundry, soap, shampoo, deodorant, and stationary supplies such as writing paper, and pens. *Id.* Such claims do not give rise to an Eighth Amendment claim. *See, e.g., Chavis v. Kienert*, No. 9:03-CV-0039 (FJS/RFT), 2005 WL 2452150, at \*21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety); *Thomas v. Smith*, 559 F. Supp. 223, 224 (W.D.N.Y. 1983) (denial of basic hygiene items such as deodorant, soap, shampoo while confined in disciplinary segregation dismissed as frivolous); *see also Trammell v. Keane*, 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.' " (quoting *Farmer*, 511 U.S. at 837)); *Fernandez v. Armstrong*, No. 3:02-CV-2252, 2005 WL 733664, at \*5 (D. Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted)). *McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); *Chavis v. Fairman*, No. 94-1503, 1995 WL 156599, at \*5 (7th Cir. Apr. 6, 1995) (no Eighth Amendment violation where inmate was forced to wear same uniform for three weeks).

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 87 of 238

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6466556

8    Defendants also argue that facility records show that on March 6, 2011, Plaintiff was a mere "three weeks into serving a 30-day keeplock sentence, which had begun on February 11, 2011." (Dkt. No. 177-5 at 6; *see* Dkt. No. 177-4 at 8.) In his opposition, Plaintiff explains that he had been keeplocked since January 11, 2011. (Dkt. No. 209-3 at 9-10.) In this instance, each position is supported by the record evidence. (*See* Dkt. No. 177-4 at 7.) Plaintiff's inmate disciplinary record indicates Plaintiff was keeplocked from January 11, 2011, through May 11, 2011, for various infractions. (Dkt. No. 177-4 at 8.) On March 6, 2011, Plaintiff was in the midst of serving a 30-day keeplock sentence, which he served from February 11, 2011 to March 13, 2011. *Id.*

Furthermore, to the extent Plaintiff relies on alleged violations of DOCCS regulations regarding laundry services and commissary buy sheets, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases).

In his opposition, Plaintiff claims he "was not getting commissary" at all. (Dkt. No. 209-3 at 11.) However, as Defendants correctly note, the record evidence demonstrates loss of commissary was part of Plaintiff's disciplinary sentences. (*See* Dkt. No. 177-4.)

Regarding Plaintiff's general allegation of being deprived of adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety while keeplocked, Defendants challenge whether Grievance No. ECF-24381-11 is sufficient on its face to exhaust Plaintiff's administrative remedies. (Dkt. No. 177-5 at 6-7.)

Second Circuit case law is clear that the grievance standard is similar to notice pleading in that a grievance "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004). Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.[9] *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Thus, "a prisoner must allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information

about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.' " *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

9    New York regulations provide that "[i]n addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, *i.e.*, specific persons/areas contacted and responses received." 7 N.Y.C.R.R. § 701.5(a)(2).

**\*14** Furthermore, the plaintiff's claim and grievance must be predicated on the same injury. *Rentas v. Nason*, No. 09-cv-5528, 2010 WL 3734086, at \*1 (S.D.N.Y. Sept. 22, 2010); *see Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance.").

In this instance, Defendants contend Plaintiff's generalized allegations in Grievance No. ECF-24381-11, to the effect that Plaintiff faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted the claims associated with Plaintiff's keeplock confinement. (Dkt. No. 177-5 at 6-7.) Although the Court tends to agree with Defendants, the decisions issued by the Superintendent and CORC suggest Plaintiff's grievance provided enough information to investigate and conduct a proper investigation regarding "hygiene items, medical treatment, meals, or laundry services" while keeplocked. (Dkt. No. 177-3 at 9, 18.)

Regardless, upon a thorough review of Plaintiff's amended complaint and opposition papers, the Court finds Plaintiff's alleged deprivations of adequate nutrition, clothing, shelter, medical care, do not meet, neither singularly nor collectively, the objective standard of the Eighth Amendment. Simply put, "the Constitutional does not require comfortable prison conditions." *Walker*, 717 F.3d at 125.

As to his alleged denial of medical care, Plaintiff's allegations are belied by his claims. (*See* Dkt. No. 12-1 at ¶¶ 106-07.)

2017 WL 6466556

Throughout his keeplock confinement, Plaintiff states he attended sick calls, received emergency dental services and pain medication, and had wrist surgery and follow-up care appointments. Specifically, the day after he was confined to keeplock, Plaintiff went to a medical call on January 12, 2011. *Id.* at ¶ 80. Thereafter, Plaintiff "went to emergency dental" on February 27, 2011, and claims to have been to "emergency dental" over "10 times" and "also emergency sick call over 8 times." *Id.* at ¶ 101. On March 1, 2011, Plaintiff again went to "emergency dental" and received antibiotics. *Id.* at ¶ 105. Plaintiff attended medical call out on March 7, 2011, March 24, 2011, March 25, 2011, April 9, 2011, and April 14, 2011. *Id.* at ¶¶ 108, 121, 128. Furthermore, on April 18, 2011, Plaintiff was transported to Foxhall Ambulatory Surgery Center for wrist surgery performed by Dr. Arliss. *Id.* at ¶ 124. Plaintiff received medical services on April 29, 2011, and follow-up care with Dr. Arliss on May 2, 2011. *Id.* at ¶ 129-30. Plaintiff received medication on May 24, 2011. *Id.* at ¶ 131.

Regarding inadequate nutrition, the "limited denial of food ... while on keeplock confinement does not rise to the level of cruel and inhuman punishment." *Barclay v. New York*, 477 F. Supp. 2d 546, 554 (N.D.N.Y. 2007) (being denied food for two or three days for a messhall violation did not constitutional a constitutional violation). At most, Plaintiff alleges meals were withheld on an isolated basis. "[S]uch conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance." *Cruz v. Church*, No. 05-CV-1067, 2008 WL 4891165, at *12 (N.D.N.Y. Nov. 10, 2008). While Plaintiff complains on January 11, 2011, January 12, 2011, and January 14, 2011, that he was provided with "general population" food instead of his "special Jewish diet," Plaintiff has not alleged a total deprivation of food for an extended period of time. Further as discussed above, Plaintiff's claims regarding religious meals were not exhausted. *Id.* at ¶ 84.

**\*15** Plaintiff also maintains he was regularly denied recreation and showers while keeplocked. [10] Specifically, Plaintiff claims he was denied outdoor exercise and fresh air on January 24, 2011, and January 25, 2011, because C.O. Allison said it was "to [sic] cold" even though general population was permitted in the "yard." *Id.* at ¶ 87. On February 3, 4, and 5, 2011, Plaintiff claims he was denied recreation and shower. *Id.* at ¶ 91. Plaintiff claims he was denied recreation and showers on February 8, 9, 11, and 13, 2011. *Id.* at ¶ 92. Plaintiff claims he was denied recreation on March 7, 2011, March 24, 2011, March 25, 2011, April 9,

2011, and April 14, 2011, because he attended medical call out. *Id.* at ¶¶ 108, 121, 128.

[10]   The Court finds that inasmuch as Plaintiff claimed he was deprived of recreation and showers for the first time in his appeal statement to CORC, such claims are also unexhausted. (Dkt. No. 177-3 at 12-18.)

Even if these claims were exhausted, a conditions of confinement claim concerning the denial of showers rises to the level of an Eighth Amendment violation only "when such a denial deprives the prisoner of basic human needs." *Dillon v. City of New York*, No. 12 Civ. 7112(LAP), 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)). As such, "courts are reluctant to consider the temporary deprivation of showers a constitutional violation." *Id.*; *see, e.g.*, *Myers v. City of N.Y.*, No. 11 Civ. 8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (temporary deprivations of personal hygiene do not deny plaintiff basic human needs and thus are not constitutional violations). Specifically, the denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim. *See McCoy*, 255 F. Supp. 2d at 260 (a two-week suspension of shower privileges does not rise to the level of an Eighth Amendment violation); *Cruz v. Jackson*, No. 94 Civ. 2600(RWS), 1997 WL 45348, at *6 (S.D.N.Y. Feb. 5, 1997) (same).

As to his alleged denial of outdoor exercise and recreation, such claims also fall short of the Eighth Amendment standard. *See, e.g.*, *Barnes v. Craft*, No. 04-CV-1269, 2008 WL 3884369, at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation."); *Gibson v. City of N.Y.*, 96 Civ. 3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days," not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment). Indeed, "an occasional day without exercise when weather conditions preclude outdoor activities ... is not cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 32, 36 (2d Cir. 1985).

Even considering the totality of Plaintiff's alleged conditions while keeplocked, such claims still fall far short of the

2017 WL 6466556

Eighth Amendment objective standards. *See, e.g.*, *McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D. Conn. Jan. 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses, unclean cell, no bedding for six days, no cleaning supplies for six days, no toilet paper for one day, no toiletries or clothing for six days, no shower shoes, dirty showers, cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)).

**\*16** In light of the above, the Court finds Plaintiff has failed to raise a triable issue of fact as to the objective element of his Eighth Amendment claim. Even if Plaintiff had satisfied the objective element, Plaintiff offers no evidence and only his conclusory allegations of retaliatory animus and harassment to support the subjective element claim that Defendants acted with deliberate indifference to his health or safety. Indeed, Plaintiff cannot rely on conclusory allegations and speculation to defeat a motion for summary judgment. *Kerzer*, 156 F.3d at 400.

Based on the foregoing, the Court recommends granting summary judgment to Defendants on Plaintiff's Eighth Amendment conditions of confinement claim.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) be **GRANTED**; and is further

**RECOMMENDED** that Plaintiff's motion for substitution of a party (Dkt. No. 231) be **DENIED** as moot; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[11]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6466556

---

2017 WL 6459512

2017 WL 6459512
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

9:17-cv-00194 (TJM/TWD)
|
Signed 12/18/2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

Attorney General, Dept. of Law, Albany, NY, pro se.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In her September 5, 2017 Report-Recommendation and Order (Dkt. No. 233), Magistrate Judge Dancks recommends that Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) be granted, and that Plaintiff's motion for substitution of a party (Dkt. No. 231) be denied as moot. Plaintiff filed objections to the Report-Recommendation and Order. See Obj., Dkt. No. 236. On November 29, 2017, Plaintiff filed a motion for a preliminary injunction. Dkt. No. 238.

**II. DISCUSSION**

**a. Objections to Report-Recommendation and Order**
When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1); see also United States v.

Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

Having considered Plaintiff's objections and having completed a *de novo* review of the issues raised by the objections, the Court has determined to accept Magistrate Judge Dancks's recommendations for the reasons stated in her thorough report. Accordingly, Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) is granted, and Plaintiff's motion for substitution of a party (Dkt. No. 231) is denied as moot.

**b. Preliminary Injunction**
Plaintiff's motion for a preliminary injunction complains of conduct subsequent to the allegations underlying the claims in this action, see Dkt. No. 238-1, pp. 1-3 (complaining about his medical treatment in October 2017), p. 5 (claiming that he was retaliated against because he filed "grievances ... with DOCS Office of Special Investigations since 2016-2017"), and appears to assert new claims for retaliation and denial of medical care based on this subsequent conduct. See id., pp. 3-5. Plaintiff cannot amend the Amended Complaint by bringing a motion for a preliminary injunction complaining about subsequent conduct. Accordingly, the motion for a preliminary injunction is denied without prejudice to being asserted in a new action complaining about the conduct underlying the motion.

**III. CONCLUSION**
For the reasons discussed above, the Court accepts and adopts Magistrate Judge Dancks's Report-Recommendation and Order (Dkt. No. 233) in its entirety. Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) is **GRANTED**, and the action is **DISMISSED** against all remaining Defendants, including those who have not been specifically identified [1] and/or served. Further, Plaintiff's motion for substitution of a party (Dkt. No. 231) is **DENIED AS MOOT**.

[1]     Plaintiff names several "Doe" defendants, as well as defendants identified only by position or

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 6459512

badge number (such as defendant "B-3 A Officer S.D.U.").

**\*2**  Plaintiff's motion for a preliminary injunction (Dkt. No. 238) is **DENIED WITHOUT PREJUDICE** to being asserted in a new action complaining about the conduct underlying the motion.

The Clerk of the Court may enter final judgment and close the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6459512

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 8716662

⚑ KeyCite Yellow Flag - Negative Treatment
Report and Recommendation Adopted as Modified by   Fox v. Labatte,
N.D.N.Y.,   March 31, 2016

2016 WL 8716662
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javell FOX, Plaintiff,
v.
Diane LABATTE, Steward; Eastern
NY Corr. Facility, Defendant.

Civ. No. 9:15-CV-144 (LEK/DJS)
|
Signed 03/11/2016

**Attorneys and Law Firms**

JAVELL FOX, 12-B-1626, Five Points Correctional Facility,
Caller Box 119, Romulus, New York 14541, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of
the State of New York, The Capitol, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

 **\*1**  Plaintiff initiated this civil rights action, pursuant to 42
U.S.C. § 1983, alleging that Defendant interfered with his
legal mail and denied him access to the courts in violation
of his First and Fourteenth Amendment rights. Dkt. No. 1,
Compl. On May 20, 2015, in *lieu* of answering, Defendant
filed a Motion for Summary Judgment, pursuant to Federal
Rule of Civil Procedure 56. Dkt. No. 14. By her Motion,
Defendant contends that prior to bringing this action, Plaintiff
failed to fully exhaust his available administrative remedies.
Plaintiff opposes the Motion. Dkt. No. 18. [1]

[1]
Defendant filed a Reply to Plaintiff's Response,
to which Plaintiff filed a Sur-Reply. Dkt. Nos.
19 & 22. The Court has reviewed all of the
papers submitted in connection with the pending
dispositive Motion.

**I. STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56(a), summary
judgment is appropriate only where "there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law." The moving party bears
the burden to demonstrate through "pleadings, depositions,
answers to interrogatories, and admissions on file, together
with [ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.
1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986)). "When a party has moved for summary judgment on
the basis of asserted facts supported as required by [Federal
Rule of Civil Procedure 56(e) ] and has, in accordance with
local court rules, served a concise statement of the material
facts as to which it contends there exist no genuine issues to
be tried, those facts will be deemed admitted unless properly
controverted by the nonmoving party." *Glazer v. Formica
Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or
denials of the facts submitted by the movant. FED. R. CIV.
P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d
Cir. 2003) ("Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment when
the moving party has set out a documentary case."); *Rexnord
Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.
1994). To that end, sworn statements are "more than mere
conclusory allegations subject to disregard ... they are specific
and detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements is
better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289
(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)
and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages, Inc.
v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.
1998). "[T]he trial court's task at the summary judgment
motion stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact to be
tried, not to deciding them. Its duty, in short, is confined at this
point to issue-finding; it does not extend to issue-resolution."
*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 93 of 238

Fox v. Labatte, Not Reported in Fed. Supp. (2016)

2016 WL 8716662

1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. DISCUSSION

### A. Facts

**\*2** The Court has reviewed the papers filed in support of and in opposition to the pending Motion and finds that there is no genuine dispute as to the material facts, which are as follows.

On December 10, 2014, while incarcerated at Eastern Correctional Facility, Plaintiff filed a grievance complaining that he had been habitually harassed by correction officers and not permitted to wear a specific hairstyle; the grievance was assigned case number ECF-26147-14. Dkt. No. 14-1, Jeffery Hale Decl., dated May 13, 2015, at ¶¶ 11, 14-15, & Ex. A. Because that grievance contained an allegation of employee harassment, it was filtered through the expedited grievance process whereby it was forwarded directly to the superintendent for review. *Id.* at Ex. B. This grievance, which did not raise any issues relevant to the current action, was decided by the superintendent on December 24, 2014. *Id.* On that same date, Plaintiff appealed the grievance to the Central Office Review Committee ("CORC"). Within that appeal packet, Plaintiff included documents that allege that Defendant Labatte interfered with his legal mail and correspondence. *Id.*, Ex. B at pp. 22-26 & 28.[2] On April 29, 2015, CORC issued a decision on that appeal upholding the superintendent's decision as to the claims presented to the superintendent. *Id.*, Ex. C. As to the complaints regarding interference with mail, CORC "advised [Fox] to address correspondence issues to mailroom staff[.]" *Id.*

[2]      Citations to the Exhibits attached to Mr. Hale's Declaration are to those page numbers noted on the bottom right corner of the Exhibits.

Prior to receiving that CORC decision, Plaintiff wrote several letters, dated December 25, 2014, January 18, 2015, January 23, 2015, which concern the subject matter of this litigation, and were filed on January 26, 2015, as one grievance: ECF-26198-15.[3] Dkt. No. 14-2, Thomas Mauro Decl., dated May 15, 2015, at ¶¶ 7-8 & Ex. A. On February 4, 2015, the Inmate Grievance Review Committee ("IGRC") issued a decision finding that the proper procedure had been followed. *Id.*, Ex. A at pp. 16-17.[4] On that same date, Plaintiff appealed the grievance to the superintendent. *Id.* The superintendent denied the grievance on April 9, 2015. *Id.*, Ex. A at p. 1.

[3]      A fourth letter, dated February 24, 2015, was subsequently consolidated with the grievance. Mauro Decl., Ex. A.

[4]      Citations to the Exhibits attached to Mr. Mauro's Declaration are to those page numbers noted on the bottom right corner of the Exhibits.

Plaintiff signed the Complaint in this action on February 2, 2015, and it was received for filing by the Court on February 20, 2015. Dkt. No. 1.

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner*, 531 U.S. 731, 741 n.6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord*, 255 F.3d 40, 43 (2d Cir. 2001)). Accordingly, the exhaustion requirements apply even when the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 94 of 238

Fox v. Labatte, Not Reported in Fed. Supp. (2016)
2016 WL 8716662

WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner*, 531 U.S. 731 (2001)).

**\*3** In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees.[5] N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

[5] The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a nonvoting chair (who may be an inmate, staff member of volunteer). N.Y. COMP. CODES R. & REGS tit.7, § 701.4.

Defendant contends that this action should be dismissed due to Plaintiff's failure to fully exhaust his available administrative remedies prior to bringing the action. Dkt. No. 14. In response, Plaintiff contends that on several occasions, the grievance supervisor thwarted Plaintiff's efforts to utilize the grievance procedure. Dkt. No. 18. For example, Plaintiff contends that he filed a grievance on December 14, presumably about Defendant Labatte, but the grievance supervisor failed to process it or delayed thirty days before filing the grievance. Dkt. No. 18, Pl.'s Statement Pursuant to Rule 7.1(a)(3), at ¶¶ 4 & 7. According to Plaintiff, the grievance supervisor told him that he would not send his grievance to CORC and that Plaintiff was wasting his time because his grievance would be denied. *Id.* at ¶¶ 6 & 8.

The Complaint in this matter is dated February 2, 2015. Pursuant to the prisoner mailbox rule,[6] the day the pleading is signed is presumed to be the date the pleading is filed, regardless of the fact that it appears to bear a postmark of February 6, 2015 and that the Court received and filed

the Complaint on February 10, 2015. Even if we were to credit Plaintiff's assertions as true, it does not ultimately affect the Court's view of the undisputed facts. Eventually, Plaintiff was able to file a grievance regarding the subject matter of this action, on January 26, 2015. This grievance may very well be the grievance which Plaintiff claims was delayed by thirty days. Nevertheless, Plaintiff was aware that his grievance was filed on that date, and instead of waiting for a response from the IGRC, he drafted his Complaint. While it is not entirely clear when Plaintiff submitted his Complaint to prison authorities for placement in the mailbox, the pleading contains a postmark of February 6, 2015, which is a mere two days after Plaintiff submitted his appeal to the superintendent. Plaintiff did not appeal the superintendent's decision to CORC. Plaintiff's complaints regarding the delay in filing the grievance and statements made to deter him from filing a grievance do not undermine the undisputed fact that his grievance was filed, processed, and investigated, decided, and appealed.

[6] The Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he or she hands the papers to the prison authorities for transmittal to the court. *Dory v. Ryan*, 999 F.2d 679, 681-82 (2d Cir. 1993), *modified on reh'g*, 25 F.3d 81 (2d Cir. 1994); *Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001), *cert. denied*, 534 U.S. 886 (2001) (extending "prison mailbox rule" to petitions seeking writ of *habeas corpus* pursuant to 28 U.S.C. § 2254); *Harmon v. People of State of New York*, 2001 WL 1590522, at *1 n.2 (E.D.N.Y. Dec. 11, 2001) (citations omitted). It is presumed that a prisoner handed the pleading to the prison guard on the date he signed the complaint. *Shaw v. Superintendent Attica Corr. Fac.*, 2007 WL 951459, at *3 n.3 (N.D.N.Y. Mar. 28, 2007) (*habeas corpus*); *Garraway v. Broome County, New York*, 2006 WL 931729, at *3-4 (N.D.N.Y. Apr. 7, 2006) (prisoner civil rights).

**\*4** It is therefore clear that with regard to the grievance filed concerning the subject matter of this litigation, Plaintiff did not exhaust all of his available administrative remedies prior to bringing the within action. His failure to comply with the correctional facility's procedures and submit his claim at all three levels of review prior to bringing this action requires dismissal. *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Woodford v. NGO*, 548 U.S. 81, 88 (2007)

(holding that in order to exhaust administrative remedies, the inmate must follow the administrative procedure set forth by the facility). Furthermore, Plaintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time, as he did with grievance number ECF 26147-14. *Woodford v. NGO*, 548 U.S. at 88.

### III. CONCLUSION

Accordingly, since the undisputed facts show that the Plaintiff failed to fully exhaust his available administrative remedies prior to bringing this action, it is hereby

**RECOMMENDED** that Defendant's Motion for Summary Judgment (Dkt. No. 14) be **GRANTED** and this case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8716662

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Labatte, Not Reported in Fed. Supp. (2016)

2016 WL 1266958

2016 WL 1266958
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javell FOX, Plaintiff,

v.

Diane LABATTE, Steward, Eastern
NY Correctional Facility, Defendant.

9:15-cv-0144 (LEK/DJS)
|
Signed 03/31/2016

**Attorneys and Law Firms**

Javell Fox, Romulus, NY, pro se.

Christopher J. Hummel, New York State Attorney General,
Albany, NY, for Defendant.

**DECISION and ORDER**

Lawrence E. Kahn, U.S. District Judge

 **\*1** This matter comes before the Court following a Report-
Recommendation filed on March 11, 2016, by the Honorable
Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 24 ("Report-
Recommendation").

Within fourteen days after a party has been served with
a copy of a magistrate judge's report-recommendation, the
party "may serve and file specific, written objections to
the proposed findings and recommendations." FED. R.
CIV. P. 72(b); L.R. 72.1(c). If no objections are made,
or if an objection is general, conclusory, perfunctory, or
a mere reiteration of an argument made to the magistrate
judge, a district court need review that aspect of a report-
recommendation only for clear error. Barnes v. Prack, No.
11-CV-0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18,
2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306-07 &
306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No.
06 Civ. 13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug.
25, 2011) ("[E]ven a *pro se* party's objections to a Report
and Recommendation must be specific and clearly aimed
at particular findings in the magistrate's proposal, such that
no party be allowed a second bite at the apple by simply
relitigating a prior argument."). "A [district] judge ... may

accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." 28
U.S.C. § 636(b). Otherwise, a court "shall make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." Id.

No objections were filed in the allotted time period. See
Docket. Accordingly, the Court has reviewed the Report-
Recommendation for clear error. In considering Plaintiff's
claim that he was denied access to grievance procedures,
the Report-Recommendation does not recognize the test set
forth by the Second Circuit regarding a failure to exhaust
under the Prison Litigation Reform Act ("PLRA"). Hemphill
v. New York, 380 F.3d 680, 686 (2d Cir. 2004); see also 42
U.S.C. § 1997e(a). We address the parties' arguments under
this framework here.

When a plaintiff "plausibly seeks to counter" an exhaustion
argument under the PLRA, a three-part inquiry is appropriate.
Hemphill, 380 F.3d at 686. First, a court asks whether
administrative remedies are available to the prisoner. Id. A
remedy is "unavailable" if the procedures in place do not
properly allow a successful grievance to be enforced. Abney
v. McGinnis, 380 F.3d 663, 668-69 (2d Cir. 2004). Second,
a court must determine whether a defendant has either
failed to timely plead the defense or by prior actions which
estop that defendant from raising the defense. Hemphill,
380 F.3d at 686; Ziemba v. Wezner, 366 F.3d 161, 163
(2d Cir. 2004) (per curiam). Finally, if there are "special
circumstances" alleged which would justify a failure to
comply with exhaustion requirements, a finding of failure to
exhaust will be inappropriate. Hemphill, 380 F.3d at 686; see
also Giano v. Goord, 380 F.3d 670, 678-79 (2d Cir. 2004)
(finding exhaustion unnecessary when Plaintiff reasonably
interpreted prison rules to raise his grievance in another
forum); Rodriguez v. Westchester Cty. Jail Corr. Dep't, 372
F.3d 485, 487 (2d Cir. 2004) (finding exhaustion unnecessary
when Plaintiff reasonably interpreted caselaw not to require
exhaustion, even when the Supreme Court later rejected that
interpretation).

 **\*2** Under this framework, Plaintiff's arguments to ignore his
lack of exhaustion fail. First, while Plaintiff's grievance was
delayed, this is not the type of unavailability contemplated
in Abney. Ruggiero v. County of Orange, 467 F.3d 170, 176
(2d Cir. 2006). The grievance process was actually used in
Plaintiff's case and was not insufficient to provide him with
a remedy for Defendant's alleged constitutional violations.

2016 WL 1266958

Therefore, the Court finds that administrative remedies were available to Plaintiff.

Second, Defendant has not waived the exhaustion defense, as it is raised in Defendant's first responsive pleading. Dkt. No. 14-4 ("Memorandum") at 6-12. Furthermore, Defendant is not estopped from asserting this defense. Plaintiff alleges in detail that prison officials deliberately interfered with his access to the grievance procedure. Dkt. Nos. 18-2 ("Response Memorandum") at 13-19; 22 ("Sur-Reply") at 4-6. However, while Plaintiff alleges that Defendant was involved in the delay of his access to the grievance procedure, Resp. Mem. at 13, the only facts he provides discuss the grievance supervisor's actions in delaying his access to grievance procedures. A party can only be estopped from asserting an exhaustion defense if they were personally involved in the restriction of access to administrative remedies. Rambert v. Mulkins, No. 11 Civ. 7421, 2014 WL 2440747, at *12 (S.D.N.Y. May 30, 2014); see also Butler v. Martin, No. 07 Civ. 521, 2010 WL 980421, at *5 (N.D.N.Y. Mar. 15, 2010) ("Even if, as alleged, Plaintiff's grievances were discarded, Plaintiff offers no evidence that a particular officer discarded the grievances."). Since Plaintiff does not discuss any actions taken by Defendant to deny him access to the grievance procedure, Defendant is not estopped from asserting this defense.

Finally, Plaintiff does not raise any special circumstances that would warrant a reasonable belief that exhaustion was not necessary or appropriate in this case. The Court finds no such special circumstances in this case justifying Plaintiff's failure to comply with administrative procedure.

As a result, the Court finds that Plaintiff's failure to fully exhaust his administrative remedies is not justified and has found no other clear error upon review of the Report-Recommendation. Therefore, the Court adopts the remainder of Judge Stewart's Report-Recommendation.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 24) is **APPROVED** and **ADOPTED as MODIFIED**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 14) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1266958

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 98 of 238

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

2021 WL 7367083
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,

v.

R. PRICE, Defendant.

9:19-CV-1413 (MAD/ATB)
|
Signed 12/29/2021

**Attorneys and Law Firms**

JAMES SIMPSON, Plaintiff, pro se.

KONSTANDINOS D. LERIS, Asst. Attorney General for
Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation, by the Honorable Mae A. D'Agostino,
United States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rules N.D.N.Y. 72.3(c). Plaintiff brought this civil
rights action asserting various allegations of constitutional
violations that occurred while he was incarcerated at Cayuga
Correctional Facility ("Cayuga C.F."), in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS").

Plaintiff filed his original complaint on November 15, 2019.
(Dkt. No. 1). By decision and order dated January 3, 2020,
Judge D'Agostino dismissed plaintiff's complaint for failure
to state a claim pursuant to 28 U.S.C. §§ 1915, 1915A. (Dkt.
No. 4). In the same order, Judge D'Agostino granted plaintiff
leave to file an amended complaint in order to cure some
of the defects identified by the court. (*Id.*). Plaintiff filed
an amended complaint on January 21, 2020. (Dkt. No. 5).
On March 17, 2020, Judge D'Agostino accepted plaintiff's
amended complaint for filing, only to the extent it asserted
an Eighth Amendment excessive force claim against C.O.
Price. (Dkt. No. 8). On August 27, 2020, plaintiff filed a
motion seeking leave to amend. (Dkt. No. 25). By decision
and order dated September 24, 2020, Judge D'Agostino
granted plaintiff's motion, in part, and accepted the second

amended complaint for filing to the extent it asserted an
Eighth Amendment excessive force claim against C.O. Price
arising from events that occurred on October 10, 2018. (Dkt.
No. 29).

There is some confusion as to what specific claims of Eighth
Amendment excessive force survived initial review by the
district court. [1] For purposes of this report-recommendation,
the court recognizes the surviving claims in plaintiff's second
amended complaint to include (1) an Eighth Amendment
excessive force claim against C.O. Price stemming from
the events that occurred on October 10, 2018, and (2) an
Eighth Amendment excessive force claim against C.O. Price
stemming from the events that occurred on August 9, 2019.

[1]   Upon initial review of plaintiff's amended
complaint, the district court acknowledged that
the pleading was "not a model of clarity," but
nevertheless liberally construed it to allege, among
other things, an Eighth Amendment excessive
force claim against C.O. Price arising out of
allegations that C.O. Price tried to place plaintiff
in leg shackles that were too small for him
on August 9, 2019. (Dkt. No. 8 at 5). In
the amended complaint, plaintiff also alleged
various constitutional violations stemming from
events which took place in October 2018. (*See
generally* Dkt. No. 5). These claims did not
survive initial review. (*See* Dkt. No. 8 at 2–8).
Plaintiff subsequently filed his second amended
complaint, which suffered from deficiencies
similar to his former pleading. (Dkt. No. 30).
Upon review, the district court construed the
second amended complaint to allege an Eighth
Amendment excessive force claim against C.O.
Price concerning the October 2018 events. (Dkt.
No. 29). The district court did not consider whether
plaintiff properly raised allegations of excessive
force against C.O. Price concerning events which
took place on August 9, 2019, presumably
because the second amended complaint did not
specifically identify this time period. However, at
his deposition plaintiff explained that his claims
against C.O. Price, as set forth in his second
amended complaint, stemmed from the events
which took place on August 9, 2019. (Plaintiff's
Deposition Transcript ("Pl.'s Dep.") at 37, 46–
47, 69). Considering plaintiff's testimony, this
court interprets the portion of the second amended

2021 WL 7367083

complaint entitled "Statement of Claim" to address the excessive force claim against C.O. Price that took place on August 9, 2019, although plaintiff has admittedly characterized this claim as one of medical deliberate indifference, as opposed to excessive force. (Dkt. No. 30 at 2–3). At the request of the moving defendant and for the sake of judicial economy, this court will assess whether the latter excessive force claim against C.O. Price survives summary judgment, assuming it was properly pleaded in the first place.

**\*2** Presently before the court is defendant C.O. Price's motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the action. (Dkt. No. 41). Plaintiff responded in opposition to the motion on September 9, 2021. (Dkt. No. 43). Defendant filed a reply brief on September 16, 2021. (Dkt. No. 44). For the reasons set forth below, the court recommends granting defendant C.O. Price's motion for summary judgment and dismissing the second amended complaint in its entirety.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences,

against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Local Rules of the Northern District of New York require that a motion for summary judgment be accompanied by a statement of material facts which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Local Rule 56.1(a). [2] The same rule requires the opposing party to file a response to the moving party's statement of material facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise. Local Rule 56.1(b). The rule specifically provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

[2]     Previously Local Rule 7.1(a)(3).

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit ... his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

### II. Factual Contentions

#### A. October 10, 2018

2021 WL 7367083

**\*3** Plaintiff alleges that on October 10, 2018, he was advised that he had a medical appointment outside Cayuga C.F. (Second Amended Complaint ("SAC") at 2) (Dkt. No. 30). He informed the correctional officers responsible for his transport that "the leg irons they intended to use were to[o] small for [plaintiff's] ankles." *Id.* The officers ignored plaintiff and proceeded to place him in the small leg irons. *Id.* Fourteen hours later, plaintiff's ankles were severely bruised, "and [his] right ankle had an open wound where the shackle had grounded through [his skin]." *Id.* Approximately a week later, a nurse informed plaintiff that the injury had become a "sever[e] infection necessitating daily attention by medical staff and antibiotics." *Id.*

**B. August 9, 2019**

Plaintiff was scheduled to attend a medical appointment at SUNY Upstate Medical University ("SUNY Upstate") on August 9, 2019. (Pl.'s Dep. at 47; Declaration of Richard Price ("Price Decl.") ¶ 10). C.O. Price was the officer responsible for escorting plaintiff to his medical appointment that morning. (Pl.'s Dep. at 49; Price Decl. ¶ 10). Accordingly, C.O. Price contacted plaintiff's dorm by phone at approximately 7:30 a.m., requesting that plaintiff arrive to the draft area by 8:15 a.m. in order to be strip frisked and to otherwise prepare for transport. (Price Decl. ¶ 12). Plaintiff was late, however, and did not arrive to the draft room until 8:45 a.m. (Pl.'s Dep. at 48–49, Price Decl. ¶ 13).

The parties' contentions diverge at this point. According to the plaintiff, when he got to the draft room C.O. Price was "screaming" at him for being late. (Pl.'s Dep. at 51). Plaintiff was subsequently strip frisked, without incident, per facility protocol. (*Id.* at 51–52, 55). After the strip frisk, plaintiff was under the assumption that he was going to be taken to the medical unit to have his ankle wrapped. (*Id.* at 52). Of note, plaintiff testified that he suffers from a medical condition that causes "abbreviations" and "deep imprints" in his skin when compression is applied. (*Id.* at 32–33). Plaintiff also asserted that, due to this medical condition, he had a permit for "big boy" cuffs to be used on his ankles. (*Id.* at 43). Plaintiff testified that C.O. Price knew plaintiff required larger ankle cuffs. (*Id.* At 56).

Nevertheless, after the strip frisk C.O. Price told plaintiff, "we don't have time for you to go over there to medical to get your leg wrapped." (*Id.* at 52). C.O. Price then put plaintiff in the transport van, and tried to put standard size cuffs on plaintiff's ankles. (*Id.* at 52–53). Plaintiff told C.O. Price he would not wear the smaller cuffs. (*Id.* at 53). When C.O.

Price tried forcing the cuffs onto plaintiff's ankles, plaintiff put his cane in front of his legs. (*Id.*). C.O. Price told plaintiff that he was going to "tell ... people that [plaintiff] tried to hit [him] with a cane" if plaintiff didn't allow himself to be placed in the smaller cuffs. (*Id.*). Plaintiff continued to refuse. (*Id.*). C.O. Price made another attempt to place the cuffs on plaintiff's ankles, which caused a "scab" from an old wound to "pop[ ] back open" on plaintiff's leg. (*Id.* at 53, 58–59). Plaintiff testified that C.O. Price had "no choice" then but to let plaintiff out of the van and take him to the medical unit to get his leg wrapped. (*Id.* at 53).

After plaintiff's leg was wrapped, C.O. Price attempted once more to put the smaller cuffs on plaintiff, and threatened to take plaintiff to "the box" if he did not cooperate. (*Id.* at 54). Plaintiff refused, and ultimately C.O. Price got bigger cuffs (however, apparently not the "big boy" cuffs) and placed them onto plaintiff's ankles. (*Id.*). Plaintiff was transferred to SUNY Upstate, and upon his return C.O. Price took him "straight to the box." (*Id.*).

**\*4** C.O. Price has submitted a declaration in support of his pending motion for summary judgement, which alternatively describes the events of August 9th. Upon plaintiff's arrival to the draft room that morning, C.O. Price maintains that he conducted a strip frisk of plaintiff, and then placed plaintiff in mechanical wrist restraints. (*Id.* ¶ 14). Plaintiff was subsequently escorted to the facility van, where C.O. Price attempted to place standard size ankle restraints on him. (*Id.* ¶¶ 14–15). Plaintiff refused and "shoved" his cane at C.O. Price, "almost striking [C.O. Price] in the nose." (*Id.* ¶ 15). Plaintiff proceeded to place his cane between his ankles. (*Id.*). The cane was taken from plaintiff and C.O. Price gave plaintiff several direct orders to allow him to apply the restraints, however plaintiff refused to comply. (*Id.* ¶ 16). C.O. Price did not threaten to take plaintiff to the Special Housing Unit ("SHU"), nor did he threaten him in any other manner. (*Id.*).

Plaintiff eventually told C.O. Price that he had a permit for "big boy" cuffs on file with Cayuga C.F. medical staff. (*Id.* ¶ 17). C.O. Price maintains that he had no knowledge of plaintiff's purported permit at the time, and had escorted plaintiff on previous medical trips where standard size leg restraints were used. (*Id.* ¶¶ 18–20). Nevertheless, C.O. Price stopped attempting to place the ankle restraints on plaintiff and contacted the area supervisor. (*Id.* ¶ 21). They escorted plaintiff from the van to the medical unit, where a nurse placed a gauze bandage around one of plaintiff's ankles. (*Id.*

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 101 of 238

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

¶ 22). [3] At the same time, C.O. Price looked for but could not find documentation of plaintiff's purported medical permit for larger ankle restraints, thus a determination was made to use the standard size restraints on plaintiff. (*Id.* ¶ 24). Plaintiff eventually allowed C.O. Price to place his ankles in the standard size leg restraints, and they departed for SUNY Upstate. (*Id.* ¶¶ 25–26). The remainder of the trip went without incident. When they returned, C.O. Price issued plaintiff a misbehavior report charging him with interference with an employee, lying/providing false information, and refusing a direct order. (*Id.* ¶ 28, Ex. B). C.O. Price avers that plaintiff was not injured, nor did he complain of being injured, at any time on August 9, 2019. (*Id.* ¶ 32).

[3]      C.O. Price denies that plaintiff was taken to medical because of an injury caused by him. (Id. ¶ 23).

**DISCUSSION**

## III. October 10, 2018 Excessive Force Claim

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted); *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). The district court interpreted plaintiff's second amended complaint to assert that C.O. Price was one of the officers who escorted plaintiff to his medical appointment. (*See* Dkt. No. 29 at 3). However, at his deposition plaintiff testified to the contrary, confirming that C.O. Price was not involved in the October 10, 2018 incident. (Pl.'s Dep. at 37). Thus, it is undisputed that C.O. Price was not present, or otherwise involved, in the events surrounding plaintiff's allegations of excessive force on October 10, 2018. [4] (*See* Pl.'s Dep. at 37; Price Decl. ¶¶ 5–6, Ex. A). Accordingly, the court recommends that the second amended complaint be dismissed against C.O. Price as it relates to this claim.

[4]      In his opposition papers, plaintiff appears to argue that this claim should not be dismissed against C.O. Price. (Plaintiff's Brief ("Pl.'s Br.") at 3–5). Plaintiff's argument is misplaced, however, as it only addresses the events which unfolded on August 9, 2019, and why C.O. Price should be held liable for his actions on that day. (*Id.*).

## IV. August 9, 2019 Excessive Force Claim

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standards

**\*5** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones,* 549 U.S. at 218-19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or

Case 9:21-cv-00135-DNH-TWD Document 79 Filed 02/12/24 Page 102 of 238

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, 578 U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

 **\*6** (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when

the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

## 2. Application

C.O. Price argues that plaintiff's excessive force claim stemming from the events that occurred on August 9, 2019 is subject to dismissal due to plaintiff's failure to exhaust his administrative remedies. Specifically, C.O. Price contends that plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Defendant's Memorandum of Law at 14). In support of his position, C.O. Price has attached to his motion papers the sworn declarations of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program ("IGP") for DOCCS, and Morgan Swan, the Incarcerated Grievance Program Supervisor at Cayuga C.F. (*See generally* Declaration of Rachael Seguin ("Seguin Decl."); Declaration of Morgan Swan ("Swan Decl.")) (Dkt. Nos. 41-3; 41-4). These declarations, and the evidence attached as exhibits thereto, provide compelling evidence that plaintiff neither filed an initial grievance, nor appealed to CORC, concerning his claim of excessive force by C.O. Price occurring on August 9, 2019. (*See* Swan Decl. ¶¶ 20–29, Ex. B; Seguin Decl. ¶¶ 15–16).

Plaintiff's response to this defense is equivocal, at best. In a prior pleading, plaintiff asserted that after returning from his medical trip on August 9th and being placed in the SHU, he "sent [three] letters to grievants [sic] I never got mail back or no one came to see me." (Dkt. No. 5 at 11). Plaintiff further alleged that when he got out of the SHU on August 20, 2019, he "went on a court trip so ... could not appeal to the Superintendent within 72 hours[.]" (*Id.*).

At his deposition, plaintiff testified that while in the SHU he made three attempts to file a grievance against C.O. Price. (Pl.'s Dep. at 69–71). Plaintiff initially testified that he heard back from one of the grievances, but admitted that he could not remember if C.O. Price was named in that specific grievance. (*Id.* at 72). Plaintiff then, alternatively, asserted that C.O. Price was not named in all three of the grievances he attempted to file in the SHU, and "he think[s]"

Simpson v. Price, Not Reported in Fed. Supp. (2021)

2021 WL 7367083

C.O. Price was only named in two out of the three. (*Id.*). Plaintiff could not remember if he received a response from either grievance. (*Id.*). Nor could plaintiff remember what the content of his grievances against C.O. Price actually were, with respect to the two he allegedly attempted to file. (*Id.* at 73). Plaintiff testified that he wrote to the grievance office to follow up about his grievance(s) against C.O. Price, but could not remember how many times or the content of his follow-up correspondences. (*Id.* at 73). Plaintiff admittedly did not retain any copies of the purported grievances or follow-up correspondences relative to his complaints against C.O. Price. (*Id.* at 71–73). [5]

[5]     Plaintiff testified that he was unable to make or obtain copies of his grievance paperwork while confined in the SHU. (Pl.'s Dep. at 70).

**\*7** Plaintiff's position is further confused by the arguments contained in his opposition to the instant motion. There, plaintiff asserts that he filed a grievance in "December of 2018," then appealed the decision to CORC. (Pl.'s Br. at 6). Plaintiff takes the position that, because he did not receive a response from CORC within the 30 day deadline, his administrative remedies should be deemed exhausted. (Pl.'s Br. at 6).

Notwithstanding plaintiff's arguments, the record before this court evidences his failure to exhaust administrative remedies with respect to the latter excessive force claim against C.O. Price, to the extent that an initial grievance was never filed, nor was the claim appealed to CORC. As such, the question becomes whether plaintiff's failure to exhaust should be excused. To this end, the defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). DOCCS regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer or forward to the grievance clerk. *See* N.Y.C.R.R. tit. 7, § 701.7. Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.*

Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of his confinement in the SHU, and the restrictions imposed on him there. In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate housed in the SHU, in the context of grievances allegedly submitted to facility staff, but purportedly never filed. There, the plaintiff alleged that while housed in the SHU, he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* "Following the Second Circuits decision in *Williams*, several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at \*15 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

**\*8** For the following reasons, this court does not find *Williams* to be controlling in the instant matter. At the outset, *Williams* reversed the underlying district court's decision on the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b). Thus, the Second Circuit was compelled to accept as true the allegations in Williams's complaint, including his assertion that a particular correctional officer never filed his grievance relevant to the subject claim. *See Williams v. Priatno,* 829 F.3d at 124. At the summary judgment stage, however, we are presented with a more complete record upon which to determine the existence of any genuine issues of material fact. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998). [6]

[6]     In *Chance,* the Second Circuit noted the difference between the motion to dismiss standard of review and summary judgment standard in reversing the

2021 WL 7367083

district court's dismissal of a complaint pursuant to Rule 12(b):

> It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment. At the 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test....
>
> [Plaintiff] might not be able to prove his claims at trial. *And even at the summary judgment stage, it may well become clear that [plaintiff] cannot proffer sufficient proof to create genuine issues of material fact.* But in his complaint, he has alleged facts that are not impossible to prove and that, if demonstrated, would state a legally cognizable claim.
>
> *Id.* at 701 (internal quotation marks and citations omitted) (alterations to original and emphasis added).

Accordingly, in this instance the court need not mechanically accept plaintiff's vague allegation that he "tri[ed] [three] times to file a grievance [with] no response back." (*See* Dkt. No. 5 at 10). Further discovery on the issue of exhaustion has revealed that plaintiff did not satisfy his burden of production of evidence overcoming the defendant's proof that the defendant did not pursue the grievance process that was available to him. Specifically, given plaintiff's uncertainty, and his inability to confirm or document whether he actually attempted to file a complaint against C.O. Price regarding the August 9, 2019 incident, he has not demonstrated a genuine issue of material fact with respect to the availability of the grievance process, notwithstanding the fact that he, like Williams, was confined to the SHU. *See, e.g., Armand v. Mosko,* No. 13-CV-5, 2019 WL 2374948, at *3 (W.D.N.Y. Apr. 9, 2019), *report and recommendation adopted*, 2019 WL 2374001 (W.D.N.Y. June 4, 2019) (rejecting plaintiff's contention of unavailability based on her claim that, while housed in the SHU, she handed grievances to a corrections officer who never filed them, where plaintiff gave conflicting statements that were "unworthy of belief" that she actually filed the relevant grievance).

Notwithstanding plaintiff's allegation that he attempted to file a grievance against C.O. Price concerning the subject incident, plaintiff's contradictory assertions regarding the

purported obstruction of his ability to do so undermine his efforts to document a material issue of fact. Plaintiff testified that he filed grievances during his confinement in the SHU, and "no one stopped [him] from filing a grievance." (Pl.'s Dep. at 70). He elaborated that "[i]f they answered, that was the problem.... you file one grievance then you have to be able to get it through. Especially in the hole." (*Id.*).

**\*9** Historically, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier,* No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross,* No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017)); *Artis v. Dishaw,* No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted,* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *Engles v. Jones,* No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith,* 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

At least one other district court has granted summary judgment on exhaustion grounds notwithstanding *Williams*, under circumstances where the plaintiff provided no specifics related to a grievance purportedly filed during his confinement in the SHU. *See, e.g., Sankara v. Montgomery,* No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an

Simpson v. Price, Not Reported in Fed. Supp. (2021)
Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 105 of 238
2021 WL 7367083

officer to send to the grievance office; and any specific follow up with the grievance office[.]"); *see also Tillman v. Phillips*, No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308, at *7 (N.D.N.Y. Nov. 10, 2021), *report and recommendation adopted*, 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021) (distinguishing the facts in that case from circumstances outlined in *Sankara*, where plaintiff has provided no specifics related to grievance purportedly filed in SHU.).

Here, the court does not merely consider plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. The court recognizes that an inmate-plaintiff's ability to process his grievances are curtailed to some extent while confined to the SHU. *See Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are 'essentially unknowable' or unavailable.") (citation omitted).

However, plaintiff in this case has "done nothing more than allege in conclusory fashion that he attempted to file [a] ... grievance" concerning excessive force at the hands of C.O. Price in August 2019. He has provided no specifics regarding when the grievances were written, their content, or the steps he took to provide them to an officer to send to the grievance office. There is also no documentary evidence to corroborate the fact plaintiff attempted to file a grievance, such as follow-up correspondences after his release from SHU. For these reasons, the court concludes that plaintiff's completely unsupported, unclear and vague implication that a grievance he attempted to file against C.O. Price relative to the August 9, 2019 incident was not properly processed does not suffice to avoid summary judgment. *Cf. Stephanski v. Allen*, No. 9:18-CV-0076 (BKS/CFH), 2020 WL 806331, at *9 (N.D.N.Y. Jan. 22, 2020), *report and recommendation adopted*, 2020 WL 777268 (N.D.N.Y. Feb. 18, 2020) (denying summary judgment despite lack of direct evidence concerning defendant's interference with the grievance he attempted to file while in SHU where plaintiff's allegation of unavailability was supported by his proper response to defendants' statement of material facts, testimony under oath on two separate occasions, and some corroborating documentary evidence.). Accordingly, the court recommends that C.O. Price be granted summary judgment and the second amended complaint be dismissed against him as to this claim, on the ground that plaintiff failed to exhaust his administrative remedies.

**B. Excessive Force**

**\*10** Should the district court disagree with my recommendation that the second amended complaint be dismissed on exhaustion grounds, this court alternatively recommends granting summary judgment on the merits of plaintiff's Eighth Amendment excessive force claim, as further discussed below.

### 1. Legal Standard

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish both the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10. " ' 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 106 of 238
Simpson v. Price, Not Reported in Fed. Supp. (2021)
2021 WL 7367083

in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### C. Application

With respect to the events of August 9, 2019, plaintiff's second amended complaint states that C.O. Price was aware that plaintiff had a "serious medical need" by virtue of "seeing [plaintiff] with a cane and special shoes on [his] feet." (SAC at 2). Plaintiff also avers that the housing officer "called [C.O. Price], letting him know [plaintiff] could not move fast enough because of [an] abscess [on his leg]." (*Id.*). Plaintiff contends that, despite this knowledge, C.O. Price "ignored the seriousness" of plaintiff's condition and "placed a small leg iron over [his] open wound[,]" causing the "wound to reopen to the point that the medical trip was delayed[.]" (*Id.*). Plaintiff then vaguely refers to "[f]oot and ankle injuries-causing infection or disease." (*Id.* at 3). Plaintiff provided additional factual context at his deposition, the majority of which has been previously summarized. In sum, plaintiff maintains that C.O. Price knew that plaintiff had a permit for "big boy" ankle restraints, due to a medical condition. Plaintiff testified that despite this knowledge, C.O. Price attempted to force standard sized ankle restraints on plaintiff because they were running late for a medical appointment, causing an abscess on his ankle to reopen and bleed in the process. (Pl.'s Dep. at 52–56).

**\*11** For the following reasons, this court finds that plaintiff has not established a genuine issue of material fact with respect to either prong of the alleged Eighth Amendment violation. As for the subjective component of plaintiff's excessive force claim, no reasonable fact finder could conclude that C.O. Price used force against the plaintiff maliciously and sadistically to cause harm based on the record presently before this court. Even assuming the truth of plaintiff's allegations, C.O. Price was attempting to place the standard size ankle restraints onto plaintiff because plaintiff had arrived late and they had to "hurry up and go" in order to make the medical appointment. (*See* Pl.'s Dep. at 52). It is undisputed that plaintiff was running late for his medical

appointment, and that ankle restraints needed to be applied before he could be transferred out of the facility. Thus, the allegation that C.O. Price caused plaintiff's wound to reopen and bleed as he was attempting to prepare plaintiff for his medical trip, for which they were running late, does not rise to the level of an improper or wanton motive on the part of C.O. Price.

Moreover, the court finds that no reasonable fact finder would credit plaintiff's unsupported allegation that C.O. Price knew plaintiff required larger ankle restraints. C.O. Price has submitted a sworn declaration stating that he had no knowledge of plaintiff's purported medical permit for "big boy" cuffs. (Price Decl. at ¶¶ 18–20).[7] The documentary evidence submitted by C.O. Price in support of his motion, including the August 9, 2019 itinerary and the August 20, 2019 Tier II hearing disposition, support C.O. Price's further contention that plaintiff did not actually have a medical permit for larger ankle restraints in place at the time of the subject incident. (C.O. Price Decl. at ¶ 24, Exs. B, C). Plaintiff has failed to provide any evidence beyond his own conclusory statements in rebuttal. Because plaintiff has not submitted "proof that tends to show that the alleged force used against him was employed maliciously and sadistically to cause harm, he has failed to satisfy the subjective prong of his excessive force claim." *Chambliss v. Rosini*, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citing *Engles v. Dunbar*, No. 09 Civ. 2457, 2010 WL 5538517, at *7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force test not satisfied where uncontroverted evidence established that force was used not maliciously or sadistically, but instead to transport the plaintiff in order to receive medical attention)).

[7]     Plaintiff did not respond to the defense's Statement of Material Fact that "C.O. Price had no recollection of such a permit as he had escorted Plaintiff on previous medical trips where standard sized restraints were utilized. Price Decl. ¶ 20." (Dkt. No. 41-5 at 3, ¶ 18).

Nor is the court convinced that plaintiff could satisfy the objective component of his excessive force claim. Courts in this district "routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness." *Livingston v. Hoffnagle*, No. 9:19-CV-0353 (GLS/CFH), 2019 WL 7500501, at *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell*, 325

Simpson v. Price, Not Reported in Fed. Supp. (2021)
Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 107 of 238
2021 WL 7367083

F. Supp.3d 249, 265 (N.D.N.Y. 2018) (dismissing pro se inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist") (internal quotation marks omitted); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (dismissing excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising") (internal quotation marks and brackets omitted).

Here, plaintiff merely alleges that, in attempting to place restraints on his ankles, C.O. Price "popped open a scab" on plaintiff's leg, causing it to bleed. (Pl.'s Dep. at 53–54, 65). C.O. Price disputes the fact that he caused any injury to plaintiff with the restraints (Price Decl. at ¶ 32), and there is no medical documentation before this court evidencing the contrary. In any event, the parties agree that plaintiff ultimately had his leg wrapped at the medical unit before being transferred to SUNY Upstate. (Pl.'s Dep. at 53–54; Price Decl. at ¶ 23). Assuming plaintiff's version of the facts, his leg was wrapped but "still bleeding" when he was placed in the SHU. (Pl.'s Dep. at 54). Plaintiff could not recall how long it took for his wound to stop bleeding, but concedes that he did not require stitches and that the wound healed "at some point." (*Id.* at 60–61, 65–66).

**\*12** Plaintiff testified that he did not obtain treatment for the injury, other than wrapping his leg – however, plaintiff concedes that his leg required continuous "wrapping" prior to the alleged incident. (*Id.* at 66). Notwithstanding plaintiff's

self-serving assertion that his alleged injury caused him pain which he described as a "9 ½" on a scale of one to ten, given his *de minimis* injury, plaintiff has failed to document a material issue of fact with respect to the objective component of the excessive force standard. *See Warren v. Purcell*, No. 03 Civ. 8736, 2004 WL 1970642, at \*8 (S.D.N.Y. Sept. 3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered de minimis injuries and no improper or wanton motive was alleged for the officers' actions).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant C.O. Price's motion for summary judgment (Dkt. No. 41) be **GRANTED**, and the second amended complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 7367083

---

2022 WL 336540

2022 WL 336540
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,

v.

R. PRICE, C.O., Defendant.

9:19-CV-1413 (MAD/ATB)
|
Signed 02/04/2022

**Attorneys and Law Firms**

JAMES SIMPSON, 18-B-0295, Cayuga Correctional
Facility, P.O. Box 1186, Moravia, New York 13118, Plaintiff
pro se.

OF COUNSEL: KONSTANDINOS D. LERIS, AAG,
OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, The Capitol, Albany, New York 12224,
Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

*1 On November 15, 2019, Plaintiff, an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), filed his original
complaint in this matter pursuant to 42 U.S.C. § 1983.
See Dkt. No. 1. On January 3, 2020, the Court dismissed
the complaint on initial review and permitted Plaintiff an
opportunity to file an amended complaint. See Dkt. No. 4.
Plaintiff filed his amended complaint on January 21, 2020,
which the Court accepted for filing to the extent that it
asserted an Eighth Amendment excessive force claim against
Defendant Price stemming from events that occurred on
August 9, 2019. See Dkt. Nos. 5 & 8. Plaintiff was granted
leave to file a second amended complaint on September 24,
2020, and the second amended complaint was accepted for
filing to the extent that it asserted an additional excessive
force claim against Defendant arising from events that
occurred on October 10, 2018. See Dkt. No. 29.

On August 24, 2021, Defendant moved for summary
judgment. See Dkt. No. 41. On September 9, 2021,
Plaintiff responded to Defendant's motion. See Dkt. No. 43.
In a Report-Recommendation dated December 29, 2021,
Magistrate Judge Baxter recommended that the Court grant
Defendant's motion in its entirety and dismiss this case.
See Dkt. No. 46. In his Report-Recommendation, Magistrate
Judge Baxter first found that Defendant was not personally
involved in the October 10, 2018 incident. See id. at 9. As to
the August 9, 2019 excessive force claim, Magistrate Judge
Baxter initially found that dismissal is appropriate because
Plaintiff failed to exhaust his administrative remedies. See
id. at 13-21. Alternatively, Magistrate Judge Baxter found
that the claim should be dismissed on the merits because
Plaintiff failed to establish both the subjective and objective
components of an Eighth Amendment excessive force claim.
See id. at 23-26.

In objections received on January 13, 2022, Plaintiff argues,
in an entirely conclusory manner, that he has set forth a valid
Eighth Amendment excessive force claim. See Dkt. No. 47 at
1-4. Additionally, Plaintiff contends that he was not required
to exhaust his claim stemming from the events on August 9,
2019 because of the "futility exception." Id. at 2. As set forth
below, Defendant's motion for summary judgment is granted
in its entirety.

**II. BACKGROUND**

For a complete recitation of the relevant factual background,
the parties are referred to Magistrate Judge Baxter's
December 29, 2021 Report-Recommendation. See Dkt. No.
46.

**III. DISCUSSION**

**A. Standard of Review**

When a party files specific objections to a magistrate judge's
report-recommendation, the district court "make[s] a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b)(1)(C). However, when a party
files "[g]eneral or conclusory objections, or objections which
merely recite the same arguments [that he] presented to the
magistrate judge," the court reviews those recommendations
for clear error only. O'Diah v. Mawhir, No. 9:08-CV-322,
2011 WL 933846, *2 (N.D.N.Y. Mar. 16, 2011) (citations

Simpson v. Price, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 109 of 238

2022 WL 336540

and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252 (emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory

allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, \*12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B. October 10, 2018 Incident**

In his second amended complaint, Plaintiff alleges that on October 10, 2018, he had a medical appointment outside of Cayuga Correctional Facility ("Cayuga C.F."). *See* Dkt. No. 30 at 2. Plaintiff informed the correctional officers responsible for his transport that the leg irons that he was placed in were too small for his ankles. *See id.* The officers ignored Plaintiff's complaints, resulting in severe bruises and aggravation of an open wound on his ankle. *See id.*

**\*3** In its initial review of Plaintiff's second amended complaint, the Court read the pleading as alleging that Defendant Price was one of the officers who transported Plaintiff to his medical appointment on October 10, 2018. *See* Dkt. No. 29 at 3. At Plaintiff's deposition, however, he confirmed that Defendant Price was not involved in the October 10, 2018 incident. *See* Dkt. No. 41-1 at 41. Since Defendant Price was not present at the time of the October 10, 2018 incident, the undisputed facts demonstrate that he was not personally involved in any constitutional violation. As such, Magistrate Judge Baxter correctly determined that this claim must be dismissed due to Defendant's lack of personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

**C. August 9, 2019 Incident**

2022 WL 336540

### *1. Exhaustion of Administrative Remedies*

As Magistrate Judge Baxter correctly determined, the excessive force claim stemming from the incident on August 9, 2019 should be dismissed due to Plaintiff's failure to exhaust. The undisputed facts before the Court establish that there is no record of a grievance being filed regarding this incident and that, even if such a grievance was filed, the denial of the grievance was not appealed to the CORC. *See* Dkt. No. 46 at 13-15; Dkt. No. 41-3; Dkt. No. 41-4. Plaintiff attempts to argue that the grievance process was unavailable to him, but his explanations/arguments have evolved over time and are insufficient to establish his burden of demonstrating unavailability, as fully explained by Magistrate Judge Baxter. *See* Dkt. No. 46 at 13-20. Plaintiff has provided no specifics regarding when the alleged grievances were written, their content, or the steps that he took to provide them to an officer to send to the grievance office. Additionally, Plaintiff has failed to provide the Court with any documentary evidence to corroborate that he attempted to file a grievance, such as follow-up correspondence after his release from SHU. As such, the Court finds that Plaintiff's conclusory allegations are insufficient to defeat summary judgment. *See Sankara v. Montgomery*, No. 9:16-cv-885, 2018 WL 4610686, *8 (N.D.N.Y. June 25, 2018)* ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined in the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances; ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office"). Plaintiff's objections to Magistrate Judge Baxter's Report-Recommendation simply reiterate his belief that administrative remedies were unavailable to him in an entirely conclusory fashion. *See* Dkt. No. 47 at 2.

Accordingly, the Court's Defendant's motion for summary judgment as to this claim based on Plaintiff's failure to exhaust the available administrative remedies.

### *2. Merits*

Magistrate Judge Baxter also correctly found, in the alternative, that Plaintiff's excessive force claim relating to the August 9, 2019 incident should be dismissed on the merits. This incident again involves the application of leg irons on Plaintiff while he was being transported that were allegedly too small and caused a wound to reopen, resulting in an infection. *See* Dkt. No. 46 at 23.

According to the undisputed facts, on August 9, 2019, Plaintiff had an appointment at SUNY Upstate Medical University at 9:45 a.m. *See* Dkt. No. 41-2 at ¶¶ 10-11. Plaintiff was required to arrive at the departure location at Cayuga C.F. no later than 8:15 a.m. for an 8:30 a.m. departure. *See id.* at ¶¶ 11-12. Plaintiff arrived at the transport location at 8:45 a.m., at which point he was frisked and then placed in the transport van. *See id.* at ¶¶ 13-14. Once Plaintiff was placed in the van, Defendant attempted to place standard-sized ankle restraints on Plaintiff, which Plaintiff refused. *See id.* at ¶ 15. Plaintiff told Defendant that he would not wear the standard-sized restraints, and that he had a permit for "big boy" cuffs to ease the pressure placed on chronic wounds on his ankles and feet. *See id.* at ¶ 17. At this point, Defendant stopped attempting to place the standard-sized leg restraints on Plaintiff and contacted the area supervisor. *See id.* at ¶ 21. Defendant and the supervisor then escorted Plaintiff from the van to the infirmary, where Plaintiff spoke with Nurse Giovannetti. *See id.* at ¶ 22. Nurse Giovannetti placed a gauze bandage around one of Plaintiff's ankles and, at this point, Plaintiff agreed to continue on the medical trip. *See id.* at ¶ 23.

**\*4** Additionally, while at the infirmary, Defendant and the supervisor checked with the Deputy Superintendent's Office and Medical Office for any documentation concerning a permit approving Plaintiff for larger restraints. *See id.* at ¶ 24. Neither office found any documentation and, therefore, it was determined that standard-sized ankle restraints would be used. *See id.* Upon returning to the van, Plaintiff permitted Defendant to apply the standard-sized restraints without further complaint. *See id.* The delay caused by the trip to the infirmary and checking for the existence of the permit resulted in Plaintiff arriving for his medical appointment thirty-five minutes after the scheduled arrival time. *See id.* at ¶ 26.

As Magistrate Judge Baxter correctly determined, the undisputed facts, beyond Plaintiff's own conclusory assertions, demonstrate that the alleged force was not employed in a sadistic or malicious manner intending to cause harm. As such, he has failed to satisfy the subjective prong of his excessive force claim. *See Chambliss v. Rosini*, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citation omitted). Moreover, Plaintiff has failed to satisfy the objective prong of his excessive force claim since he has alleged only *de minimis* injury without any plausible allegations of wantonness or maliciousness. *See Livingston v. Hoffnagle*,

Simpson v. Price, Not Reported in Fed. Supp. (2022)

2022 WL 336540

No. 9:19-cv-353, 2019 WL 7500501, *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 265 (N.D.N.Y. 2018) (dismissing the *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist").

Based on the foregoing, the finds that Defendant is entitled to summary judgment on this alternative ground.

### IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's December 29, 2021 Report-Recommendation (Dkt. No. 46) is **ADOPTED in its entirety** for the reasons set forth therein; and the Court

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 41) is **GRANTED in its entirety**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; [1] and the Court further

[1]    In a one-page letter motion dated January 18, 2022, Plaintiff asks the Court "for permission for the defendant to take a voice analysis with my question, about the event that happen [sic] at my cost." Dkt. No. 48. It is entirely unclear what Plaintiff is seeking in this letter motion. However, since the Court has granted Defendant's motion for summary judgment in its entirety, this letter motion is denied as moot.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 336540

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 112 of 238

Burton v. Abraham, Not Reported in Fed. Supp. (2020)

2020 WL 1169295

2020 WL 1169295
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Courtney BURTON, Plaintiff,
v.
Mamoun ABRAHAM, Defendant.

5:18-CV-150 (ATB)
|
Signed 03/11/2020

**Attorneys and Law Firms**

COURTNEY BURTON, Plaintiff, pro se.

DANIEL CARLO BOLLANA, Asst. Corporation Counsel for Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

*1 This matter was referred to me for all proceedings and entry of a final judgment, in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 55, 59). Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant Abraham violated plaintiff's federal constitutional rights during the course of, and after, his arrest on May 18, 2016. (Complaint ("Compl.") *generally*) (Dkt. No. 1).

**I. Procedural Background**

Plaintiff's complaint contained twelve causes of action. (Compl. at 7-8). The first five causes of action were against defendant Abraham. The first three causes of action alleged that defendant Abraham unlawfully arrested, searched, and maliciously prosecuted plaintiff. (Compl. First-Third Causes of Action). Plaintiff's Fourth and Fifth Cause of Action alleged that defendant Abraham violated plaintiff's Fourth Amendment rights relative to the search and seizure of plaintiff's car. (Compl. Fourth-Fifth Causes of Action). The next five causes of action mirror the first five, but were alleged against then-Chief of the Syracuse Police Department, Frank Fowler. (Compl. Sixth-Tenth Causes of Action). The Eleventh and Twelfth Causes of Action allege wrongful imprisonment

by each of the defendants. (Compl. Eleventh-Twelfth Causes of Action).

On May 15, 2018, the Honorable David N. Hurd, United States District Court Judge granted defendant Fowler's motion to dismiss plaintiff's complaint against him for lack of personal involvement pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 22). This order had the effect of dismissing the Sixth through Tenth and Twelfth Cause of Action, which were asserted against defendant Fowler alone. (*Id.*) On June 1, 2018, defendant Abraham filed an answer to the complaint. (Dkt. No. 24).

Presently before the court is defendant Abraham's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 46). In support of his motion, defendant Abraham has filed Exhibits A-D, including the transcript of a hearing before Syracuse City Court Judge James Cecile (Def.'s Ex. A); the application for, and accompanying search warrants for the first and second floor apartments at 309 Merriman Avenue in Syracuse New York (Def.'s Exs. B & C); and plaintiff's deposition in this case (Def.'s Ex. D). Plaintiff has not responded in opposition to defendant's motion, despite being informed of the consequences of such failure and despite being afforded two extensions of time to do so. [1] (Dkt. Nos. 47, 56, 57, 58).

[1]    Plaintiff asked for an extension of time to respond shortly after defendant filed his motion. (Dkt. No. 47). Defense counsel filed a letter brief on October 28, 2019, enclosing the Notice of Consequences, which were also served on plaintiff on October 28, 2019. (Dkt. Nos. 56, 57). The Notice of Consequences includes the warning that if plaintiff fails to respond to the defendant's motion, the court may deem defendant's factual statements to be true and plaintiff's claim may ultimately be dismissed in the appropriate case. (*Id.*) Based on defendant's submission, and in an abundance of caution, the court sua sponte granted plaintiff another extension of time to respond to defendant's motion. (Dkt. No. 58). This extension expired on December 2, 2019. (*Id.*) To date, plaintiff has neither responded to the motion, nor has he requested an extension of time to do so. Thus, the court will proceed to consider the defendant's motion.

**II. Summary Judgment**

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 113 of 238

Burton v. Abraham, Not Reported in Fed. Supp. (2020)
2020 WL 1169295

*2 Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the party opposing summary judgment does not respond to the motion, the court may "grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." *DeJesus-Hall v. New York State Unified Court*, No. 18-CV-1241, 2020 WL 918517, at *5 (S.D.N.Y. Feb. 27, 2020) (Fed. R. Civ. P. 56(e)(3)). Where the non-moving party willfully fails to respond to a motion for summary judgment, the court has no duty to perform an independent review of the record to find proof of a factual dispute, even if the non-moving party is pro se. *Gray v. Coeyman's Police Dep't*, No. 1:16-CV-1239, 2020 WL 871179, at *5 (N.D.N.Y. Feb. 21, 2020). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### III. Facts

The court will briefly review the facts as stated in the complaint as well as the facts as developed through further discovery and currently unopposed by plaintiff.[2] In his complaint, plaintiff alleged that on May 18, 2016, at approximately 1:00 pm, defendant Abraham "without a warrant, probable case, or reasonable suspicion, unlawfully entered upon the premises of the Plaintiff ... using excessive force in the form of pointed a loaded pistol firearm" at his head, "forcing him to get on the ground, handcuffing him, searching his entire person, and removing him to another location (the driveway of 309 Merriman Avenue) against his will." (Complaint ("Compl." at 4).)

2    The allegations of fact in the complaint are different than the testimony that plaintiff gave during his deposition, and different than the facts articulated by the officers during the state court probable cause/dismissal hearing.

Plaintiff claimed that, after he lay on the ground for nearly two hours, handcuffed with his hands behind his back, defendant Abraham transported him to the Onondaga County Justice Center, where defendant Abraham filed a "false criminal complaint against Plaintiff charging him with possession of a Controlled Substance in the 3rd and 7th degree as well as loitering." (*Id.*) Plaintiff states that these charges were filed "despite the fact that the search of Plaintiff did not yield any items of criminality." (*Id.*)

*3 Plaintiff also alleged that defendant Abraham was responsible for seizing, driving away, and impounding plaintiff's car. (Compl. at 4-5). Plaintiff stated that the car was impounded for two months, the windows were left open, and the car was substantially damaged before it was returned. (Compl. at 5). As a result of defendant Abraham's actions, plaintiff alleged that he was falsely incarcerated for seven months before the charges were "resolved in the Plaintiff's favor on December 2, 2016." (*Id.*)

Plaintiff was deposed in this action on May 24, 2019. (Dkt. No. 46-5) ("Pl.'s Dep.") Plaintiff testified that on May 18, 2016, he was on parole and living at 302 Merriman Avenue. (Pl.'s Dep. at 18-19). Plaintiff testified that he went to "Parole" on the morning of May 18, and he was given an "ankle bracelet" to wear because he was late for his curfew the week before. (Pl.'s Dep. at 27). Plaintiff testified that when he got back from his parole visit, he pulled up in front of his house at 302 Merriman Avenue, and as he got out of the car, he saw "the guys" who "got raided," and "they" were bringing out four wheelers and dirt bikes from a garage behind the house. (Pl.'s Dep. at 28-29, 30). Plaintiff stated that, usually he did not go over to 309 Merriman when invited, but he did this time, because he saw a dirt bike like the one that he used to own. (Pl.'s Dep. at 29).

Burton v. Abraham, Not Reported in Fed. Supp. (2020)

2020 WL 1169295

Plaintiff testified that he spoke with someone who offered plaintiff a ride on the bike. (Pl.'s Dep. at 29-30). Plaintiff stated that "they" brought the bikes outside of the fence, making sure to emphasize that he "never" set foot outside of the fence. (Pl.'s Dep. at 30). Plaintiff stated that this conversation took place in front of 307 Merriman Avenue. (Pl.'s Dep. at 31). Plaintiff "took [the bike] around the block." (*Id.*) Plaintiff testified that as he got off the bike, and began walking back toward 302 Merriman Avenue, he heard "the guy" saying that he locked his keys in "the car." (Pl.'s Dep. at 32). Although plaintiff did not know the individual's name at the time, after plaintiff was arrested, he discovered that the individual's name was Abimael Rodriguez. (*Id.*)

Plaintiff testified that Mr. Rodriguez was standing behind a car, parked in front of 311 Merriman Avenue and that he was "ranting and raving" about having locked his keys in the trunk. (Pl.'s Dep. at 32-33). Plaintiff stated that he turned around and noticed that the car's sun roof was open, and he heard Mr. Rodriguez say that he was going to have to call a locksmith. (Pl.'s Dep. at 33). As plaintiff walked back toward Mr. Rodriguez, plaintiff told Mr. Rodriguez that if he got plaintiff a clothes hanger, he would help him unlock the door, let the back seat down, and "fish the keys out." (Pl.'s Dep. at 33-34).

Plaintiff waited at the car while Mr. Rodriguez went to get a clothes hanger, which took between two and four minutes. (Pl.'s Dep. at 36-37). Plaintiff stated that there were "a lot of people outside," but that he just stood by himself at the car and did not speak with anyone. (*Id.*) Mr. Rodriguez returned with the hanger, and plaintiff described how he helped Mr. Rodriguez retrieve his keys. (Pl.'s Dep. at 37). Plaintiff testified that as he gave Mr. Rodriguez his keys, he heard some one talking about a U-Haul truck. (Pl.'s Dep. at 38). Plaintiff stated that as he turned around, he saw the U-Haul truck pass by, and it "went right in front of us." (*Id.*) Plaintiff stated that as he watched, the back of the U-Haul opened, he saw a "lot of cops run out," and they "all attacked the location." (*Id.*) Plaintiff stated that some people ran and some people stayed there, but "they were getting beat down to the ground." (*Id.*)

**\*4** Plaintiff watched for a "second" and realized that this was "an actual raid." (Pl.'s Dep. at 41). Plaintiff then testified that "[a]ll I did was walk right across the street. I didn't run. I didn't try to get away. I wasn't doing anything wrong. I felt like I wasn't doing anything wrong, but, I guess I was

associating with this guy who was actually being targeted with this investigation." (*Id.*) Plaintiff stated that he was happy that no drugs were found in the car because he was worried that if "they found anything in there" they would "think that I had something to do with it." (Pl.'s Dep. at 42).

Plaintiff testified that, after he watched for a short time, he "snapped back into it," and "just walked across the street" toward his own home. (Pl.'s Dep. at 43). Plaintiff stated that the raid caused a lot of attention, and a lot of people began "coming around." (*Id.*) There were a lot of people on the sidewalk. Plaintiff testified that as he was walking toward his house, he heard a truck behind him, and as plaintiff reached his driveway, defendant Abraham jumped out of the truck. (Pl.'s Dep. at 44). Plaintiff states that he turned around, and he was face to face with defendant Abraham, who allegedly had his gun out and told plaintiff to "freeze" and "get on the ground." (Pl.'s Dep. at 45). Plaintiff stated that he complied with the defendant's order. (*Id.*)

Plaintiff testified that defendant Abraham came over to him, told him to put his hands behind his back, put the handcuffs on him, and helped him stand up. (Pl.'s Dep. at 46). Plaintiff stated that defendant Abraham then asked plaintiff whether he had anything on him, drugs, weapons, "anything going to poke me?" (*Id.*) Plaintiff said no, and defendant Abraham patted him down, and "he [felt] the ankle bracelet." (Pl.'s Dep. at 47). Plaintiff told defendant Abraham that he was on parole, and explained that he lived at 302 Merriman, and that he was "never over there." (*Id.*) When defendant Abraham confronted plaintiff about "just walking over from ... there," plaintiff explained that he was helping Mr. Rodriguez get his keys out of the car. (Pl.'s Dep. at 48). Plaintiff tried to explain that he did not know anyone from 309 Merriman, but defendant Abraham told plaintiff that he was still going to bring him over there "to see what you know." (Pl.'s Dep. at 48-49).

Plaintiff testified that defendant Abraham brought him back to 309 Merriman, brought plaintiff "inside the fence," and sat him on the grass with all the other individuals in handcuffs. (Pl.'s Br. at 49). Plaintiff states that as he was sitting on the ground, he stopped a sergeant who was walking by, and explained that he did not know how he got over there. (*Id.*) According to plaintiff, the sergeant had an officer come over to pat plaintiff down again, but told him that if they didn't find anything in the car, they would let him go. (Pl.'s Dep. at 50).

2020 WL 1169295

However, instead, plaintiff was brought into the house and strip searched, but plaintiff does not allege that defendant Abraham was involved in this search. (Pl.'s Dep. at 54-55). Plaintiff never saw anyone search the car that was in front of 311 Merriman. (Pl.'s Dep. at 56). He testified that the police were already towing cars away. (Pl.'s Dep. at 57). Plaintiff testified that his own car was driven away. (*Id.*) The car was a 1996 Lincoln Town Car with Alabama licence plates. (Pl.'s Dep. at 58-59). The car was parked in front of 302 Merriman and was registered to plaintiff's mother. (Pl. Dep. at 59). Plaintiff testified that, after he was strip searched and his belongings were returned to him, two other officers found the "key fab [sic]" of his car. (Pl.'s Dep. at 61-63). They unlocked the car and began to search it. (Pl.'s Dep. at 63). However, defendant Abraham was not involved in either taking the "keys" or the search of plaintiff's car. (Pl.'s Dep. at 63, 65). After searching the car, the officers drove away with plaintiff's car. (Pl.'s Dep. at 65). Plaintiff was ultimately taken and "booked" at the Onondaga County Justice Center, where plaintiff called his mother so that she could get "money up." (Pl.'s Dep. at 66). Plaintiff then described all the damage that was done to the car between May and when it was returned to her at the end of July 2016. (Pl.'s Dep. at 67-68).

 **\*5** Plaintiff testified that he discussed his case with an attorney and asked him to "put in a motion to dismiss." (Pl.'s Dep. at 70). However, plaintiff's attorney allegedly told plaintiff that he was arrested while he was on parole so "they have six months to indict you." (Pl.'s Dep. at 71). Plaintiff testified that he began to do his own research and made various determinations about the validity of his confinement. (Pl.'s Dep. at 72-73). Plaintiff stated that he contacted the Citizens' Review Board, which "came in" August 16 th ." (Pl.'s Dep. at 74). Plaintiff's charges were ultimately dismissed on December 2, 2016. (Pl.'s Dep. at 76-77). However, plaintiff was not released until December 23, 2016 because he had to have a parole hearing. [3] (Pl.'s Dep. at 77-78).

[3]     Three months later, plaintiff was charged with an unrelated shooting and was convicted after a jury trial. (Pl.'s Dep. at 79-80). Plaintiff is currently incarcerated on those unrelated charges.

Defendant has also filed the transcript of a December 2, 2016 hearing held before the Honorable James H. Cecile, Syracuse City Court Judge. (Dkt. No. 46-2) (Probable Cause Hearing ("PCH")). Judge Cecile stated at the beginning of the hearing that it was "really, a probable cause hearing as to the

circumstances surrounding Mr. Burton's arrest, as well as the issue of the constructive possession." (PCH at 3). Witnesses at this hearing included: SPD Detective Scott Henderson (PCH at 4-13); SPD Detective Matthew MacDerment (PCH at 13-24), defendant Abraham (PCH at 24-30), and SPD Officer Jerry Mosqueda (PCH at 30-34).

Detective Henderson testified that he worked with the special investigation division, narcotics section. (PCH at 4). He testified that on May 18, 2016, he was the "case detective" for a narcotics and weapons investigation involving both the first and second floor apartments at 309 Merriman Avenue. (PCH at 5). The investigation had been ongoing for several months, during which information was gathered "relative to narcotics, sales from the location from parties gathering around the location on the property, as well as possession of weapons by those parties." (*Id.*) Detective Henderson testified that controlled purchases were made from individuals who were at the property. (*Id.*) During "street level investigation," individuals were stopped after purchasing the drugs and leaving the location. (PCH at 6). 309 Merriman was known as a "purchase point" for both heroin and cocaine. (*Id.*)

Detective Henderson testified that "daily," throughout the day, individuals gathered "on and around" the property, including the driveway and yard area. (*Id.*) Some individuals acted as "lookouts," some would "actually hold the narcotics," some individuals would be using the drugs, and some would possess firearms for protection at the location. (*Id.*) Detective Henderson used the information gathered from the investigation to apply for a search warrant for the property. (*Id.*) A copy of the application as well as the resulting search warrants, signed by Judge Cecile have been included as exhibits in this case. (Def.'s Exs. B & C) (Dkt. Nos. 46-3, 46-4). The search warrants were executed on May 18, 2016. (*Id.*)

Detective Henderson testified that, prior to the execution of the search warrants, surveillance was established at the location, and eventually, the SWAT Team was dispatched to the address. (PCH at 7). During the execution of the warrants, numerous individuals were taken into custody both on the property, around the property, and inside the residence. (*Id.*) The officers recovered "amounts of heroin, as well as cocaine" in multiple spots throughout the property. (*Id.*) One individual who fled on foot was found with heroin and a firearm. (*Id.*) Drug paraphernalia and packaging was found throughout the property inside and outside the home, including in garbage cans. (*Id.*) Detective Henderson stated

that, over the course of the operation, approximately 15 people were arrested, including people who were leaving the property after purchasing drugs. (PCH at 9). Plaintiff was one of those arrested as a result of the execution of the search warrants. (*Id.*) On cross-examination, Detective Henderson testified that a bundle of bags of heroin was found in the middle of the front yard, as if someone had discarded it. (*Id.* at 11).

**\*6** Detective MacDerment testified that he was the U-Haul driver in the "takedown at 309 Merriman Ave." (PCH at 15). The officers used a U-Haul rather than marked vehicles so that the officers could go undetected, giving them time "to get a little closer before people realize what's going on." (PCH at 13). Detective MacDerment testified that, on March 18 th , "there was radio communication before we ever started down the street as far as the number of people who were out and what they had been doing." (PCH at 15). There were individuals in front of the house and in the driveway. (*Id.*)

Detective MacDerment testified that the radio communications also described a Toyota parked in front of the house, and surveillance had reported that "people were moving from the – yard, the driveway, back and forth between the car and that the car was definitely involved with the people there at 309 Merriman." (H at 15-16). Although Detective MacDerment did not see the vehicle before he arrived at the scene, he was advised by radio that people had been moving back and forth from the vehicle. (PCH at 17). Detective MacDerment testified that he drove past the Toyota and parked in front of it. (*Id.*) At that time, Detective MacDerment did observe the plaintiff come from the driveway to the passenger side of the vehicle. (*Id.*)

Detective MacDerment testified that when the doors of the U-Haul opened and the officers came out, there was "quite a bit of confusion[ ]." (PCH at 18). People were being taken into custody in front of the house and in the driveway. (*Id.*) Detective MacDerment stated that he observed the plaintiff leave the car, "trying to melt into the background and walk away along with the driver." [4] (*Id.*) Detective MacDerment testified that he sent defendant Abraham and two other officers to apprehend plaintiff and the other individual. (*Id.*) Detective MacDerment watched as defendant Abraham and the two other officers "made contact" with the individuals, but then went onto something else. (*Id.*)

[4]    Shortly thereafter, Detective MacDerment reiterated that "I saw the gentlemen come from the sidewalk to the car ... as I overtook it. And then, when I got out of the car, I saw them exiting the car, basically trying to slink away." (PCH at 19). One of those individuals was the plaintiff. (*Id.*)

Defendant Abraham testified that he was a detective with the gang violence task force. (PCH at 24). On May 18, 2016, defendant Abraham was assigned with Detective Bailey from the Sheriff's Special Investigations Unit to the "takedown vehicle." (PCH at 25). This meant that defendant Abraham was assigned to assist in taking into custody those individuals who were fleeing or leaving the scene. (*Id.*) Defendant Abraham testified when they arrived, Detective MacDerment told them that there were two males walking away from the scene who were "involved." (PCH at 25-26). One of those individuals was plaintiff Burton. (PCH at 26).

The other individual was taken into custody by Detective Bailey. (PCH at 27). Defendant Abraham testified that he "then walked over to Mr. Burton, who was taken into custody without incident." (*Id.*) The individuals were a few houses west of 309 Merriman. (PCH at 29). Although he was involved in the arrest process, defendant Abraham did not recall whether he actually searched the plaintiff himself. (PCH at 27). On cross-examination defendant Abraham testified that he was not sure that he searched plaintiff himself, other than making sure that he was not armed. (PCH at 29). After that, plaintiff was escorted back to 309 Merriman, where "the" search was conducted. (*Id.*) He could not recall whether he conducted, or was even involved in, the search back at the residence. (PCH at 30).

**\*7** The last detective to testify was Jerry Mosqueda. He was in the "perimeter" unit, which included apprehending any individuals who attempted to run away. (PCH at 32). Detective Mosqueda testified that he did not take any people into custody that day. However, during his search of the fenced-in front yard of 309 Merriman, he located a bundle of ten glassine envelopes of heroin wrapped with a rubber band. [5] The bundle was laying in the front yard. (*Id.*)

[5]    The substance in the envelopes field tested positive for heroin. (PCH at 33).

At the probable cause hearing, plaintiff's criminal attorney argued that the People were trying to establish "constructive possession" of the drugs, presumably the heroin found in the yard. (PCH at 34). Counsel pointed out that no drugs

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 117 of 238

Burton v. Abraham, Not Reported in Fed. Supp. (2020)

2020 WL 1169295

were found on the plaintiff's person. (PCH at 34). Counsel concluded by arguing that in order to show constructive possession, the "defendant" must be near the drugs to establish that he "had control to possess the controlled substances." (PCH at 35-36). After allowing the prosecutor to make his argument, Judge Cecile found that there was probable cause to arrest plaintiff. However, based on the evidence at the hearing, the prosecution would not be able "to sustain their burden of proof with respect to constructive possession at trial." (PCH at 37). Judge Cecile then dismissed the criminal charges against plaintiff. (PCH at 37-38).

### IV. <u>Collateral Estoppel</u>

#### A. Legal Standards

The doctrine of collateral estoppel provides that once a court has actually and necessarily decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States*, No. 3:10-CV-1970, 2012 WL 3043110, at *2 n.5 (D. Conn. 2012) (discussing collateral estoppel) (citations omitted). Federal courts must accord state court judgments the same issue and claim preclusion to which they would be entitled in state court. *Pappas v. Giuliani*, 118 F. Supp. 2d 433, 439 (S.D.N.Y. 2000) (citation omitted).

Collateral estoppel is applicable under New York law if (1) the identical issue was decided in the prior action and was decisive of the present action; and (2) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding. *Jenkins v. City of New York*, 487 F.3d 76, 85 (2d Cir. 2007) (citing *Juan C. v. Cortines*, 89 N.Y.2d 659, 667 (1997)).

#### B. Application

Defendant argues that plaintiff is precluded by collateral estoppel from relitigating his false arrest/imprisonment and malicious prosecution claims because Judge Cecile found after a hearing, that the officers had probable cause to arrest plaintiff. Defendant cites *Reyes v. City of New York*, No. 10-CV-1838, 2012 WL 37544 at *4 (E.D.N.Y. Jan. 9, 2012) which held that Mr. Reyes was barred by collateral estoppel from relitigating the legality of his arrest when the issue was decided against him in a pre-trial motion in state court, even though plaintiff was later acquitted by a jury. (Def.'s Mem. of Law at 2-3).

The court notes that in *Reyes*, at the beginning of the decision, when outlining the facts of the case, the court mentioned that the plaintiff had been acquitted by a jury. The issue of the plaintiff's acquittal was not discussed in the collateral estoppel analysis. The court in *Reyes* found that plaintiff had a full and fair opportunity to litigate the issue of probable cause because he participated in a state court suppression hearing, during which the officers testified, and after which, the trial court judge issued a decision. 2012 WL 37544, at *2, *4.

**\*8** The case cited by defense counsel contradicts a much more recent case from the Eastern District of New York, which relied on a Second Circuit case in finding that facts determined in a pre-trial suppression hearing *cannot* be given preclusive effect against an individual who is subsequently acquitted of the charges. *Daniel v. Orlando*, No. 16-CV-1418, 2019 WL 1791517, at *4 (E.D.N.Y. Apr. 24, 2019) (citing *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996)). In *Daniel* the court specifically stated that

> [a]lthough the question of whether probable cause supported Plaintiff's arrest was necessarily decided at the state-court suppression hearing and is decisive in adjudicating Plaintiff's false arrest claim, Plaintiff did not have a full and fair opportunity to contest the probable cause determination in state court because the charges against her were ultimately dismissed.

2019 WL 1791517, at *4.

The court in *Daniel* reasoned that if plaintiff's charges were dismissed, she would not have had the "opportunity" to appeal the state court's adverse determination on the probable cause issue because there was insufficient incentive to do so. *Id.* In *Johnson*, the court held that under New York law, "appellate review plays a critical role in safeguarding the correctness of judgments." 101 F.3d at 795 (citing *Malloy v. Trombley*, 50 N.Y.2d 46, 51 (1980)). Collateral estoppel cannot be applied without first considering the availability of such review. *Id.* If the party has not had an opportunity to appeal the adverse finding, then "it has not had a full and fair opportunity to litigate the issue." *Id.* (citations omitted). The court in *Johnson* then cited several New York State cases in which the state court held that facts determined in

Burton v. Abraham, Not Reported in Fed. Supp. (2020)

2020 WL 1169295

a pre-trial suppression hearing could not be given preclusive effect against a defendant who was subsequently acquitted of the charges because the defendant lacked the opportunity to obtain review of the issue decided against him. *Id.* (citing inter alia *Williams v. Moore*, 197 A.D.2d 511, 513 (2d Dep't 1993); *People v. Howard*, 152 A.D.2d 325, 329 (2d Dep't 1989), *appeal denied*, 75 N.Y.2d 814 (1990); *People v. Sweeper*, 127 A.D.2d 507, 509 (1st Dep't 1987)).

In this case, Judge Cecile first found that the officers had probable cause to arrest the plaintiff, but ultimately dismissed the charge of constructive possession for lack of evidence. The court found probable cause and dismissed the charges all in the same proceeding. There clearly was no opportunity for the plaintiff, nor was there any incentive for the plaintiff to appeal the adverse probable cause determination. Thus, collateral estoppel does not apply in this case to prevent re-litigation of the probable cause issue. However, as will be discussed below, notwithstanding the unavailability of collateral estoppel, plaintiff's claims may still be dismissed.

## V. False Arrest/False Imprisonment

### A. Legal Standards

In analyzing § 1983 claims for unconstitutional false arrest, the court looks to the law of the state in which the arrest occurred. *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (citing *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Under New York law, a false arrest claim requires a plaintiff to show that "the defendant intentionally confined him without his consent and without justification." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) and citing *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Reid v. Yisrael*, No. 19-CV-1220, 2019 WL 2437848, at *2 (E.D.N.Y. June 10, 2019) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)) (quotations omitted) and citing *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) ("Probable cause is a complete defense to a constitutional claim of false arrest and false imprisonment." (citations omitted)).

*9 "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to

be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d at 152 (quotation omitted). The existence of probable cause must be based on the totality of the circumstances. *Turyants v. City of New York*, No. 18-CV-841, 2020 WL 804900, at *4 (E.D.N.Y. Feb. 18, 2020) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)). In addition, the "collective knowledge doctrine" provides that, "for the purpose of determining whether an arresting officer had probable cause to arrest, " 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' " " *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983)). However, the arresting officer must have acted reasonably in relying on the information communicated to him. *Husbands ex rel. Forde v. City of New York*, 335 Fed. App'x 124, 128 (2d Cir. 2009) (citation omitted). Furthermore, the fact that the criminal charges are subsequently dismissed is not relevant to the determination of probable cause to arrest. *Danforth v. City of Syracuse*, No. 09-CV-307, 2012 WL 4006240, at *7 (N.D.N.Y. Sept. 12, 2012).

### B. Application

In this case, a review of the testimony at plaintiff's state court hearing, plaintiff's own testimony at the deposition in this action, and the documents associated with the search warrant applications in state court show that defendant Abraham had probable cause to arrest the plaintiff on May 18, 2016, even if the charges against him were later dismissed.[6]

[6]        As stated above, plaintiff has failed to respond to the defendant's motion for summary judgment, despite being warned about the consequences. Thus, plaintiff has essentially admitted the facts as stated by the defendant. During his deposition, plaintiff admitted to some of the facts that the defendant alleges. The court will then determine if defendant has shown that he is entitled to judgment as a matter of law based on those facts.

There is no question, and plaintiff never disputed, that 309 Merriman Avenue was the center of a drug dealing organization. Detective Henderson outlined the investigation, both in his application for warrants to search the house and surrounding areas, and at plaintiff's probable cause hearing. (Def.'s Ex. C at 4-8). As stated above, Detective Henderson testified at the plaintiff's hearing that the investigation lasted several months prior to the execution of the search warrants in question on May 18, 2016. (PCH at 5). In the search

warrant application, and at the hearing, Detective Henderson described various controlled purchases of narcotics at 309 Merriman and also stated that, based on previous investigations, it was known that the responsible individuals would conceal drugs in "extremely unusual locations," including locations inside the home, outside the home, and in vehicles located on the property. (Def.'s Ex. C at 8; PCH at 5-6).

Without detailing each observation, purchase, and arrest that lead to law enforcement's activities on May 16, 2016, it is clear that there was substantial narcotics trafficking from both apartments located at 309 Merriman Avenue, and that people who were involved in this trafficking would be located inside and outside the home. This included police observation that individuals would gather in and around the property in the driveway and the yard "areas," where some people would act as lookouts, others would hold onto the drugs, and others would be responsible for protecting the location. (Def.'s Ex. C at 5; PCH at 6). Based on this information, Judge Cecile issued the search warrants for the property. (Def's Ex. B).

Detective Henderson testified that prior to the execution of the search warrants, surveillance of the property was established, and ultimately, a SWAT team was dispatched to the location. (PCH at 7). Detective Henderson also stated that, during the execution of the warrants, heroin and cocaine were found in "multiple spots throughout the property," inside and outside the location. (Id.) Detective Henderson also testified that one of the individuals who fled the location was discovered with drugs and a firearm. (Id.) A bundle of bags with heroin in them was found abandoned in the front yard.

**\*10** Detective MacDerment, who was driving the U-Haul, testified at plaintiff's state court hearing that the surveillance team described the Toyota that was parked in front of the house, and that people were moving "from the – yard, the driveway, back and forth and that the car was definitely involved with the people there at 309 Merriman." (H at 15-16). The Toyota was parked "maybe a car length and a half west of the driveway" at 309 Merriman. (PCH at 20) (cross-examination). Detective MacDerment observed the plaintiff go from the driveway of 309 Merriman to the passenger's side of the Toyota. (PCH at 17). Before he got out of the U-Haul, Detective MacDerment observed a different individual running away, so the officers "addressed that first." (PCH at 18). There was a bit of confusion as the officers took into custody individuals who were in front of the house and in the driveway. (Id.) When Detective MacDerment got out of

the U-Haul, he observed the plaintiff leaving the car, trying to "melt into the background" and walk away along with the driver." (PCH at 18). He ordered defendant Abraham and another officer to apprehend plaintiff and the other individual. (Id.)

Based on the general investigation of the area, together with Detective MacDerment's observations, and the fact that drugs were found in the front yard of 309 Merriman, defendant Abraham had probable cause to stop and arrest the plaintiff, who according to Detective MacDerment had moved from the driveway of 309 Merriman, to the passenger side of the Toyota (which was reportedly being used in conjunction with the activities at 309 Merriman), and who then attempted to walk away from the scene unnoticed.

Plaintiff's own testimony at his deposition, supports the officers' testimony. Plaintiff conceded at his deposition, that he went over to the Toyota and stood by the passenger door, allegedly to help the owner of the car get his keys out. Plaintiff testified that he stood by the car waiting for the owner to get a hanger, and then when the officers started arresting people, attempted to casually walk away from the car. (Pl.'s Dep. at 36-41). Defendant Abraham was assigned to assist in apprehending individuals who were attempting to flee or to get away from the scene (PCH at 25), and he was told by Detective MacDerment to apprehend the plaintiff and the other individual who had been next to the Toyota. Plaintiff was taken into custody without incident. [7] (PCH at 27). While no contraband was found on plaintiff, there were drugs found in the yard of 309 Merriman which had apparently been discarded by someone. Defendant Abraham brought plaintiff back to 309 Merriman and placed him where the rest of the detained individuals were sitting. (PCH at 29). He could not remember whether he was involved in the search of plaintiff. (PCH at 30). Based on the totality of the circumstances and the collective knowledge doctrine, this court agrees that there was probable cause to arrest plaintiff. Defendant Abraham acted reasonably in relying on the information provided by Detective MacDerment, when he took plaintiff into custody during the raid.

[7]     Although plaintiff testified at his deposition that defendant Abraham approached him in or around plaintiff's driveway at 302 Merriman with his gun drawn, plaintiff testified that he got on the ground, defendant Abraham came over, put handcuffs on him and "helped" him up. (Pl.'s Dep. at 45-46). Plaintiff testified that defendant Abraham then

Burton v. Abraham, Not Reported in Fed. Supp. (2020)

2020 WL 1169295

asked if plaintiff had anything on him and patted him down. (Pl.'s Dep. at 46). Defendant Abraham allegedly felt the plaintiff's ankle bracelet and inquired about it. (*Id.* at 47).

Plaintiff does not question any of the surrounding facts. In his deposition, plaintiff admitted being in the area right before the raid, riding a dirt bike that some individuals had taken out of the garage at 309 Merriman Ave, and standing by the Toyota for several minutes while Mr. Rodriguez went to get a hanger. He remembered the U-Haul van drive by the Toyota and park in front of it, and he remembered seeing all the officers jump out of the U-Haul. [8] In fact, at his deposition, plaintiff testified that "I felt like I wasn't doing anything wrong, but I guess, I was associating with this guy who was actually being targeted with this investigation." [9] (Pl.'s Dep. at 41).

[8]   As stated above, this testimony was completely contrary to the facts that plaintiff wrote in his complaint, where he stated that defendant Abraham "entered upon the [plaintiff's] premises," pointed a loaded gun at him, and arrested him, searching his entire person. (Compl. at 4).

[9]   The court notes that plaintiff also claims to have had a discussion with former Police Chief Fowler while plaintiff was sitting at 309 Merriman with the rest of the individuals who had been taken into custody. However, Chief Fowler has been terminated from this action. (Pl.'s Dep. at 51-52).

**\*11**  Because probable cause to arrest plaintiff existed, plaintiff's claims for false arrest/imprisonment must be dismissed. [10]

[10]   Although plaintiff alleged during his deposition that he was taken by officers into the house at 309 Merriman Avenue and strip searched, he specifically stated that defendant Abraham was not involved in that search. (Pl.'s Dep. at 54-56).

## VI. Qualified Immunity

### A. Legal Standards
The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the

Court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel. Duncan v. White Plains School Dist.,* No. 11 Civ. 6756, 2013 WL 440556, at \*10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011)).

Because qualified immunity is " 'an immunity from suit rather than a mere defense to liability,' " the Supreme Court has " 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " *Pearson v. Callahan,* 555 U.S. 223, 231-32 (2009) (citations omitted). In the case of probable cause, the Second Circuit has held that an officer is entitled to qualified immunity if he can show "arguable probable cause" for the arrest. *Crenshaw v. City of Mt. Vernon,* 372 F. App'x 202, 205 (2d Cir. 2010). "Arguable probable cause ... exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Id.* (quoting *Droz v. McCadden,* 580 F.3d 106, 109 (2d Cir. 2009) (per curiam) (other quotations omitted)). In deciding whether arguable probable cause existed, the court examines whether " '(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Id.* (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991)) (internal quotation marks omitted)). Even in situations in which an officer reasonably but mistakenly concludes that probable cause exists, " 'the officer is nonetheless entitled to qualified immunity.' " *Id.* (quoting *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002)).

### B. Application
Based on all the information above, even assuming that probable cause did not exist, the defendant would have had at least arguable probable cause to stop plaintiff, take him into custody, pat him down for weapons, and bring him back to 309 Merriman for further investigation. Thus, plaintiff's claims for false arrest/imprisonment may be dismissed.

## VII. Malicious Prosecution

### A. Legal Standards

2020 WL 1169295

**\*12**   The elements of a malicious prosecution claim under both section 1983 and New York State law are: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice[,] and[ ] (4) the matter terminated in plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016). When raising a malicious prosecution claim under section 1983, the plaintiff must also show a " 'seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.' " *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks and citation omitted)).

### B. Application

In this case, the court has found that defendant had probable cause to arrest the plaintiff. This alone would defeat plaintiff's claim of malicious prosecution. However, it is also unclear who filed the charges against plaintiff, and there is no indication in the facts that defendant Abraham filed the charges. Therefore, it is likely that defendant Abraham did not even "initiate the prosecution" as required to establish malicious prosecution. He was only involved in plaintiff's apprehension based on Detective MacDerment's observations. In any event, there is no indication that the charges were filed with "malice," sufficient to establish a claim for malicious prosecution. Thus, plaintiff's claim for malicious prosecution against defendant Abraham must be dismissed.

### VIII. Personal Involvement

#### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is

an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

### B. Application

In the complaint, plaintiff's second cause of action alleged that defendant Abraham unlawfully searched plaintiff and his fourth and fifth cause of action alleged that defendant Abraham unlawfully seized and searched plaintiff's car. (Compl. at 7). However, during plaintiff's deposition, he conceded that defendant Abraham only patted him down at the time of his arrest. Plaintiff specifically stated that defendant Abraham was not involved in any of the other "searches" to which he was subjected. (Pl.'s Dep. at 54). Finally, plaintiff testified that defendant Abraham was not involved in the seizure, search, or damage to his car. (Pl.'s Dep. at 62, 63, 65). Plaintiff stated that two other officers took his keys and drove his car from the scene. (*Id.*) "It wasn't Abraham." (*Id.* at 62). Plaintiff repeated this twice. (*Id.* at 62, 63, 65). Plaintiff's own testimony makes it quite clear that, even assuming that there were a Fourth Amendment violation associated with the search and seizure of plaintiff's car, defendant Abraham was not involved. Thus, plaintiff's Fourth and Fifth Causes of Action may also be dismissed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the defendant's motion for summary judgment (Dkt. No. 46) is **GRANTED**, and the plaintiff's complaint is **DISMISSED IN ITS ENTIRETY**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

### All Citations

Not Reported in Fed. Supp., 2020 WL 1169295

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

2016 WL 5440596
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trazz SAWYER, Plaintiff,

v.

Albert PRACK, et al., Defendants.

Civil Action No. 9:14-CV-1198 (DNH/DEP)

|

Signed 07/29/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: TRAZZ SAWYER, Pro se, 97-B-2413, Orleans Correctional Facility, 3531 Gaines Basin Road, Albion, NY 14411.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, Attorney General of the, State of New York, The Capitol, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Albany, NY 12224.

REPORT AND RECOMMENDATION

David E. Peebles, U.S. Magistrate Judge

*1 *Pro se* plaintiff Trazz Sawyer, a New York state prison inmate, has commenced this civil rights action against several employees of the New York State Department of Corrections and Supervision ("DOCCS"), four who are identified by name and three of whom are sued as "John Doe" defendants, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that he was assaulted by corrections officers, and that a prison nurse failed to intervene and later refused to treat his injuries resulting from the beating. Plaintiff also contends that he was denied procedural due process at a related disciplinary hearing, resulting in a finding of guilt and service of five months confinement in a special housing unit ("SHU").

Currently pending before the court is a motion for summary judgment brought by the defendants seeking dismissal of plaintiff's pending claims. In their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies before commencing suit, (2) no reasonable factfinder could conclude plaintiff's procedural due process rights were violated based upon the record now before the court, (3) the claim asserted against defendant Albert Prack, the

DOCCS Director of Special Housing/Inmate Disciplinary Program should alternatively be dismissed for lack of personal involvement, (4) the John Doe defendants should be dismissed from the action based upon plaintiff's failure to timely identify and serve process upon them, and (5) in any event all defendants are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied, and that plaintiff's claims against defendants Phelix and Prack and the John Doe defendants be dismissed.

I. BACKGROUND [1]

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. At the times relevant to his claims in this action, he was confined at the Bare Hill Correctional Facility ("Bare Hill"), located in Malone, New York. *Id.*

On the morning of October 1, 2011, plaintiff was working in the music room at Bare Hill. Dkt. No. 1 at 8; Dkt. No. 37-1 at 1; Dkt. No. 35-21 at 1. For reasons that are in dispute, the plaintiff was ordered to submit to a pat frisk, and was holding a pen in his hand when corrections officers Richards and Langdon, both of whom are defendants in this case, began conducting the frisk. Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. Defendants Richards and Langdon forcibly removed the pen from plaintiff's hand and took him to the ground. *Id.* Dkt. No. 1 at 11-12; Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. The parties dispute whether additional force was used once plaintiff was on the ground. Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 2-3. Plaintiff claims that defendants Richards and Langdon "violently slammed him to the floor" and dislocated his shoulder. Dkt. No. 1 at 12.

*2 Plaintiff alleges that after being transported to the Bare Hill SHU, he was again assaulted by corrections personnel. Dkt. No. 1 at 3, 12-14. At the time he filed his complaint, plaintiff did not know the identities of the corrections officers who assaulted him, and therefore asserted claims related to this alleged second assault against three John Doe defendants. *Id.* Plaintiff now "believe[s]" that one of the three corrections officers who assaulted him in the SHU was defendant Richards. Dkt. No. 37-2 at 5.

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
Case 9:21-cv-00135-DNH-TWD Document 79 Filed 02/12/24 Page 123 of 238
2016 WL 5440596

Based on the events of October 1, 2011, plaintiff was issued a Tier III misbehavior report for violent conduct, disobeying a direct order, interference, and harassment.[2] Dkt. No. 1 at 15; Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 3. In preparation for the hearing, plaintiff met with a counselor, who plaintiff refers to as an employee assistant, three days before the hearing. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Plaintiff contends that the "employee assistant was inadequate." Dkt. No. 37-2 at 5. Plaintiff also contends that his due process rights were violated at the ensuing Tier III disciplinary hearing, and with respect to the notice that gave rise to the hearing. Dkt. No. 37-2 at 5-6.

[2]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* *Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

On October 6, 2011, a disciplinary hearing was conducted by Deputy Superintendent of Security D. Phelix, another defendant in this action. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 3. During the hearing, defendants Langdon and Richards testified regarding the incident that occurred on the morning of October 1, 2011. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 4; Dkt. No. 35-10 at 17, 22. Defendant Phelix also heard testimony from plaintiff and considered the following documents: (1) the October 1, 2011 misbehavior report signed by defendant Richards; (2) a memorandum from defendant Richards to Sergeant Carey, dated October 1, 2011; (3) a memorandum written by Sergeant Carey to Lieutenant Munson, dated October 1, 2011; (4) a use of force report, dated October 1, 2011; and (5) an inmate injury report, dated October 1, 2011. Dkt. No. 35-10 at 7-16.

As part of his defense, plaintiff requested that inmates Ponder and Farrell be called to testify on his behalf. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. While inmate Ponder was called as a witness, he testified that he was not present during the encounter between the plaintiff and defendants Langdon

and Richards. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Inmate Farrell refused to appear as a witness at the plaintiff's disciplinary hearing. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

During the hearing plaintiff also requested a sign-in sheet from the music room. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Defendant Phelix recessed the hearing so that an attempt could be made to locate the requested sign-in sheet. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Upon reconvening the hearing, defendant Phelix advised plaintiff that the sign-in sheets are not kept on file, and were therefore unavailable. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

**\*3** Defendant Phelix then called Officer Sauve as a witness, who testified that the sign-in sheets are not maintained by Bare Hill staff. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Officer Sauve did, however, provide defendant Phelix with a list of ten porters who worked in the music room area on October 1, 2011. Dkt. No. 35-10 at 49; Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Plaintiff requested that he be permitted to call all ten of the listed porters as witnesses. Dkt. No. 35-10 at 49. Plaintiff was unable to identify which of the ten porters were working in the music room during the relevant events on October 1, 2011, stating only that he "saw a whole bunch of guys that day." Dkt. No. 35-10 at 50. Defendant Phelix declined to allow plaintiff to call all ten porters as witnesses, but did permit him to identify five inmate porters that he desired to call as witnesses, and then contacted each of those five porters. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 50-51. All five of the requested inmate porters that defendant Phelix contacted refused to testify. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. There was no testimony at the hearing from any witnesses other than the officers involved and plaintiff as to what happened during the pat frisk. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 7-12. Plaintiff also did not provide defendant Phelix with any documentary evidence, other than medical records, in defense of the charges brought against him. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5-6.

At the conclusion of the hearing, defendant Phelix found plaintiff guilty of all charges, except as to the allegation of interference, and sentenced Sawyer to two years of disciplinary SHU confinement. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff appealed the hearing officer's determination to defendant Prack, another defendant in this case. Dkt. No. 1 at 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. In his decision, defendant Prack upheld the hearing officer's finding of guilt, but reduced the sentence to six months in

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 124 of 238

SHU. Dkt. No. 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff subsequently filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York state court. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. While that petition was pending, the disciplinary determination was administratively reversed. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. By that time, plaintiff had spent approximately five months in SHU confinement. Dkt. No. 1 at 17; Dkt. No. 35-3 at 79.

Plaintiff claims that defendant Phelix violated his Fourteenth Amendment right to due process by failing to provide him with proper notice regarding the charges against him, finding him guilty without supporting evidence, denying him adequate assistance in preparation for the hearing, and rejecting his request for witnesses. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff claims that defendant Prack violated plaintiff's Fourteenth Amendment right to due process by ignoring "strong" evidence that would have warranted a reversal of defendant Phelix's determination. Dkt. No. 1 at 17-18; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8.

## II. PROCEDURAL HISTORY

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on October 1, 2014. Dkt. No. 1. Plaintiff's complaint named as defendants the following DOCCS employees: (1) Albert Prack, the DOCCS Director of Special Housing/Inmate Discipline Program; (2) D. Phelix, a deputy superintendent of security at Bare Hill; (3) Bare Hill corrections officers D. Richards and S. Langdon; (4) Ms. Mulverhill, a registered nurse at Bare Hill; and (5) two John Doe corrections officers and a John Doe corrections sergeant at Bare Hill. *Id.* at 1.

On December 31, 2014, the court issued an order granting plaintiff's request for leave to proceed *in forma pauperis* and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 4. Based on that decision, plaintiff's two remaining claims include: (1) excessive use of force and failure to protect claims under the Eighth Amendment, asserted against defendants Richards, Langdon, John Doe #1, John Doe #2, and John Doe #3; and (2) a violation of due process cause of action under the Fourteenth Amendment, asserted against defendants Phelix and Prack. *Id.* at 9-11, 22-23. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering, as well as for his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 18-20.

**\*4** Following the close of discovery, defendants filed a motion for summary judgment, arguing that plaintiff's complaint should be dismissed because the record evidence conclusively establishes that plaintiff inexcusably failed to exhaust his administrative remedies and, in any event, defendants are all entitled to qualified immunity. *See generally* Dkt. No. 35. In their motion, defendants additionally argue that the John Doe defendants should be dismissed from the action based upon plaintiff's failure to identify and serve them with process, and that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Phelix and Prack violated plaintiff's due process rights; or (2) defendant Prack was personally involved in the Fourteenth Amendment constitutional violation alleged. *Id.* Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 125 of 238

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. Exhaustion of Available Administrative Remedies

### 1. Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*5** Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified three circumstances in which such unavailability can be found. *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[ ] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Lastly, exhaustion can be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." [4] *Id.* at 1860.

[4]     Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the exhaustion requirement by the Second Circuit in such cases as *Hemphill v. New York*, 380 F. 3d 680 (2d Cir. 2004).

### 2. The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that an inmate must satisfy when he has a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(i), (ii).

[5]     Depending on the type of matter complained of by the grievant, the superintendent has either seven or

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 126 of 238

twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

### 3. Analysis

Plaintiff has conceded that he did not fully exhaust his administrative remedies with respect to any of the claims currently remaining in this action. *Compare* Dkt. No. 35-21 at 7 *with* Dkt. No. 37-1 at 8-9. When asked during his deposition whether he attempted to exhaust his administrative remedies with respect to the first use-of-force incident that occurred on October 1, 2011, plaintiff testified that he did not file a grievance while he was in SHU because he thought "it would have been futile" to do so based on his understanding that mail he was "sending out" was not "arriving where it was going." Dkt. No. 35-3 at 70. Plaintiff further testified that he did not "believe" he filed a grievance once he was "out of that particular SHU," but further stated, "maybe I did[,] I'm not one hundred percent sure[,] I would have to look at the documents." [6] Dkt. No. 35-3 at 70. With regard to the alleged second incident of assault that occurred on October 1, 2011 in the Bare Hill SHU, plaintiff testified candidly that he did not file a grievance. *Id.* at 71. Plaintiff further testified that he did not file a grievance against either defendant Phelix or defendant Prack based on their alleged violations of his due process rights because, according to him, formal exhaustion is not a requirement for raising a Fourteenth Amendment due process claim when an inmate has pursued an administrative appeal from a hearing officer's determination. *Id.* at 80; *see also* Dkt. No. 37-1 at 10.

[6]   Plaintiff testified that he was held in SHU at Bare Hill for sixteen days before being transferred into the Upstate Correctional Facility ("Upstate"). Dkt. No. 1 at 14; Dkt. No. 35-3 at 71.

**\*6** The record evidence adduced by defendants in support of their non-exhaustion defense includes a declaration from Jeffery Hale, the Assistant Director of the DOCCS IGP, and the custodian of records maintained by the CORC. Dkt. No. 35-6. In his declaration, Hale states that his office conducted a search of the appeals filed by plaintiff with the CORC, which revealed that plaintiff filed twenty-four appeals to the CORC between August 21, 2000 and January 3, 2012. *Id.* at 2. Hale further states that plaintiff filed a grievance with the CORC bearing grievance number UST-48092-12, and that grievance alleges that "[p]laintiff tried to file a related grievance on October 26, 2011 at Bare Hill." [7] *Id.* at 3. Hale indicates that plaintiff's grievance dated October 26, 2011 was "properly returned to [p]laintiff by the Bare Hill IGRC" because plaintiff was not housed at Bare Hill at that time, and that plaintiff's subsequent filing of a grievance on December 27, 2011 at Upstate, where he was housed, was "untimely." *Id.*

[7]   A letter sent to plaintiff on November 9, 2011 from the Director of the Inmate Grievance Program, Karen Bellamy, identifies October 20, 2011, and not October 26, 2011, as the actual date that plaintiff attempted to file a grievance at Bare Hill. Dkt. No. 35-8 at 15.

Grievance Number UST-48092-12 mentions the October 1, 2011 use of force incident, but does not name any specific officers and does not raise any due process complaints. *Id.*; Dkt. No. 35-8 at 6-10, 17-20. Plaintiff also states in that grievance that he "attempted to file a grievance" regarding the alleged assault as early as October 11, 2011, [8] "[f]irst at Bare Hill where the assault occurred, then here at Upstate[,]" and that "[e]very attempt to file a grievance concerning the assault by officers have [sic] been prevented[.]" Dkt. No. 35-8 at 17. Plaintiff identifies October 20, 2011 as the second date on which he attempted to file a grievance, and states that this grievance was mailed from Upstate to the Bare Hill IGRC, and responded to on October 26, 2011, with a notation that the grievance needed to be filed at Upstate. *Id.* Plaintiff further states that on November 7, 2011, after he was released from the hospital at Upstate, he sent a letter to the Upstate IGRC requesting a forty-five day extension of his deadline to grieve the events of October 1, 2011, and attached to that

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Case 9:21-cv-00135-DNH-TWD     Document 79     Filed 02/12/24     Page 127 of 238

letter a copy of the grievance he filed on October 20, 2011. *Id.* at 18. Plaintiff claims he never received a response to that request, but did receive a letter from "director Bellamy" on November 9, 2011, informing him that "Upstate and Bare Hill claim their IGRC were not receiving [his] grievances and none were on file." *Id.* Against this backdrop, the court must decide whether plaintiff's failure to exhaust his administrative remedies regarding the use of excessive force is excusable.

8    In that grievance, plaintiff initially states that he was assaulted on September 1, 2011, and first attempted to file a grievance on September 11, 2011. At a later point in the same grievance, plaintiff identifies the date he first attempted to file a grievance as October 11, 2011. Dkt. No. 35-8 at 17. In his affidavit submitted in opposition to defendants' motion, plaintiff identifies October 11, 2011 as the first date on which he attempted to file a grievance. Dkt. No. 37-2 at 7. The affidavit does not indicate whether the grievance plaintiff attempted to file on October 11, 2011 pertained to both alleged incidents of assault that occurred on October 1, 2011, or just the first use of force incident. Plaintiff also states in paragraph 72 of his statement of additional material facts that his reference to September 11 was incorrect, and should have read October 11, 2011. Dkt. No. 37-1 at 12. Defendants have not responded to plaintiff's statement of additional material facts. In light of this, the deference owed to plaintiff as the non-movant, the undisputed fact that a use-of-force incident occurred on October 1, 2011, and the impossibility of plaintiff filing a grievance in September with respect to an event that occurred in October of the same year, I view all references to a September date in Grievance Number UST-48092-12 as mistakes.

**\*7** Plaintiff has submitted record evidence, in the form of an affidavit, indicating that he attempted to file a grievance at Bare Hill on October 11, 2011, and that "guards at Bare Hill in-take the grievances and they would then disappear." Dkt. No. 37-2 at 7. Plaintiff also testified that, while he was confined in the SHU at Bare Hill, he attempted to mail letters to his sisters, and that those letters never arrived. Dkt. No. 35-3 at 71. While the court has not been provided with a copy of the October 11, 2011 grievance and understands defendants' position to be that no such grievance was ever filed, viewing the evidence in the light most favorable to plaintiff, these assertions create questions of fact regarding the filing of the grievance and availability of a grievance

procedure to plaintiff. *See Ross*, 136 S. Ct. at 1860 (noting that "thwart[ing] [the] inmate[ ] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation" may effectively render a grievance program unavailable to an inmate).

I note, moreover, that the undisputed record before the court conclusively establishes plaintiff mailed a grievance to the IGRC at Bare Hill on October 20, 2011, nineteen days after the incidents that occurred on October 1, 2011, pertaining to at least the first alleged assault. [9] While it is also undisputed that plaintiff should have filed this grievance at Upstate, where he was housed on October 20, 2011, [10] it appears that Bare Hill did not receive plaintiff's grievance until October 26, 2011, and therefore plaintiff did not receive a response notifying him of his mistake until October 26, 2011. *See* Dkt. No. 35-8 at 1, 18. This date, of course, is beyond the twenty-one day exhaustion deadline. Plaintiff's grievance dated December 29, 2011 also contains a statement by him that within twelve days of receiving a response from Bare Hill regarding his October 20, 2011 grievance, he submitted a request to the Upstate IGRC for an extension of his exhaustion deadline relative to the events of October 1, 2011, pursuant to 7 N.Y.C.R.R. § 701.6(g), and attached to that request a copy of the October 20, 2011 grievance. [11] *See* Dkt. No. 35-8 at 8. Plaintiff states that he did not receive a response to his request, but did speak with a woman "whom [he was] told was grievance staff," which caused him to believe that his grievance was being investigated. [12] *Id.*; *see also* Dkt. No. 37-1 at 12.

9    Neither party has submitted a copy of this grievance. While I have serious doubts regarding whether plaintiff ever attempted to exhaust his administrative remedies with respect to the second alleged incident of assault, based on his deposition testimony, I am unable to decide this issue based on the current record.

10    *See* 7 N.Y.C.R.R. § 701.5.

11    Plaintiff's grievance dated December 29, 2011 also indicates that he was in the hospital at Upstate beginning on an undisclosed date and concluding on November 7, 2011, and that he was unable to "mail anything" from the hospital during this period. Dkt. No. 35-8 at 8.

12    While not citing any record evidence in support of this statement, plaintiff has indicated in his

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 128 of 238

2016 WL 5440596

statement of additional material facts that he submitted the October 20, 2011 grievance to the Upstate IGRC on November 7, 2011, and that the grievance was "held without filing until 45 days expired, then deemed untimely." *See* Dkt. No. 37-1 at 12.

The regulation on which plaintiff purportedly relied in requesting his extension, 7 N.Y.C.R.R. § 701.6(g), contemplates an extension of an inmate's time to grieve when the request is made beyond twenty-one days but within forty-five days of the incident, upon a showing of mitigating circumstances. Assuming plaintiff made his request to the Upstate IGRC on November 7, 2011, that is within forty-five days of October 1, 2011. Assuming further that plaintiff never received a response to his request for an extension of time, as he states, a question of fact remains regarding whether the process for requesting an extension of time under 7 N.Y.C.R.R. § 701.6(g) was available to plaintiff within forty-five days of October 1, 2011.

**\*8** Moreover, plaintiff has adduced evidence of mitigating circumstances, in that he tried to timely file his grievance but submitted it to the wrong facility, and has further established that he filed a separate complaint grieving, among other things, the denial of an extension to the time limit. Dkt. No. 35-8 at 6-9. Defendants have not responded to plaintiff's contention that he requested an extension of time to exhaust his administrative remedies and never received a response to this request. It is therefore unclear whether, if the Upstate IGRC received plaintiff's request for an extension and the October 20, 2011 grievance within forty-five days of October 1, 2011, the request would have been granted. Based on these circumstances as well, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of plaintiff's excessive force claims for failure to exhaust available administrative remedies. [13]

[13]  Recently, the Second Circuit ruled in *Williams v. Priatno*, ___ F.3d ___, 2016 WL 3729383 (2d Cir. July 12, 2016) that a *pro se* inmate plaintiff was excused from exhausting his administrative remedies where the record showed that he (1) attempted to file a grievance at a facility where he was assaulted, (2) followed up with the Superintendent at the facility about the grievance after having received no response, (3) was then transferred to another facility, and (4) never appealed the grievance. 2016 WL 3729383, at

\*2, \*5-\*6. The *Williams* court rejected defendants' argument that the plaintiff in that case "still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)" even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that "even if Williams technically could have appealed his grievance, ... the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it].' " *Id.* at \*5 (quoting *Ross,* 136 S. Ct. at 1859). Based on the Second Circuit's holding in *Williams*, it would seem that plaintiff's failure to appeal the non-decision on his request for an extension, as well as plaintiff's failure to appeal the non-decision on his grievance submitted on October 11, 2011, is excusable.

With respect to plaintiff's due process claim, plaintiff does not contend that administrative remedies were not available to him. Rather, his argument appears to be that the IGP procedure need not be followed in situations where the claim is for a due process violation stemming from a disciplinary hearing and there has been a "final administrative appeal." Dkt. No. 35-21 at 7; Dkt. No. 37-1 at 10.

There is support for plaintiff's claim that formal exhaustion may not be required with respect to plaintiff's due process claim against defendant Phelix, based on his having appealed defendant Prack's affirmance of defendant Phelix's determination into the New York state courts. *See, e.g. Toliver v. Stefinick*, 12-cv-0077, 2016 WL 3351974, at \*2 (N.D.N.Y. Mar. 22, 2016) (Baxter, M.J.) ("This court agrees that, before he initiated this lawsuit, plaintiff failed to exhaust his administrative remedies with respect to all of his remaining claims, except for the due process claims relating to disciplinary proceedings, which must be exhausted by administrative appeals of the sanctions imposed, not through the grievance process."), *adopted by* 2016 WL 3349316 (N.D.N.Y. June 15, 2016) (D'Agostino, J.); *see also LaBounty v. Johnson,* 253 F. Supp.2d 496, 502 n. 5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at \*2 (S.D.N.Y. Jan. 29, 2002)); *Samuels v. Selsky,* No. 01-CV-8235, 2002 WL 31040370, at \*8 (S.D.N.Y. Sept. 12, 2002). Based upon these decisions, I recommend that plaintiff's due process claim be addressed on the merits.

C. <u>Merits of Plaintiff's Claims</u>

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 129 of 238

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

**\*9** Defendants maintain that in the event plaintiff is allowed to pursue his due process claim on the merits, summary judgment dismissing that claim is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff's due process rights were violated during the course of his disciplinary hearing.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 79-80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin.*

Atypicality in a *Sandin* inquiry is normally a question of law.[14] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases

involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

14    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*").

**\*10** In this instance, the record evidence shows that, as a result of defendant Phelix's decision following the disciplinary hearing, plaintiff was held in disciplinary confinement for approximately 150 days before the decision was administratively reversed. Dkt. No. 35-3 at 79. Defendants do not dispute this fact.

The Second Circuit has explained that when an inmate plaintiff claims a due process violation plaintiff has been confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions ... and make a fact-intensive inquiry, ... examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards,* 364

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 130 of 238

F.3d 60, 65 (2d Cir. 2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, ... but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff has introduced minimal evidence regarding the conditions of his SHU confinement during the period in question. [15] Defendants, however, have failed to introduce any evidence concerning the conditions of SHU confinement at Bare Hill and Upstate. Because the parties have provided the court with little evidence regarding the conditions of plaintiff's SHU confinement, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally cognizable liberty interest as a result of defendant Phelix's determination.

[15]    Plaintiff argues in his opposition brief that the conditions were atypical because he was denied medical treatment, prevented from filing complaints, and had his mail tampered with. Dkt. No. 37 at 12. Plaintiff has offered some evidence in support of his argument that his mail was tampered with and that, on one occasion, he was prevented from filing a grievance while in Bare Hill. However, plaintiff has not offered any evidence that he was denied medical treatment at either facility, aside from his conclusory statement, or subject to any atypical conditions of confinement while housed in Upstate's SHU. Plaintiff merely states that the conditions he experienced while confined in SHU were "terrible," and that while there he faced "extreme hostile, threating [sic] conditions." Dkt. No. 1 at 17.

## 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and

the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

**\*11**   The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Examining the record to determine whether plaintiff was afforded procedural due process at the disciplinary hearing, I find no reasonable factfinder could conclude that defendant Phelix or defendant Prack denied plaintiff the protections afforded under the due process clause. Plaintiff was served with formal notice of the charges against him four days before the hearing, was provided with an assistant three days prior to the hearing, was present for the hearing and allowed to question witnesses, had witnesses called on his behalf, and had the opportunity to respond to statements made by DOCCS employees as well as provide his own version of the events giving rise to the charges against him. Dkt. No. 35-10; Dkt. No. 35-21 at 3-5; Dkt. No. 37-1 at 3-7.

Plaintiff contends that the notice of charges provided to him was deficient, that defendant Phelix denied him the opportunity to call five witnesses, identified as inmate porters who may or may not have been working in the music room on October 1, 2011, that defendant Phelix was biased, and

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 131 of 238

2016 WL 5440596

that defendant Phelix's determination was not supported by any credible evidence. Dkt. No. 37-2 at 5-6. Plaintiff further claims that the assistant provided to him was "inadequate." *Id.* at 5.

With respect to plaintiff's challenge to the notice, plaintiff appears to be arguing that the notice charging him with "violent conduct" was procedurally improper because it did not identify the specific incident of violent conduct that gave rise to the charge. Dkt. No. 37-2 at 5-6. The misbehavior report that listed the charges against plaintiff, which was read into the record at the outset of plaintiff's disciplinary hearing, [16] set forth the date, time, and location of the incident giving rise to the charges, and included a very specific account of the interaction between plaintiff and defendants Richards and Langdon. *See* Dkt. No. 35-12. The description of the incident also explained that plaintiff refused to release an uncapped pen during a pat frisk procedure despite multiple orders for him to do so. *Id.*

16    *See* Dkt. No. 35-10 at 10-11.

It appears to be plaintiff's position that a refusal to release an uncapped pen when a guard is preparing a pat frisk cannot be construed as "violent conduct." It is unnecessary to resolve that question, since in any event there is no dispute that plaintiff was apprised of the charges against him in a manner that allowed him to prepare his defense, which is the relevant inquiry as it relates to plaintiff's due process claim against defendant Phelix based on improper notice. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir. 1999) (rejecting inmate plaintiff's due process challenge based upon a "discrepancy as to the precise nature of the threatened harm" because the discrepancy "did not represent a failure of specificity that would impair Kalwasinski's ability to prepare his defense" given that the variance between the charge and proof arose in the context of an otherwise detailed misbehavior report). Moreover, to the extent plaintiff felt that the charge of violent conduct was improper or unwarranted, such a belief does not give rise to a due process claim against defendant Phelix. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *Fulmore v. Raimo,* 10-cv-1096, 2012 WL 4033731, at *4 (N.D.N.Y. Sept. 12, 2012) ("[J]ust as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate

possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing."); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."); *Alexander v. Fischer,* 14-cv-0548, 2015 WL 10568892, at *8 (N.D.N.Y. Dec. 21, 2015) (Baxter, M.J.) ("A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process."), *adopted by* 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016) (Sharpe, J.).

**\*12** Turning next to the issue of uncalled witnesses, the record clearly shows that (1) plaintiff did not know which inmate porters were working in the music room on October 1, 2011, (2) plaintiff did not know whether any of the inmate porters who were working in the music room on October 1, 2011 witnessed the use of force by defendants Langdon and Richards, (3) plaintiff was allowed to choose five out of the ten inmate porters to call as witnesses, and (4) defendant Phelix asked the five inmate porters identified by plaintiff to be witnesses, and each declined. Dkt. No. 35-10 at 50-52. Plaintiff contends that, once the five inmate porters that he identified refused to testify as witnesses, defendant Phelix was obligated to ask the other five inmate porters to participate as witnesses, and his failure to do so violated plaintiff's due process rights. Dkt. No. 37 at 6-7, 15; Dkt. No. 37-2 at 5-6.

Prison disciplinary hearings are subject to judicial review for harmless error in a setting such as that now presented. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation."). Moreover, it is well-established that "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy,* 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell,* 418 U.S. 539, 566-67 (1974).)

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

In denying plaintiff's request to call all ten inmate porters, defendant Phelix noted that plaintiff's request was "a little excessive," and that whether any of these inmate porters had relevant testimony to offer was "a shot in the dark" given that plaintiff did not know who was in the music room on October 1, 2011, or what they witnessed, if anything. Dkt. No. 35-10 at 50. Plaintiff did not object to this characterization by defendant Phelix. Instead, he chose the witnesses he wanted to call, and informed defendant Phelix that he spoke with one of these witnesses, implying that he knew the identity of at least one inmate porter who was working in the music room on October 1, 2011. Dkt. No. 35-10 at 50. That witness, as well as the other four inmate porters identified by plaintiff, refused to testify.

An inmate's refusal to testify at the disciplinary hearing of another inmate does not give rise to a due process claim against the hearing officer. *See, e.g., Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify). Similarly, an inmate's speculation regarding what testimony a potential witness might have offered is not enough to demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing. *See Tafari v. Rock,* 10-cv-0729, 2012 WL 1340799, at *7 (W.D.N.Y. Apr. 18, 2012) (dismissing due process claim based on denial of right to call employee witnesses where inmate plaintiff "failed to show how he was prejudiced, if at all, by the alleged lack of their testimony" and "it appear[ed] that [the plaintiff did] not know whether [these witnesses] would have provided helpful or even relevant testimony"). Accordingly, defendant Phelix's decision not to ask five inmate porters whether they would be witnesses in plaintiff's disciplinary hearing based on plaintiff's speculation that one or more of them could potentially possess relevant information regarding the charges against him does not rise to the level of a due process violation. *Id.; see also Hinton v. Prack,* 12-CV-1844, 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's ... regulations, ... [the] decision to deny, without reason, Plaintiff's request to call ... witnesses ... did not rise to the level of a due process violation because Plaintiff failed to allege ... how he was prejudiced").

**\*13** Plaintiff's claim of bias on the part of defendant Phelix is entirely conclusory with no evidentiary support, and is therefore insufficient to withstand a motion for summary judgment. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460-61 (S.D.N.Y. 2006) ("[I]n order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment' " of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir. 1989)). Indeed, there is no evidence in the record that defendant Phelix ever even had any interactions with plaintiff prior to the disputed disciplinary hearing, nor is there any evidence in the record that would in any way suggest a prejudging of the charges by defendant Phelix. Similarly, plaintiff's contention that his assistant was inadequate does not give rise to a claim against defendant Phelix, who was not personally involved in any alleged inadequate services rendered by the corrections counselor assigned to assist plaintiff at his disciplinary hearing.

Finally, with respect to plaintiff's contention that defendant Phelix's ruling on the charges was not supported by "any real credible evidence," plaintiff is misguided. The Supreme Court has made clear that "where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least 'some evidence' to support the decision." *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir. 2001) (quoting *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445, 455 (1985)).

In this case, plaintiff was charged with violent conduct, interference with an employee, harassment, violating a direct order, and refusal of a search and frisk. Dkt. No. 35-10 at 4-5, 17. Plaintiff was found guilty of all charges with the exception of the charge of interference with an employee. *Id.* at 55. In addition to both the misbehavior report and written memorandum created by defendant Richards setting forth grounds for the charges against plaintiff for which he was found guilty, defendants Langdon and Richards testified at plaintiff's disciplinary hearing. Dkt. No. 35-10 at 17-19, 23-25. Both testified that plaintiff refused several orders to drop an uncapped pen in his hand while he was in a pat frisk position, despite having time to drop the pen and knowing that defendants Langdon and Richards were ordered by Sergeant Carey to conduct a pat frisk. *Id.* Defendant Richards further testified that, after plaintiff was ordered to drop the pen, plaintiff cursed at defendant Richards and then resisted his and defendant Langdon's effort to place him in restraints, while still holding the pen. *Id.* at 17-19. This testimony constitutes "some evidence" that plaintiff was guilty of the

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

charges against him other than interference, as defendant Phelix concluded. *Id.* at 55.

In short, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Phelix during the course of his disciplinary hearing. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's claims against defendants Phelix and Prack should be dismissed. [17]

[17]    It could be argued that plaintiff's due process claim against defendant Prack is also potentially subject to dismissal for lack of personal involvement. Plaintiff's claim against defendant Prack is based on defendant Prack's failure to overturn defendant Phelix's determination. While the issue is the subject of debate in this circuit, at least some courts have held that a failure to reverse a disciplinary hearing officer's determination at the administrative appellate level does not, by itself, give rise to a separate constitutional violation. *See Jackson v. Bradt*, 13-cv-0004, 2014 WL 2505218, at *4 (W.D.N.Y. May 28, 2014) ("As to defendant Prack, the only allegation is that he affirmed Murray's disposition[, and] [t]his allegation alone is insufficient to state a claim against Prack."); *Parks v. Smith*, 08-CV-0586, 2011 U.S. Dist. LEXIS 102460, 2011 WL 4055415, at *13 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.); *Woodward v. Mullah*, No. 08-CV-463A, 2009 U.S. Dist. LEXIS 113917, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009); *but see Smith v. Rosati*, 10-cv-1502, 2013 WL 1500422, at *7 (N.D.N.Y. Feb. 20, 2013) (collecting cases holding that "the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon [v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)]."*)* (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y. Apr. 10, 2013) (Hurd, J.).

### D. Qualified Immunity

**\*14** Defendants also seek dismissal of plaintiff's claims asserted against them based on the doctrine of qualified immunity. Dkt. No. 35-22 at 20. Having already dismissed

plaintiff's due process claims against defendants Phelix and Prack on the merits, I will only address this argument with respect to plaintiff's excessive force claims against defendants Langdon and Richards.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However,

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

‘[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful.' " *Higazy v. Templeton, 505 F.3d 161, 169-70 (2d Cir. 2007)* (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs, 475 U.S. 335, 341 (1986).* Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995).*

**\*15** In this case, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for defendants Langdon and Richards to believe their acts were lawful when they used force against plaintiff on the morning of October 1, 2011. For example, plaintiff testified that defendant Richards knew plaintiff to be in possession of a pen before commencing a pat frisk, and proceeded with the frisk while at the same time preventing plaintiff from releasing the pen. Dkt. No. 35-3 at 18-19, 38-45. The misbehavior report drafted by defendant Richards also indicates that plaintiff's possession of the pen was the reason why force was used against him.[18] Dkt. No. 35-12. Crediting plaintiff's version of the events, a reasonable factfinder could conclude that no amount of force was needed to effectuate a pat frisk under the circumstances such that defendant Richards and Langdon's use of force was not objectively reasonable. Plaintiff also testified that, as a result of the force used against him, he suffered a dislocated shoulder. Dkt. No. 35-3 at 56-57. Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against defendants Langdon and Richards on the basis of qualified immunity be denied.

[18]    The misbehavior report notes that Sergeant Casey ordered defendants Richards and Langdon to take plaintiff to the floor. *See* Dkt. No. 35-12. Plaintiff, however, testified that it was defendant Richards who gave that order. *See* Dkt. No. 35-3 at 43-45.

With respect to the second alleged use-of-force incident that occurred on October 1, 2011, plaintiff testified that, while at the SHU facility and facing the wall in a room, he was approached from behind and punched in the ribs by a sergeant

he did not know, after which point he was hit multiple times on the head, legs and inner-thigh by other unknown officers, all without provocation or any justification. Dkt. No. 35-3 at 58, 61-63. Defendants have not offered any evidence to contradict plaintiff's version of the events. Accordingly, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for any force to be used against plaintiff while he was in SHU on October 1, 2011.

### E. Status of Doe Defendants

In his complaint, plaintiff alleges that he was assaulted twice on October 1, 2011. Dkt. No. 1 at 12-14. With respect to the second alleged incident of assault, plaintiff names as defendants John Doe #1, John Doe #2, and John Doe #3. *Id.* at 3. Plaintiff admitted during his deposition that he did not know the identity of anyone who participated in this second alleged incident of assault. Dkt. No. 35-3 at 63, 68. In plaintiff's response to defendants' motion for summary judgment, plaintiff now states for the first time that he believes defendant Richards was one of the individuals present during this second assault. Dkt. No. 37-2 at 5. Plaintiff cites as support for this believe an inmate injury report. *Id.* (citing Dkt. No. 37-3 at 21).

Leaving aside the question of whether defendant Richards was involved in the second assault on October 1, 2011, plaintiff has failed to take any steps to identify any of the Doe defendants despite his testimony that the names of the officers who escorted him "around in the SHU area to a cell" after the second alleged assault ended was "probably part of discovery" because he "asked who was present including those people who was working there." Dkt. No. 35-3 at 68.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock, No. 12-CV-0447, 2015 WL 791547, at \*21 (N.D.N.Y. Feb. 24, 2015)* (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 209 (2d Cir. 2001)* (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.,* 07-cv-2027, *2010 WL 882990, at * 5 (S.D.N.Y. Mar. 4, 2010)* (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time

and opportunity to identify and serve John Doe Defendants");
*Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."). Likewise, on a motion from a defendant, and in the absence of a showing of good cause by the plaintiff, dismissal of a claim under Rule 4(m) is appropriate if the defendant has not been served within ninety days after the complaint is filed.

**\*16** The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against the John Doe defendants, provided that plaintiff "take reasonable steps to ascertain the identity" of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them. Dkt. No. 4 at 22. That order warned plaintiff, however, as follows: "If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed." *Id.* The deadline for joining parties to this lawsuit and amending pleadings was originally July 2, 2015. Dkt. No. 15 at 5. That deadline was extended twice, and ultimately passed on September 8, 2015. Dkt. Nos. 19, 21. Discovery in this matter was originally scheduled to close on September 4, 2015. Dkt. No. 15 at 5. That deadline was subsequently extended four times, ultimately to December 18, 2015. Dkt. Nos. 19, 21, 28, 31.

It is now more than ten months past the extended deadline for joinder of parties. Yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed corrections officers. As such, I recommend that the claims brought against these unnamed Doe defendants be *sua sponte* dismissed, without prejudice.

## IV. SUMMARY AND RECOMMENDATION
Defendants seek dismissal of all of plaintiff's claims set forth in the complaint based on a variety of grounds, both procedural and substantive. While plaintiff's due process claim is subject to dismissal on the merits, plaintiff's excessive force claim asserted against defendants Langdon and Richards should survive defendants' motion because questions of fact remain relating to the procedural issue of exhaustion, and at least the factual issue of whether the amount of force used against plaintiff was reasonable under the circumstances. Plaintiff's excessive force claim asserted against the John Doe defendants, however, should be dismissed based upon plaintiff's failure to take the steps necessary to identify the three Doe defendants and join them in the action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED in part and DENIED in part, as follows:

(1) Plaintiff's due process claim asserted against defendants Phelix and Prack should be DISMISSED;

(2) Plaintiff's excessive force claims asserted against the John Doe defendants should be DISMISSED; and

(3) Plaintiff's excessive force claims, asserted against defendants Richards and Langdon, should survive defendants' motion; and it is further respectfully

RECOMMENDED that defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 be DISMISSED from this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 29, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5440596

---

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    14

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5415790

KeyCite Yellow Flag - Negative Treatment

Order Amended by  Sawyer v. Langdon,  N.D.N.Y.,  February 5, 2018

2016 WL 5415790
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trazz SAWYER, Plaintiff,
v.
Albert PRACK; D. Phelix; D. Richards;
S. Langdon, John Doe #1-3, Defendants.

9:14-CV-1198 (DNH/DEP)
|
Signed 09/28/2016

**Attorneys and Law Firms**

TRAZZ SAWYER, 97-B-2413, 3531 Gasin Basin Road,
Albion, NY 14411, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: KEVIN M.
HAYDEN, ESQ., Ass't Attorney General, Albany, NY 12224,
Attorneys for Defendant James Thomsen.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

 **\*1**  *Pro se* plaintiff Trazz Sawyer brought this civil rights
action pursuant to 42 U.S.C. § 1983. On July 29, 2016, the
Honorable David E. Peebles, United States Magistrate Judge,
advised by Report-Recommendation that defendant's motion
for summary judgment pursuant to Federal Rule of Civil

Procedure 56 be granted in part and denied in part. See ECF
No. 40. Plaintiff has filed timely objections. See ECF No. 41.

Based upon a de novo review of the portions of the Report-
Recommendation to which plaintiff objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

(1) Defendants' motion for summary judgment (ECF No.
35) is **GRANTED** in part and **DENIED** in part;

(2) Plaintiff's due process claim asserted against defendants
Phelix and Prack is **DISMISSED WITH PREJUDICE**;

(3) Plaintiff's excessive force claims asserted against
the John Doe defendants are **DISMISSED WITH
PREJUDICE**;

(4) Defendants' motion with regards to plaintiff's excessive
force claims against defendants Richards and Langdon
is **DENIED** and such claims remain;

(5) Defendants Phelix, Prack, John Doe #1, John Doe #2
and John Doe #3 are **DISMISSED** from this action; and

(6) The Clerk serve a copy of this Decision and Order upon
plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

Dated: September 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5415790

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 717915
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry EPPS, Plaintiff,

v.

The CITY OF SCHENECTADY, John Doe, individually
and in his capacity as an employee of The City of
Schenectady, New York Police Department, Defendants.

No. 1:10–CV–1101 (MAD/CFH).
|
Feb. 27, 2013.

**Attorneys and Law Firms**

Henry Epps, Schenectady, NY, pro se.

Bailey, Kelleher & Johnson, P.C., Washington Avenue
Extension, William C. Firth, Esq., Nannette R. Kelleher, Esq.,
of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**INTRODUCTION**

 **\*1** Plaintiff commenced the within action pursuant to
42 U.S.C. § 1983 claiming that defendants The City of
Schenectady and John Doe ("defendants") violated his
constitutional rights on November 6, 2009. In addition,
plaintiff asserted state law causes of action for battery and
negligence. [1] When the action was commenced, plaintiff was
represented by counsel. On February 23, 2012, Magistrate
Judge Homer relieved Grasso & Breedlove as attorneys of
record. Plaintiff is now proceeding *pro se.* Presently before
the Court is defendants' motion summary judgment and
dismissal of plaintiff's complaint pursuant to Fed.R.Civ.P. 56.
(Dkt. No. 19).

[1]    This action was originally commenced in New
York State Supreme Court, County of Schenectady.
On September 16, 2010, defendants removed the
action based on 28 U.S.C. § 1331 and 42 U.S.C. §
1983. (Dkt. No. 1).

**BACKGROUND** [2]

[2]    The facts set forth in this section are taken from:
(1) the Complaint; (2) the Answer; (3) defendants'
Statement of Material Facts; and (4) the exhibits
and evidence submitted by defendants in support of
the Motion for Summary Judgment. The facts, as
discussed herein, are for the relevant time period as
referenced in the complaint.

On November 6, 2009, at approximately 2:00 p.m., plaintiff
consumed a few alcoholic beverages at his home. Sometime
between 3:00 p.m. and 4:00 p.m., plaintiff walked, less than
a half mile, to an apartment at 824 Grant Avenue to visit
with a friend, Francine Holiday. When plaintiff arrived at
the apartment, Ms. Holiday indicated that she needed food.
Plaintiff walked back to his home to retrieve some food, then
to a store to purchase beverages. Plaintiff returned to Ms.
Holiday's apartment. Plaintiff remained at the apartment for
approximately twenty minutes. Ms. Holiday then attempted
to leave the apartment but plaintiff refused to allow her
to leave. Ms. Holiday "pushed" past plaintiff to leave and
ran down the street yelling that she intended to contact the
police. Plaintiff left Ms. Holiday's apartment and returned
home. Shortly after arriving at his home, two police officers
appeared at plaintiff's residence and placed plaintiff under
arrest. One officer displayed a badge numbered "128" and
during plaintiff's deposition, he identified the police officer as
Officer Schonewald. [3] The officers told plaintiff he was being
arrested for harassment. The officers handcuffed plaintiff,
behind his back, and placed him in a police cruiser and
transported plaintiff to the police station for processing.

[3]    Plaintiff has not identified the second police officer.

At approximately 5:00 p.m., plaintiff arrived at the police
station and was escorted to the booking area. The handcuffs
were removed and plaintiff was asked to remove his shoes
and strings from his sweatpants. Plaintiff was asked a series
of questions by the booking officer. There is a factual dispute
with regard to what happened when plaintiff was asked to
leave the booking area. Plaintiff claims that "just prior to
leaving the booking area", Officer Schonewald reapplied
the handcuffs behind his back. Plaintiff alleges that Officer
Schonewald became "boisterous" and belligerent and began
cursing at plaintiff. Plaintiff alleges that Officer Schonewald
"yanked the handcuff chains" and "pushed" him while still in

the booking area. Plaintiff did not fall or come into contact with any objects.

Defendants contend that after questioning was complete, Officer Chris Haigh, stated, "Henry, let's go" but plaintiff refused to comply with Officer Haigh's verbal commands to accompany him out of the booking area. Officer Schonewald overheard the exchange. Upon receiving no response to his third request, defendants claim that the officer then placed a hand on each of plaintiff's sides (above his waist) to escort plaintiff from the booking area. Defendants claim that handcuffs were not reapplied while plaintiff was in the booking area. [4]

[4]    Defendants allege that video footage annexed to the motion for summary judgment supports their version of the events. The video footage is discussed *infra.*

**\*2**  Later that day, plaintiff was arraigned at the police station and then transported to the Schenectady County Correctional Facility. Plaintiff was sentenced to thirty days of incarceration. During his incarceration, plaintiff experienced pain in his hand but did not request or receive medical attention. On or about November 24, 2009, after serving twenty days, plaintiff was released. The next day, plaintiff claims that he sought medical attention at Ellis Hospital for an injury to his right hand/wrist. Plaintiff had three subsequent visits at Schenectady Regional Orthopedic Associates, P.C.

On August 28, 2012, defendants filed the within motion seeking summary judgment and dismissal of plaintiff's complaint. Defendants claim that: (1) plaintiff's § 1983 claim for excessive force and state law battery claim must be dismissed because the force used and injury sustained were *de minimis;* (2) all claims against John Doe must be dismissed due to plaintiff's failure to identify and serve said defendant; (3) plaintiff's § 1983 claim against the City fails to state a cause of action; (4) plaintiff's negligence is subject to dismissal because it is based upon intentional conduct; and (5) all causes of action against all defendants must be dismissed based upon video evidence. (Dkt. No. 19).

## DISCUSSION

### I. Standard on Motion for Summary Judgment
Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. See *id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.* "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012).

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.,* 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56(c). In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). These determinations are within the sole province of the jury. *Id.*

**\*3**  In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp .2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Id.* (quoting *Traguth*

*v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* 2001 WL 527484, *2 (S.D.N.Y.2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

Here, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1. Local Rule 7.1(a)(3) states:

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/ or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3) (emphasis in original). Plaintiff has failed to properly respond to defendants' Statement of Material Facts, thus, the Statement will be accepted as true to the extent that the facts are supported by evidence in the record. *See Orraca v. Pilatich,* 2008 WL 4443274, at *3 (N.D.N.Y.2008); *see also N.Y. Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc .,* 426 F.3d 640, 648– 49 (2d Cir.2005) (the Court deemed the properly supported allegations in the defendant's L.R. 7.1 Statement admitted for the purposes of the motion).

## II. *De Minimis*
Defendants argue that, assuming that the incident occurred as plaintiff described, the application of force was "so extraordinarily minimal" that it did not rise to the level of

force necessary to constitute excessive force under the Fourth Amendment or battery under New York State Law. [5]

> [5] While plaintiff does not articulate the basis for his excessive force claim, defendants correctly note that the Fourth Amendment controls. *See Bonilla v. Jaronczyk,* 354 F. App'x 579, 581 (2d Cir.2009) (claims of excessive force "in the course of an arrest" should be analyzed under the Fourth Amendment).

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010). To succeed on a Fourth Amendment excessive force claim, a plaintiff must show the amount of force used was objectively unreasonable. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) ("In determining whether the force used by a police officer was reasonable, the court must ... consider the perspective of the officer at the time of the arrest, taking into account the fact that the officer may have been required to make a split-second decision"); *see also Rodriguez v. Vill. of Ossining,* 2013 WL 154334, at *4 (S.D.N.Y.2013) (citations omitted) (on an excessive force claim, a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable).

**\*4** "[N]ot every push or shove, [ ... ] violates the Fourth Amendment, and several courts in this Circuit have required plaintiffs to allege more than a *de minimis* use of force to succeed on their excessive force claims." *LaFrance v. Bemben,* 2013 WL 132702, at *3–4 (E.D.N.Y.2013) (citation omitted). "Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness [,] ... minor discomfort[,] ... and two superficial scratches with a cut inside the mouth." *Lemmo v. McKoy,* 2011 WL 843974, at *5 (E.D.N.Y.2011). While "the extent of the injury suffered ... is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim." *Ortiz v. Pearson,* 88 F.Supp.2d 151, 160 (S.D.N.Y.2000). "While [a plaintiff] [may] not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, the failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries

inflicted were not permanent or severe." *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987).

Here, plaintiff admitted at his deposition that during his twenty days of incarceration, he did not make any complaints of any injury or pain to any medical personnel at the correctional facility. However, plaintiff testified that he experienced pain during his first night at the correctional facility. Plaintiff testified that he sought treatment the day after his release at Ellis Hospital for injuries to his hand/wrist. Plaintiff also treated three times with orthopedic specialists. Defendants contend that the certified medical records do not support plaintiff's timeline or treatment for the injuries allegedly sustained in the subject incident. Defendants also dispute the severity of plaintiff's alleged injury noting that records reflect a "contusion". Given this factual disputes and viewing the facts in the light most favorable to the plaintiff, the Court cannot say as a matter of law that plaintiff's alleged injuries are *de minimis. See Sash v. U.S.,* 674 F.Supp.2d 531, 539–540 (S.D.N.Y.2009) (although the plaintiff's immediate injuries turned out to be minor, the Court cannot find them *de minimis* as a matter of law).

Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's excessive force claim and battery claim, on this issue, is denied.

### III. Failure to Identify and Serve John Doe
In the alternative, defendants argue that all of plaintiff's claims against the "John Doe" defendant must be dismissed because plaintiff failed to timely and properly identify and serve the John Doe defendant.

"Using 'Doe' in place of specifically naming a defendant does not serve to sufficiently identify the defendant." *Coward v. Town and Vill. of Harrison,* 665 F.Supp.2d 281, 300–302 (S.D.N.Y.2009) (citation omitted). "Courts typically resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.' " *Id.* (citations and quotations omitted). "Where a plaintiff 'has had ample time to identify' a John Doe defendant, [ ... ] the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant". *Id.* (citations omitted).

 **\*5** Here, it has been two and a half years since plaintiff commenced this action. In August 2010, plaintiff filed the complaint in state court. On June 5, 2012, plaintiff was deposed and positively identified only Officer Schonewald,

by name. Plaintiff has failed to amend his complaint or serve any officer. Plaintiff submitted opposition to defendants' motion but did not explain why he has failed to serve the alleged responsible officer. Plaintiff simply states, "It has been made clear by the defendant's moving papers who actually caused my injury. As such, there is no prejudice to the defendant because the defendant has now been properly identified". Defendants disagree and argue that plaintiff misidentified the officers during his deposition. Indeed, defendants contend that Officer Haigh, not Officer Schonewald, directed plaintiff to leave the booking area. Regardless, plaintiff misunderstands his burden and the legal ramifications of his failure to identify and serve the proper defendant. Despite years of litigation, plaintiff does not explain why he did not amend his complaint to assert a claim against the officer allegedly responsible and further, why he failed to serve the officer once he was able to positively identify the proper defendant. *See Burns v. Trombly,* 624 F.Supp.2d 185, 197–198 (N.D.N.Y.2008) (collecting cases) (after two years of litigation, the *pro se* plaintiff failed to identify the John Doe defendants, thus, the plaintiff's claims against the John Doe defendants were dismissed without prejudice due to Plaintiff's failure to name or serve those defendants). All discovery is complete and thus, plaintiff's failure to identify the "John Doe" defendant mandates dismissal. *Keesh v. Artuz,* 2008 WL 3166654, at *2 (S.D.N.Y.2008) (citing *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997)); *see also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005) (the plaintiff's request to amend the complaint after discovery was completed was denied as the plaintiffs were provided with ample time to attempt to identify the John Doe defendants).

### IV. Failure to State a Claim
Defendants also contend that plaintiff's 1983 claims against the City of Schenectady are subject to judgment as a matter of law because plaintiff failed to plead that the alleged deprivation of rights was the result of a municipal policy or custom. Moreover, even assuming plaintiff properly articulated a policy and further assuming that the incident amounted to excessive force, defendants claim that dismissal is nonetheless appropriate because a single incident of unconstitutional activity is not actionable. Plaintiff has failed to respond to this argument.

A municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658,

694 (1978); *see also Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir.2004). To state a Section 1983 claim against a municipality based on the actions of employees below the policymaking level, a plaintiff must plead "three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Batista v. Rodriquez,* 702 F.2d 393, 397 (2d Cir.1983)). Under *Monell,* to prevail against municipal defendants a plaintiff must demonstrate that the governmental entity had an unconstitutional or unlawful policy, and that the policy caused or was the moving force behind the violation of plaintiff's rights.

**\*6** In this matter, plaintiff's § 1983 claims against the City of Schenectady fail as a matter of law because the complaint is completely devoid of any fact alleging that plaintiff was injured as a result of the defendant's policy, custom or practice or actions of an employee with final policymaking authority. *Lawrence v. Town of Brookhaven Dep't of Housing, Community Development & Intergovernmental Affairs,* 2007 WL 4591845, at \*19 (E.D.N.Y.2007) (the plaintiff offered no explanation in her opposition papers for her failure to plead such required facts); *see also McGaw v. City of N.Y.,* 1993 WL 148959, at \*3 (S.D.N.Y.1993) (the municipal defendants were additionally entitled to summary judgment because the plaintiff has failed to plead the existence of any unconstitutional or unlawful policy, custom, or practice on the part of the City of New York or the Police Department as required for § 1983 liability under *Monell* ). Thus, defendants' motion for summary judgment and dismissal of plaintiff's 1983 claims against the City of Schenectady is granted. *See Pooler v. Hempstead Police Dep't,* 2012 WL 4060743, at \*4 (E.D.N.Y.2012) (court awarded summary judgment in favor of County because the plaintiff made no allegations regarding a municipal policy, practice or custom in his complaint).

## V. Negligence Cause of Action

Defendants contend that plaintiff's negligence cause of action is subject to dismissal and summary judgment because it is duplicative of plaintiff's excessive force/battery claims. Defendants argue that plaintiff cannot assert that defendants' conduct was intentional and at the same time claim that it was negligent. Plaintiff has not responded to this argument.

"New York has adopted the view that, 'once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.' " *Morgan v. Nassau*

*County,* 2009 WL 2882823, at \*19 (E.D.N.Y.2009) ("[s]ince plaintiff has alleged facts supporting a claim for assault and battery, he may not also base a claim of negligence on the same conduct"). If the plaintiff alleges intentional conduct in support of a claim for excessive force or battery, he may not also base a claim for negligence on that same conduct. *Glowczenski v. Taser Int'l Inc.,* 2010 WL 1936200, at \*7 (E.D.N.Y.2010) (citation omitted) ("to the extent that the negligence claims are duplicative of the false arrest, excessive force, or battery counts, or are based on intentional conduct, they should not (and will not) go to the jury"). If allegations may be read as asserting negligence, as a basis for liability for constitutional torts, the assertions must fail because negligence cannot be a basis for liability for constitutional torts. *Rafter v. Bank of Am.,* 2009 WL 691929, at \*10 (S.D.N.Y.2009) (citing *inter alia Daniels v. Williams,* 474 U.S. 327 (1986)).

In plaintiff's Third Cause of Action, he alleges:

> **\*7** The plaintiff restates every allegation contained in paragraphs "1" through "17".

> That on or about November 6, 2009 the plaintiff was caused to suffer personal injuries as a result of the negligence of the defendant, the City, its agents, servants and/or employees.

In the complaint, plaintiff describes defendants' conduct as, "forcibly yanking on plaintiff's handcuffs". Plaintiff also claims that defendants "yanked" and "shoved" plaintiff and that their actions were "willful and intentional". Plaintiff contends that defendants acted with the intent to violate his rights. Based upon plaintiff's own allegations, the claim of negligence cannot survive. Accordingly, on the facts currently before this Court, defendants' motion for summary judgment on plaintiff's negligence claim is granted.

## VI. Video Evidence

In the alternative, assuming the court does not award summary judgment based upon the arguments above, defendants claim that a video recording captured the events that transpired at the police station on November 6, 2009 and that a review of the tape demonstrates that the incident that is the subject of this action did not occur. Defendants included a DVD copy of the video with the motion herein together with an affidavit from Ed Barbagelata, a lieutenant with the City of Schenectady Police Department, attesting to its authenticity. Plaintiff does not specifically challenge the authenticity of the tape. Plaintiff states, "I am unable to view the video as I do

Epps v. City of Schenectady, Not Reported in F.Supp.2d (2013)

2013 WL 717915

not have the required video player" and therefore, he is "not aware [ ... ] whether this video has been altered or modified in any way".

The Court has attempted to review the DVD several times using several different means. The DVD is unreadable. [6] As the Court has already determined that defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, for the reasons set forth above, this issue is moot.

[6]      On February 19, 2013, the Court contacted defense counsel to advise that the DVD was unreadable. Counsel did not resubmit any further DVD to the Court or to plaintiff.

**CONCLUSION**

It is hereby

**ORDERED** that defendants' motion for summary judgment and dismissal of plaintiff's excessive force and battery claims (Dkt. No. 19) based upon the argument that the force did not rise to the level of force necessary to constitute excessive force under the Fourth Amendment or battery under New York State Law is **DENIED;** it is further

**ORDERED** that defendants' motion for dismissal of plaintiff's claims against defendant "John Doe" (Dkt. No. 19) is **GRANTED** without prejudice; it is further

**ORDERED** that defendants' motion for summary judgment and dismissal of plaintiff's 1983 claims against the City of Schenectady (Dkt. No. 19) is **GRANTED;** it is further

**ORDERED** that defendants' motion for summary judgment and dismissal of plaintiff's negligence claim (Dkt. No. 19) is **GRANTED,** it is further

**ORDERED** that defendants' motion for summary judgment and dismissal of plaintiff's complaint based upon video evidence (Dkt. No. 19) is **DENIED.**

**\*8** The Clerk is directed to close the case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 717915

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5351017
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shakeim JOHNSON, Plaintiff,

v.

Robert OWENS, Adam Eberley,
John Does # 1-5, Defendants.

9:20-cv-0982 (AMN/CFH)

|

Signed August 21, 2023

**Attorneys and Law Firms**

DANIEL R. SMALLS, ESQ., LAW OFFICE OF DANIEL R. SMALLS, PLLC, 251 State Street, Ste 202, Schenectady, New York 12305, Attorneys for Plaintiff.

OLIVIA R. COX, ESQ., Assistant Attorney General, ATTORNEY GENERAL FOR THE STATE OF NEW YORK, The Capitol, Albany, NY 12224-0341, Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

**\*1** On August 24, 2020, Plaintiff Shakeim Johnson ("Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") asserting claims arising from his incarceration at Great Meadow Correctional Facility ("Great Meadow"). [1] Dkt. No. 1 ("Complaint"). [2]

[1]    Plaintiff initially commenced this action *pro se* but subsequently retained counsel. *See* Dkt. No. 22.

[2]    Citations to Court documents utilize the pagination generated by CM/ECF docketing system and not the documents' internal pagination.

Following review pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A, the following claims survived: (1) Plaintiff's Eighth Amendment conditions of confinement claims [3] against Lieutenant Robert Owens ("Owens") and

corrections officer Adam Eberley ("Eberley") [4]; and (2) Fourteenth Amendment due process claims against Owens and Eberley. *See* Dkt. No. 6. On May 10, 2021, Plaintiff filed a Second Amended Complaint ("SAC"), naming Owens, Eberley, Christopher Miller ("Miller"), Anthony J. Annucci ("Annucci"), and John Does #1-5 [5] ("John Does") as defendants. [6] *See* Dkt. No. 29. In the SAC, Plaintiff asserts four claims: denial of First Amendment rights; Eighth Amendment deliberate indifference; denial of Fourteenth Amendment due process; and intentional infliction of emotional distress. [7] *Id.* Plaintiff seeks compensatory and punitive damages. *See id. ad damnum.* Plaintiff's Fourteenth Amendment and intentional infliction of emotional distress claims were dismissed by Decision and Order dated March 30, 2022. Dkt. No. 47. Owens and Eberley (together, "Defendants") now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on several grounds, including on the ground that Plaintiff failed to exhaust his administrative remedies. Dkt. No. 56 ("Motion"). The parties filed responsive briefing. Dkt. Nos. 61, 63. On July 7, 2023, the Court issued an Order to Show Cause ("OTSC") for Plaintiff to demonstrate why the claims against the John Does are not time-barred. Dkt. No. 64. Plaintiff did not respond to the Court's order. *See generally* Docket.

[3]    The Court notes that this claim is also referred to as an Eighth Amendment deliberate indifference claim. *See, e.g.,* Dkt. Nos. 29, 56. For purposes of resolving this Motion, the Court understands these claims to be synonymous.

[4]    Defendant Eberley is at times incorrectly referred to as Ederley in several documents filed on the docket.

[5]    The Court notes that there is a discrepancy in the number of John Doe defendants referenced by Plaintiff. In the caption of the SAC, Plaintiff names "John Does 1-4," however, Plaintiff refers to "John Does 1-5" throughout the SAC. Dkt. No. 29.

[6]    Claims against Annucci and Miller were dismissed. *See* Dkt. No. 47.

[7]    Plaintiff's contention that his intentional infliction of emotional distress claim is pursuant to Section 1983 is wrong. *See* Dkt. No. 29 at 7. Intentional infliction of emotional distress is a state law tort.

*See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir. 1996).

**\*2** For the reasons set forth below, the Court denies Defendants' motion for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies, grants Defendants' motion for summary judgment on other grounds, and *sua sponte* dismisses the claims against the John Does because such claims are time-barred.

## II. BACKGROUND

### A. Factual Background

Plaintiff's claims in this action stem from his placement on contraband watch while incarcerated at Great Meadow. *See* Dkt. No. 29. Plaintiff's contraband watch lasted from August 25, 2019, to September 6, 2019. *See* Dkt. No. 56-2 at ¶¶ 27, 58. On August 25, 2019, Plaintiff was placed on contraband watch after he was observed by security swallowing "what was believed to be a sheathed blade." *Id.* at ¶ 27. Plaintiff's contraband watch was authorized by Captain C. Fraser, Officer of the Day. *Id.* at ¶ 28. While on contraband watch, Plaintiff was continuously watched in 15-minute increments by multiple corrections officers. *Id.* at ¶ 31. Plaintiff alleges that Defendants and John Does were deliberately indifferent to his health and safety, in violation of the Eighth Amendment, when they deprived him of food and water while on contraband watch from August 25, 2019 to August 30, 2019. *See* Dkt. No. 29 at ¶ 30. On August 29, 2019, Plaintiff was taken to Glens Falls Emergency Room and was diagnosed with dehydration. Dkt. No. 56-2 at ¶¶ 43-44. Defendants dispute that Plaintiff was denied drinking water and food and aver that Plaintiff (i) refused drinking water, food, and medication, and (ii) did in fact eat meals and drink water. *Id.* at ¶¶ 33-39.

Plaintiff also alleges that while on contraband watch from August 31, 2019 to September 6, 2019, Defendants and John Does violated his First Amendment rights when they failed to provide him with water to properly "bathe before and after his meals," which deprived Plaintiff of his right to exercise his Rastafarian religion. Dkt. No. 29 at ¶¶ 43-48; Dkt. No. 56-2 at ¶ 19. Plaintiff alleges that he is a devout Rastafarian. Dkt. No. 29 at ¶ 43. Prior to being discharged from contraband watch, on September 5, 2019, Plaintiff provided a stool sample that tested positive for synthetic cannabinoid and contained a white plastic ceramic blade inserted in a pen cap. Dkt. No. 56-2 at ¶¶ 47-52. Defendant Eberley, who was

assigned to observed Plaintiff on September 5, 2019, was responsible for the testing of the stool sample and authored a misbehavior report, charging Plaintiff with contraband, weapon smuggling, and drug possession. *Id.* at ¶ 53. Plaintiff requested and was provided with drinking water at 3:50 pm on September 5, 2019. *Id.* at ¶ 56. On September 5, 2019, at 4:00 p.m., Plaintiff received and ate a tray of food. *Id.* at ¶ 57.

Plaintiff was subsequently placed in the Special Housing Unit ("SHU"), where he remained until he was transferred from Great Meadow to Five Points Correctional Facility ("Five Points") via Down State Correctional Facility ("Down State"). *See* Dkt. No. 29 at ¶ 21; Dkt. No. 47 at 4-5. Plaintiff arrived at Five Points on October 3, 2019. *See* Dkt. No. 31-3 at ¶ 9. Plaintiff remained at Five Points until December 24, 2019, when he was transferred to Attica Correctional Facility. *Id.* When he first arrived at Great Meadow in February 2018, Plaintiff attended an orientation program that included instructions on how to use the inmate grievance process. *See* Dkt. No. 31-3 at ¶ 11. However, Plaintiff contends that he was told that he was not required to file a grievance for "any complaint where the facility could not provide a [sic] relief." Dkt. No. 45-3 at ¶ 6; *see also* Dkt. No. 45-2 at ¶ 3. Defendants contend that "during all relevant times, Great Meadow, Downstate, and Five Points had fully functioning inmate grievance processes available to incarcerated individuals," Dkt. No. 31-3 at ¶ 10, and that Plaintiff never filed any grievance related to the claims at issue in this case at Great Meadow, Downstate, or Five Points, nor filed any extension request or appeal related to those claims, *id.* at ¶¶ 12-22.

**\*3** Plaintiff disputes these assertions, stating that on September 9, 2019, while housed in the SHU at Great Meadow, he "handwrote two identical letters to the Inmate Grievance Unit and complained about being deprived of food, water and other essentials." Dkt. No. 45-3 at ¶ 8. Plaintiff further attests that he placed one copy of that grievance "in an envelope addressed to the Inmate Grievance Unit and placed it on his cell gate, per facility policy, for the correction officer to take and place in the mailbox." *Id.* Plaintiff states that he repeated this process on September 20, 2019, and that he also submitted grievances while at Downstate. *Id.* at ¶¶ 9-10. Plaintiff also asserts that he wrote a letter to the Superintendent of Great Meadow. *Id.* at ¶ 12. Finally, Plaintiff contends that he wrote a letter to the Commissioner of Corrections complaining that he never received a response to the grievances he filed at Great Meadow.[8] *Id.* There is no dispute that Plaintiff never appealed the September 9 and 20, 2019 grievances.

8    There is some discrepancy in the record as to the number of letters that Plaintiff authored. Plaintiff testified that he submitted a letter to a Superintendent, *see* Dkt. No. 56-3 at 73:2-5, two letters to two different Commissioners, *see id.* at 98:22-102:4, and a grievance directly to Central Office Review Committee ("CORC"), *id.* at 78:4-7.

### B. Procedural Background

In the original Complaint, Plaintiff identified the following individuals as defendants: Owens, Eberley, Superintendent Miller, and Commissioner Annucci. Dkt. No. 1. By Decision and Order filed on December 23, 2020, the Court reviewed the sufficiency of the Complaint in accordance with 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and dismissed the following claims, with prejudice: (1) Plaintiff's official capacity claims against the defendants; and (2) Plaintiff's constitutional claims related to the violations of facility rules and regulations. Dkt. No. 6. The Court dismissed the following claims, without prejudice: (1) First Amendment claims; (2) Fourteenth Amendment due process claims related to disciplinary hearings and due process claims against Miller and Annucci; (3) constitutional claims related to false misbehavior reports; (4) conspiracy claims; and (5) state law claims. *Id.* The Court also dismissed Miller and Annucci from the action. *Id.* at 20. The Court held that Plaintiff's Eighth Amendment conditions of confinement claims against Owens and Eberley; and (2) Fourteenth Amendment due process claims against Owens and Eberley survived *sua sponte* review and required a response. *Id.*

Plaintiff subsequently requested to file an amended complaint as a matter of right. Dkt. No. 18. After retaining counsel, Plaintiff withdrew his request and the parties stipulated to Plaintiff filing a SAC. Dkt. Nos. 26, 27. On May 10, 2021, Plaintiff filed a SAC, naming Owens, Eberley, Miller, Annucci, and John Does as defendants alleging four claims: denial of First Amendment rights; Eighth Amendment deliberate indifference; denial of Fourteenth Amendment due process; and intentional infliction of emotional distress. *See* Dkt. No. 29. Owens, Eberley, Miller and Annucci filed motions for summary judgment in lieu of an Answer for exhaustion purposes only and alternatively partial motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12 (b)(6)"). *See* Dkt. Nos. 31, 44. The parties filed responsive briefings. *See* Dkt. Nos. 45, 46. On March 30,

2022, the Court (i) granted Miller's and Annucci's motion to dismiss pursuant to Rule 12(b)(6); (ii) granted Owens' and Eberley's motion to dismiss as to Plaintiff's due process and intentional infliction of emotional distress claims; (iii) denied Miller's and Annucci's motion for summary judgment; (iv) denied Owens' and Eberley's motion for summary judgment; and (iv) referred the matter to Magistrate Judge Christian F. Hummel for limited discovery on the question of administrative exhaustion and an evidentiary hearing. Dkt. No. 47. Therefore, the remaining claims in this action are Plaintiff's First Amendment free exercise claims and Eighth Amendment deliberate indifference claims against Owens and Eberley. *See id.*

**\*4** On April 13, 2022, the Court set a 60-day extension of the discovery deadline for the limited purpose of conducting discovery into the issue of exhaustion. Text Minute Entry dated April 13, 2022. Plaintiff's deposition on the limited issue of exhaustion was taken on May 5, 2022. *See* Dkt. No. 56-3 at 5-153. The parties attended an in-person conference before Magistrate Judge Hummel on June 16, 2022. Text Minute Entry dated June 16, 2022. Following the conference, the Court extended the discovery deadline to September 15, 2022. Dkt. No. 53. Plaintiff's second deposition was taken on September 2, 2022. *See* Dkt. No. 56-3 at 154-226. After a series of extensions, a Text Order extended the Dispositive Motion deadline to December 1, 2022. *See* Dkt. No. 55.

On November 28, 2022, Defendants filed the Motion, Dkt. No. 56, and on February 21, 2023, Plaintiff filed a response, Dkt. No. 61 [9], and Defendants replied on February 27, 2023, Dkt. No. 63. Defendants move for summary judgment arguing that: (1) Defendants did not violate Plaintiff's First Amendment free exercise of religion rights; (2) Plaintiff's claims against Defendants should be dismissed for lack of personal involvement; (3) Plaintiff cannot establish an Eighth Amendment claim because he was not deprived food or drinking water; (4) Plaintiff failed to exhaust his administrative remedies; and that (5) Defendants are entitled to qualified immunity. *See* Dkt. No. 56.

9    Plaintiff's response to Defendants' motion for summary judgment was due on December 19, 2022. *See* Dkt. No. 56. On January 23, 2023, the Court *sua sponte* granted Plaintiff until February 10, 2023, to file a response. Dkt. No. 58. On February 17, 2023, Plaintiff filed a motion requesting an extension of time to answer the motion for summary judgment. Dkt. No. 59.

Plaintiff filed his response on February 21, 2023—two months after the due date. Dkt. No. 61.

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. V. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

**\*5** Defendants move for summary judgment on several grounds, including that Plaintiff failed to exhaust his administrative remedies. *See* Dkt. No. 56. Because the exhaustion of administrative remedies is mandatory before an inmate can bring a claim in federal court, *see Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011), the Court will first address this threshold issue.

Under the Prison Litigation Reform Act ("PLRA"), prisoners may not bring any action "with respect to prison conditions under ... Federal law, ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "To exhaust administrative remedies, an inmate must avail himself of all steps that the [prison-grievance system] holds out, and [do] so properly (so that the [prison-grievance system] addresses the issues on the merits)." *Moreau v. Ellsworth*, No. 21-2997, 2023 WL 3477153, at *2 (2d Cir. May 16, 2023) (summary order) (internal quotations marks and citation omitted).

"In New York, there is a three-tiered process for adjudicating inmate grievances." *Id.* "First, an inmate must file a grievance with the facility's Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the incident." *Id.* (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5(a)(1)). "If the IGRC renders an adverse decision, the inmate may appeal to the superintendent of the facility, who then has twenty days to respond." *Id.* (citing NYCRR tit. 7, § 701.5(c)(3)(i)). "The prisoner may appeal an adverse decision of the superintendent by submitting a Form 2133 to the Central Office Review Committee ("CORC") within seven days of the superintendent's decision; the CORC, in turn, must render a decision within thirty days of receiving the appeal." *Id.* (citing NYCRR tit. 7, § 701.5(d)(1)(i), (3)(ii)). "Matters not decided within the statutory time limits "may be appealed to the next step." *Id.* (citing NYCRR tit. 7, § 701.6(g)(2)).

Typically, inmates file grievances with the grievance clerk. *See* NYCRR tit. 7, § 701.5(a)(1). However, if an inmate is housed in the SHU (*i.e.*, segregated from the general prison population), he may give the grievance complaint to a corrections officer to file for him. *See id.* § 701.7.

If an inmate is transferred to another facility while a grievance is pending, a response to the grievance shall be mailed to the

inmate at the new facility. *Id.* § 701.6(h)(1). "If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* § 701.6(h)(2). If an inmate wishes to file a new grievance about an incident that occurred prior to a transfer, he must file the grievance in the facility where he is currently housed, "even if it pertains to another facility." *Id.* § 701.5(a)(1).

An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross v. Blake*, 578 U.S. 632 (2016). The Supreme Court in *Ross* determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 642 (internal quotation marks and citation omitted).

*6 The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendant bears the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). The defendant discharges his or her initial burden by "demonstrating that a grievance process exists" and that the plaintiff failed to utilize the grievance procedure. *White v. Velie*, 709 Fed. App'x. 35, 38 (2d Cir. 2017) (summary order). The burden then shifts to the plaintiff, who must show that "other factors ... rendered a nominally available procedure unavailable as a matter of fact." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted).

Here, Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to the filing of this action because he did not follow the three-tiered process for adjudicating inmate grievances. *See* Dkt. No. 31-1 at 7-12; Dkt. No. 56-1 at 21-24. In support of their argument,

Defendants submit declarations from Inmate Grievance Program Supervisors ("IGPS"), which describe DOCCS's administrative exhaustion process. Dkt. Nos. 31-4, 31-5, 31-6. Each IGPS stated that Plaintiff never filed a grievance relating to the purported violations alleged in this action. Dkt. No. 31-4 at ¶¶ 20-21; Dkt. No. 31-5 at ¶¶ 17-20; Dkt. No. 31-6 at ¶¶ 17-20. Defendants also submitted a document showing Plaintiff's grievance-filing history. Dkt. No. 31-7 at 6-7. With these submissions, Defendants have met their initial burden. *Hubbs*, 788 F.3d at 59; *see also Bennett v. Onua*, No. 09 Civ. 7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records ... did not reveal any record of a grievance" filed by the plaintiff).

Because Defendants have met their initial burden, the burden shifts to Plaintiff to show that the administrative remedies were unavailable to him. *See Hubbs*, 788 F.3d at 59. Plaintiff concedes that he did not follow the established three-tier process but alleges that he was precluded from doing so because unnamed corrections officers at Great Meadow discarded or destroyed his grievances. *See generally* Dkt. Nos. 45, 61. Plaintiff principally argues that summary judgment on the exhaustion of administrative remedies should be denied because there are questions of material fact.[10] Dkt. No. 61 at 15. In support of his argument, Plaintiff cites to his deposition testimony and the purported handwritten duplicates of the grievances that he allegedly authored. *Id.* Plaintiff contends that while he was housed in the SHU, he authored and placed grievances "in an envelope addressed to the Inmate Grievance Unit and placed [them] on his cell gate, per facility policy, for the correction officer to take and place in the mailbox," Dkt. No. 45-2 at ¶ 4, on September 9, 2019, and on September 20, 2019, but did not receive a response to either of these grievances.[11] Dkt. No. 45-3 at ¶¶ 8, 9; *see* Dkt. No. 61 at 15. Plaintiff also testified that he submitted a letter to a Superintendent, *see* Dkt. No. 56-3 at 73:2-5, letters to two different Commissioners, *see id.* at 98:22-102:4, and a grievance directly to CORC, *id.* at 78:4-7.

10    Although not clear from Plaintiff's Opposition, he appears to argue that the administrative remedies were unavailable to him. *See* Dkt. No. 45-5 at 4-5 (arguing that the Court should engage in a three-party inquiry as set forth in *Hemphill v. New York*,

[380 F.3d 680 (2d Cir. 2004)](#), and that there were no administrative remedies available to plaintiff).

11    While Plaintiff has provided the Court with what appears to be two handwritten grievances, both grievances are dated September 20, 2019. *See* Dkt. No. 45-3 at 5-6. Moreover, one of the handwritten grievances appears to be a draft. *See id.* at 5; Dkt. No. 56-3 at 93:23-25 ("This is the rough draft. They're both the same. I did them both at the same time, I submitted differently, though.").

 *7  Based on the record before the Court, the Court finds that Plaintiff's administrative remedies were unavailable under *Williams v. Priatno*, [829 F.3d 118 (2d Cir. 2016)](#). In *Williams*, the Second Circuit considered whether administrative remedies had been "actually available" to an inmate housed in the SHU, in the context of grievances allegedly submitted to facility staff, but purportedly never filed. [829 F.3d at 119-20](#). The plaintiff alleged that while housed in the SHU, he drafted a grievance that he delivered to a corrections officer to forward to the grievance office on his behalf. *[Id.](#) at 120-21*. Approximately two weeks later, the plaintiff was transferred to a different facility. *[Id.](#)* at 121. He never received a response to his grievance and alleged that it was never filed by the corrections officer to whom he had given it. *Id.* It was undisputed that the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *[Id.](#) at 124*. The *Williams* court rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The *Williams* court also found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* "Following the Second Circuit's decision in *Williams*, several courts ... have concluded that where a grievance is both *unfiled and unanswered*, the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *[Maldonado v. Mandalaywala](#)*, No. 9:17-CV-1303 (BKS/TWD), [2020 WL 1159426, at *15 (N.D.N.Y. Feb. 12, 2020)](#), *report and recommendation adopted*, [2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020)](#) (emphasis in the original, internal quotation marks omitted and citations omitted); *[Hurst v. Mollnow](#)*, No. 16-CV-1062 (DNH/TWD), [2018 WL 4178226, at *10 (N.D.N.Y. July 20, 2018)](#) ("Therefore, [a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current

situation falls squarely within the Second Circuit's decision in *Williams*[.]") (alterations in original, internal quotation marks and citation omitted), *report and recommendation adopted*, [2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018)](#).

Although neither party discussed *Williams* in its papers, *Williams* controls here. As in *Williams*, Plaintiff alleges that while he was housed in the SHU, he drafted two grievances that he placed on his cell door for a corrections officer to pick up and deliver to the grievance office on his behalf. Dkt. No. 45-3 at ¶¶ 8, 9; *see* Dkt. No. 61 at 15. Moreover, as in *Williams*, Plaintiff was transferred to a different facility shortly after delivering his grievances to the corrections officer while in the SHU. *See* Dkt. No. 56-3 at 73:6-17. Plaintiff also alleges that he never received a response to his grievances and alleges that his grievances were never filed and/or were destroyed by the corrections officer(s) that picked up the grievances from his cell door. *See id.* at 76:13-19; 79:21-81:23. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court finds that the factual allegations raise a genuine issue of material fact as to exhaustion. *See, e.g., [Fann v. Graham](#)*, No. 9:15-CV-1339 (DNH/CFH), [2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018)](#) (finding issue of fact as to the availability of administrative remedies where the record suggested the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted*, [2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018)](#). Therefore, the Court denies Defendants' motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. [12]

12    For the reasons discussed *infra*, the Court finds that an exhaustion hearing in not warranted.

### B. Plaintiff's Claims Against Defendants

 *8  Plaintiff seeks damages for alleged violations of his constitutional rights under [Section 1983](#). "To state a valid claim under [Section] 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *[Whalen v. Cnty. of Fulton](#)*, [126 F.3d 400, 405 (2d Cir. 1997)](#) (citation omitted). "[Section 1983](#) itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *[Sykes v. James](#)*, [13 F.3d 515, 519 (2d Cir. 1993)](#) (citing *[City of Okla. City v. Tuttle](#)*, [471 U.S. 808, 816 (1985)](#)).

To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). "[T]here is no special rule for supervisory liability [under § 1983]. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and citation omitted).

Defendants argue that Plaintiff's Section 1983 claims against Defendants fail as a matter of law because he, among other things, cannot establish that Owens and Eberley were personally involved in the alleged constitutional violations. *See* Dkt. 56-1 at 8-14. Plaintiff did not respond to Defendants' arguments in his Opposition. [13] *See generally* Dkt. No. 61.

[13]    Plaintiff alleges that he is unable to respond to Defendants' motion for summary judgment because he did not conduct discovery. Dkt No. 61 at 14. Plaintiff's contention strains credulity. Plaintiff testified in two depositions and was in possession of documentary evidence produced by Defendants evidencing Defendants' involvement, or lack thereof, in Plaintiff's contraband watch. *See* Dkt. Nos. 56-3, 56-4.

### i. Defendant Owens

The summary judgment record is devoid of any evidence establishing Defendant Owens' personal involvement in the alleged constitutional violations. Defendants submitted documentary evidence, such as the "Watch Commander Log Book" and the "Log Book," all of which demonstrate that Owens did not participate in observing—or authorizing—Plaintiff's contraband watch from August 25, 2019 to September 6, 2019. *See* Dkt. No. 56-4 at 10-47. In addition, Plaintiff testified that Owens did not observe him during the contraband watch, which is when Plaintiff was allegedly denied water to "bathe" before and after meals, and was deprived of food and drinking water. Dkt. No. 56-3 at 182:15-17 ("Q: Okay, do you remember ever being watched by Owens, Lt. Owens? A: No. No."). Moreover, Plaintiff testified that Owens violated his constitutional right when "he authorized me and put me in the defecation

room without no proper authority. He's the one who told them to put me in there." *Id.* at 202:23-203:2. [14] But documentary evidence demonstrates that Captain Fraser authorized Plaintiff's contraband watch. *See* Dkt. No. 56-4 at 11. Moreover, Plaintiff has not proffered any evidence demonstrating Owens' involvement in Plaintiff's remaining claims—that is, the First and Eighth Amendment claims. At summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Plaintiff has not met his burden and has failed to raise a genuine dispute of fact as to Defendant Owens' personal involvement in the alleged constitutional violations. *See e.g., Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986) (where corrections officer had only filed a report and was not personally involved in a hearing which plaintiff alleged had violated his due process rights, summary judgment was appropriate because plaintiff had failed to raise an issue of material fact regarding the personal involvement of the corrections officer).

[14]    Plaintiff's due process claim against Owens and Eberley relating to the deprivation order was dismissed by this Court on March 30, 2022. *See* Dkt. No. 47.

### ii. Defendant Eberley

**\*9**  Similarly, the summary judgment record is devoid of any facts establishing Defendant Eberley's personal involvement in Plaintiff's Eighth Amendment claim. Based on the documentary evidence, the record shows that Eberley was not assigned to—nor involved in—Plaintiff's contraband watch from August 25, 2019 to September 4, 2019. *See* Dkt. No. 56-2 at ¶ 65 (citing Dkt. No. 56-5); Dkt. No. 56-4 at 10-47. Because Plaintiff alleges that he was deprived of drinking water and food from August 25, 2019 to August 30, 2019, Eberley could not have been involved in the alleged violation of the Eighth Amendment. Moreover, Plaintiff failed to offer any evidence demonstrating otherwise, and even testified that he did not recall being observed by Defendant Eberley during his contraband watch, nor could he identify what, if anything, Eberley did to violate his constitutional rights. *See* Dkt. No. 56-3 at 182:18-183:2 ("Q. Do you remember -- remember being watched by Eberlly (sic)? A. I -- I don't remember who was watching me. Because like I said, I get three different people, or two different people a day, and I was up there for fifteen days. So, I wasn't really -- like I said, they don't talk

to me. They just sit here and read their books and listen -- they look at me."); *Id.* at 203:14-19 ("Q. Okay. What about Mr. Eberlly (sic)? What did he do specifically? A. What he did was I don't know. Like I said, I don't -- I can't exactly tell you what ...."); *Id.* at 203:20-204:4 ("Q. Okay. So, you don't remember what Mr. Eberly's actions that violated your constitutional [rights]? A. Exactly what he did, no. I can't sit here and say right, Mr. Eberlly (sic) did this or Mr. Eberlly (sic) did that, or Mr. Owens did this. Because like I said, I don't know what ... role they played in it exactly. But did they play a role in it? Yes."). Therefore, Plaintiff has not met his burden and has failed to raise a genuine dispute of fact as to Defendant Eberley's personal involvement in Plaintiff's Eighth Amendment deliberate indifference claim.

That leaves Plaintiff's First Amendment claim—that he was deprived of water to bathe himself before and after meals from August 30, 2019 to September 6, 2019, which prevented him from practicing his Rastafarian religion. Dkt. No. 29 at ¶¶ 43-48; Dkt. No. 56-2 at ¶ 19. The summary judgment record shows that Defendant Eberley observed Plaintiff during the contraband watch only on one day during the period in question—on September 5, 2019. Dkt. No. 56-2 at ¶ 46; Dkt. No. 56-4 at 47. Even though Defendant Eberley was involved in Plaintiff's contraband watch, Plaintiff has only put forth "conclusory allegations, conjecture and speculation ... [which] are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Indeed, Plaintiff has failed to proffer any evidence demonstrating that on September 5, 2019, he requested—and was denied—water from Eberley. [15] Moreover, Plaintiff testified that he "can't say" what, if anything, Eberley did to violate his constitutional rights. *See* Dkt. No. 56-3 at 203:20-204:4. Put simply, Plaintiff has failed to proffer any evidence from which a reasonable jury could find that Eberley was personally involved in the alleged violation of Plaintiff's First Amendment rights. [16]

[15]  The Court notes that the notations in the "Log Book" show that Plaintiff requested and was provided with water at 3:50 pm on September 5, 2019. *See* Dkt No. 56-4 at 47. Plaintiff has not put forth any evidence disputing this showing.

[16]  Even assuming *arguendo* that Plaintiff had met his burden (he did not), Plaintiff's First Amendment claim against Defendant Eberley fails as a matter of law because he cannot satisfy the third prong of the three-part test to establish a First Amendment

free exercise claim. To state a First Amendment free exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials does not further some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). Defendants argue that it is "clear that legitimate penological objectives existed – DOCCS Directive 4910 (J)(5) outlines procedures that the water supply to the cell/ room shall be turned off while the incarcerated individual is being observed in contraband watch" and that "[t]he implementation and enforcement of these standardized procedures aid in the control of contraband being further introduced into the prison population." Dkt. No. 56-1 at 8. The burden shifts to Plaintiff to show that the penological reasons articulated by Defendants are irrational. *Ford v. McGinnis*, 352 F.3d 582, 595 (2d Cir. 2003). Plaintiff has failed to do so. Plaintiff contends that he was unable to respond to Defendants' arguments on this issue because he did not conduct discovery. *See* Dkt. No. 61 at 14. It is not clear to the Court what discovery Plaintiff could have sought from Defendants to demonstrate that the penological reason articulated by Defendants is irrational. Thus, the Court finds that summary judgment is also warranted on this ground.

**\*10**  Accordingly, the Court grants Defendants' motion for summary judgment for lack of personal involvement. [17]

[17]  Because the Court is granting Defendants' motion for summary judgment on other grounds, the Court need not address Defendants' argument that they are entitled to qualified immunity.

### C. Plaintiff's Claims Against John Doe Defendants

In the SAC, Plaintiff asserts claims against John Doe defendants. *See* Dkt. No. 29. But there is nothing in the record showing that Plaintiff has identified or served the John Does in this action, which was commenced nearly three years ago. [18] *See generally* Docket. The Court finds that the claims against the John Does are time-barred and any

attempt by Plaintiff to amend the SAC to substitute the John Doe defendants would be futile. Therefore, the Court will "forestall further motion practice and *sua sponte* dismiss the John Doe claims with prejudice" because the claims do not relate back to the SAC. *Aniades v. New York State Div. of Parole*, No. 21 Civ. 5975 (CM), 2023 WL 4421877, at *13 (S.D.N.Y. July 10, 2023).

18    The Court notes that Plaintiff's failure to identify and serve the John Does when the SAC was filed approximately two years ago is in and of itself grounds for this Court to *sua sponte* dismiss the Joe Does. *See Williams v. Johnson*, No. 17 Civ. 2351 (ER), 2019 WL 1437820, at *8 (S.D.N.Y. Mar. 31, 2019) (dismissing claims *sua sponte* against unidentified John Doe defendants when suit was filed nearly two years ago and plaintiff "ha[d] not amended his complaint to identify the John Doe defendants"). Courts have routinely held, "[w]here a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the [defendant's] name, ... the plaintiff simply cannot continue to maintain a suit against the John Doe defendant." *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (internal quotation marks and citation omitted).

Each of Plaintiff's claims in the SAC are subject to a three-year statute of limitations. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing NYCPLR § 214(5) (because Section 1983 does not contain a specific statute of limitations, courts apply the statute of limitations for personal injury actions under state law, which in New York is three years). For each of Plaintiff's claims, the limitations period began to run at the time the alleged violations occurred— August 25, 2019 to September 6, 2019. *See generally* Dkt. No. 29. Therefore, Plaintiff's claims became time-barred on or around September 6, 2022 (at the latest). *See Pearl*, 296 F.3d at 80 ("Federal law determines when a section 1983 cause of action accrues, and we have ruled that accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action.") (internal quotation marks and citations omitted). "Generally, John Doe pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (internal quotation marks and citations omitted). "John Doe substitutions ... may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met." *Id.*

(internal quotation marks and citations omitted). Plaintiff cannot meet these specifications.

### i. Rule 15(c)(1)(C)

*11  Pursuant to Federal Rule of Civil Procedure 15(c)(1)(C), an amended complaint which adds a new party, or replaces a "Doe" defendant with a named defendant, will be deemed to relate back to the date of the original pleading, provided that:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within [90] days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Hogan*, 738 F.3d at 517 (citing Fed. R. Civ. P. 15(c)(1)(C)) (further citation omitted); *see* Fed. R. Civ. P. 15(c)(1)(B), (C) (setting forth requirements for permitting amended complaint against newly named defendants to relate back to an original complaint); *see also* Fed. R. Civ. P. 4(m) (noting 90-day service period for services of summons and complaint under Rule 4(m)). The Second Circuit has "interpreted the rule to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Id.* (citations omitted). Moreover, "although Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties ... [,] the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as mistake." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995), *modified*, 74 F.3d 1366 (2d Cir. 1996). Thus, "relation back is precluded under Rule 15(c)(1)(C) where a plaintiff does not know the names of the officers against whom he seeks to assert a § 1983 claim." *Chow v. Shorefront Operating LLC*, No. 19-CV-3541

(FB)(SJB), 2021 WL 225933, at *5 (E.D.N.Y. Jan. 20, 2021) (internal quotation marks and citations omitted).

Here, Plaintiff cannot satisfy the third element—that the unnamed "party should have known that, but for a mistake of identity, the original action would have been brought against it." *Hogan*, 738 F.3d at 517 (citation omitted). Plaintiff's failure to name the corrections officers who allegedly deprived him of food and water was from a lack of knowledge of their names, rather than a "mistake of their identity." *See id.* Accordingly, Plaintiff's claims against the Joe Does do not relate back under Rule 15(c)(1)(C).

#### ii. Rule 15(c)(1)(A)

Nor do Plaintiff's claims relate back under Rule 15(c)(1)(A), which permits an amended pleading to relate back when "the law that provides the applicable statute of limitations allows relation back." "Rule 15(c)(1)(A) instructs courts ... to look to the entire body of limitations law that provides the applicable statute of limitations. As discussed *supra*, § 1983 derives its statute of limitations from state law." *Hogan*, 738 F.3d at 518. "[T]he New York Civil Practice Law and Rules ("CPLR") creates a special procedure for claims alleged against John Doe defendants." *Id.* Section 1024 of the CPLR reads:

> **\*12** A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

"New York courts have interpreted this section to permit John Doe substitutions *nunc pro tunc.*" *Id.* at 518-19 (collecting cases). "To take advantage of § 1024, a party must meet two requirements." *Id.* at 519 (citations omitted). "First, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* (internal quotation marks and citations omitted). "Second, the party must describe the John Doe party in such form as will

fairly apprise the party that [he] is the intended defendant." *Id.* (internal quotations marks and citations omitted).

Plaintiff cannot avail himself of § 1024 because he failed to exercise due diligence to timely ascertain the names of the John Does. *See, e.g., Vasconcellos v. City of New York*, No. 12 Civ. 8445 (CM), 2014 WL 4961441, at *9 (S.D.N.Y. Oct. 2, 2014) ("Vasconcellos did nothing to exercise due diligence prior to the running of the statute—or for that matter, after it ran."); *JCG v. Ercole*, No. 11 Civ. 6844 (CM) (JLC), 2014 WL 1630815, at *14 (S.D.N.Y. Apr. 24, 2014), *report and recommendation adopted*, 2014 WL 2769120 ("Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed, waiting until the statute of limitations had nearly run to file his complaint."). "The onus of identifying an officer defendant's name, or at least making a good faith effort, lies on the plaintiff." *Barrett v. City of Newburgh*, 720 Fed. App'x 29, 33 (2d Cir. 2017) (citations omitted) (summary order). "Due diligence is not exercised by 'last minute' or token discovery requests." *Id.* (citations omitted). "A plaintiff exercising due diligence will take concrete and timely steps to ascertain an officer defendants' identity, for example by submitting multiple discovery demands, requests under state or federal Freedom of Information laws, or requests to the Attorney General's office." *Id.* (citing *Mabry v. New York City Dep't of Corr.*, No. 05 Civ. 8133(JSR)(JCF), 2008 WL 619003, at *6 (S.D.N.Y. Mar. 7, 2008) (allowing relation back where plaintiff "aggressively sought the identities of the defendants"). "Courts typically find a lack of due diligence where the plaintiff failed to take any action beyond filing his original complaint prior to the expiration of the statute of limitations." *Perrien v. City of New York*, No. 21-CV-4443 (MKB), 2022 WL 4134367, at *4 (E.D.N.Y. Sept. 12, 2022) (internal quotation marks and citations omitted). Here, there is nothing in the record demonstrating that Plaintiff exercised any diligence—let alone due diligence—to ascertain the identities of the John Does. In fact, in connection with the Motion, Defendants provided the contraband watch "Log Book," which appears to include the names of the corrections officers that were assigned to Plaintiff's contraband watch. *See* Dkt. No. 56-4 at 10-47. Plaintiff has been in possession of these materials since November 28, 2022 (at the latest) and has taken no action to amend the SAC to substitute the John Doe defendants. [19] Accordingly, the Court *sua sponte* dismisses the claims against the John Does because such claims are time-barred. *See, e.g., Abreu v. City of New York*, 657 F. Supp. 2d 357, 363 (E.D.N.Y. 2009) (*sua sponte*

dismissing John Doe defendants in a Section 1983 action because such claims were barred by the statute of limitations).

19      In connection with the OTSC, Plaintiff was given an opportunity to explain to the Court what steps he has taken to ascertain the identity of the John Does since the filing of the SAC on May 10, 2021. Dkt. No. 64. However, Plaintiff did not respond to the Court's order. *See generally* Docket.

**V. CONCLUSION**

*13   Accordingly, the Court hereby

**ORDERS** that the Defendants' motion for summary judgment, Dkt. No. 56, is **GRANTED**; and the Court further

**ORDERS** that the claims against the John Doe #1-5 defendants are **DISMISSED with prejudice** as time-barred; and the Court further

**ORDERS** that the Clerk shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5351017

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1200328

2021 WL 1200328
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jamel CLARK, Plaintiff,
v.
Gerald GARDNER, et al., Defendants.

9:17-CV-0366 (DNH/TWD)
|
Signed 03/08/2021

**Attorneys and Law Firms**

JAMEL CLARK, Plaintiff, pro se, 99-A-0475, Sullivan
Correctional Facility, Box 116, Fallsburg, NY 12733.

OF COUNSEL: LAUREN ROSE EVERSLEY, ESQ., Ass't
Attorney General, LETICIA JAMES, Attorney General of the
State of New York, Attorney for Defendants, The Capitol,
Albany, NY 12224.

## REPORT-RECOMMENDATION AND ORDER

Thérèse Wiley Dancks, United States Magistrate Judge

## I. INTRODUCTION

 *1 This matter was referred for a Report and
Recommendation by the Honorable David. N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c). *Pro se* Plaintiff Jamel Clark ("Plaintiff"
or "Clark"), an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983 alleging violations of his constitutional rights at
Shawangunk Correctional Facility ("Shawangunk") in 2014.
(Dkt. No. 1.)

Defendants and claims remaining following initial review
and motion practice are: (1) First Amendment retaliation
claims against Corrections Officer ("C.O.") David DeGraff
("DeGraff") and C.O. George Karamanos ("Karamanos");
(2) Eighth Amendment excessive force claims against
DeGraff, Karamanos, C.O. Richard McElroy ("McElroy"),
and Sergeant ("Sgt.") Robert Harrison ("Harrison"); and
(3) Fourteenth Amendment due process claims against
Lieutenant ("Lt.") Gerald Gardner ("Gardner"), Deputy
Superintendent of Security Louis Pingotti ("Pingotti"), Lt.

Gregory Palen ("Palen"), Plant Superintendent Ronald Farah
("Farah"), Superintendent Joseph Smith ("Smith"), DOCCS
Director Donald Venettozzi ("Venettozzi"), and DOCCS
Acting Commissioner Anthony Annucci ("Annucci"). (Dkt.
Nos. 9, 47. [1] )

[1]     The Court refers to Defendants' DOCCS' ranks
        as indicated in 2014. Their present ranks and
        employment status may differ.

Defendants now move for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure seeking
dismissal of the complaint in its entirety. (Dkt. No. 80.)
In support of their motion, each Defendant has submitted
declarations: Annucci (Dkt. No. 80-3); DeGraff (Dkt. No.
80-5); Farah (Dkt. No. 80-6); Gardner (Dkt. No. 80-8);
Harrison (Dkt. No. 80-9); Karamanos (Dkt. No. 80-10);
McElroy (Dkt. No. 80-11); Palen (Dkt. No. 80-12); Pingotti
(Dkt. No. 80-13); Smith (Dkt. No. 80-16); and Venettozzi
(Dkt. No. 80-17). Defendants also submit declarations from
the following DOCCS employees: Michael Cunningham,
Shawangunk Inmate Grievance Program ("IGP") Supervisor
(Dkt. No. 80-4); Debra Fuller, Attica Correctional Facility
("Attica") IGP Supervisor (Dkt. No. 80-7); Corey Proscia,
Sullivan Correctional Facility ("Sullivan") IGP Supervisor
(Dkt. No. 80-14); Rachel Seguin, Assistant Director of the
IGP for DOCCS (Dkt. No. 80-15); John Werlau, Shawangunk
Correction Captain (Dkt. No. 80-18); and Sean White,
Attica Correction Captain (Dkt. No. 80-19). Plaintiff filed a
response. (Dkt. No. 87.) Defendants filed a reply and Plaintiff
filed a sur-reply permitted by the Court. (Dkt. Nos. 88, 90,
92.)

For reasons explained below, the Court recommends that
Defendants' motion for summary judgment be granted in part
and denied in part.

## II. BACKGROUND

### A. Plaintiff's Housing Assignments

Plaintiff has been in DOCCS' custody since 1999. As relevant
to this action, Plaintiff was incarcerated at Shawangunk from
October 1, 2013, through December 23, 2014. (Dkt. No. 80-1
at ¶ 2. [2] ) He was temporarily housed at Attica from July 20,
2014, through August 25, 2014, for a court trip. (Dkt. No. 1
at 11.) Between September 8 and 11, 2014, and October 30
and November 17, 2014, Plaintiff was temporarily housed at
Downstate Correctional Facility ("Downstate") and Sullivan,
respectively, for mental health observation. (Dkt. No. 1 at

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 155 of 238

20-21; Dkt. No. 80-18 at ¶ 7; 80-1 at ¶¶ 13, 14.) On December 23, 2014, Plaintiff was moved to Sullivan and on January 30, 2015, Plaintiff was transferred to Attica, where he remained through February 8, 2016. (Dkt. No. 80-1 at ¶¶ 16, 17.)

[2]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected unless indicated.

**\*2** Generally, Plaintiff claims he spent more than 300 days in disciplinary confinement as a result of the six disciplinary hearings at issue. (Dkt. No. 1 at 41-42.) During his deposition, Plaintiff testified that he was "continuously" housed in disciplinary confinement from August 2014 until July 2015. (Dkt. No. 80-2 at 140-42.)

Defendants' submissions indicate that from August 5, 2014, through August 25, 2014, Plaintiff was housed in the general population "B block" in cell 0B-1130 at Shawangunk. (Dkt. No. 80-18 at ¶ 7.) On August 25, 2014, Plaintiff was placed in the Special Housing Unit ("SHU") result of a disciplinary infraction following a hearing conducted by Gardner. (Dkt. No. 80-1 at ¶ 3; *see* Part II.B., *infra*.) Plaintiff was assigned to cell SH-00-006.[3] (Dkt. No. 80-18 at ¶ 8.) Plaintiff remained in the SHU at Shawangunk from August 25, 2014 through September 4, 2014. (Dkt. No. 80-1 at ¶ 5.) On September 3, 2014, Plaintiff's August 25, 2014, disciplinary hearing disposition was administratively reversed and, on September 4, 2014, Plaintiff was released back to general population. *Id.* at ¶¶ 4, 5.

[3]    Inmates in Shawangunk's SHU are subject to, *inter alia*, limitations on personal property, packages, commissary, programs, visits, and telephone calls, and out-of-cell recreation is limited to one hour daily. (Dkt. No. 80-18 at ¶ 11.)

On September 4, 2014, Plaintiff was involved in an incident whereby he was violently assaulted. *Id.* at ¶ 6.[4] Plaintiff was transported to an outside hospital for medical evaluation and treatment of his injuries. (Dkt. No. 1 at 19.) Thereafter, Plaintiff was confined in the facility hospital. *Id.* at 19-20.

As a result of this incident and on the recommendation of Lt. Connors, who is not a party, Plaintiff was placed under Involuntary Protective Custody ("IPC") status for his personal safety and for the safety and security of the facility. *Id.* at ¶¶ 7, 8.[5] Plaintiff was housed in IPC cell SD-00-005 from September 11, 2014, through October 30, 2014. *Id.* at ¶¶ 11, 12.

[4]    Plaintiff's Eighth Amendment claims related to the September 4, 2014, incident were dismissed on initial review without prejudice. (Dkt. No. 9.)

[5]    At Shawangunk, inmates in IPC are housed in the same block as the SHU, but on a different side of the block. (Dkt. No. 80-1 at ¶ 9.) Inmates in IPC are not subject to the same degrees of restriction as are inmates in SHU. *Id.* at ¶ 10.

As noted, from October 30 through November 17, 2014, Plaintiff was temporarily housed at Sullivan for mental health observation. *Id.* at ¶¶ 13, 14. When he returned to Shawangunk, he was housed in the SHU from November 17 through December 23, 2014. *Id.* at ¶¶ 14, 15. On December 23, 2014, Plaintiff was moved to Sullivan. *Id.* at ¶ 16.

On January 30, 2015, Plaintiff was transferred from Sullivan to Attica. *Id.* at ¶ 17. Plaintiff was housed in the general population at Attica from January 30 through March 11, 2015. *Id.* at ¶¶ 18, 19. Between March 11 and March 16, 2015, Plaintiff was relocated to Attica's mental health observation unit. *Id.* at ¶ 20. From March 16, 2015, through February 8, 2016, Plaintiff was housed in general population at Attica. *Id.* at ¶ 21. Plaintiff was not housed in the SHU at Attica at any time in 2015. *Id.* at ¶ 22.

**B. The August 25, 2014, Disciplinary Hearing**[6]

[6]    Defendants refer to the six disciplinary hearings at issue by the date the decision was rendered. For consistency and ease of reference, the Court does the same.

**\*3** On July 24, 2014, while temporarily housed at Attica, Plaintiff's cell at Shawangunk was searched. (Dkt. No. 1 at 11.) Various items of contraband were allegedly recovered during the search, along with several other unauthorized items. *Id.* Upon his return to Shawangunk on August 5, 2014, Plaintiff was served with an inmate misbehavior report ("IMR") regarding the cell search. *Id.* at 12.

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 156 of 238

2021 WL 1200328

Plaintiff alleges that on August 6, 2014, Gardner conducted a disciplinary hearing. *Id.* at 13. [7] Plaintiff claims that his requests for an employee assistant and for production of relevant documents and reports were denied, including, among other things, a copy of DOCCS Directive 4934. *Id.* at 14-15. Plaintiff's request to call inmate Benjamin as a witness on his behalf was also denied. *Id.* at 15. Inmate Benjamin had told Plaintiff that he observed officers placing a television set and lamp in his cell prior to the July 24, 2014, cell search. *Id.* at 16.

[7]    Gardner has no recollection of serving as the hearing officer for the August 25, 2014, disciplining hearing. (Dkt. No. 80-8 at ¶ 4 n.1.) Venettozzi states DOCCS' records reflect that Plaintiff had a Tier III disciplinary hearing at Shawangunk on August 25, 2015, which was administratively reversed on September 3, 2014. (Dkt. No. 80-17 at ¶ 13.)

At the conclusion of the hearing, Gardner found Clark guilty of four of the five rule violations with which he had been charged. *Id.* Plaintiff was sanctioned with 60 days confinement in the SHU and loss of privileges, loss of honor visiting privileges for four months, loss of television in his cell for one year, and six months' loss of good time credits. *Id.*

According to Plaintiff, the disciplinary determination was affirmed on administrative appeal by Smith. *Id.* at 17. After speaking with a member of the mental health staff regarding his hearing, Clark was informed by Smith that the disciplinary determination was being reviewed by DOCCS' Central Office. *Id.*

On September 3, 2014, Plaintiff's August 25, 2014, disciplinary hearing disposition was administratively reversed. (Dkt. No. 80-2 at ¶ 4.) On September 4, 2014, Plaintiff was released from SHU. *Id.* at ¶ 5.

### C. The September 23, 2014, Disciplinary Hearing Conducted by Gardner

On September 7, 2014, C.O. Algarin search Plaintiff's cell and issued an IMR charging Plaintiff with possession of marijuana. (Dkt. No. 80-1 at ¶ 23.) Plaintiff was served a copy of the IMR the following day. *Id.* at ¶ 24.

Shortly after receiving the IMR and being informed that a Tier III disciplinary hearing would be held upon his release from the facility hospital, Plaintiff attempted suicide. (Dkt.

No. 1 at 20.) Upon his release from the hospital, Plaintiff was sent to Downstate Correctional Facility and admitted to the "Office of Mental Health Suicide Prevention Crisis Observation and Treatment Unit." *Id.* at 21. DOCCS' Office of Special Housing/Inmate Disciplinary Programs granted an extension to commence the Tier III disciplinary hearing until Plaintiff returned to Shawangunk. (Dkt. No. 80-1 at ¶ 30.) On September 11, 2014, Clark was returned to Shawangunk and confined in the SHU. (Dkt. No. 1 at 21.)

Plaintiff's Tier III disciplinary hearing commenced on September 15, 2014. *Id.* at ¶ 31. Garner served as the hearing officer. *Id.* at ¶ 32. Plaintiff claims Gardner denied his request for an employee assistant and deprived him of his right to call witnesses and present a defense. (Dkt. No. 1 at 22-23.)

**\*4**  The hearing transcript reflects Gardner read Plaintiff his rights and obligations, which included his right to call witnesses and present evidence. (Dkt. No. 80-1 at ¶ 33.) Gardner adjourned the Tier III hearing on September 15, 2014, to address Plaintiff's concerns regarding his pre-hearing assistance. *Id.* at ¶ 34. Plaintiff selected Mr. Chumas, a civilian employee at Shawangunk, to be his assistant. *Id.* at ¶ 25. During his meeting with Mr. Chumas, Clark requested two inmates to appear as witnesses at his hearing, and he also requested a copy of DOCCS Directive 4933, which was provided. *Id.* at ¶¶ 26, 27, 28. On September 16, 2014, Mr. Chumas provided Plaintiff with additional requested documents, including certain log book pages, Unusual Incident Report, memoranda, cell inspection form, and contraband chain-of-custody documentation. *Id.* at ¶ 35.

The hearing resumed on September 18, 2014. *Id.* at ¶ 36. Two inmate witnesses requested by Plaintiff testified at the hearing by speakerphone, and Plaintiff was permitted to ask the inmates questions. *Id.* at ¶ 37. A third inmate requested by Plaintiff refused to testify, which was documented for the hearing record. *Id.* at ¶ 38. C.O. Comito, C.O. Keys, and C.O. Miller also testified at Plaintiff's request. *Id.* at ¶¶ 39, 43. Mr. Chumas testified regarding the assistance he provided to Plaintiff and C.O. Algarin testified regarding the circumstances of the IMR he wrote. *Id.* at ¶¶ 40, 41.

On September 23, 2014, Gardner found Plaintiff guilty of violating prison rule 113.25, as charged by C.O. Algarin. *Id.* at ¶¶ 42-44. Gardner imposed penalties of 3 months SHU confinement, 6 months loss of certain privileges, and 6 months recommended loss of good time. *Id.* at ¶ 45. He

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 157 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

advised Plaintiff of his right to appeal the Tier III hearing determination within 30 days. *Id.* at ¶ 46.

Gardner provided Plaintiff with a written hearing disposition sheet on September 23, 2014, which included a statement of the evidence used for the determination. *Id.* at ¶ 47. In his declaration, Gardner states he did not predetermine his decision prior to the conclusion of the hearing. *Id.* at ¶ 48.

Plaintiff claims both Smith and Annucci affirmed the disciplinary determination. (Dkt. No. 1 at 23.) On October 3, 2014, the DOCCS Commissioner's office received an appeal from Plaintiff. (Dkt. No. 80-1 at ¶ 49.) The DOCCS Commissioner's office received further correspondence from Plaintiff regarding his appeal of the September 23, 2014, Tier III hearing disposition on October 9 and October 17, 2014. *Id.* at ¶ 50. The DOCCS Commissioner's office does not handle appeals of Tier III hearing dispositions, which are delegated to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at ¶ 51. Annucci had no knowledge of the of the substance of Plaintiff's appeals and no involvement in the determination of the appeal. *Id.* at ¶ 52.

On December 3, 2014, Plaintiff's hearing determination was review by the Office of Special Housing/Inmate Disciplinary Programs and affirmed by Venettozzi. *Id.* at ¶¶ 53-55. Subsequently, on January 20, 2016, Plaintiff's September 23, 2014 Tier III hearing disposition was administratively reversed. [8] *Id.* at ¶ 56.

[8]    Plaintiff commenced a state court proceeding pursuant to New York CPLR Article 78 to challenge several of the disciplinary hearings at issue in this case. (Dkt. No. 1 at 24.) In April 2016, the Article 78 proceeding was dismissed as moot, upon the advice of the Attorney General that all of the challenged disciplinary determinations had been administratively reversed and expunged from Plaintiff's record. *Id.*; *see Clark v. State Dep't of Corrections and Community Supervision*, 138 A.D.3d 1331 (N.Y. App. Div. 3d Dep't 2016). Venettozzi states this hearing was administratively reversed when his office learned that confidential testimony relevant to Plaintiff's mental health status may not have been taken prior to this hearing. (Dkt. 80-17 at ¶ 19.)

**D. The October 14, 2014, Disciplinary Hearing Conducted by Pingotti**

**\*5** Plaintiff alleges that on September 24, 2014, DeGraff and Harrison searched his cell. (Dkt. No. 1 at 24.) No contraband was discovered during the search. *Id.* at 24-25. However, DeGraff threatened Plaintiff and told him that he would "make sure you come up dirty for 'K-2'." *Id.* at 25. Later that day, Plaintiff was ordered to undergo a urinalysis. *Id.* On September 30, 2014, on the basis of that test, C.O. Strang issued an IMR charging Plaintiff with being under the influence of K2, a synthetic form of marijuana. (Dkt. No. 80-1 at ¶ 57.) On October 1, 2013, Plaintiff was served a copy of the IMR. *Id.* at ¶ 58. Plaintiff selected Mr. Chumas to be his assistant. *Id.* at ¶ 59.

On October 1, 2014, Plaintiff met with Mr. Chumas. *Id.* at ¶ 60. Plaintiff claims that in preparation for this hearing, he requested numerous documents and reports regarding the testing apparatus and protocols, but these requests were denied. (Dkt. No. 1 at 26.) Plaintiff also requested audio and video of the threats made by DeGraff on September 24, 2014, which were also denied. *Id.* at 27. Plaintiff was removed from the hearing prior to its conclusion and claims he never received a written statement of the disposition. *Id.*

The hearing transcript reflects that Plaintiff's Tier III disciplinary hearing commenced on October 7, 2014, with Pingotti serving as the hearing officer. (Dkt. No. 80-1 at ¶ 63-64.) Pingotti read Plaintiff his rights and obligations, which included his right to call witnesses and present evidence. *Id.* at ¶ 65. Pingotti informed Plaintiff that the company that manufactured the chemical reagent used in the drug test does not testify at prison disciplinary proceedings. *Id.* at ¶ 66.

Plaintiff requested two documents for the hearing on October 7, 2014: a K2 test reliability assessment and a memorandum regarding disciplinary procedures for K2 written by DOCCS Deputy Commissioner Joseph Bellnier. *Id.* at ¶ 67. Plaintiff reviewed the requested documents during an adjournment of the hearing and he had an opportunity to take any notes that he needed. *Id.* at ¶ 68.

On October 14, 2014, C.O. Strang testified regarding the circumstances of the IMR and the drug test that he conducted. *Id.* at ¶ 69. At Plaintiff's request, Nurse Scofield also testified. *Id.* at ¶ 70. However, Pingotti denied Plaintiff's request to call Deputy Commissioner Bellnier because he had no firsthand knowledge of the drug test conducted by C.O. Strang. *Id.* at ¶ 71. Pingotti also denied Plaintiff's request for a video recording of his housing block from September 24, 2014,

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 158 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

because it had no relevance to the drug test conducted on September 30, 2014. *Id.* at ¶ 72.

The hearing transcript reflects that Pingotti warned Plaintiff on three occasions not to speak over him when he spoke. *Id.* at ¶ 73. On October 14, 2014, Plaintiff was removed from the hearing for being disruptive and noncompliant with Pingotti's directions. *Id.* at ¶ 74. The hearing concluded in Plaintiff's absence. *Id.* at ¶ 75.

Pingotti found Plaintiff guilty of violating prison rule 113.13, as charged by C.O. Strang. *Id.* at ¶ 76. Pingotti imposed penalties of 2 months of SHU confinement, in addition to 2 months loss of packages, commissary, and telephone privileges. *Id.* at ¶ 77. He prepared a written hearing disposition sheet on October 14, 2014, which included a statement of the evidence relied upon which he relied. *Id.* at ¶ 78.

Pingotti directed C.O. North to deliver the written hearing disposition to Plaintiff at his cell, together with a form advising Plaintiff of his right to appeal to the Commissioner within 30 days. *Id.* at ¶ 79. C.O. North documented that he delivered Pingotti's written hearing disposition and appeal form to Plaintiff on October 15, 2014 at 9:45 A.M., and that Plaintiff refused to sign a form acknowledging receipt. *Id.* at ¶ 80. In his declaration, Pingotti avers he did not predetermine his decision prior to the conclusion of the Tier III hearing on October 14, 2014. *Id.* at ¶ 81.

**\*6** Plaintiff claims he appealed the determination, which was affirmed by Smith and Annucci. (Dkt. No. 1 at 28.) On October 17, 2014, the DOCCS' Commissioner's office received Plaintiff's appeal. (Dkt. No. 80-1 at ¶ 82.) On December 12, 2014, the Acting Director of Special Housing, Corey Bedard, signed the appeal affirmance. *Id.* at ¶¶ 84-86. Annucci had no knowledge of the substance of Plaintiff's appeal and had no involvement in the determination of the appeal. *Id.* at ¶ 83. On January 20, 2016, Plaintiff's October 14, 2014, Tier III hearing disposition was administratively reversed. *Id.* at ¶ 87. [9]

[9]    Venettozzi explains this hearing, like the September 23, 2014, hearing, was administratively reversed when his office learned that confidential testimony relevant to Plaintiff's mental health status may not have been taken prior to this hearing. (Dkt. 80-17 at ¶ 19.)

### E. The November 17, 2017, Disciplinary Hearing Conducted by Palen

On October 15, 2014, DeGraff conducted a search of Plaintiff's IPC cell at Shawangunk and observed small hole, approximately one (1) inch in length, in Plaintiff's mattress. (Dkt. No. 80-1 at ¶ 88.) On October 17, 2014, during a subsequent cell search, DeGraff observed that the hole in Plaintiff's mattress had expanded from approximately one (1) inch to six (6) inches in length since October 15, 2014. *Id.* at ¶ 89. DeGraff reached his hand inside the mattress and found pieces of lead wrapped in paper. *Id.* at ¶ 90. He then removed Plaintiff's mattress from the cell to further search it in the sally port area of the cell block. *Id.* at ¶ 91. DeGraff cut open Plaintiff's mattress, removed all of the stuffing, and found copper wire wrapped in paper and pieces of bedsheet. *Id.* at ¶ 92. DeGraff secured all evidence and disposed of the mattress. *Id.* at ¶ 93.

Thereafter, on October 17, 2014, DeGraff issued an IMR charging Plaintiff with possession of contraband and destruction of property. *Id.* at ¶ 94. Plaintiff was served with the IMR on October 18, 2014. *Id.* at ¶ 95. [10]

[10]    Plaintiff claims he had previously filed a grievance complaining about the condition of his mattress and also about the fact that the cell equipment report had not been completed when Plaintiff was first assigned to the cell. (Dkt. No. 1 at 30.) He also verbally complained about his mattress to Smith during rounds. *Id.* DOCCS records indicate Plaintiff filed a grievance numbered SHG-29231-14, entitled "Mattress Needs Replacing," which was received for filing on October 21, 2014, *after* Plaintiff received the October 10, 17, 2014, IMR. (*See* Dkt. No. 80-4 at ¶ 14; *see also id.* at 6-13.)

On October 21, 2014, Plaintiff's Tier II hearing commenced on the October 17, 2014, IMR. *Id.* at ¶ 96. Palen served as the hearing officer. *Id.* at ¶ 97. Plaintiff claims that Palen denied his requests for an assistant and also denied his requests for relevant videos and witnesses. (Dkt. No. 1 at 31.) Plaintiff alleges DeGraff destroyed the mattress (prior to the hearing so its condition could not be examined during the hearing) in retaliation for Plaintiff's grievance activity. *Id.* at 32.

The hearing transcript reflects Palen read Plaintiff his rights and obligations. *Id.* at ¶ 98. Inmates are not provided with employee assistants for Tier II hearings. *Id.* at ¶ 99.

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 159 of 238

2021 WL 1200328

Palen informed Plaintiff that he would not have an assigned assistant, but he gave Plaintiff an opportunity to advise him what evidence and witnesses Plaintiff needed for his defense. *Id.* at ¶ 100.

DeGraff testified at the hearing regarding the circumstances of the IMR that he wrote and Plaintiff asked DeGraff questions. *Id.* at ¶ 101. At Plaintiff's request, Sgt. Lutz testified regarding prior complaints made by Plaintiff about his mattress. *Id.* at ¶ 102. Plaintiff requested to view the video recording of his cell block from October 17, 2014, at the time DeGraff removed Plaintiff's mattress from his cell, and Plaintiff reviewed this video in Palen's presence during an adjournment of the haring on October 22, 2014. *Id.* at ¶ 103. Karamanos also testified at the hearing regarding a prior inspection of Plaintiff's cell and Plaintiff asked him questions. *Id.* at ¶ 104.

**\*7** Plaintiff's Tier II hearing was adjourned from October 30, 2014, through November 17, 2014, while he was housed at Sullivan for mental health observation. *Id.* at ¶ 105. The Office of Special Housing/Inmate Disciplinary Programs granted an extension to continue the Tier II hearing until Plaintiff returned from Sullivan to Shawangunk, and subsequently granted a further extension due to the temporary unavailability of Palen. *Id.* at ¶ 106.

Plaintiff's Tier II hearing recommenced on November 26, 2014. *Id.* at ¶ 107. Plaintiff submitted documentary evidence in his defense, including prior complaints he made to Shawangunk and DOCCS officials. *Id.* at ¶ 108. Plaintiff requested copies of complaints he claimed to have made to DOCCS' Office of the Inspector General ("OIG") in September and October 2014, and he requested that an OIG investigator, Investigator Russo, testify regarding those complaints. *Id.* at ¶ 109. At Plaintiff's request, Palen contacted the OIG, and he was advised by the OIG that no such complaints existed and, accordingly, Plaintiff's request was denied. *Id.* at ¶ 110. Plaintiff also requested to present his mattress as evidence during the hearing. *Id.* at ¶ 111. However, it was unavailable as DeGraff had disposed of it after cutting it open on October 17, 2014. *Id.*

Plaintiff requested video showing rounds made by the Smith and Sgt. Lutz, but the video did not exist as it was beyond the normal retention period. *Id.* at ¶ 112. Plaintiff requested video showing a previous interaction with DeGraff on September 24, 2014, but the video was unavailable due to an equipment malfunction. *Id.* at ¶ 113. Plaintiff also requested a video of the

October 15, 2014, search conducted by DeGraff, which Palen denied as not relevant because it would not have depicted the condition of the mattress inside of the cell. *Id.* at ¶ 114. Plaintiff requested video showing the sally port area of his housing block where DeGraff brought Plaintiff's mattress on October 17, 2014. *Id.* at ¶ 115. Palen denied this request as redundant of the October 17, 2014, video that Plaintiff had already reviewed. *Id.* Lastly, Plaintiff requested video showing the linen exchange on his housing block on three dates prior to October 17, 2014. *Id.* at ¶ 116. Palen denied this request as not relevant because the condition of his linens upon receipt was not at issue in the hearing. *Id.*

Clark requested copies of contraband receipts resulting from cell searches on three dates prior to October 17, 2014. *Id.* at ¶ 117. Palen denied this request as not relevant because any evidence of contraband confiscated on prior occasions would not be relevant to the October 17, 2014, cell search at issue in the hearing. *Id.*

Plaintiff requested to call as a witness the prior inmate assigned to his cell before him. *Id.* at ¶ 118. Specifically, Plaintiff requested inmate Bey, believing that inmate Bey was the prior inmate assigned to his cell. *Id.* It was determined that inmate Bey was not the prior occupant of Plaintiff's cell, and that two other inmates were assigned to the cell after Bey and prior to Plaintiff. *Id.* at ¶ 119. The inmate identified as the last to occupy the cell prior to Plaintiff refused to testify, and his refusal was documented in the hearing record. *Id.* at ¶ 120.

Plaintiff also requested to call Smith to testify regarding a prior complaint voiced by Plaintiff concerning his mattress. *Id.* at ¶ 121. Palen denied this request, however, as redundant of the testimony given by Sg. Lutz, who was with Smith and already testified about the same conversation. *Id.* at ¶ 121.

**\*8** Plaintiff's hearing concluded on November 27, 2017. *Id.* at ¶ 122. Palen found Plaintiff guilty of violating prison rules 113.23 and 116.10, as charged by DeGraff. *Id.* at ¶ 123. Palen imposed penalties of 30 days of keeplock [11] confinement, 30 days loss of privileges, and restitution of $65.25 for the cost of the mattress. *Id.* at ¶ 124. Plaintiff was advised of his right to appeal his Tier II hearing disposition to the Superintendent. *Id.* at ¶ 125. He was provided with a written hearing disposition sheet on November 27, 2014, which included a statement of the evidence supporting the determination. *Id.* at ¶ 126. In his declaration, Palen avers he did not predetermine his decision prior to the conclusion of the Tier II hearing on November 27, 2014. *Id.* at ¶ 127.

Clark v. Gardner, Not Reported in Fed. Supp. (2021)
Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 160 of 238

2021 WL 1200328

11    Keeplock is a form of disciplinary confinement whereby an inmate is confined to his own cell for a period of time. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

On December 3, 2014, Pingotti, as Smith's designee, affirmed the disposition. *Id.* at ¶ 128. On December 22, 2014, Plaintiff wrote to Smith to request a limited "re-review" of the timeliness of his Tier II hearing and to complain that DeGraff had disposed of his mattress prior to the hearing. *Id.* at ¶ 129. Smith responded to Plaintiff that the chain of extensions granted by the Office of Special Housing/Inmate Disciplinary Programs was in Order and that all contraband secreted in the mattress had been secured. *Id.* at ¶ 130.

**F. The December 10, 2014, Disciplinary Hearing Conducted by Gardner**

As noted, Plaintiff was temporarily housed at Sullivan from October 30 to November 17, 2014. On November 13, 2014, a social worker at Sullivan issued an IMR charging Plaintiff with threatening to kill a corrections officer on November 12, 2014, and stating that he "know[s] his face." (Dkt. No. 80-1 at ¶¶ 131, 132.) The Office of Special Housing/Inmate Disciplinary Programs granted an extension to commence the hearing until after Plaintiff returned from Sullivan to Shawangunk. *Id.* at ¶ 133.

On November 18, 2014, Plaintiff was served a copy of the IMR at Shawangunk. *Id.* at ¶ 134. The Tier II hearing commenced on November 20, 2014, with Gardner serving as the hearing officer. *Id.* at ¶ 135, 136. Plaintiff claims his request for an employee assistant was denied, as were his requests for relevant documents and witnesses. (Dkt. No. 1 at 38-39.)

The hearing transcript reflects that Gardner read Plaintiff his rights and obligations. (Dkt. No. 80-1 at ¶ 137.) Gardner informed Plaintiff that he would not have an assigned assistant as it was a Tier II hearing, but he told Plaintiff to advise him of what evidence and witnesses he needed to present his defense. *Id.* at ¶ 138.

Plaintiff requested a video recording from November 12, 2014, at Sullivan at the time that a mental health nurse made rounds to his cell. *Id.* at ¶ 139. This request was denied as no such video existed. *Id.* at ¶ 140. Plaintiff requested to call as witnesses inmates who were in neighboring cells to his at Sullivan on November 12, 2014. *Id.* At Plaintiff

request, inmates Aviles and Perez testified at the hearing by speakerphone, and Plaintiff had an opportunity to ask questions. *Id.* at ¶ 141. A third inmate, who was located at Great Meadow Correctional Facility at the time of the Tier II hearing, refused to testify and signed a refusal form for the hearing record. *Id.* at ¶ 142.

Plaintiff requested to call the Assistant Commissioner of the New York State Office of Mental Health ("OMH") as a witness. *Id.* at ¶ 143. Gardner denied this request because the Commissioner of OMH was not present during the incidents alleged in the November 13, 2014, IMR. *Id.* Plaintiff requested to call Investigator Russo from DOCCS OIG as a witness. *Id.* at ¶ 145. Gardner denied this request because Investigator Russo was not present during the alleged incidents. *Id.*

**\*9** Plaintiff also requested copies of his OMH mental health records, stating that he wanted these records to establish the reason why he was at Sullivan for mental health observation. *Id.* at ¶ 146. This request was denied as not relevant because the reason for Plaintiff's mental health observation was not relevant to the incidents alleged in the November 13, 2014, IMR. *Id.* The clinical social worker who authored the November 13, 2014, IMR testified by speakerphone on December 10, 2014, and Plaintiff had an opportunity to ask her questions. *Id.* at ¶ 147.

On December 10, 2014, Lt. Gardner found Plaintiff guilty of violating prison rule 102.10, as charged in the November 13, 2014, IMR. *Id.* at ¶¶ 148, 149. Gardner imposed penalties of 30 days of keeplock confinement and 30 days loss of privileges. *Id.* at ¶ 151. Plaintiff was advised of his right to appeal his Tier II hearing disposition to the Superintendent. *Id.* at ¶ 151.

Gardner provided Plaintiff with a written hearing disposition sheet on December 10, 2014, which included a statement of the evidence relied upon. *Id.* at ¶ 152. In his declaration, Gardner states he did not predetermine his decision prior to the conclusion of the hearing. *Id.* at ¶ 153. Plaintiff alleges Smith affirmed the disciplinary determination. (Dkt. No. 1 at 37.) Defendants assert Pingotti, as Smith's designee, affirmed Plaintiff's Tier II hearing disposition on December 12, 2014. (Dkt. No. 90-1 at ¶ 154.)

**G. The December 18, 2014, Disciplinary Hearing Conduced by Farah**

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 161 of 238

2021 WL 1200328

On October 24, 2014, DeGraff and Karamanos escorted Plaintiff from his IPC cell to a scheduled shower. (Dkt. No. 80-1 at ¶ 155.) The parties disagree as to what happened next. Plaintiff alleges he was assaulted by DeGraff and Karamanos in retaliation for having filed grievances and complaints against these officers. (Dkt. No. 1 at 34.) Specifically, Plaintiff claims DeGraff "aggressively squeezed" Plaintiff's penis "causing him pain" during an "improper" pat frisk, and Karamanos slammed Plaintiff's head into the wall. *Id.*

According to Defendants, DeGraff observed items stuffed in Plaintiff's pocket and initiated a pat frisk. (Dkt. No. 80-1 at ¶ 156.) During the pat frisk, Plaintiff made a sudden movement toward DeGraff. *Id.* at ¶ 158. As a result, Karamanos pushed Plaintiff to the wall to secure him. *Id.* at ¶ 159. After "gaining control" of Plaintiff, DeGraff and Karamanos escorted Plaintiff back to his cell. *Id.* at ¶ 160.

Thereafter, on October 24, 2014, DeGraff issued an IMR charging Plaintiff with refusal to obey a direct order and a movement violation. *Id.* at ¶ 161. Plaintiff was served a copy of the IMR on October 25, 2014. *Id.* at ¶ 162.

A Tier III hearing commenced on October 30, 2014, with Farah serving as the hearing officer. *Id.* at ¶¶ 163, 164. During this hearing, Plaintiff claims he was denied an employee assistant and was also denied relevant documents and video of the incident. (Dkt. No. 1 at 35.) Plaintiff also claims he was improperly removed from the hearing and was not provided with a written statement of Farah's disposition. *Id.*

The hearing transcript demonstrates Farah commenced the Tier III hearing on October 30, 2014, and read Plaintiff his rights and obligations. (Dkt. No. 80-1 at ¶ 165.) Plaintiff informed Farah that he had not met with an assistant prior to the hearing. *Id.* at ¶ 166. Farah adjourned the hearing to provide Plaintiff with an opportunity to select and meet with an assistant. *Id.* at ¶ 167.

On November 18, 2014, Plaintiff met with his selected assistant, Mr. Austin, a Recreation Supervisor. *Id.* at ¶ 168. The hearing recommenced on December 1, 2014. *Id.* at ¶ 169.

**\*10** Plaintiff was provided with several documents including a Use of Force report, Watch Commander and SHU log book pages, and copies of certain DOCCS Directives. *Id.* at ¶ 170.

On December 4, 2014, Plaintiff viewed a video recording from the time of the October 24, 2014, incident. *Id.* at ¶ 171. Plaintiff requested a second video recording from October 17, 2014; however, that request was denied as not relevant to the October 24, 2014 incident. *Id.* at ¶ 172. Plaintiff requested to call three inmates as witnesses. *Id.* at ¶ 173. Two of the three inmates requested by Plaintiff refused to testify from the outset. *Id.* at ¶ 174. One inmate requested by Plaintiff initially agreed to testify but later refused. *Id.* at ¶ 175.

Plaintiff requested to call Investigator Russo from DOCCS OSI as a witness and to provide records. *Id.* at ¶ 176. However, Farah was advised Investigator Russo could not testify or provide documents due to an ongoing investigation at that time. *Id.* at ¶ 176.

DeGraff and Karamanos both testified at the hearing. *Id.* at ¶ 175. Plaintiff was warned multiple times during the course of the hearing not to speak over Farah and other witnesses when they spoke. *Id.* at ¶ 178. In his declaration, Farah explains Plaintiff was removed from the hearing partway through DeGraff's testimony because he became extremely disruptive and noncompliant with his directions. (Dkt. No. 80-2 at ¶ 179.) Farah continued questioning DeGraff and adjourned the hearing. (*See* Dkt. No. 80-6 at 52-54.)

The hearing resumed on December 15, 2014. (Dkt. No. 80-1 at ¶ 180.) But Plaintiff refused to leave his cell to attend the continuation of the hearing. *Id.* Farah, together with C.O. North and C.O. Vitarius, went to Plaintiff's cell on December 15, 2014, to encourage Plaintiff to attend the hearing and advised Plaintiff that a penalty may be imposed if he were found guilty. *Id.* at ¶ 181. Plaintiff refused to leave his cell. *Id.* at ¶ 182.

At Farah's direction, C.O. North went to speak to Plaintiff a second time about returning to the hearing. *Id.* at ¶ 183. C.O. North reported to Farah that he asked Plaintiff multiple times if he wanted to leave his cell to attend the hearing and Plaintiff refused each time. *Id.* at 184. Plaintiff signed a form waiving his right to attend the Tier III hearing on December 15, 2014, but added a handwritten note that he was afraid of retaliation and felt that Farah was unfair. *Id.* at ¶ 185.

On December 18, 2014, Farah found Plaintiff guilty of violating prison rules 106.10 and 109.12, as charged by DeGraff and imposed penalties of 120 days of SHU confinement, and 120 days loss of packages, commissary, telephone, recreation, and television privileges. *Id.* at ¶¶

2021 WL 1200328

186, 187. Farah prepared a written hearing disposition sheet on December 18, 2014, which included a statement of the evidence. *Id.* at ¶ 188. He directed C.O. North to deliver the written hearing disposition to Plaintiff at his cell, together with a form advising Plaintiff of his right to appeal to the Commissioner within thirty (30) days. *Id.* at ¶ 189. C.O. North documented that he delivered the written hearing disposition and appeal form to Plaintiff on December 18, 2014, at 11:35 AM, and that Plaintiff refused to sign a form acknowledging receipt. *Id.* at ¶ 190. In his declaration, Farah states he did not predetermine his decision prior to the conclusion of the Tier III disciplinary hearing on December 18, 2014. *Id.* at ¶ 191.

**\*11**  Plaintiff claims he appealed the disposition, which was affirmed by Smith and Venettozzi. (Dkt. No. 1 at 37.) Defendants submit that on December 22, 2014, the Office of Special Housing/Inmate Disciplinary Programs received Plaintiff's appeal. (Dkt. No. 80-1 at ¶ 192.) Staff working in the Office of Special Housing/Inmate Disciplinary Programs reviewed Plaintiff's appeal and recommended that the December 18, 2014, disposition be affirmed. *Id.* at ¶ 193. Venettozzi compared the disciplinary charges to the penalties imposed and signed off the recommended affirmance of the hearing disposition. *Id.* at ¶ 194.

On April 21, 2016, Plaintiff's December 18, 2014, Tier III hearing disposition was administratively reversed pursuant to a court order. *Id.* at ¶ 195; *see Clark v. State Dep't of Corrections and Community Supervision*, 138 A.D.3d 1331 (N.Y. App. Div. 3d Dep't 2016); *see also* Dkt. No. 80-17 at ¶ 19.

### H. Eighth Amendment Claims

As discussed above, Plaintiff claims he was assaulted by DeGraff and Karamanos on October 24, 2014, during an escort to a scheduled shower. (Dkt. No. 1 at 28.) Specifically, Plaintiff claims DeGraff "aggressively squeezed" Plaintiff's penis "causing him pain" during an "improper" pat frisk, and Karamanos slammed Plaintiff's head into the wall. *Id.*

According to Defendants, DeGraff observed objects stuffed in Plaintiff's pockets and DeGraff ordered Plaintiff to spread his legs and initiated a pat frisk. (Dkt. Nos. 80-5 at ¶ 9.) Plaintiff did not comply with DeGraff's instruction and made a "sudden and aggressive movement" to his left side towards DeGraff. *Id.* Karamanos then pushed Plaintiff against the wall once in order to "gain control" of him. *Id.* Defendants contend this "minimal amount of force was reasonable and necessary to secure control of plaintiff after his sudden and aggressive

movement." (Dkt. No. 80-10 at ¶ 7.) DeGraff and Karamanos declare they did not strike Plaintiff or use any further force. (Dkt. Nos. 80-5 at ¶ 9; 80-10 at ¶ 7.) They further declare they did not touch Plaintiff in any sexual way. *Id.* Defendants state they escorted Plaintiff back to his cell with no further incident. *Id.*

Plaintiff also claims he was subjected to verbal and physical abuse by DeGraff, McElroy, and Harrison during an escorted trip to Shawangunk's facility hospital. *Id.* at 29. [12] Specifically, Plaintiff claims DeGraff pushed Plaintiff up against the wall and "pressed his pelvis and genitals against the Plaintiff," McElroy "punched" Plaintiff in the back of his head, while Harrison stood by and made "intimidating statements." (Dkt. No. 1 at 29.) Plaintiff filed a complaint with the "Office of Special Investigations." *Id.*

[12]    Plaintiff's complaint does not specify the date of this alleged assault.

In their declarations, DeGraff, Karamanos, McElroy, and Harrison deny having ever struck, physically assaulted, used excessive force on, or improperly touched Plaintiff in any way at any time. (Dkt. Nos. 80-5 at ¶ 14, 80-9 at ¶ 5, 80-10 at ¶ 12, 80-11 at ¶ 6.) These Defendants further declare they have never threatened or harassed Plaintiff, verbally or otherwise at any time. *Id.* Harrison further states he has never allowed or encouraged any correctional staff to assault an inmate. (Dkt. No. 80-9 at ¶ 6.)

### I. First Amendment Claims

As discussed above, Plaintiff claims DeGraff and Karamanos assaulted him on October 24, 2014, in retaliation for Plaintiff having filed inmate grievances regarding their mistreatment of him in violation of the First and Eighth Amendments. (Dkt. No. 1 at 34.) Plaintiff also claims DeGraff destroyed his mattress (and thereby prevented Plaintiff from presenting a meaningful defense to the October 17, 2014, IMR issued by DeGraff) in retaliation for Plaintiff's grievance activity. *Id.* at 42.

**\*12**  For his part, DeGraff declares that on October 17, 2014, he was unaware of any grievances that Plaintiff may have filed against him or against other correctional staff. (Dkt. No. 80-1 at ¶ 196.) He further states that he disposed of Plaintiff's mattress on that date because it was cut open and unusable, and all contraband had been removed and secured. *Id.* at ¶ 197.

2021 WL 1200328

As to the October 24, 2014, incident, DeGraff and Karamanos state that they were unaware of any grievances that Plaintiff may have filed against them or against other correctional staff. *Id.* at ¶¶ 198, 199. Further, as noted above, Defendants aver Plaintiff did not comply with DeGraff's instruction and argue that the "minimal amount of force was reasonable and necessary to secure control of plaintiff after his sudden and aggressive movement." (Dkt. No. 80-10 at ¶ 7.)

### J. Grievances

Defendants' submissions demonstrate Plaintiff never filed a grievance concerning his claim that DeGraff and Karamanos used excessive force on him on October 24, 2017. (Dkt. No. 80-1 at ¶ 204.) Plaintiff never filed a grievance concerning his claim that DeGraff and Karamanos retaliated against him on October 24, 2017. *Id.* at ¶ 205. He never filed a grievance concerning his claim that DeGraff retaliated against him on October 17, 2014, by disposing of his mattress. *Id.* at ¶ 206. Lastly, Plaintiff never filed a grievance concerning his claim that DeGraff, McElroy, and Harrison used excessive force on him at any time. *Id.* at ¶ 207. In response, Plaintiff argues administrative remedies were unavailable. (Dkt. Nos. 87, 92.)

## III. LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to

create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

**\*13** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH LOCAL RULE 7.1

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3). [13] (Dkt. Nos, 87, 92.)

[13]     Local Rule 7.1(a)(3) requires the opposing party
          to file a response to the movant's Statement of

2021 WL 1200328

Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, [14] and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [15] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[14]    Local Rule 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[15]    Defendants and the Clerk's office provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 80 at 2; Dkt. No. 81.)

Accordingly, the facts set forth in Defendants' Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint and verified opposition submissions will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept

the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) ... supplemented by Plaintiff's verified complaint ... as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

**\*14**    Moreover, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record.

## V. LEGAL STANDARDS GOVERNING CLAIMS AND DEFENSES

### A. Fourteenth Amendment Due Process Claims

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; [16] (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *See Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 165 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

2004). Additionally, the hearing officer's findings must be supported by "some" "reliable evidence." *Sira*, 380 F.3d at 69 (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (other citation omitted).

16      The right to call witnesses is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative").

The due process clause also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing, *inter alia, Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Barnes v. Annucci*, No. 9:15-CV-0777 (GTS/DEP), 2019 WL 1387460, at *11 (N.D.N.Y. Mar. 12, 2019) (citations omitted).

**\*15**  "To state a claim for procedural due process, there must first be a liberty interest which requires protection." *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). To establish a procedural due process claim under § 1983, a plaintiff must

show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013). Thus, while not dispositive, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)). By contrast, 305 days or more of segregated confinement has been deemed an atypical and significant hardship. *See Colon*, 215 F.3d at 231-32. "A period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting*, 452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

2021 WL 1200328

Additionally, "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky*, 292 F. App'x 120, 122 (2d Cir. 2008) (summary order). "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement [that may be aggregated] when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions." *Taylor v. Artus*, No. 9:05-CV-271 (LEK/GHL), 2007 WL 4555932, at *8 & n.40 (N.D.N.Y. Dec. 19, 2007) (emphasis in original).

**B. First Amendment Retaliation Claims**

**\*16** "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show ... '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (internal quotation marks and citations omitted). The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling." *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (citations omitted).

In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions,

factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995)). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

Upon satisfying his initial burden, "the burden shifts to defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, i.e., 'even if they had not been improperly motivated.' " *Davidson v. Desai*, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting *Graham*, 89 F.3d at 80). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999); *see also Murray v. Hulihan*, 436 F. App'x 22, 23 (2d Cir. 2011) ("Defendants cannot be liable for First Amendment retaliation if they would have taken the adverse action even in the absence of the protected conduct.").

**C. Eighth Amendment Excessive Force Claims**

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments ... including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and quotation marks omitted). An Eighth Amendment excessive force claim has two elements —"one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

**\*17** "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must

2021 WL 1200328

examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and quotation marks omitted)). The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

In addition, a corrections officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate in the use of force. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010). Indeed, an official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Cicio*, 2010 WL 980272, at *13. In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Tafari*, 714 F. Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

**D. Personal Involvement**

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)). Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Traditionally, to establish supervisory liability in the Second Circuit, a plaintiff must allege that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). However, the Second Circuit recently held that the *Colon* test was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Court held that:

> **\*18** [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (alteration in original). [17]

17       *Tangreti* was decided in the context of an Eighth Amendment deliberate indifference claim against a prison official, and therefore did not specify the "factors necessary" to establish a claim against a

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 168 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

supervisor for the types of claims Plaintiff alleges here. *Tangreti*, 983 F.3d 609 at 618.

**E. Exhaustion**

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211. In New York state prisons, DOCCS has a well-established three-step IGP. N.Y. Comp. Codes R. & Regs. tit. 7 ("NYCRR"), § 701.5 (2013).

Generally, the IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id.* § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision

under the process applicable to the third step. *Id.* § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

**\*19** Complaints of harassment are handled by an expedited procedure which provides that such grievances, once it is given a number and recorded by the IGP clerk, are forwarded directly to the superintendent of the facility, after which the inmate may appeal any negative determination to CORC. *Id.* §§ 701.8(h),(i).

Generally, a plaintiff must properly appeal through all three levels of the IGP before seeking relief in a federal court under § 1983. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

However, for complaints regarding sexual abuse or sexual harassment, DOCCS has established a different procedure. *See* DOCCS Directive 4040 § 701.3(i); 7 NYCRR § 701.3(i). "Revised in 2014 pursuant to the Prison Rape Elimination Act ("PREA"), *see Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14, 2016), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault." *Sheffer v. Fleury*, No. 9:18-cv-1180 (LEK/DJS), 2019 WL 4463672, at *4 (N.D.N.Y. Sept. 18, 2019). Specifically, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement." 7 NYCRR § 701.3(i). Instead:

> [A]ny allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 169 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

*Id.* (citations omitted). If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." *Id.* Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." *Id.*

Finally, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*20** As an affirmative defense, the defendant bear the burden of showing the plaintiff failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).

#### F. Qualified Immunity

"Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432-33 (2d Cir. 2009) (internal quotation marks and citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 433 (citation omitted). "The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (internal quotation marks and citation omitted).

### VI. ANALYSIS

Defendants argue summary judgment is appropriate because: (1) Plaintiff was not deprived of a protected liberty interest sufficient to support a Fourteenth Amendment due process claim; (2) Plaintiff received all of the process he was due in connection with the hearings; (3) Annucci and Venettozzi were not personally involved in the alleged deprivations under the Fourteenth Amendment; (4) Annucci, Venettozzi, and Smith are entitled to qualified immunity; (5) Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment retaliation and Eighth Amendment excessive force claims; (6) Plaintiff's Eighth Amendment excessive force claim against DeGraff, McElroy, and Harrison arising from the unspecified incident fails on the merits; and (7) Plaintiff's First amendment retaliation claims against DeGraff and Karamanos fail on the merits. (*See generally* Dkt. No. 80-20, 92.) Plaintiff opposes the motion. (Dkt. Nos. 87, 92.)

#### A. Fourteenth Amendment Due Process Claims

Plaintiff alleges he was denied due process at six disciplinary hearings conducted by Gardner, Pingotti, Palen, and Farah in violation of his rights under the Fourteenth Amendment. (Dkt. No. 1 at 41-42.) Generally, as detailed above, Plaintiff claims he was denied the opportunity to present a defense, documents, videos, witnesses, and employee assistance. He claims Defendants were biased and he was removed from two hearings and was not provided with a written statement of the disposition at one hearing. Plaintiff claims he appealed all of the disciplinary determinations, which were affirmed on administrative appeal by Smith, Venettozzi, and/or Annucci.

Defendants argue the sentences imposed by Gardner, Pingotti, Palen, and Farah at the disciplinary hearings did not implicate a protected liberty interest and that, even if they did, Plaintiff received due process. (Dkt. No. 80-20 at 32-38.) According

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 170 of 238

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

to Defendants, Plaintiff's assertion that he served more than 305 days of consecutive disciplinary confinement is belied by the record. *Id.* at 34. Defendants point out that Plaintiff did not actually serve anywhere near the full amount of time in the SHU with which he was sanctioned from the six disciplinary hearings at issue. *Id.* Additionally, Defendants argue Plaintiff's claims against Annucci and Venettozzi should be dismissed for lack of personal involvement. *Id.* at 25-29. Lastly, Annucci, Venettozzi, and Smith argue they are entitled to qualified immunity. *Id.* at 29-32.

**\*21** In his response and sur-reply, liberally construed, Plaintiff suggests that Defendants have "already conceded" that he was denied due process because the disciplinary hearings at issue were administratively revered. (Dkt. No. 87 at ¶¶ 10, 11.) As to the length of his disciplinary confinement, Plaintiff asserts that he was always housed in "continuous" "restrictive" confinement, from September 2014 through May/June 2015, including the SHU at Shawangunk and Sullivan and, the "long term confinement unit" at Attica, which is a "secure confinement unit," known as "18 company." (Dkt No. 87 ¶¶ 12-15; Dkt. No. 92 at ¶ 7.) Plaintiff further argues Annucci and Venettozzi were personally involved, are liable as supervisors ("someone must stop the buck") and are not entitled to qualified immunity. (Dkt No. 87 ¶¶ 12-15.)

### 1. Liberty Interest

As a preliminary matter, Plaintiff had " 'no right to due process [at his hearing] *unless* a liberty interest' was infringed." *Palmer*, 364 F.3d at 64 (alternation and emphasis in original). Here, the record evidence demonstrates Plaintiff was housed in disciplinary confinement at Shawangunk during the relevant time period for a total of 46 days in 2014: from August 25, 2014, through September 4, 2014, and from November 18, 2014, through December 23, 2014. (Dkt. No. 80-18 at ¶ 17.)

As detailed above, during the intervening period, Plaintiff was housed in Shawangunk's facility hospital after the September 4, 2014, incident and was then placed under IPC status for his personal safety and for the safety and security of the facility from September 11, 2014, through October 30, 2014. (Dkt. Nos. 1 at 19-20, 80-1 at ¶¶ 7-14.) Thereafter, he was temporarily transferred to Sullivan for mental health observation from October 30, 2014, through November 17, 2014. (Dkt. Nos. 1 at 19-20, 80-1 at ¶¶ 7-14.) Subsequently,

Plaintiff was transferred from Shawangunk to Sullivan on December 23, 2014, and then to Attica on January 30, 2015. (Dkt. No. 80-1 at ¶¶ 16, 17.) Plaintiff was housed in the general population at Attica for all of 2015, except for five days in March when he was temporarily relocated to the mental health observation unit. *Id.* at ¶¶ 18-21. He was not housed in the SHU at Attica at any time in 2015. *Id.* at ¶ 22.

Courts routinely find similar disciplinary confinement insufficient to constitute a liberty interest. *See Holmes v. Grant*, No. 03-CIV-3426, 2005 WL 2839123, \*5 (S.D.N.Y. Oct. 25, 2005) (finding 60 days in the SHU at Shawangunk is "insufficient to constitute a deprivation of a liberty interest"); *see also Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, \*7 (W.D.N.Y. July 13, 2006) (finding 77 days in keeplock during which the plaintiff was deprived of TV, phone, packages, and commissary, and was unable to attend Muslim services and classes, did not constitute a liberty interest); *Pilgrim v. Bruce*, No. 9:05-CV-198, 2008 WL 2003792, \*15 (N.D.N.Y. May 7, 2008) (finding 60 days in keeplock failed to establish that he was subject to more severe conditions than in normal restrictive confinement).

Moreover, because the record evidence demonstrates Plaintiff's disciplinary confinement was not "contiguous," the Court agrees with Defendants that aggregation is not appropriate in the case at bar and any disciplinary confinement Plaintiff actually served in connection with his hearings should be evaluated individually. (*See* Dkt. No. 80-2 at 35.)

Where, as in this case, the plaintiff's disciplinary confinement "was not long enough to constitute an atypical and significant deprivation by itself," courts "look to the conditions of confinement" as alleged by plaintiff. *Smith v. Hamilton*, 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at \*3 (N.D.N.Y. July 12, 2016) (quoting *Palmer*, 364 F.3d at 66). Here, given the absence of any allegations from Plaintiff about unusually harsh or abnormal conditions of his confinement at Shawangunk, the Court finds Plaintiff's liberty interests were not implicated by the disciplinary hearings challenged in this action. *See McEachin v. Selsky*, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at \*9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall 'within the expected parameters of the sentence imposed by a court of law.' ") (citations omitted); *see also* Dkt. No. 87 at ¶ 15

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 171 of 238

2021 WL 1200328

(alleging he was "locked into cell housing" for "23 hours[s]" a day). [18]

[18]    Inmates in the SHU are subject to, *inter alia*, limitations on personal property, packages, commissary, programs, visits, and telephone calls, and out-of-cell recreation is limited to one hour daily. (Dkt. No. 80-18 at ¶ 11.)

**\*22** Further, as noted, Plaintiff was not housed in Attica's SHU in 2015. (Dkt. No. 80-1 at ¶ 22.) While Plaintiff describes his confinement at Attica as "restrictive" while housed in "18 company," he only claims that his "personal property, i.e., television sets, hot pots, etc." was "confiscated," which fails to implicate an atypical and significant hardship. (Dkt. No. 87 at ¶ 12.) Moreover, Plaintiff has not alleged that this "restrictive" confinement differed from other inmates housed in 18 company. *See id.*

Based on the forgoing, the Court finds Plaintiff has failed to establish a protected liberty interest and, as a result, Plaintiff's Fourteenth Amendment due process claims fail as a matter of law. Accordingly, the Court recommends granting summary judgment to Gardner, Pingotti, Farah, Palen, Smith, Venettozzi, and Annucci.

### 2. Due Process

Even assuming Plaintiff demonstrated the existence of material questions of fact as to a protected liberty interest, which, for reasons set forth he did not, Defendants have established their entitlement to summary judgment because Plaintiff was afforded the process he was due. (*See* Dkt. No. 80-20 at 36-38.)

### a. Gardner

Gardner conducted Plaintiff's disciplinary hearings that concluded on September 23, 2014, and December 10, 2014. (Dkt. No. 80-8 at ¶¶ 4, 6.[19]) The record shows that at each hearing, Plaintiff received advance notice of the charges against him (the IMRs issued September 8, 2014, and November 13, 2014), an opportunity to call witnesses and present evidence, and a written statement of the evidence relied upon at the conclusion of each hearing. *Id.* at ¶¶ 9-17, 39-44. Plaintiff was assisted by Mr. Chumas in connection with the September 23, 2014, Tier III hearing and, although he

was not assigned an employee assistant for the December 10, 2014, Tier II hearing, Plaintiff made his requests for evidence and witnesses directly to Gardner. *Id.* at ¶¶ 10, 38.

[19]    As noted, Plaintiff also claims Gardner conducted the August 25, 2014, hearing. Gardner has no recollection of any such hearing. (Dkt. No. 80-8 at ¶ 4 n.1.) Defendants have not submitted the transcript of that hearing. Thus, the Court makes no finding as the process afforded to Plaintiff during that hearing. Nevertheless, the record shows Plaintiff only was confined in the SHU for 10 days as a result of that hearing, which fails to create a liberty interest. *See Ochoa v. DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 WL 4517806, at \*4 (N.D.N.Y. Sept. 30, 2008) (holding 30 days SHU and keeplock confinement insufficient to create liberty interest); *Escalera v. Charwand*, No. 9:04-CV-0983 (FJS/DEP), 2008 WL 699273, at \*8 (N.D.N.Y. Mar. 12, 2008) (same).

Upon review of the hearing transcripts, Gardner acted fairly and impartially. As to the September 23, 2014, hearing, Gardner relied upon the IMR issued by C.O. Algarin, as well as the verbal testimony given at the hearing. *Id.* at ¶¶ 23, 26. Similarly, as to the December 10, 2014, hearing, Gardner relied upon the IMR issued by social worked at Sullivan, and upon all of the verbal testimony. *Id.* at ¶ 49.

### b. Pingotti

Pingotti conducted the October 14, 2014, Tier III disciplinary hearing. (Dkt. No. 80-13 at ¶ 4.) Plaintiff received a copy of the September 30, 2014, IMR, was assisted by Mr. Chumas, and had an opportunity to call relevant witnesses and present evidence. *Id.* at ¶¶ 9-17. Plaintiff attended the hearing until just prior to the conclusion, when he was removed due to his disruptive and unruly behavior. *See id.* at ¶ 18. Plaintiff was provided with a copy of the written disposition, which included a statement of evidence utilized by Pingotti including the IMR, the documentation regarding Plaintiff's urinalysis result, and all of the verbal testimony given during the course of the hearing. *Id.* at ¶ 24. Upon review of the hearing transcript and record, Pingotti acted fairly and impartially. *Id.* at ¶ 25.

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

2021 WL 1200328

### c. Palen

**\*23** Palen conducted Plaintiff's November 27, 2014, Tier II hearing regarding the October 17, 2014, IMR. (Dkt. No. 80-12 at ¶ 6.) Plaintiff received a copy of the IMR giving him advance notice of the charges against him, an opportunity to call witnesses and present evidence, and a written statement of the evidence Palen considered, which included the IMR and all of the verbal testimony given at the hearing. *Id.* at ¶ 29. As this was a Tier II hearing, Plaintiff was not assigned an assistant and was directed to make all requests for the evidence and witnesses he needed to Palen. *Id.* at ¶ 11. Upon review of the hearing transcript and record evidence, Palen acted fairly and impartially. *Id.* at ¶ 30.

### d. Farah

Farah conducted the December 18, 2014, Tier III hearing regarding the October 24, 2014, IMR. (Dkt. No. 80-6 at ¶ 6.) Plaintiff received a copy of the IMR giving him advance notice of the charges against him, was assisted by Mr. Austin, was presented with an opportunity to call witnesses and present relevant evidence, and received a written explanation of the disposition. *Id.* at ¶¶ 9, 15, 36. In finding Plaintiff guilty, Farah considered the IMR written by DeGraff, the verbal testimony given at the hearing, the documentation regarding the October 24, 2014, incident, as well as the video recording depicting the incident. *Id.* at ¶ 32. The three inmate witnesses that Plaintiff requested refused to testify. *Id.* at ¶¶ 16, 30. After multiple warnings, Plaintiff was removed during the course of the hearing due to his disruptive behavior. *See id.* at ¶ 23. Plaintiff then refused to attend the remainder of the hearing. *See id.* at ¶¶ 26-29. Upon review of the hearing transcript and record evidence, Palen also acted fairly and impartially and did not predetermine Plaintiff's guilt. *Id.* at ¶¶ 30, 37.

For these reasons, summary judgment is also warranted.

### 3. Appeals

Plaintiff appealed all of the disciplinary determinations at issue, which he claims were affirmed on administrative appeal by Smith, Venettozzi, and/or Annucci. However, for reasons discussed above, Plaintiff has failed to establish a liberty interest and he was afforded due process. As such, Plaintiff cannot establish a Fourteenth Amendment due process claim

against these Defendants based on their alleged affirmance of a constitutional disciplinary hearing. *See Cole v. New York State DOCCS*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at \*28 (N.D.N.Y. Aug. 25, 2016); *see also Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at \*11 (July 16, 2015). Thus, summary judgment is also warranted on this basis. [20]

[20]   As the Court recommends granting summary judgment for reasons discussed above, the Court declines to address Defendants whether Annucci, Venettozzi, and Smith are entitled to qualified immunity. (*See* Dkt. No. 80-20 at 25-32.)

Moreover, since Defendants filed this motion, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Merely being in the chain of command is not enough to satisfy this standard. *See id.* While " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676) (second alteration in original), "[t]he violation must be established against the supervisory official directly." *Id.* (emphasis added). Failing to correct another officer's violation does not suffice. *Id.* at 617 n.4. "Indeed, even before *Tangreti*, affirming the outcome of a prison hearing was not sufficient to establish personal involvement." *Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at \*5 (S.D.N.Y. Jan. 26, 2021) (citing *Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009) (collecting cases)).

**\*24** Here, Plaintiff has not alleged, and the record does not demonstrate, that Smith, Venettozzi, or Annucci had any personal involvement during the disciplinary hearings at issue. *See Smart*, 2021 WL 260105, at \*5 ("That [defendants] failed to act on plaintiff's complaints, and that [they] denied plaintiff's administrative appeals, cannot support the inference that these [d]efendants, through "[their] own individual actions, [have] violated the Constitution.") (quoting *Tangreti*, 983 F.3d at 615). Thus, summary judgment is also warranted on this basis. [21]

[21]   As the Court recommends granting Defendants' motion insofar as it seeks dismissal of Plaintiff's Fourteenth Amendment claims, the Court declines

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 173 of 238

2021 WL 1200328

to address whether Annucci, Venettozzi, and Smith are entitled to qualified immunity. (*See* Dkt. No. 80-20 at 29-32.)

**B. Exhaustion**
Defendants argue Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment retaliation and Eighth Amendment excessive force claims. (Dkt. No. 80-20 at 21-25.) To that end, Defendants submit evidence demonstrating Plaintiff did not file any grievances at Shawangunk, Sullivan, or Attica regarding his claims that: (1) DeGraff and Karamanos assaulted him on October 24, 2014, as he was exiting his cell to take a shower; (2) DeGraff and Karamanos retaliated against him on October 24, 2014, by subjecting him to excessive force; (3) DeGraff, McElroy, and Harrison assaulted Plaintiff on another unspecified date while escorting him to the facility hospital; or (4) DeGraff retaliated against him on October 17, 2014, by disposing of his mattress. (Dkt. No. 80-1 at ¶¶ 204-07.) CORC has no record of an appeal filed by Plaintiff related these claims. (Dkt. No. 80-15 at ¶¶ 15-16.) Defendants thus argue summary judgment is warranted.

Plaintiff counters administrative remedies were unavailable and, alternatively, requests an exhaustion hearing. (Dkt. No. 87 at ¶¶ 2-7.) Specifically, Plaintiff claims administrative remedies had become unavailable as to his Eighth Amendment excessive force claims because his "complaints, grievance, etc., were the subject of much tampering, and mishandling." *Id.* at ¶ 6. Plaintiff further argues the IGP is "opaque" and "confusing as it applies to what an inmate can do—when his grievance are not making it to the grievance staff, or what a plaintiff can do when his grievances are causing officers to retaliate." *Id.* at ¶ 7.

**1. Excessive Force**

As pointed out by Defendants, when questioned about his excessive force claims during his deposition, Plaintiff testified that he did not remember whether he filed a grievance against DeGraff, McElroy, and Harrison and could not recall the date of the alleged incident. (Dkt. No. 80-2 at 63, 70.) With respect to the October 24, 2014, incident, Plaintiff also testified that he could not remember whether he filed a grievance against DeGraff or Karamanos. *Id.* at 60-61.

In his sworn response to Defendants' motion, Plaintiff explains that his memory was "unclear" at the time of his

deposition and further states that as to his excessive force claims "a grievance was filed" by "giving said grievance" to a SHU officer at Shawangunk. (Dkt. No. 87 at ¶ 2.) The parties agree a grievance was never filed at Shawangunk.

Plaintiff states that he sent a copy of the grievance to Lanny E. Walter, an attorney, whom he claims to have acted as the "custodian and record keeper of [his] grievances," because he was "having a hard time getting grievances against Shawangunk SHU officers filed or even delivered for filing at Shawangunk Inmate Grievance Office/Staff." *Id.* at ¶¶ 2, 3. [22]

[22]    Attorney Walter does not represent Plaintiff in this action. (*See* Docket Report; *see also* Dkt. No. 87 at 18.)

**\*25**  Plaintiff has submitted a copy of a November 22, 2019, letter from Attorney Walter addressed to Judge Hurd, which in turn identifies "[a] December 14, 2014[,] grievance sent to J. Taylor-Stewart ... to which are attached pink copies of Inmate Grievance Complaint dated November 26, 2014[,] and December 4, 2014." *Id.* at 1-2, 18. Plaintiff also submitted photocopies of grievances dated November 26, 2014, and December 4, 2014. *Id.* at 32-33. In the November 26, 2014, grievance, Plaintiff states:

> Prior to being sent OMH/OBS I filed this complaint but it was never answered. While under escort from the dentist on Oct. 15, 2014, Officer DeGraff in an act of retaliation and intimidation put his groin up against my buttocks and grabbed my penis, after which Officer McElroy punched me in the back of the head, while their Supervisor Sgt. Harrison stood by and threatened my (sic) to stop writing complaints to the commissioner, and Superintendent about Captain Bertone. Then on Oct. 24, 2014, C.O. DeGraff and Karamanos violated facility SHU shower policy and pat frisked me at which time C.O. DeGraff grabbed my penis and Karamanos slammed my head into the wall with his forearm repeatedly.

2021 WL 1200328

(Dkt. No. 87 at ¶ 2.)

According to Defendants, this "grievance," which lacks a grievance number, is insufficient to exhaust his Eighth Amendment excessive claims because there is no indication it was *actually filed*. (Dkt. No. 88 at 4-5.) The Court agrees. Defendants further assert that even if Plaintiff may have relayed this "grievance" to Deputy Superintendent Taylor-Stewart, along with a letter complaining of difficulties in the grievance process, it would not substitute for proper exhaustion because "a plaintiff's letters to prison officials or other officials outside the grievance chain of command are insufficient to properly exhaust administrative remedies." *Id.* at 5 (quoting, *inter alia, Cucchiara v. Dumont*, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *5 (N.D.N.Y. Apr. 26, 2019), *report and recommendation adopted*, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016)). The Court also agrees.

The Court reaches a different conclusion, however, as to Defendants' contention that Plaintiff's Eighth Amendment excessive force claims are not "salvaged" from the PLRA's exhaustion requirement by his "unsupported assertion that one or more unnamed Shawangunk officers destroyed, mishandled, or otherwise failed to file his grievance or grievances." *Id.* (citing, *inter alia, Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("mere contention or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations"), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

Contrary to Defendants' assertion, Plaintiff had not speculated that his grievance was misplaced. (Dkt. No. 88 at 5-6.) In his sworn opposition, Plaintiff states he gave the grievance to a SHU officer and mailed a copy of the grievance to Attorney Walter. (Dkt. No. 87 at ¶¶ 2, 5.) Plaintiff proffers a copy of the November 26, 2014, grievance, and a cover letter from Attorney Walter dated November 22, 2019, which, among other things, references a November 26, 2014, grievance. (Dkt. No. 88 at 18, 32.) "Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not submit it." *McLean v. LaClair*, No. 9:19-CV-1227 (LEK/ATB), 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021); *Fann v. Graham*, No. 15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts

in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), *report and recommendation adopted*, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); *Thaxton v. Simmons*, No. 10-CV-1318, 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."); *see also Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 4643036, at *4-5 (N.D.N.Y. Sept. 27, 2018) (finding an issue of fact as to the availability of the grievance process where plaintiff drafted and submitted a grievance that was never filed or answered) (collecting cases).

**\*26** Additionally, Defendants' contention that Plaintiff was able to successfully navigate the IGP as to other matters at Shawangunk during the relevant time (*see* Dkt No. 88 at 6) does not necessarily weaken Plaintiff's unavailability argument—his history of filing grievances could also suggest that, absent interference, he was capable of complying with it. *See Burrell v. Zurek*, No. 9:17-CV-0906 (LEK/TWD), 2019 WL 4051596, at *3 (N.D.N.Y. Aug. 28, 2019).

Based on the foregoing, the Court finds Plaintiff has raised a genuine issue of fact as to the availability of the IGP with respect to his Eighth Amendment excessive force claims and therefore summary judgment is not warranted.

### 2. Sexual Assault

Rachel Seguin, the Assistant Director of DOCCS IGP, states that "with the exception of the sexual assault allegations," Plaintiff's excessive force and retaliation claims are the proper subject for a grievance. (Dkt. No. 80-15 at 10.) Defendants acknowledge that "DOCCS regulations exempt claims of sexual abuse or harassment from the requirement of filing a grievance for exhaustion purposes, so long as the incident is properly reported." (Dkt. No 80-20 at 25, citing 7 NYCRR § 701.3(i).)

Here, Plaintiff testified that he believed his October 29, 2014, letter to DOCCS' Inspector General obviated the need for

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 175 of 238
Clark v. Gardner, Not Reported in Fed. Supp. (2021)
2021 WL 1200328

a grievance because it implicated PREA. (Dkt. No. 80-2 at 60-62. [23] ) In that letter, Plaintiff states:

> Dear Inspector General: Once again I am to make a request for your intervention on my behalf and investigate the ongoing retaliation, abuse, and again this inappropriate touching of my "penis" genitals by "C.O. D. DeGraff" who work the SHU/PC SD Unit here at Shawangunk. Officer DeGraff ... on Oct. 24, 2014, ... in an act of retaliation, "grabbed my penis" my buttock ... under the guise of a pat frisk that is not a part of the policy at Shawangunk before a SHU shower. Please investigate!!

*Id.* at 191. Moreover, in his declaration, DeGraff states, "I understand that plaintiff filed a complaint against me concerning the October 24, 2014[,] incident at some point thereafter. Attached as Exhibit D is a memorandum that I wrote to a different supervisor, Sgt. Lutz, on December 4, 2014 after plaintiff lodged his complaint. To the best of my knowledge, plaintiff's complaint was found unsubstantiated and dismissed." (Dkt. No. 80-5 at ¶ 12.) In that memorandum, DeGraff states:

> At no time have I sexually assaulted inmate Clark, J. 99A0475 or any other inmate. I do not have it 'out for him.' I have not 'set up' inmate Clark or any other inmate. CO Karamanos and myself were involved in a minor use of force on October 24, 2014 with inmate Clark. Inmate Clark was being disruptive and failed to follow staff direction. A Tier 3 misbehavior report was issued for that incident and is still pending. Inmate Clark was out of the Facility for an extended period of time after that incident, and there have been no incidents since.

(Dkt. No. 80-5 at 13.)

[23] Plaintiff also states in the verified complaint that he filed a complaint with the Office of Special Investigations about the alleged excessive force incident involving DeGraff, McElroy and Harrison on the way to Shawangunk's facility hospital. (Dkt. No. 1 at 29.)

Nevertheless, Defendants argue DeGraff's alleged conduct does not fall under the purview of the exemption because "'Sexual Contact' does not include touching of the intimate parts of another person *during the performance of a personal search in accordance with Department procedures* ..." (Dkt. No. 80-20 at 24-25, emphasis in Defendants' memorandum of law.) Defendants also note Plaintiff does not claim Karamanos participated in the alleged sexual touching and, therefore, his excessive force against Karamanos must be "properly grieved for exhaustion purposes." *Id.* at 25.

**\*27** However, the parties dispute whether the sexual contact was in accordance with Department procedures. *See Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020) ("Prison regulations state that, while '[c]ontact through the clothing with the genitalia, groin, ... inner thigh, and buttocks is a necessary component of a thorough pat frisk[,] ... staff must avoid any penetration of the anal or genital opening through the clothing" and "must not lift or otherwise manipulate the genitalia during a pat frisk.") (alterations in original). "Further, while it is true that not all grievances by inmates are covered by Directive 4040, conduct that is specifically related to the act of sexual abuse, such as a failure to intervene and protect that abuse, could be reasonably interpreted by the inmate as being covered by the Directive." *Sheffer v. Fleury*, 2019 WL 3891143, at \*4 (N.D.N.Y. Aug. 19, 2019) (finding an "incident" of sexual abuse under § 701.3(i) could include "not only the acts of sexual abuse by an inmate or a corrections officer, but also other events which are necessarily intertwined with such a claim, such as a physical assault during the course of the abuse ...").

Given the record and considering the evidence in the light most favorable to Plaintiff, the Court finds Defendants have not sustained their burden of demonstrating that Plaintiff's sexual assault claims, along with the alleged physical assaults, were not properly exhausted under the relaxed procedures found in § 701.3(i).

Clark v. Gardner, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 176 of 238

2021 WL 1200328

### 3. Retaliation

The Court reaches a different result as to Plaintiff's First Amendment retaliations claims. Here, there is no dispute that Plaintiff never filed a grievance concerning his claims that DeGraff or Karamanos retaliated against him for his grievance activity. Plaintiff does not suggest, and the record does not demonstrate, that Plaintiff's administrative remedies were unavailable under *Ross*.

Based upon the foregoing, the Court finds Plaintiff did not exhaust his administrative remedies with respect to his First Amendment retaliation claims as the PLRA requires and, therefore, recommends granting Defendants' motion and dismissing Plaintiff's First Amendment retaliation claims against DeGraff and Karamanos.

Generally, a dismissal for failure to exhaust administrative remedies is without prejudice, so that the inmate-plaintiff can cure the defect by exhausting his administrative remedies and then reinstituting his suit. *See Snider v. Melindez,* 199 F. 3d 108, 111-12 (2d Cir. 1999). However, dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir. 2004). Here, more than several years have passed since Plaintiff should have filed a grievance. As Plaintiff's failure to exhaust his administrative remedies is incurable at this point, the Court recommends dismissing Plaintiff's First Amendment retaliation claims with prejudice. *See Castineiras v. Helms,* No. 9:17-CV-1084 (BKS/ATB), 2019 WL 2870300, at *5-6 (N.D.N.Y. June 6, 2019). [24]

[24]    In light of this recommendation, the Court does not address the merits of Plaintiff's First Amendment retaliation claims.

### C. Excessive Force Claims

As discussed, Plaintiff claims he was physically and sexually assaulted on two separate occasions while confined at Shawangunk. Defendants only seek summary judgment on the merits as to Plaintiff's Eighth Amendment excessive force claim premised on the incident involving DeGraff, McElroy, and Harrison. (Dkt. No. 80-20 at 15-17.)

Defendants argue summary judgment is warranted because Plaintiff has never provided a date or time of this alleged

incident. (Dkt. No. 80-20 at 16; *see* Dkt. No. 1 at 29.) When questioned at his deposition about this alleged incident, Plaintiff testified that he did not remember when it occurred. (Dkt. No. 80-20 at 16.) Without such essential information as the date or time, Defendants argue Plaintiff's excessive force claim in connection with this alleged incident should be dismissed. *Id.*, citing, *inter alia, Lopez v. City of New York,* No. 05 Civ. 10321, 2009 WL 229956, at *8 (S.D.N.Y. Jan. 30, 2009) (granting summary judgment dismissing an excessive force claim where the plaintiff failed to provide, among other things, a timeframe for the alleged incident.)

**\*28** To be sure, Plaintiff testified that he could not recall the exact date of this incident. (Dkt No. 80-2 at 63.) However, Plaintiff recalled the incident and described it taking place within the infirmary area, in the "short corridors leading" to the "emergency room areas and sick-call areas of Shawangunk." *Id.* Plaintiff further testified DeGraff "pushed me up against the wall" and "he pressed up against me and talking into my ear and pressing his pelvis, like up against my buttocks." *Id.* at 64-65. Although he could not recall what DeGraff said, "it was some perverted stuff[.]" *Id.* at 65. Plaintiff testified McElroy "punched" him a "couple times" in the "back area" of his head. *Id.* at 65-66. Plaintiff also testified Harrison came up to the side of him and threatened Plaintiff that "it will get rougher." *Id.* at 65. When questioned about any witnesses, he suggested the nurses or the "dentist office might have heard it." *Id.* at 67. More importantly, in his sworn opposition statement, Plaintiff has now proffered the date of the incident: October 15, 2014. (Dkt. No. 87 at ¶ 5; *see also* Dkt. No. 87 at 32 ("While under escort from dentist on Oct. 15, 2014, Officer DeGraff in an act of retaliation and intimidation put his groin up against my buttocks and grabbed my penis, after which Officer McElroy punched me in the back of my head, while their supervisor Sgt. Harrison stood by and threatened me....").)

Without question, the evidentiary support for Plaintiff's excessive force claim against these Defendants is thin. Plaintiff testified that the incident happened quickly, approximately one to two minutes, and the injuries were not extensive in that he had "a little soreness in the back of my head." (Dkt. No. 80-2 at 67, 69.) Moreover, DeGraff, McElroy, and Harrison affirmatively deny having ever physically assaulted, used excessive force on, or improperly touched Plaintiff in any way. (Dkt. No. 80-5 at ¶¶ 5, 14; Dkt. No. 80-9 at ¶ 5; Dkt. No. 80-11 at ¶ 6.)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 177 of 238
Clark v. Gardner, Not Reported in Fed. Supp. (2021)
2021 WL 1200328

Nevertheless, on the record before the Court, Plaintiff has also testified and identified the date, location, and described the alleged force and sexual touching. Since Plaintiff's "allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is inappropriate. *See Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009); *see also Hayes*, 976 F.3d at 275 ("Indeed, as we explained in *Crawford*, if an "officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.") (quoting *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases – not whether a certain quantum of injury was sustained.").

Based on the foregoing, the Court recommends denying Defendants' motion as to Plaintiff's excessive force claim against DeGraff, McElroy, and Harrison arising from this incident.

## VII. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court recommends that Defendants' motion for summary judgment be granted as to all claims, with the exception of the Eighth Amendment excessive force claims against DeGraff, Karamanos, McElroy, and Harrison.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No 80) be **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [25] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[25]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1200328

---

2021 WL 1198199

2021 WL 1198199
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jamel CLARK,

v.

Gerald GARDNER et al., Defendants.

9:17-CV-366
|
Signed 03/30/2021

**Attorneys and Law Firms**

JAMEL CLARK, Plaintiff, Pro Se, 99-A-0475, Sullivan Correctional Facility, Box 116, Fallsburg, NY 12733.

HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: LAUREN ROSE EVERSLEY, ESQ., Ass't Attorney General, Attorneys for Defendants, The Capitol, Albany, NY 12224.

### ORDER ADOPTING REPORT
### & RECOMMENDATION

DAVID N. HURD, United States District Judge

**\*1** *Pro se* plaintiff Jamel Clark ("plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed this 42 U.S.C. § 1983 action alleging that various corrections officials violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Dkt. Nos. 9, 47. Defendants later moved under Federal Rule of Civil Procedure ("Rule") 56 seeking summary judgment on all of plaintiff's claims. Dkt. No. 80.

On March 8, 2021, U.S. Magistrate Judge Thérèse Wiley Dancks advised by Report & Recommendation that defendants' motion be granted as to all claims except plaintiff's Eighth Amendment excessive force claims against defendants DeGraff, Karamanos, McElroy, and Harrison. Dkt. No. 93.

Plaintiff has since filed objections to the Report & Recommendation. Dkt. No. 94. Upon *de novo* review of the portions to which plaintiff has objected, the Report & Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ADOPTED;

2. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

3. Plaintiff's Eighth Amendment excessive force claims against defendants DeGraff, Karamanos, McElroy, and Harrison survive dismissal and remain for trial; and

4. Plaintiff's First and Fourteenth Amendment claims are DISMISSED.

5. The Clerk of the Court shall serve a copy of this Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1198199

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4015689
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark A. LAPIERRE, Plaintiff,

v.

Chad LAVALLEY, et al., Defendants.

9:15-CV-1499 (MAD/DJS)
|
Signed 08/26/2019

**Attorneys and Law Firms**

MARK A. LAPIERRE, Plaintiff, Pro Se, 15-A-1283, Washington Correctional Facility, 72 Lock Eleven Lane, P.O. Box 180, Comstock, New York 12820-0180.

HON. LETITIA JAMES, Attorney General of the State of New York, OF COUNSEL: CHRIS LIBERATI-CONANT, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendants.

### <u>REPORT-RECOMMENDATION and ORDER</u>

DANIEL J. STEWART, United States Magistrate Judge

## I. INTRODUCTION

**\*1** On December 18, 2015, *pro se* Plaintiff Mark A. LaPierre commenced this action pursuant to 42 U.S.C. § 1983, asserting claims arising from his confinement at both Clinton Correctional Facility ("Clinton") and Marcy Correctional Facility ("Marcy"). Dkt. No. 1, Compl. Following initial review of the Complaint and after receiving leave from the Court, Plaintiff filed his Amended Complaint on November 30, 2017, removing previously dismissed Defendants and adding Officer Randy Russell as a named Defendant. Dkt. No. 68, Am. Compl. Plaintiff's Amended Complaint contains five causes of action arising from an incident that allegedly occurred on December 21, 2012, and medical treatment for injuries associated with that same incident, while in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Am. Compl. at pp. 9-10.

Presently before this Court is Defendants' Motion for Summary Judgment. Defendants contend that Plaintiff failed to exhaust his administrative remedies as to his claims regarding Defendants Guynup, LaValley, Delisle, and Russell, and that Plaintiff's Eighth Amendment claim against Defendant Vadlamudi fails as a matter of law. Dkt. No. 79, Defs.' Mot. Summ. J. Plaintiff opposes Defendants' Motion for Summary Judgment, Defendants have replied, and Plaintiff has provided supplemental responses. Dkt. No. 90, Pl.'s Opp.; Dkt. No. 91, Defs.' Reply; Dkt. Nos. 92 & 93, Pl.'s Supp. Resp. The Court finds that Plaintiff: (1) failed to exhaust his administrative remedies; and (2) failed to show there is a material question of fact as to whether Dr. Vadlamudi was deliberately indifferent to his serious medical needs and therefore recommends that the Motion be **granted**.

## II. BACKGROUND

Plaintiff alleges that while housed at Clinton on December 21, 2012, he was the victim of an assault by DOCCS staff and was subsequently denied medical treatment for injuries associated with that assault. Am. Compl. at pp. 11-12. These allegations are made as to Defendants Delisle, LaValley, Guynup and Russell, who have denied the allegations made by Plaintiff. *Id.*; *see also* Dkt. Nos. 72 & 76. The particular facts underlying these allegations are not relevant to the Motion and, therefore, are not discussed in detail. There is no record of a grievance being filed with respect to this incident. *See* Dkt. Nos. 79-6, Pickett Decl.; 79-7, Pfendler Decl.; 79-10, Gregory Decl.

Plaintiff was subsequently transferred to Downstate Correctional Facility from Clinton on December 28, 2012 and was seen in the infirmary, given an x-ray that revealed that Plaintiff's ninth rib was fractured, and he was prescribed pain medication. Dkt. No. 79-13, Vadlamudi Decl. at ¶¶ 3-4. Plaintiff was transferred to Marcy and was subsequently examined by Dr. Vadlamudi who prescribed Plaintiff Tylenol or Ibuprofen to treat his pain and issued Plaintiff a permit limiting him to a bottom bunk. Vadlamudi Decl. at ¶¶ 4-6. Plaintiff was then transferred again and did not return to Marcy until March 2013. *Id.* at ¶ 7.

**\*2** Plaintiff again presented to Dr. Vadlamudi complaining of back and shoulder pain on March 21, 2013. Vadlamudi Decl. at ¶ 8. Plaintiff disputes that Dr. Vadlamudi properly examined or treated him at that time. Pl.'s Opp. at ¶ 20. Plaintiff requested an MRI, but Dr. Vadlamudi determined that an MRI was not medically indicated at that time and prescribed Tylenol or Ibuprofen and ice to Plaintiff. *Id.* at ¶¶ 8 & 10.

On March 28, 2013, Plaintiff filed a grievance complaining of the treatment he received from Dr. Vadlamudi during his January 22nd visit and March 21st visit. Pfendler Decl. at ¶ 7 & Ex. B. The Inmate Grievance Review Committee ("IGRC") at Marcy did not reach a determination as to the merits of Plaintiff's grievance, and the grievance was appealed to and later denied by the Superintendent after which Plaintiff again appealed to the Central Office Review Committee ("CORC"). Pfendler Decl., Ex. B. at pp. 1 & 13. On September 18, 2013, the CORC upheld the Superintendent's determination as to Plaintiff's grievance relating to Dr. Vadlamudi's treatment at Marcy. *Id.* at p. 1.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

**\*3** Defendants seek summary judgment as to all claims, other than those against Dr. Vadlamudi, on the ground that Plaintiff failed to exhaust his available administrative remedies by filing a grievance regarding the claims surrounding the December 2012 assault. Dkt. No. 79-1, Defs.' Mem. of Law at pp. 4-8.

#### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a)

2019 WL 4015689

requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [1]

[1] Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answers to the Amended Complaint. Dkt. No. 72 at ¶ 17; Dkt. No. 76 at ¶ 17.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### B. Plaintiff's Failure to Exhaust Administrative Remedies

**\*4** The record before the Court establishes that DOCCS has no record of any grievance being filed by Plaintiff regarding the December 2012 incident that allegedly occurred at Clinton Correctional Facility. *See generally* Pickett Decl.; Pfendler Decl.; & Gregory Decl. Plaintiff contends that he did file a handwritten grievance while housed at Downstate Correctional Facility. Dkt. No. 90, Pl.'s Affirm. at ¶ 27. Plaintiff also generally argues that the DOCCS grievance process was not available to him within the meaning of *Ross* and that any failure to fully exhaust should be excused. Dkt. No. 90-2, Pl.'s Mem. of Law at pp. 9-15. Plaintiff's arguments lack merit and the Court recommends that the Motion for Summary Judgment be granted based on Plaintiff's failure to exhaust.

### 1. Whether Plaintiff Actually Filed a Grievance

Initially, Plaintiff's conclusory allegation that he filed a grievance that "disappeared," Pl.'s Mem. of Law at p. 12, is insufficient to raise a question of fact regarding exhaustion. "Courts have consistently held [ ] that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." *Rosado v. Fessetto*, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010); *see also Rodriguez v. Cross*, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations."); *Artis v. Dishaw*, 2016 WL 11266599, n.13 (N.D.N.Y. Sept. 12, 2016) (finding that plaintiff's failure to exhaust was not excusable, in part because, while the plaintiff "state[d] that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them."). Significantly, during Plaintiff's deposition when asked about whether he "ever attempt[ed] to submit a written complaint about the [ ] December 21 incident," Plaintiff made no mention of the handwritten grievance, stating:

> December 29th or December 30th. I wrote the D.O.C. I wrote the Inspector. I asked for a grievance. They would not give me one. Up in the infirmary where I was locked up, they said they didn't have any. I had been interviewed by – by the D.O.C.C.S. O.S.I. agent, M. Smith on January 11th. I explained everything to him. He took extensive notes, which are – all seem to be missing. I tried to file a grievance when I got back to G Unit and in our unit – in G Unit, I was only there a very

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 182 of 238

Lapierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4015689

short time, but they didn't have any grievances. So, I put in a request for Law Library. I never got to go.

Dkt. No. 91-2, Pl.'s Dep. at p. 79. Indeed, rather than stating that he filed a grievance, Plaintiff's testimony recounts only his inability to do.

In addition, Plaintiff makes no allegation that he ever received a response to his handwritten grievance or that he acted to follow-up on that grievance when he did not receive a response. Under DOCCS regulations, a grievance not decided within applicable time limits may be the subject of an appeal. 7 N.Y.C.R.R. § 701.6(g)(2). The clear weight of authority in the Northern District is that the failure of the IGRC to timely respond to a grievance, even in a case such as this where apparently no grievance number was issued for the grievance, requires the inmate to appeal the lack of action to the facility Superintendent. *Wallace v. Fisher*, 2015 WL 9275001, at *2 & n. 6 (N.D.N.Y. Dec. 18, 2015) (citing cases). [2] Plaintiff makes no allegation that he did so in this case.

[2]    Footnotes seven and eight in the *Wallace* decision recite a similar weight of authority in the courts of the Southern and Western Districts of New York.

**\*5** Under these circumstances, the record before the Court establishes that Plaintiff did not file a grievance [3] regarding the alleged assault at Clinton. He, therefore, did not exhaust his administrative remedies.

[3]    Finally, Plaintiff asserts that he did in fact exhaust his administrative remedies because "[t]he Marcy Grievance incorporates the assault & battery into the grievance and appeals." Dkt. No. 90-3 at ¶ 35. To the extent that Plaintiff claims that the grievance he successfully filed with regard to his appointments with Dr. Vadlamudi in January and March of 2013, the grievance itself is entitled "[r]equest for stronger pain meds" and in no way details anything relating to the alleged assault on December 21, 2012. Dkt. No. 79-9 at p. 2.

*2. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused*

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Plaintiff cannot demonstrate either that the DOCCS grievance program operates as a dead end or is "so opaque that it becomes, practically speaking, incapable of use." *Id.* Despite his assertion that the grievance system "in 2012/2013 was [o]paque and impossible to follow," Pl.'s Mem. of Law at p. 13, Plaintiff appears to have had no difficulty in navigating the three step grievance process between March 2013 and September 2013 when he filed and appealed, both to the Superintendent and CORC, a grievance regarding his medical care at Marcy Correctional Facility. Pfendler Decl. at Ex. B.

> This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such, the first two exceptions identified under *Ross* are not applicable here.

*Walker v. Ball*, 2018 WL 1415212, at *5 (N.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018); *see also Gonzalez v. Coburn*, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end nor so opaque that Plaintiff could not avail himself of it.").

Plaintiff also seeks to invoke the third basis for unavailability identified in *Ross* by asserting that "prison officials thwarted

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 183 of 238

Lapierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4015689

the Plaintiff through machination, misrepresentation, threats and intimidation, from ... filing a grievance or seeking medical attention." Pl.'s Mem of Law at pp. 11-12.

**\*6** Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. However, on this record such a contention is inconsistent with Plaintiff's assertions that he did properly grieve the assault, and with Plaintiff's filing of grievances after that time. *See, e.g.*, Pl.'s Mem. of Law at p. 12; Pfendler Decl. Ex. B; *Gough v. Morris*, 2018 WL 7199494, at \*5 (N.D.N.Y. Dec. 14, 2018), *report and recommendation adopted*, 2019 WL 416150 (N.D.N.Y. Feb. 1, 2019); *Crawford v. Baltazar*, 2018 WL 2041711, at \*6 (S.D.N.Y. Apr. 30, 2018).

Instead, Plaintiff's allegations amount to a "generalized fear of retaliation" without allegations of any specific threats or other actions that would prevent him from filing a grievance regarding the alleged assault. Such allegations are insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance[.]"); *see also Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at \*5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere 'generalized fear' when no actual threat was made.") (internal citation omitted). This is particularly true given that Plaintiff was transferred out of Clinton to Downstate Correctional Facility soon after the alleged assault and makes no credible threat of harm at Downstate. There is no evidence in the record that suggests that Plaintiff reasonably feared retaliation by any personnel at Downstate or that administrative remedies were otherwise unavailable to him there. *See Contino v. City of New York*, 2013 WL 4015816, at \*6 (S.D.N.Y. Aug. 7, 2013) ("An inmate's fear that disciplinary actions will be taken against him if he proceeds with a grievance process must, at a minimum, be reasonable in order to relieve the plaintiff of his obligation to exhaust."); *Goodson v. Silver*, 2012 WL 449937, at \*8 (N.D.N.Y. Sept. 25, 2012) ("[E]ven if the Court were to find that Plaintiff was effectively prevented by Defendants from filing a grievance while he was at Clinton C.F., the Court would find that he was not prevented by Defendants (or anyone) from filing that grievance ... once he was transferred from Clinton C.F.").

Plaintiff also appears to contend that he satisfied the exhaustion requirement via informal means: his Complaint describes letters he wrote to officials and states that he

was interviewed by the Inspector General. Plaintiff alleges that Lt. Olmstead stated, "that since the Inspector General's Office was involved, the issue was ... a 'non-grievable matter.' "[4] Am. Compl. at pp. 14-15. However, the described interactions, indicating that prison officials were likely aware of the nature of Plaintiff's complaint, are insufficient to constitute "proper exhaustion." *See Davis v. Doe*, 2017 WL 8640829, at 3 (N.D.N.Y. Dec. 29, 2017); *see also Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' ") (internal citation omitted)). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance 'in a substantive sense,' ... to satisfy the PLRA a prisoner must also procedurally exhaust his available administrative remedies." *Macias v. Zenk*, 495 F.3d at 43.

[4]     To the extent Plaintiff had any doubt about whether the matter was grievable, and his purported attempts to file grievances certainly suggest this was not the case, he was obligated under New York's process to file the grievance. "If an inmate is unsure whether an issue is grievable, he or she should file a grievance and the question will be decided through the grievance process ..." 7 N.Y.C.R.R. § 701.3(e)(3).

**\*7** Accordingly, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust.

## V. EIGHTH AMENDMENT DELIBERATE MEDICAL INDIFFERENCE

### A. Legal Standard

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a

Lapierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4015689

prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

The second prong of the Eighth Amendment analysis is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, *i.e.*, an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

**B. Analysis**

Plaintiff claims that Dr. Vadlamudi was deliberately indifferent to his serious medical needs based on three occasions where Dr. Vadlamudi was dismissive of his requests for further testing and for stronger pain medication to

alleviate the pain associated with injuries to his ribs, right shoulder and back. *See* Am. Compl.; Dkt. No. 90. Defendants argue that Dr. Vadlamudi was not deliberately indifferent to Plaintiff's medical needs, that he treated Plaintiff according to his professional judgment and that Plaintiff's claim in this regard "boils down to a disagreement with that professional judgment." Defs.' Mem. of Law at p. 8. For the reasons that follow, I recommend that Defendants' Motion for Summary Judgment as to this claim be granted.

*1. Objective Standard: Sufficiently Serious Medical Condition*

**\*8** As a preliminary matter, Defendants do not contest the seriousness of Plaintiff's injuries for which he sought medical treatment. Medical records ranging from January of 2013 to June of 2013 indicate that Plaintiff repeatedly reported to sick call and presented to different medical personnel throughout that time period complaining of discomfort and chronic pain in his neck, back, shoulder, and pain radiating from his ribs. *See generally* Dkt. No. 80. Severe pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment. *See, e.g.*, *Hathaway v. Coughlin*, 37 F.3d at 67 (finding Plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"). Moreover, "chronic pain can be a serious medical condition." *Price v. Reilly*, 697 F. Supp. 2d 344, 363 (E.D.N.Y. 2010) (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)). The Court finds that Plaintiff's repeated complaints of extreme pain and discomfort relating to back and right shoulder pain at sick call are sufficiently serious conditions to satisfy, at least for purposes of this Motion, the objective prong of the Eighth Amendment analysis.

*2. Subjective Standard: Conscious Disregard*

Construing the evidence in the light most favorable to Plaintiff, the facts in the record fail to demonstrate that Dr. Vadlamudi acted with the requisite deliberate indifference to Plaintiff's serious medical needs. Instead, the record indicates that Plaintiff's claim that Dr. Vadlamudi was deliberately indifferent to his serious medical needs amounts to a difference in opinion as to medical treatment.

Dr. Vadlamudi's Declaration indicates that he saw Plaintiff on four different occasions: January 18, 2013, January 22, 2013,

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 185 of 238

Lapierre v. LaValley, Not Reported in Fed. Supp. (2019)
2019 WL 4015689

March 21, 2013, and May 23, 2013. Vadlamudi Decl. at ¶¶ 5, 6, 8, & 9. During Plaintiff's first visit with Dr. Vadlamudi, Dr. Vadlamudi ordered Tylenol 3 for Plaintiff and put in an order permitting him to use the bottom bunk in his cell. *Id.* at ¶ 5. Plaintiff then presented to Dr. Vadlamudi on January 22, 2013 complaining of "extensive physical pain" in his spine, neck, and shoulder pain and requested further testing to "determine the extent of the damage." Am. Compl. at p. 17; Vadlamudi Decl. at ¶ 6. Based on his observations during that visit, Dr. Vadlamudi determined that Plaintiff had a cervical strain, but further testing was not indicated at that time and ordered Tylenol or Ibuprofen for Plaintiff to treat his pain. Am. Compl. at p. 17; Vadlamudi Decl. at ¶ 6. On March 21, 2013, [5] Dr. Vadlamudi again examined Plaintiff and it was documented in his progress note that Plaintiff presented with restricted motion in his right shoulder in addition to complaining of back pain. *See* Vadlamudi Decl. at ¶ 8; *see also* Dkt. No. 80 at p. 12. Dr. Vadlamudi contends that after examining Plaintiff that day an MRI was not medically indicated and the course of treatment for Plaintiff's complaints included continuing to prescribe Tylenol or Ibuprofen and ice packs. Vadlamudi Decl. at ¶ 8. Plaintiff alleges that Dr. Vadlamudi "failed to investigate the cause of the pain through diagnostic testing." Am. Compl. at p. 10. Plaintiff's last noted visit with Dr. Vadlamudi occurred on May 23, 2013, when Dr. Vadlamudi examined Plaintiff and noted sufficient range of motion in his right shoulder so much so that he authorized exercise. Vadlamudi Decl. at ¶ 9. Additionally, Dr. Vadlamudi noted during this visit that Plaintiff's ambulation was fine and an MRI was not medically indicated at that time although Plaintiff continued to request diagnostic testing. *Id.*

[5]    This visit prompted Plaintiff to file a grievance against Dr. Vadlamudi.

Plaintiff states in his opposition papers that Dr. Vadlamudi did not "examine" him during visits, that his complaints were only listed, and that Dr. Vadlamudi was deliberately indifferent to his medical needs. *See generally* Dkt. No. 90. However, Plaintiff has failed to show a genuine dispute of material fact as to whether Dr. Vadlamudi had the requisite culpable state of mind to establish an Eighth Amendment violation. First, the record revealed that, contrary to Plaintiff's position, Dr. Vadlamudi did see and treat Plaintiff on four different occasions. At the very least, the visits referenced in Dr. Vadlamudi's declaration indicate that Plaintiff was in fact examined and/or prescribed pain medication on every single occasion. Vadlamudi Decl. at ¶¶ 5, 6, 8, & 9. Second, Plaintiff's grievance specifically requested stronger

pain medication and diagnostic testing in the form of x-rays and MRIs. Dkt. No. 79-9 at p. 2. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d at 703. The law is clear that "the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* Moreover, Defendant's alleged failure to prescribe stronger medication or order additional diagnostic testing is no basis for relief as it is well established that "disagreements over medications, diagnostic techniques (*e.g.*, the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) ("A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment."); *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference."). The record shows that Plaintiff clearly preferred a different course of treatment than what Dr. Vadlamudi was recommending; however, Dr. Vadlamudi was exercising his professional judgment when deciding whether or not to order additional diagnostic testing or prescribe stronger pain medication. Therefore, Dr. Vadlamudi's treatment as to Plaintiff's back and shoulder pain does not rise to the level of deliberate indifference and the Court recommends granting the Motion.

## VI. Plaintiff's Additional Arguments as to Defendants' Motion for Summary Judgment

### A. Timeliness of the Motion for Summary Judgment

**\*9** Plaintiff contends in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment that Defendants failed to timely file their Motion for Summary Judgment pursuant to FED. R. CIV. P. 56. Pl.'s Mem. of Law. Specifically, he contends that Defendants were required to file their Motion by October 13, 2018 and that Defendants filed their Motion on November 13, 2018, one month past the deadline. Pl.'s Mem. of Law. The Court issued a Text Order on June 13, 2018, resetting the pre-trial deadlines in this case, including the dispositive motion deadline. Dkt.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 186 of 238
Lapierre v. LaValley, Not Reported in Fed. Supp. (2019)
2019 WL 4015689

No. 73. The new dispositive motion deadline was set for November 13, 2018. *Id.* The Court's docket sheet in this case confirms that Defendants filed their Motion for Summary Judgment on November 13, 2018 in accordance with the Text Order. Dkt. No. 79. Therefore, Plaintiff's argument that Defendants failed to timely file their dispositive motion pursuant to FED. R. CIV. P. 56 is unsupported.

### B. The Failure to Name Defendant Russell in the Notice of Motion

Additionally, Plaintiff argues that because Defendants did not include Defendant Russell when they addressed Plaintiff's failure to exhaust administrative remedies in a portion of their argument in their Memorandum of Law that his claim against this particular Defendant should stand. *See* Pl.'s Mem. of Law at p. 9. Defendants' Reply identifies this as a "scrivener's error" that does not prejudice Plaintiff in any way since the exhaustion argument equally applies to all relevant Defendants in relation to the December 21, 2012 incident. *See* Dkt. No. 91, at p. 1, n.1. Defendants further address this issue by pointing out that the Notice of Motion itself seeks dismissal of the entire Amended Complaint and that the Memorandum of Law in Support of Summary Judgment specifically calls for the dismissal of the Amended Complaint with regard to Defendant Russell. *Id.* Defendants' Memorandum of Law specifically references Defendant Russell in regard to the exhaustion argument. Dkt. No. 79-1 at p. 7. Plaintiff's argument, therefore, is no basis for denying summary judgment to Russell.

### VII. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 79) be **GRANTED** and that Plaintiff's Amended Complaint be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [6] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[6]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4015689

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4686415

2019 WL 4686415
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark LAPIERRE, Plaintiff,

v.

Chad LAVALLEY, et al., Defendants.

9:15-CV-1499 (MAD/DJS)
|
Signed 09/26/2019

**Attorneys and Law Firms**

MARK A. LAPIERRE, 15-A-1283, Washington Correctional Facility, Box 180, 72 Lock 11 Lane, Comstock, New York 12821, Plaintiff, pro se.

OF COUNSEL: CHRISTOPHER LIBERATI-CONANT, AAG, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

*\*1* Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, asserting claims arising from his confinement at both Clinton Correctional Facility ("Clinton") and Marcy Correctional Facility ("Marcy"). *See* Dkt. No. 1. Following initial review of the complaint and after receiving leave from the Court, Plaintiff filed his amended complaint on November 30, 2017, which removed previously dismissed Defendants and added Officer Randy Russell as a named Defendant. *See* Dkt. No. 68. Plaintiff's amended complaint contains five causes of action arising from an incident that allegedly occurred on December 21, 2012, and medical treatment for injuries associated with that same incident. *See id.* at 9-10.

On November 13, 2018, Defendants moved for summary judgment. *See* Dkt. No. 79. In their motion, Defendants contend that Plaintiff's four causes of action relating to the December 21, 2012 use of force incident must be dismissed

because Plaintiff failed to exhaust administrative remedies. *See* Dkt. No. 79-1 at 6-10. As to his deliberate medical indifference claim against Defendant Vadlamudi, Defendants argue that the claim fails on the merits. *See id.* at 10-14.

In an August 26, 2019 Report-Recommendation and Order, Magistrate Judge Stewart recommended that the Court grant Defendants' motion in its entirety and dismiss this action. *See* Dkt. No. 96. Specifically, Magistrate Judge Stewart found that Plaintiff failed to file a grievance regarding the December 2012 incident and that Plaintiff failed to demonstrate that his failure to exhaust should be excused because administrative remedies were available to him. *See id.* at 8-14. As to the claim of deliberate medical indifference against Defendant Vadlamudi, Magistrate Judge Stewart found that the facts in the record fail to demonstrate that he acted with the requisite deliberate indifference to Plaintiff's serious medical needs. *See id.* at 17-21. Rather, the Report-Recommendation and Order found that Plaintiff's claim that Defendant Vadlamudi was deliberately indifferent is nothing more than a difference of opinion as to the appropriate medical treatment. *See id.*

Currently before the Court is Magistrate Judge Stewart's Report-Recommendation and Order and Plaintiff's objections thereto.

**II. BACKGROUND**

For a complete recitation of the relevant factual background, the Court refers the parties to Magistrate Judge Stewart's August 26, 2019 Report-Recommendation and Order.

**III. DISCUSSION**

**A. Standard of Review**

When a party files specific objections to a magistrate judge's order and report-recommendation, the district court "make[s] a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[g]eneral or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error." *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part,

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 188 of 238

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4686415

the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**\*2** A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the nonmovant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).

"Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.* (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, at \*1 (S.D.N.Y. May 16, 2001)). Moreover, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B. Exhaustion**

The Prison Litigation Reform Act ("PLRA") states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

**\*3** The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90-103.

New York State has a three-step administrative review process. First, a grievance is submitted to the IGRC which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to the CORC, which makes the final determination within the administrative review process. *See id.* at § 701.5(d).

If an inmate's grievance contains issues of employee harassment, then the grievance bypasses the first step of IGRC review and is forwarded directly to the Superintendent. *See id.* at § 701.8(b)(c). The Superintendent must render a written decision within twenty-five days of receipt of the grievance. *See id.* at § 701.8(g). An inmate may appeal such a decision to the CORC within seven days of its receipt. *See id.* at § 701.8(h).

If all three levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by the CORC, must be completed before an action asserting that claim may be filed in court. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002)); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross*, 136 S. Ct. at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams*, 829 F.3d at 123 (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

**\*4** In the present matter, the Court finds that Magistrate Judge Stewart correctly determined that Plaintiff failed to exhaust his administrative remedies that were available to

him regarding the December 2012 incident that occurred at Clinton. Initially, as Magistrate Judge Stewart correctly noted, Plaintiff's conclusory allegation that he filed a handwritten grievance that "disappeared" is insufficient to raise a question of fact regarding exhaustion. In his objections, Plaintiff claims that on or about December 29, 2012, Plaintiff "submitted the hand-written complaint/grievance because the Infirmary officers did not have official grievance forms." Dkt. No. 97 at 9. "Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriquez v. Cross*, No. 9:15-cv-1079, 2017 WL 2791063, *7 (N.D.N.Y. May 9, 2017) (citations omitted). Plaintiff has not provided the Court with any evidence, other than his own conclusory allegation, to support his claim that he attempted to file a grievance.

Moreover, in a January 1, 2013 letter Plaintiff sent to then DOCCS Commissioner Brian Fischer, Plaintiff mentions the assault and asks that his security designation be changed so that he would not have to be housed at Clinton later in the month when he had another court date scheduled. *See* Dkt. No. 79-5 at 1-3. In that letter, no mention is made of Plaintiff's alleged attempt to file a grievance. *See id.* Similarly, no mention is made of any alleged grievance in the other documents Plaintiff submitted to DOCCS officials around the time of the alleged assault. *See, e.g.*, Dkt. No. 57-2 at 35. Additionally, Plaintiff did cause an investigation by the Inspector General through filing non-grievance complaints. *See* Dkt. No. 79-5 at 5-9. In documents generated as part of that investigation and by Plaintiff, again no mention is made of any grievance. *See id.*; *see also* Dkt. No. 36-1 at 28. Moreover, while Plaintiff repeatedly checked on the status of the Inspector General's investigation into the incident, Plaintiff made no inquiries into the status of the grievance he now alleges that he attempted to file. *See* Dkt. No. 79-5 at 5-9.

Previously, courts in the Second Circuit had held that " 'a letter to the Superintendent who then commences an Inspector General investigation can constitute "special circumstances" that satisfy the PLRA requirement that prison officials be afforded time and opportunity to address prison complaints internally.' " *Winfield v. Bishop*, No. 9:09-cv-1055, 2013 WL 4736378, *6 (N.D.N.Y. Sept. 3, 2013) (quotation omitted). As discussed above, however, the Supreme Court recently rejected the Second Circuit's "special circumstances" exception to the PLRA's exhaustion requirement. Therefore, Plaintiff's complaints to the Inspector General's Office and

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 190 of 238

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4686415

Commissioner Fischer, which do not constitute complete and proper exhaustion under New York's grievance scheme, cannot excuse his failure to exhaust. *See Kearney v. Gebo*, No. 9:15-cv-253, 2017 WL 61951, *6 (N.D.N.Y. Jan. 4, 2017).[1]

[1]    In his objections, Plaintiff contends that his "written complaint/grievance" was forwarded to Lieutenant Horan, who interviewed him on January 9, 2013. *See* Dkt. No. 97 at 11. The "written complaint/grievance" that Plaintiff is referring to is his January 1, 2013 letter to Commissioner Fischer which, as discussed, does not constitute complete and proper exhaustion. *See* Dkt. No. 79-5 at 1-4.

Plaintiff also argues that he was "threatened with further beatings and stabbing, (murder) should he complain, file a grievance, or seek medical attention." Plaintiff further alleged in his amended complaint that he "was threatened with Assault and Murder if I sought medical attention or filed a Grievance or complaint between December 21, 2012 and December 28, 2012, while at Clinton Correctional Facility." Dkt. No. 68 at 3-4. Yet Plaintiff was transferred to Downstate Correctional Facility on December 28, 2012. The record is clear that once there, Plaintiff was not deterred from raising complaints about the alleged December 21, 2012 incident. Nor was Plaintiff deterred from filing a grievance regarding his medical treatment, in which he reiterated his claim that he had been the victim of assault by staff. *See* Dkt. No. 79-9. The only threats Plaintiff claims to have received were from officers at Clinton. Since Plaintiff was transferred back to Downstate on December 28, 2012, and had until January 21, 2013 to file his grievance, Plaintiff was not prevented from exhausting his administrative remedies by anyone at DOCCS. *See McNab v. Doe*, 686 Fed. Appx. 49, 51 (2d Cir. 2017); *Riles v. Buchanan*, 656 Fed. Appx. 577, 581 (2d Cir. 2016) (holding that where the plaintiff filed a grievance, despite being threatened by a corrections officer, "it cannot be said that the threat interfered with his exhaustion. He was not deterred from exhausting, he simply did not exhaust in accordance with the procedures"). Thus, Plaintiff expressed fear of reprisal or retaliation for filing a grievance is "inconsistent with Plaintiff's assertion that he did properly grieve the assault, and with Plaintiff's filing of grievances after that time." *Gough v. Morris*, No. 9:16-cv-1107, 2018 WL 7199494, *5 (N.D.N.Y. Dec. 14, 2018) (citation omitted).

**\*5**  Plaintiff also contends that DOCCS employees told him that the issue was not grievable and that it was "taken care of." Dkt. No. 90 at 12. However, Plaintiff allegation that he filed a grievance undermines his contention that he was misled regarding the grievability of the issue. *See McNab*, 686 Fed. Appx. at 51. Moreover, DOCCS Directive 4040 clearly instructs that "[i]f an inmate is unsure whether an issue is grievable, he or she should file a grievance and the question will be decided through the grievance process[.]" Dkt. No. 79-8 at 2.

Accordingly, the Court finds that the undisputed facts establish that Plaintiff failed to exhaust administrative remedies that were available to him and, therefore, Magistrate Judge Stewart correctly determined that Defendants are entitled to summary judgment on Plaintiff's claims relating to the December 21, 2012 incident.

## C. Deliberate Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Hathaway*, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether

2019 WL 4686415

the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith*, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id. at 703; Chance*, 143 F.3d at 703 (finding that mere disagreement with the prescribed treatment does not amount to deliberate indifference to a serious medical need). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

*6  Finally, while "[c]ruel and unusual punishment may consist of prison officials delaying an inmate['s] access to needed medical care," *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991), the case law of this Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (table) (affirming summary judgment for the defendants where the plaintiff received knee surgery approximately three years after sustaining the underlying injury) (internal citations omitted).

In the present matter, the Court finds that Magistrate Judge Stewart correctly determined that Defendant Vadlamudi did not act with the requisite deliberate indifference to Plaintiff's serious medical need. Rather, the record demonstrates that Plaintiff's claim amounts to nothing more than a difference in opinion as to the medical treatment Plaintiff required.

Initially, Plaintiff claims that Magistrate Judge Stewart improperly relied on Defendant Vadlamudi's declaration "to the exclusion of all other evidence." Dkt. No. 97 at 17. Plaintiff also alleges that the report incorrectly states that Defendant Vadlamudi examined Plaintiff on January 18, 2013

and that he ordered Tylenol 3 for Plaintiff and ordered that he be permitted to use the bottom bunk. *See id.* Plaintiff claims that he arrived at Marcy on January 18, 2013 with a prescription for Tylenol 3 from the doctor at Downstate and that he was only seen by a nurse that first day, who consulted with Defendant Vadlamudi by telephone. *See id.* Plaintiff claims that Defendant Vadlamudi directed that Plaintiff's Tylenol 3 prescription not be renewed, and that he only had seven days of medication remaining. *See id.* Plaintiff complains that Defendant Vadlamudi "had a long reputation of cancelling other doctor's prescriptions, as well as being rude, forgetful[ ], and unable to see or hear well." *Id.*

When Defendant Vadlamudi saw Plaintiff for the first time on January 22, 2013, Plaintiff takes issue with the limited examination that was actually performed, claiming that he only "listened to Plaintiff's heart and lungs with a stethoscope [sic] and tested Plaintiff's knee reflexes." *Id.* at 18. Moreover, Plaintiff claims that he informed Defendant Vadlamudi that the doctor at Downstate informed him that he would need an MRI and that it could be ordered once Plaintiff arrived at his permanent facility, *i.e.*, Marcy. *See id.* Despite being so informed, Defendant Vadlamudi refused to order an MRI. *See id.*

Plaintiff also notes that on two occasions, he was transferred to Franklin Correctional Facility ("Franklin") for scheduled court appearances. *See id.* at 19. On both occasions, the doctor at Franklin prescribed Tylenol 3 for Plaintiff "due to his obvious severe pain." *Id.* Upon his return to Marcy, Plaintiff claims that Dr. Vadlamudi again cancelled his prescription for Tylenol 3. *See id.*

As Plaintiff's objections make clear, his deliberate medical indifference claim is based exclusively on his disagreement with Defendant Vadlamudi's prescribed treatment. *See Chance*, 143 F.3d at 703. In his declaration, upon which the Court may properly rely, Defendant Vadlamudi indicates that he did not believe that an MRI was medically indicated and that nothing more than regular Tylenol or Ibuprofen and ice were needed to treat Plaintiff's symptoms. *See* Dkt. No. 79-13 at ¶¶ 8-10. He further determined that Tylenol 3, which contains codeine, was inappropriate for Plaintiff's treatment, in part, because Plaintiff had a history of opiate-seeking behavior, which was documented in his medical records. *See id.* at ¶¶ 11-12. [2]

2      Plaintiff indicates in his objections that it is DOCCS policy that medical records to not travel

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 192 of 238

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)
2019 WL 4686415

with an inmate who is sent to a temporary facility for short periods of time. *See* Dkt. No. 97 at 19. Since it was noted in Plaintiff's medical record at Marcy that he has a history of opiate seeking behavior, it is not surprising that he would be able to obtain a new prescription from a non-treating physician, unfamiliar with his past attempts at obtaining opiates.

**\*7** As Plaintiff's medical records make clear, Plaintiff was seen and treated by the medical staff at Marcy on a regular basis. He was never denied treatment, he was simply denied the treatment that he wanted. Accordingly, the Court finds that Magistrate Judge Stewart correctly determined that Defendants' motion for summary judgment should be granted as to Plaintiff's deliberate medical indifference claim.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Daniel J. Stewart's August 26, 2019 Report-Recommendation and Order (Dkt. No. 96) is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 79) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance in the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4686415

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Gough v. Morris, Not Reported in Fed. Supp. (2018)

2018 WL 7199494

2018 WL 7199494
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lamont GOUGH, Plaintiff,

v.

Sergeant MORRIS, Sergeant Davidson, John Doe
Correctional Officer 1, John Doe Correctional Officer
2, and John Doe Correctional Officer 3, Defendants.

9:16-CV-1107 (GTS/DJS)
|
Signed 12/14/2018

**Attorneys and Law Firms**

LAMONT GOUGH, Plaintiff, Pro Se, 13-A-0134, Coxsackie
Correctional Facility, Box 999, Coxsackie, New York
12051-099.

BARBARA D. UNDERWOOD, Attorney General of the
State of New York, OF COUNSEL: WILLIAM A. SCOTT,
ESQ., The Capitol, Albany, New York 12224, Attorney for
Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On September 9, 2016, *pro se* Plaintiff Lamont Gough
commenced this action pursuant to 42 U.S.C. § 1983,
asserting claims arising from his confinement at Coxsackie
Correctional Facility ("Coxsackie C.F."). Dkt. No. 1, Compl.
Plaintiff has named two Defendants, Sergeant Davidson
and Sergeant Morris, and three John Doe Defendants
who are purported to be officers at Coxsackie C.F.
Following initial review by the District Court, Plaintiff's
First Amendment retaliation claim against Defendant Morris,
Eighth Amendment excessive force claim against Defendant
Morris, and Eighth Amendment failure to intervene claim
against Defendant Davidson and the three John Does survive.
Dkt. No. 9. Specifically, Plaintiff contends that in retaliation
for filing a grievance, he was assaulted by Defendant Morris
while Defendant Davidson witnessed and did not intervene.
Compl.

Presently before this Court is the Motion for Summary
Judgment of Defendants Davidson and Morris, which

Plaintiff opposes and to which Defendants have filed a
reply. Dkt. No. 47, Defs.' Mot. Summ. J.; Dkt. No. 49,
Pl.'s Opp.; Dkt. No. 50, Defs.' Reply. Defendants contend
that Plaintiff failed to exhaust his administrative remedies,
and that his Complaint should therefore be dismissed. Dkt.
No. 47-13, Def.'s Mem. of Law. The Court finds that
Defendants have established that Plaintiff failed to exhaust
his administrative remedies and therefore recommends that
the Motion be **granted**. In addition, as discussed below, the
Court recommends that Plaintiff's claims against the still
unidentified Defendants be **dismissed** *sua sponte.*

**I. LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(a), summary
judgment is appropriate only where "there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law." The moving party bears
the burden to demonstrate through "pleadings, depositions,
answers to interrogatories, and admissions on file, together
with [ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.
1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323
(1986) ).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or
denials of the facts submitted by the movant. FED. R. CIV.
P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d
Cir. 2003) ("Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment when
the moving party has set out a documentary case."); *Rexnord
Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.
1994). To that end, sworn statements are "more than mere
conclusory allegations subject to disregard ... they are specific
and detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements is
better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289
(citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983)
and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) ).

**\*2** When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages, Inc.
v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.
1998). "[T]he trial court's task at the summary judgment

2018 WL 7199494

motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. EXHAUSTION

### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [1]

---

[1]  Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19,

28-29 (2d Cir. 1999). The Named Defendants properly raised the affirmative defense in their Answer to the Complaint. Dkt. No. 18 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### B. Plaintiff's Failure to Exhaust Administrative Remedies

 **\*3**  At the time of the relevant events of this action, Coxsackie C.F. had a grievance program to which inmates had full access. Dkt. No. 47-3, Decl. of Rachel Seguin, at ¶¶ 4-12; Dkt. No. 47-4, Seguin Decl., Ex. A.

There are no recorded grievances filed by Plaintiff regarding any alleged assault or use of excessive force claims against Defendant Morris, an alleged failure to intervene claim against Defendant Davidson, or a retaliation claim against Defendant Morris. *See* Seguin Decl. at ¶¶ 20-23. While Plaintiff was housed at Coxsackie, Plaintiff filed five grievances. Dkt. No. 47-8, Decl. of Tisha Surprenant, ¶ 10; Dkt. No. 47-9, Surprenant Decl., Ex. A. Three of those five grievances were filed before the events at issue in this lawsuit, and so Plaintiff could not have exhausted his administrative remedies utilizing these grievances. Surprenant Decl. at ¶11; Surprenant Decl., Ex. A (reflecting filing dates of February 28, 2014, April 23, 2014, and September 10, 2014). Plaintiff

2018 WL 7199494

filed two grievances at Coxsackie after the date of the alleged incident. *Id.* Those grievances are not related to the events at issue in the Complaint. The first, "Unprofessional Remarks," was filed on April 22, 2015, four months after the events at issue in the Complaint, and is dated March 20, 2015, nearly three months after the events at issue. Dkt. No. 47-7, Seguin Decl., Ex. D. This grievance alleged that Plaintiff was being verbally harassed, that Plaintiff's mail was being violated, and that he was being called a rapist; that grievance only named Counselor Iarusso. *Id.* While this grievance has some similar allegations as does Plaintiff's claim, it has to do with Counselor Iarusso "going around the jail" talking about Plaintiff, and other verbal harassment which was allegedly ongoing, unlike the verbal and physical alteration alleged in the Complaint. It does not provide any allegations regarding the physical assault and is not otherwise particularized to the January 22, 2015 incident. The other grievance filed after the alleged assault, "Sneakers Not Mailed Out," pertained to sneakers that Plaintiff believed were in the package room. Dkt. No. 47-6, Seguin Decl., Ex. C. This grievance is not relevant to the events at issue in the Complaint and did not name any of the Defendants in this case. As such, neither of these grievances could have been used to properly exhaust Plaintiff's claims.

In his deposition, Plaintiff claimed that he did file a grievance regarding harassment that went to the superintendent. Dkt. No. 47-11, Decl. of Louis Jim, Ex. A, Pl.'s Dep., pp. 20-23. Such harassment grievances are subject to expedited review, which provides for first level review by the superintendent, and a subsequent appeal to the Central Office Review Committee to have fully exhausted the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. While Plaintiff claims that he did appeal the superintendent's response to CORC, there is no evidence in Plaintiff's opposition, or any other submission, of either the harassment grievance itself, the superintendent's response, or Plaintiff's alleged appeal to CORC. Pl.'s Dep. at pp. 21-22. Indeed, Plaintiff testified at his deposition that he never received a response from CORC, and that he did not write a grievance complaining that he did not receive a response. *Id.* at p. 39. Plaintiff's "vague and conclusory allegations that he filed other grievances ... do not, in light of the documentation that Defendants have provided about Plaintiff's grievance history, create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies." *Toliver v. Stefinik*, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016). As such, Plaintiff failed to exhaust his administrative remedies relative to the complaint.

## C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

**\*4** A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in that case, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

In his opposition papers, Plaintiff claims that (1) he followed the proper procedures and was ignored; (2) his mail was tampered with; (3) he feared retaliation, and (4) he grieved through informal means. *See* Compl. at p. 13; [2] Dkt. No. 1-1, Exs. to Compl. at pp. 18-21; Pl.'s Opp. at pp. 2-5. None of these allegations, however, are sufficient to raise an issue of material fact as to the availability of administrative remedies that would excuse his failure to exhaust.

[2]     When citing to Plaintiff's submissions, the Court will cite to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

First, in his Complaint, Plaintiff describes frustration with Coxsackie C.F.'s grievance process, stating that he followed the proper procedures and that he did not get any responses and that he was "basically ignored." Exs. to Compl. at p. 20. In his letters to correctional facility staff, Plaintiff specifically describes issues with Coxsackie C.F.'s mail process, stating that the mail he attempts to send is not properly delivered and that he believes his mail is being tampered with. Seguin Decl., Ex. C. at p. 21; Seguin Decl., Ex. D at p. 6. Plaintiff also makes loose claims that his paperwork gets lost. Seguin Decl., Ex. D at p. 6. Plaintiff attaches to his Opposition a written request dated February 15th, 2015, in which Plaintiff asked for his grievances back and described his frustration regarding lack of responses and allegedly missing paperwork. Pl.'s Opp. at p.

2018 WL 7199494

6. However, it is entirely unclear to what this refers; it is not evident that this relates to the claims in Plaintiff's Complaint, and Plaintiff does not demonstrate that it does.

In his general allegations regarding the mail and being ignored, Plaintiff fails to provide any facts regarding when he tried to file administrative grievances or appeals regarding the alleged assault. For example, he offers no evidence about when or to whom he allegedly provided grievances regarding the incident at issue in this case. Nor does he provide copies of the any alleged grievances regarding this incident. "Courts have consistently held [ ] that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." *Rosado v. Fessetto*, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010); *Rodriguez v. Cross*, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations."); *Artis v. Dishaw*, 2016 WL 11266599, n.13 (N.D.N.Y. Sept. 12, 2016) (finding that plaintiff's failure to exhaust was not excusable, in part because, while the plaintiff "state[d] that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them.").

 *5  Further, even if Plaintiff did believe that his attempts at filing a grievance regarding his assault would be ineffective, this does not excuse his failure to do so. The case law is clear that "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile.' " *Harrison v. Goord*, 2009 WL 1605770, at *4 (S.D.N.Y. June 9, 2009); *see also Woodford v. Ngo*, 548 U.S. at 89-90 (stating that "exhaustion requirements are designed to deal with parties who do not want to exhaust," including those who "conclude—correctly or incorrectly— that exhaustion is not efficient in that party's particular case.").

Plaintiff asserts in his Complaint and deposition that he is being consistently harassed and intimidated by officers at Coxsackie C.F. Exs. to Compl. at p. 20; Pl.'s Dep. at p. 39. Plaintiff also stated in his deposition that he stopped writing grievances because he had been threatened. Pl.'s Dep. at p. 39; *see also* Exs. to Compl. at p. 36. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. However, on this record such a contention is inconsistent with Plaintiff's assertions that he did properly grieve the assault,

and with Plaintiff's filing of grievances after that time. *See*, *e.g.*, Pl.'s Opp. at ¶ 20; Seguin Decl. Ex. B; *Crawford v. Baltazar*, 2018 WL 2041711, at *6 (S.D.N.Y. Apr. 30, 2018).

Instead, Plaintiff's allegations amount to a "generalized fear of retaliation" without allegations of any specific threats or other actions that would prevent him from filing a grievance regarding the alleged assault. Such allegations are insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance[.]"); *see also Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at *5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere 'generalized fear' when no actual threat was made.") (internal citation omitted).

Plaintiff also appears to contend that he satisfied the exhaustion requirement via informal means, as in his Complaint he states that he was interviewed by the Inspector General. Compl. at p. 13. However, the described interactions, indicating that prison officials were likely aware of the nature of Plaintiff's complaint, are insufficient to constitute "proper exhaustion." *See Davis v. Doe*, 2017 WL 8640829, at 3 (N.D.N.Y. Dec. 29, 2017). *See also Macias v. Zenk*, 495 F.3d 37,44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' ") (internal citation omitted). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance '*in a substantive sense*,' ... to satisfy the PLRA a prisoner must also *procedurally* exhaust his available administrative remedies." *Id.* at 43.

Plaintiff has not provided any evidence that could satisfy any of the three circumstances that could excuse failing to exhaust under *Ross*. Plaintiff does not demonstrate that the grievance procedure operated as a dead end in that officers were unable or unwilling to provide relief, or that the administrative scheme was so opaque that it was incapable of use. *Ross v. Blake*, 136 S. Ct. at 1853-54. Nor does Plaintiff sufficiently allege that prison officials " 'misled, threatened, or otherwise deterred' him from utilizing the IGP." *Hooks v. Howard*, 2010 WL 1235236, at *7 (N.D.N.Y. Mar. 30, 2010).

 *6  Accordingly, for the foregoing reasons, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 197 of 238
Gough v. Morris, Not Reported in Fed. Supp. (2018)
2018 WL 7199494

## III. JOHN DOE DEFENDANTS

As to the still unidentified John Doe Defendants, I recommend these Defendants be **dismissed** for a number of reasons: (1) Plaintiff's failure to comply with a court order under Fed. R. Civ. P. 16(f); [3] (2) Plaintiff's failure to prosecute under Fed. R. Civ. P. 41(b) and N.D.N.Y.L.R. 41.2(a); and (3) Plaintiff's failure to serve within 90 days under Fed. R. Civ. P. 4(m). I also note that even if Plaintiff had properly named the John Doe Defendants, it would be of no consequence because, as noted above, Plaintiff has failed to exhaust his administrative remedies.

[3]    The District Judge ordered Plaintiff to "take reasonable steps through discovery to ascertain their identities," and "advised that any unnamed individual is not timely served, the action may be dismissed against that defendant." Dkt. No. 9 at p. 12; *see also* Dkt. No. 13 (Decision and Order providing guidance on identifying the John Doe Defendants). Discovery ended in this matter on January 31, 2018. *See* Dkt. No. 41.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 47) be **GRANTED** and that Plaintiff's claims be **DISMISSED**; and it is further

**RECOMMENDED**, that Plaintiff's claims against the John Doe Defendants be **DISMISSED** *sua sponte*; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[4]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7199494

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Gough v. Morris, Not Reported in Fed. Supp. (2019)

2019 WL 416150

2019 WL 416150
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lamont GOUGH, Plaintiff,

v.

Sergeant MORRIS, Coxsackie Corr. Fac.; Sergeant
Davidson, Coxsackie Corr. Fac.; John Doe #1,
Officer, Coxsackie Corr. Fac.; John Doe #2,
Officer, Coxsackie Corr. Fac.; and John Doe
#3, Officer, Coxsackie Corr. Fac., Defendants.

9:16-CV-1107 (GTS/DJS)
|
Signed January 31, 2019
|
Filed 02/01/2019

**Attorneys and Law Firms**

LAMONT GOUGH, Plaintiff, Pro Se, Coxsackie
Correctional Facility, P.O. Box 999, Coxsackie, New York
12051.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ.,
Assistant Attorney General, The Capitol, Albany, New York
12224, Counsel for Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Lamont Gough ("Plaintiff") against
the five above-captioned employees of the New York State
Department of Corrections and Community Supervision
("Defendants") pursuant to 42 U.S.C. § 1983, is the
Report-Recommendation of United States Magistrate Judge
Daniel J. Stewart recommending that Defendants Morris
and Davidson's motion for summary judgment be granted,
that the Court dismiss Plaintiff's claims against those two
Defendants for failure to exhaust his available administrative
remedies, and that the Court *sua sponte* dismiss Plaintiff's
remaining claims against the three John Doe Defendants for
(1) failure to comply with a Court Order and/or to prosecute
this action under Fed. R. Civ. P. 41(b) and N.D.N.Y. L.R.
41.2(a), (2) failure to serve under Fed. R. Civ. P. 4(m), and/or

(3) failure to exhaust his available administrative remedies.
(Dkt. No. 53.) None of the parties have filed objections to
the Report-Recommendation, and the deadline in which to do
so has expired. (*See generally* Docket Sheet.) After carefully
reviewing the relevant papers herein, including Magistrate
Judge Stewart's thorough Report-Recommendation, the Court
can find no clear-error in the Report-Recommendation: [1]
Magistrate Judge Stewart employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Report-Recommendation is
accepted and adopted in its entirety: Defendants Morris
and Davidson's motion for summary judgment is granted;
Plaintiff's claims against those two Defendants are dismissed
for failure to exhaust his available administrative remedies;
and Plaintiff's remaining claims against the three John Doe
Defendants are *sua sponte* dismissed for (1) failure comply
with a Court Order and/or to prosecute this action, (2)
failure to serve and/or (3) failure to exhaust his available
administrative remedies.

[1]     When no objection is made to a report-
recommendation, the Court subjects that report-
recommendation to only a clear error review. Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, "the court need only satisfy itself that there
is no clear error on the face of the record in order to
accept the recommendation." *Id.; see also Batista
v. Walker*, 94-CV-2826, 1995 WL 453299, at *1
(S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
permitted to adopt those sections of [a magistrate
judge's] report to which no specific objection is
made, so long as those sections are not facially
erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Stewart's Report-
Recommendation (Dkt. No. 53) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants Morris and Davidson's motion
for summary judgment (Dkt. No. 47) is **GRANTED**; and it
is further

**ORDERED** that Plaintiff's claims against Defendants Morris
and Davidson are **DISMISSED** for failure to exhaust his
available administrative remedies; and it is further

 **\*2 ORDERED** that Plaintiff's remaining claims against the three John Doe Defendants are *sua sponte* **DISMISSED** for (1) failure to comply with a Court Order and/or to prosecute this action under Fed. R. Civ. P. 41(b) and N.D.N.Y. L.R. 41.2(a), (2) failure to serve under Fed. R. Civ. P. 4(m), and/or (3) failure to exhaust his available administrative remedies; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment for Defendants and close this action.

The Court certifies that an appeal from this Decision and Order would not be taken in good faith.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 416150

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

2020 WL 1812556
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 04/09/2020

**Attorneys and Law Firms**

Theresa M. Trzaskoma, Yu Han, Allegra Noonan, Sher
Tremonte LLP, New York, NY, for Plaintiff.

Ryan T. Donovan, Ryan E. Manley, Harris, Conway &
Donovan, PLLC, Albany, NY, for Defendant Jason Hanson.

Andrew R. Safranko, Lamarche Safranko Law PLLC,
Albany, NY, for Defendant Joseph Sharpe.

Cynthia E. Neidl, Katie Louise Birchenough, Greenberg
Traurig, LLP, William A. Hurst, Young, Sommer Law Firm,
Albany, NY, for Defendant Scott Mere.

Eric Michael Soehnlein, Lippes Mathias Wexler Friedman
LLP, Buffalo, NY, Lawrence H. Schaefer, Lippes Mathias
Wexler Friedman LLP, Albany, NY, for Defendant Zachary
Peck.

Mark G. Mitchell, New York State Attorney General, Albany,
NY, for Defendants Craig Robideau, Jason Kearney, John
Kingston, Bruce Yelich.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, Senior U.S. District Judge

**I. INTRODUCTION**
 **\*1** Plaintiff Raymond Lewis has sued defendants Jason
Hanson, Jason Kearney, John Kingston, Scott Mere,
Zachary Peck, Craig Robideau, Joseph Sharpe, and
Bruce Yelich, all of whom, at the relevant time, were
employees of New York State's Department of Corrections
and Community Supervision ("DOCCS"). Dkt. No. 61
("Amended Complaint"). [1] Plaintiff sues under 42 U.S.C.
§ 1983 and alleges that Defendants violated his civil rights

while he was imprisoned at Bare Hill Correctional Facility
("Bare Hill"). Id.

[1]      Plaintiff filed an initial complaint in this court
        on January 3, 2018 against Hanson, Mere, Peck,
        Sharpe, and two John Doe defendants. Dkt. No.
        1 ("Complaint"). After several defendants filed
        answers, Plaintiff filed the Amended Complaint on
        April 11, 2019, in which he replaced the two John
        Doe defendants with Kearney, Kingston, Robideau,
        and Yelich. See Am. Compl.

Now before the Court is a motion to dismiss brought
under Federal Rules of Civil Procedure 12(b)(1) and
12(b)(6) by Kearney, Kingston, and Yelich (the "Moving
Defendants"). Dkt. Nos. 79 ("Motion to Dismiss"); 79-1
("Memorandum"). Lewis opposes the Motion to Dismiss,
Dkt. No. 84 ("Opposition"), and Moving Defendants have
filed a reply, Dkt. No. 85 ("Reply"). For the following
reasons, the Court grants in part and denies in part the Motion
to Dismiss.

**II. BACKGROUND**
At the motion to dismiss stage, the Court draws all facts from
the Complaint, and "assumes all factual allegations in the
Complaint are true." Colangelo v. Champion Petfoods USA,
Inc., No. 18-CV-1228, 2020 WL 777462, at \*1 (N.D.N.Y.
Feb. 18, 2020) (Kahn, J.) (citing Bryant v. N.Y. State Educ.
Dep't, 692 F.3d 202, 210 (2d Cir. 2012)).

**A. The Parties**
Plaintiff is a 59-year-old man who "suffers from a variety of
chronic medical conditions, including asthma" and, when the
incidents alleged in this lawsuit took place, was imprisoned
at Bare Hill. Am. Compl. ¶ 18.

At all relevant times, Kearney, Mere, Peck, Robideau, and
Sharpe were correction officers ("C.O.s") at Bare Hill. Id. ¶
12. Hanson was a correction sergeant and Kingston was a
correction lieutenant, both at Bare Hill. Id. ¶¶ 13–14. Finally,
Yelich was the Superintendent of Bare Hill. Id. ¶ 15.

**B. Relevant Factual Background**

*1. The Beating*

2020 WL 1812556

On April 23, 2016, Hanson and Robideau summoned Plaintiff from his dorm, handcuffed him, and made him lie down in the back of a prisoner transport van. Am. Compl. ¶¶ 19–20. Plaintiff asked what was going on and was told, "Our buddy wants us to give a nigger like you the special treatment." Id. ¶ 20. The van then started driving towards the Special Housing Unit ("SHU") while certain C.O.s, including Hanson and Robideau "stomped on [Plaintiff's] back and punched [him] repeatedly." Id. ¶ 21.

When the van arrived at the SHU, Hanson and Robideau "dragged [Plaintiff] out of the van by his feet," brought him to a room in the SHU, and told him to face the wall. Id. ¶ 22. Sharpe then entered the room, and Hanson told him, "This nigger gets the special treatment because he filed a lawsuit against one of our brothers." Id. ¶ 23. Hanson then struck Plaintiff in the head. Id.

**\*2** The lawsuit to which Hanson referred had been filed by Plaintiff in June 2015 against Brian Cowan (the "Cowan Lawsuit"), a C.O. at nearby Franklin Correctional Facility. Id. ¶ 24. The Cowan Lawsuit was ongoing in April 2016, when the assault alleged here took place. Id.

After Hanson hit Plaintiff in the head, he and Sharpe "grabbed [Plaintiff], threw him to the floor, and kicked and punched him for approximately 10 minutes." Id. ¶ 25. During this assault, Plaintiff heard either Hanson or Sharpe say, "Let's say he had a weapon," and the other say, "Let's just say he assaulted one of us." Id.

After the beating, the C.O.s uncuffed Plaintiff, removed his clothes, and left him lying naked on the floor for about five minutes. Id. ¶ 26. They then put Plaintiff's underwear back on him and, because Plaintiff was unable to stand on his own, leaned him against the wall. Id. ¶ 27. A nurse arrived and took several photos of Plaintiff's injuries. Id. In great pain from the beating, Plaintiff asked the nurse for some pain medication, but the nurse told Plaintiff he could not get any pain medication "unless he signed up for sick call." Id.

After the nurse left, Hanson ordered that Plaintiff be placed on suicide watch. Id. ¶ 27. Plaintiff was then placed in a cell in the SHU. Id. Before Hanson left, he grabbed Plaintiff by the back of the neck and threatened, "If [I] hear[ ] anything about this, all this can happen again." Id. ¶ 28. Mere was then assigned to stand guard outside Plaintiff's cell. Id.

### 2. The Aftermath

Later that day, Plaintiff began having difficulty breathing and feared he was having an asthma attack. Id. ¶ 29. No C.O.s were nearby, and Plaintiff could not yell because of his breathing trouble, so he began kicking the door. Id. Mere came by about ten minutes later and, after Plaintiff explained that he needed his asthma medicine, Mere said he would "look into it." Id. ¶ 30. After an hour passed and Mere still had not returned, Plaintiff began to kick his cell door again. Id. ¶ 31. An unidentified C.O. arrived at Plaintiff's cell, and Plaintiff again explained that he needed his asthma medicine. Id. The C.O. replied, "People in hell need ice water," and walked away. Id. Now desperate, Plaintiff began kicking the door again until a different unidentified C.O. arrived, who finally arranged for Plaintiff to get his asthma medicine. Id. ¶ 32.

The next day, Plaintiff did not receive a breakfast tray or his daily medication. Id. ¶ 33. When he asked why, he was told "because you assaulted an officer." Id. Later that day, once again experiencing shortness of breath, Plaintiff again had to ask multiple C.O.s before one of them helped him to get his asthma medicine. Id. ¶¶ 34–35.

### 3. The Hospital Trip

At 5:00 AM on the morning of April 25, 2016, Plaintiff woke up with "severe chest pains and difficulty breathing." Id. ¶ 36. He told the C.O. in front of his cell that he needed to see a doctor and was eventually taken to the infirmary. Id. ¶ 36–37. The doctor on duty examined Plaintiff and determined that he needed to go to the hospital. Id. ¶ 37. An ambulance took Plaintiff to Alice Hyde hospital, where x-rays revealed that he had multiple fractured ribs and a collapsed lung. Id. ¶ 38. Doctors there told Plaintiff that, if his injuries had not been treated, he might have died. Id. Plaintiff stayed in the hospital until April 27, 2016, when he was transferred to Upstate Correctional Facility ("Upstate"), just down the road from Bare Hill. Id. ¶¶ 40–41.

### 4. The Cover-Up and Kingston's Involvement

**\*3** After the assault, on April 28, 2016, Plaintiff received five Tier III misbehavior report disciplinary tickets. Id. ¶ 42. Each of these tickets was based on false allegations and designed to cover up the assault on Plaintiff. Id.

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

The first ticket, written by Hanson, alleged that Plaintiff's personal identifying number ("PIN") was used to make calls during the period from April 15, 2016 to April 22, 2016, a period when Plaintiff was supposedly prohibited from using the phone. Id. ¶ 43. The ticket falsely stated that Kearney had told Plaintiff he could not use the phones during this period. Id. But Kearney had never given Plaintiff such an order, nor had Plaintiff used the phone during this period. Id. ¶ 44. In fact, this ticket was concocted to justify Plaintiff's April 23 transfer to the SHU, and Kearney made false statements to supply the factual basis for the ticket. Id. ¶¶ 46–47. "Though the ticket alleged that Lewis violated a direct order from Kearney not to use the phone on April 22, 2016, the ticket was not written until the day after the SHU transfer—April 23, 2016—and not until 3:05 PM, just before other misbehavior tickets were written." Id. ¶ 45. At a subsequent disciplinary hearing related to the ticket, the hearing officer found Plaintiff not guilty and dismissed the ticket. Id. ¶¶ 48, 51.

In addition to this first ticket, on April 23, 2016, other C.O.s filed four other fabricated tickets against Plaintiff to provide a false justification for his injuries. Id. ¶¶ 52–57.

Kingston was, in part, responsible for the cover-up. Id. ¶¶ 49–50. First, "[h]ad Kingston ... performed any sort of investigation into whether [Plaintiff] had used the telephone ..., [he] would have discovered that another inmate had used [Plaintiff's] PIN to call [a] number not associated with [Plaintiff] during the time period described in th[is] ... ticket." Id. ¶ 49. Kingston should have done this given the suspicious timing of this ticket. Id. Additionally, "Kingston was also involved in the issuing of false misbehavior tickets and made false statements to cover up the assault on [Plaintiff]." Id. ¶ 50.

*5. Yelich's Involvement*

Yelich's "gross negligence led to the assault on [Plaintiff]." Id. ¶ 70. First, Yelich "failed to take action to appropriately supervise Hanson, who Yelich knew or should have known had previously been involved in at least one other serious assault of an inmate[,] in 2015." Id. ¶ 71. Despite Hanson's misconduct, he "became a sergeant and was hired at Bare Hill." Id. ¶ 72. Then, in the assault on Plaintiff, "numerous ... policies and procedures were violated." Id. ¶ 73. "Had Yelich been properly supervising staff at Bare Hill ..., these events would not have transpired." Id. ¶ 74.

Additionally, "under Yelich's supervision, Bare Hill does not use any means of video surveillance in the entire facility, including the SHU." Id. ¶ 75. Thus, Yelich's "grossly negligent supervision allowed, and even encouraged, misconduct ... as [Bare Hill staff] knew that they could act with impunity and cover up their behavior by breaking procedure and there would be no repercussions." Id. ¶ 76. [2]

[2]    The Amended Complaint contains a more complete statement of Plaintiff's allegations. Am. Compl.

**C. Plaintiff's Claims**

*4 Based on the above facts, Plaintiff asserts the following claims against each defendant: (1) excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments, Am. Compl. ¶¶ 77–85; (2) deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, id. ¶¶ 86–95; and (3) retaliation against Plaintiff for filing the Cowan Lawsuit in violation of the First and Fourteenth Amendments, id. ¶¶ 96–104. Plaintiff sues Yelich in both his individual and official capacities, and all other defendants in their individual capacities only. Id. ¶ 1. He seeks compensatory and punitive damages. Id. ¶ 105.

**III. LEGAL STANDARDS**

**A. 12(b)(1)**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "Where, as here, the case is at the pleading stage and no evidentiary hearings have been held, ... we must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009) (internal alterations, citations, and quotation marks omitted). The "[p]laintiff bears the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence." Sprole v. Underwood, No. 18-CV-1185, 2019 WL 4736241, at *4 (N.D.N.Y. Sept. 27, 2019) (Kahn, J.).

**B. 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 203 of 238

on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citing Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Put another way, a claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].' " Pare v. Valet Park of Am., Inc., No. 19-CV-206, 2020 WL 495038, at *4 (N.D.N.Y. Jan. 30, 2020) (Kahn, J.) (alterations in original) (quoting Twombly, 550 U.S. at 556). "In assessing whether this standard has been met, courts 'must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[ ]....' " Charles Ramsey Co., Inc. v. Fabtech-NY LLC, No. 18-CV-546, 2020 WL 352614, at *9 (N.D.N.Y. Jan. 21, 2020) (Kahn, J.) (alteration in original) (quoting In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)).

## IV. DISCUSSION

Plaintiff brings his claims under 42 U.S.C. § 1983. "[Section] 1983 provides a civil action for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; instead it provides litigants a procedure to redress the deprivation of rights established elsewhere. Doe v. Patrick, No. 17-CV-846, 2020 WL 529840, at *7 (N.D.N.Y. Feb. 3, 2020) (Kahn, J.) (citing Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)).

Bearing these principles in mind, the Court considers in turn: (A) the claims against Yelich in his official capacity; (B) the excessive force claims; (C) the medical indifference claims; (D) the retaliation claims; (E) whether to grant Plaintiff leave to amend.[3]

[3]   Moving Defendants also argue that, "to the extent ... Plaintiff purports to assert a conspiracy claim, that claim must be dismissed...." Mem. at 12; Reply at 5. It does not appear to the Court that Plaintiff has alleged a conspiracy claim, see generally Am. Compl., and, indeed, Plaintiff makes no attempt to defend such a claim in

his Opposition, see generally Opp'n. However, to the extent Plaintiff may have asserted such a claim, the Court deems that claim abandoned, and therefore dismisses it. See Holmes v. Cty. of Montgomery, No. 19-CV-617, 2020 WL 1188026, at *4 (N.D.N.Y. Mar. 12, 2020) (Kahn, J.) ("[A]t the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.") (citing Felix v. New York State Dep't of Corr. & Cmty. Supervision, No. 16-CV-7978, 2018 WL 3542859, at *6 (S.D.N.Y. July 23, 2018)).

### A. Claims Against Yelich in His Official Capacity

**\*5** Moving Defendants move under Rule 12(b)(1) to dismiss all claims against Yelich in his official capacity. Mem. at 13. They argue that, because Plaintiff seeks only monetary damages, the official capacity claims against Yelich are barred by the Eleventh Amendment. Id. (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.")). Plaintiff does not dispute this argument, see Opp'n at 7 n.1, and therefore appears to abandon these claims, see Holmes, 2020 WL 1188026, at *4. For this reason, and because amendment could not cure these claims, the Court dismisses with prejudice the official capacity claims against Yelich. See id. (dismissing abandoned claims); Animashaun v. Fischer, No. 19-CV-820, 2020 WL 374578, at *7 (N.D.N.Y. Jan. 23, 2020) (Kahn, J.) (dismissing with prejudice claims barred by the Eleventh Amendment).

### B. Excessive Force Claims

The Court addresses first Plaintiff's excessive force claims brought under the Eighth Amendment, then his claims under the Fourth and Fourteenth Amendments.

#### 1. Eighth Amendment

Moving Defendants do not contest that certain Bare Hill C.O.s "were involved in a use of force incident against Plaintiff on April 23, 2016," Mem. at 6, nor even Plaintiff's allegations that this "use of force" was excessive and violated his Eighth Amendment rights, see generally Mem. Instead, they argue that they were not personally involved incident

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 204 of 238

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

and, therefore, cannot be held liable for any alleged Eighth Amendment violation. Id. at 4–7. With respect to Kearney and Kingston, the Court disagrees. However, with respect to Yelich, the Court finds that Plaintiff's allegations have not satisfied the personal involvement requirement. To explain these decisions, the Court first addresses whether Plaintiff has stated an underlying excessive force claim, then examines whether Moving Defendants were personally involved in the events giving rise to that claim.

### a. Underlying Excessive Force Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. An excessive force claim brought under this Amendment has both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). "The objective element is 'responsive to contemporary standards of decency' and requires a showing 'that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection.' " Bennett v. Fletcher, No. 17-CV-849, 2020 WL 872491, at *8 (N.D.N.Y. Jan. 16, 2020) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)), report and recommendation adopted sub nom. Bennett v. Jiguere, No. 17-CV-849, 2020 WL 871156 (N.D.N.Y. Feb. 21, 2020). The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted).

The Amended Complaint clearly states a claim for excessive force. It alleges that several C.O.s savagely and without justification attacked Plaintiff. Am Compl. ¶¶ 18–26. It alleges that, while they beat him, these C.O.s yelled racial epithets at Plaintiff. Id. ¶¶ 20, 23. And it alleges that Plaintiff was so badly hurt as a result of this beating, doctors told him "the injuries could have been fatal." Id. ¶ 38. These allegations amply satisfy both the objective and subjective requirements of an Eighth Amendment excessive force claim. See, e.g., Rivera v. Goord, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (denying motion to dismiss where the plaintiff alleged that C.O. defendants attacked him and beat him without provocation). Therefore, the Court now turns to whether

Plaintiff has plausibly alleged that Moving Defendants were personally involved in this constitutional violation.

### b. Personal Involvement

*6 To be liable under § 1983, a defendant must be "personally involved" in the alleged constitutional violation. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Indeed, a "§ 1983 plaintiff must show a 'tangible connection' between the acts of the defendant and the plaintiff's injuries.' " Sheffer v. Fleury, No. 18-CV-1180, 2019 WL 4463672, at *9 (N.D.N.Y. Sept. 18, 2019) (Kahn, J.) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)).

In particular, where a plaintiff brings claim against a supervisory official, that "official[ ] may not be held liable merely because they held a position of authority." Amaker v. Boyd, No. 19-CV-1253, 2020 WL 210317, at *12 (N.D.N.Y. Jan. 14, 2020) (Kahn, J.) (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)); see also Iqbal, 556 U.S. at 676 ("[V]icarious liability is inapplicable to ...§ 1983 suits."). Instead:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information

2020 WL 1812556

indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [4] "Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, [she or he] 'must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation.' " Harrell v. New York State Dep't of Corr. & Cmty. Supervision, No. 15-CV-7065, 2019 WL 3821229, at *7 (S.D.N.Y. Aug. 14, 2019) (quoting Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014)).

[4]  The Court notes here that the Second Circuit has not yet addressed how Iqbal affected Colon's standards for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon); Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [Iqbal] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations"). However, for the purposes of resolving this Motion to Dismiss, the Court assumes that all five branches of the Colon tree are alive and well. See, e.g., Mattison v. Johnson, No. 17-CV-1198, 2019 WL 1493188, at *4 n.4 (N.D.N.Y. Apr. 3, 2019) (assuming that "all five categories under Colon remain valid" for the purposes of resolving the defendants' 12(b)(6) motion).

Bearing these principles in mind, the Court first addresses whether Kearney and Kingston were personally involved in the use of excessive force against Plaintiff, then examines Yelich's personal involvement.

### i. Kearney and Kingston

**\*7** Moving Defendants argue that "Plaintiff sets forth no facts supporting a reasonable inference that ... Kearney was involved in the alleged use of force," or that "Kingston failed to properly supervise the other defendants [or] was

actively involved in a violation of Plaintiff's rights. Mem. at 6. Instead, according to Moving Defendants, "Plaintiff merely alleges that ... Kearney made a false statement in a misbehavior report" and "Kingston failed to investigate Plaintiff's situation." Id. These allegations, say Moving Defendants, fail to "support an inference of personal involvement" or "support a constitutional claim." Id. The Court disagrees.

Prison officials who participate in preparing false misbehavior reports to cover up incidents of excessive force by other officials have been found personally involved in the underlying unconstitutional activity. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) (denying the defendants' 12(b)(6) motion and finding that they were personally involved in an excessive force incident committed by other prison guards because the defendants filed false reports in an effort to cover up the incident); Gillard v. Rovelli, No. 09-CV-860, 2010 WL 4905240, at *13 (N.D.N.Y. Sept. 29, 2010) ("The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. This allegation is potentially sufficient to state a claim against Defendant Kelly."), report and recommendation adopted by No. 09-CV-860, 2010 WL 4945770 (N.D.N.Y. Nov. 24, 2010). These are exactly the sort of allegations Plaintiff brings here.

Plaintiff asserts that "Kearney made false statements to supply the factual basis" for the ticket that Hanson fabricated to cover up the assault. Am. Compl. ¶ 46. Similarly, Plaintiff alleges that "Kingston himself was involved in issuing ... false misbehavior tickets and made false statements to cover up the assault on [Plaintiff]." Opp'n at 14 (citing Am. Compl. ¶ 50). These allegations are sufficient to plausibly allege Kearney and Kingston's personal involvement in the assault on Plaintiff. See Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013) (denying motion to dismiss on personal involvement grounds where the plaintiff alleged that a prison guard-defendant "participated directly in the [underlying] conduct by filing a false report to his supervisors in order to cover up" constitutional violations by other guards); see also Edwards, 2019 WL 1284295, at *7 (denying motion to dismiss where the plaintiff alleged that a defendant "wrote and submitted a memorandum in response to plaintiff's grievance in which [the defendant] falsely reported that a witness to the assault did not see anything[ ]" and "lied that he sp[oke] with all named staff" sufficient to state a claim against that defendant).

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

Moving protest that "Plaintiff's allegations that ... Kearney[ ] [and] Kingston ... failed to investigate Plaintiff's situation and engaged in a "cover up" subsequent to the alleged use of force fail to plausibly allege their personal involvement in a violation of Plaintiff's Eighth Amendment rights." Reply at 2. The Court is unconvinced. First, whether a plaintiff has a right to any investigation and whether a defendant who sabotages an investigation into a constitutional violation is personally involved in that underlying violation are analytically distinct questions. Next, the cases Moving Defendants cite in support of their argument that an official who covers up a constitutional violation is not personally involved in that violation are inapposite. See Reply at 2 (citing McCloud v. Prack, 55 F. Supp. 3d 478 (W.D.N.Y. 2014); Banks v. Annucci, 48 F. Supp. 3d 394 (N.D.N.Y. 2014); Reeder v. Hogan, No. 09-CV-520, 2012 WL 4107822 (N.D.N.Y. July 11, 2012), report and recommendation adopted by No. 09-CV-520, 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012)). These cases primarily provide support for Moving Defendants' contention that an inmate has no right to an investigation of alleged wrongful conduct. See McCloud, 55 F. Supp. 3d at 481 ("The law is clear, however, that inmates do not enjoy a constitutional right to an investigation of any kind by government officials.") (internal quotation marks omitted); Banks, 48 F. Supp. 3d at 414 (same); Reeder, 2012 WL 4107822, at *6 ("The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement [in the protested conduct].")). Only one of these cases, McCloud, appears to address the question of whether a "cover up" by officials can support a constitutional violation, but the Court does not find it persuasive here. See McCloud, 55 F. Supp. 3d at 481 ("Plaintiff's allegations that Olles deliberately conducted an inadequate investigation for the purpose of covering up Griffin's alleged misconduct ... [is] insufficient to make out a § 1983 claim against [him].")). McCloud discusses whether an alleged "cover up" or inadequate investigation is itself a constitutional violation actionable under § 1983. See id. at 481–82 (discussing whether allegations of a cover-up can support a valid § 1983 claim"). But it says nothing about whether or not a defendant may be personally involved in a constitutional violation separate from the cover-up—such as the use of excessive force—when that defendant covers up evidence regarding the violation. See generally id. Therefore, neither McCloud nor the other cases cited by Moving Defendants can displace the weight of authority cited by Plaintiff in support of the proposition that falsifying misbehavior reports to cover up a constitutional tort suffices

to establish the falsifying defendants' personal involvement in that tort.

**\*8** For these reasons, the Court finds that Plaintiff has plausibly alleged Kearney and Kingston's personal involvement in the excessive force incident. Therefore, the Court denies the Motion to Dismiss on this issue.

### ii. Yelich

Moving Defendants also argue that Plaintiff has insufficiently alleged Yelich's personal involvement in any constitutional deprivations. Mem. at 6–7. Here, the Court agrees.

At the outset, the Court thinks it worth quoting the sum total of the allegations against Yelich:

**Defendant Yelich Was Grossly Negligent in Supervising Bare Hill**

70. Defendant Yelich is specifically charged with supervising Bare Hill, ensuring that the facility is safe for inmates, and making hiring decisions. Yet Yelich's gross negligence led to the assault on Lewis.

71. Among other things, Yelich failed to take action to appropriately supervise Hanson, who Yelich knew or should have known had previously been involved in at least one other serious assault of an inmate in 2015, the year before Lewis was assaulted.

72. Despite Hanson's very serious misconduct, Hanson became a Sergeant and was hired at Bare Hill Correctional Facility as a Sergeant.

73. Numerous other policies and procedures were violated and/or disregarded in connection with the assault on Lewis.

74. Had Yelich been properly supervising staff at Bare Hill to ensure compliance, these events would not have transpired.

75. Further, under Yelich's supervision, Bare Hill does not use any means of video surveillance in the entire facility, including the SHU, even though this is where inmates with disciplinary issues or who pose a threat to themselves or others are housed.

76. This grossly negligent supervision allowed, and even encouraged, misconduct on the part of Bare Hill staff, as

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 207 of 238

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

they knew that they could act with impunity and cover up their behavior by breaking procedure and there would be no repercussions.

Am. Compl. ¶¶ 70–76. In addition to these allegations in the body of the Amended Complaint, under each cause of action the Amended Complaint also states that "Supervisor Defendants are liable as supervisors for the behavior of the other defendants, due to their gross negligence in supervising the staff at Bare Hill. Id. ¶¶ 84, 94, 103.

Based on these allegations, Plaintiff seeks to establish Yelich's personal involvement in his subordinates' alleged misconduct through the fourth Colon prong: gross negligence. See Colon, 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts...."). A supervisor is grossly negligent when she or he "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the] [p]laintiff." Bivona v. McLean, No. 19-CV-303, 2019 WL 2250553, at *4 (N.D.N.Y. May 24, 2019); see also Nelson v. City of New York, No. 18-CV-4636, 2019 WL 3779420, at *15 (S.D.N.Y. Aug. 9, 2019) ("[G]ross negligence denotes a higher degree of culpability than mere negligence."). Plaintiff solely relies upon the allegation that Hanson was involved in a prior assault on an inmate to establish Yelich's grossly negligent supervision.[5]

[5]    There are no other allegations in the Amended Complaint about any other prior misconduct by any other named defendant or Bare Hill staff member more generally. See generally Am. Compl. Since there are no other allegations of conduct that would have put Yelich on notice of a "high degree of risk that his subordinates [other than Hanson] would behave inappropriately," Bivona, 2019 WL 2250553, at *4, there are, therefore, no "facts from which to infer [his] ... gross negligence in preventing [those] subordinates from causing the constitutional violations alleged," Alexander v. Racette, No. 17-CV-309, 2019 WL 121670, at *3 (N.D.N.Y. Jan. 7, 2019); see also Rahman v. Fischer, No. 08-CV-4368, 2010 WL 1063835, at *5 (S.D.N.Y. Mar. 22, 2010) ("Without alleging

that [the supervisor defendant] was personally on notice of a condition that could reasonably lead to an assault of an inmate ..., [plaintiff] has failed to state a claim against [the supervisor].”). Therefore, Yelich's gross negligence must be inferred from his knowledge of Hanson's alleged past misconduct alone.

 *9  Although the Amended Complaint alleges that "Yelich knew or should have known" that Hanson had "previously been involved in at least one other serious assault of an inmate in 2015," Am. Compl. ¶ 71, this "naked assertion[,] devoid of ... factual enhancement," Iqbal, 556 U.S. at 678, is insufficient to plausibly establish Yelich's knowledge of a high degree of risk that his subordinates would engage in misconduct. Plaintiff asserts that, after the 2015 assault, "Hanson became a Sergeant and was hired at Bare Hill," Am. Compl. ¶ 72, but he has failed to provide additional allegations confirming that it was Yelich who promoted Hanson or Yelich who hired him, see id. Moreover, the Amended Complaint has not provided information about the location of Hanson's 2015 assault, whether Hanson worked at Bare Hill at the time of the assault, or whether Yelich worked there either.[6] See id. Finally, the Amended Complaint lacks details about Hanson's prior assault, such as whether lawsuits or grievances were filed, or whether Hanson was disciplined as a result, see Am. Compl., details that would help to put Yelich on notice. Without such allegations, the Amended Complaint contains insufficient "factual content to nudg[e] [Plaintiff's claim against Yelich] across the line from conceivable to plausible." Iqbal, 556 U.S. at 683 (internal quotation marks omitted); see also Rucano v. Koenigsmann, No. 12-CV-35, 2014 WL 1292281, at *14 (N.D.N.Y. Mar. 31, 2014) (dismissing claim where plaintiff "fail[ed] to allege any facts from which it could plausibly be concluded that [the supervisory] Defendant ... was, or should have been, aware of the allegedly deficient performance of his subordinates."); Nash v. McGinnis, 585 F. Supp. 2d 455, 460 (W.D.N.Y. 2008) ("Although plaintiff need not plead facts in great detail, the formulaic allegation that [the supervisory defendant] was aware of the alleged violations ... without some factual allegations to explain the basis for that conclusion, is insufficient to render it plausible that [the supervisory defendant] was personally involved in the alleged constitutional deprivations.").

[6]    In fact, the Amended Complaint suggests that Hanson's prior assault occurred someplace other than at Bare Hill, as it alleges that, "[d]espite [this

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 208 of 238

assault], Hanson ... was at Bare Hill...." Am Compl. ¶ 72.

Moreover, even assuming that Plaintiff plausibly alleged Yelich's knowledge of Hanson's 2015 assault—and, therefore, Yelich's knowledge that Hanson posed a high risk of behaving improperly—Plaintiff has failed to establish that Yelich "either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk." Bennett v. Columbe, No. 16-CV-653, 2017 WL 6049238, at *4 n.5 (N.D.N.Y. Oct. 17, 2017), report and recommendation adopted by No. 16-CV-653, 2017 WL 6062904 (N.D.N.Y. Dec. 6, 2017); see also Poe v. Leonard, 282 F.3d 123, 140 n.14 (2d Cir. 2002) (discussing supervisory liability and stating "[w]e have often equated gross negligence with recklessness...."). Most of Plaintiff's allegations on this point are vague and conclusory. See Am. Compl. ¶¶ 70 ("Defendant Yelich is specifically charged with supervising Bare Hill ... Yet Yelich's gross negligence led to the assault on [Plaintiff]."); 71 ("Among other things, Yelich failed to take action to appropriately supervise Hanson."); 74 ("Had Yelich been properly supervising staff at Bare Hill to ensure compliance, [the assault on Plaintiff] would not have transpired."); 76 ("[Yelich's] grossly negligent supervision allowed, and even encouraged, misconduct on the part of Bare Hill staff...."). These allegations say little to nothing about what exactly Yelich did or did not do to supervise Hanson or any other Bare Hill staff member. Nor does Plaintiff elaborate in his Opposition, asserting that "Yelich should have been supervising the staff at Bare Hill ..., but he was not." Opp'n at 11. Unadorned claims such as these are insufficient to plausibly allege Yelich's personal involvement in his subordinates' misconduct. See Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *15 (E.D.N.Y. Aug. 22, 2017) (dismissing the plaintiff's claim because, in part, he "fail[ed] to set forth any detail regarding how [the supervisory] Defendant ... failed to supervise his subordinates or which subordinates he failed to supervise"), report and recommendation adopted by No. 16-CV-3674, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017); McRae v. Gentile, No. 14-CV-783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) ("[V]ague and conclusory allegations that a supervisor failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability." (citing Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009))); Styles v. Goord, 431 F. App'x 31, 33 (2d Cir. 2011) (no personal involvement where plaintiff "did

not allege ... any facts concerning [supervisor defendants'] particular conduct in supervising their subordinates").

**\*10** Once the Court disregards the conclusory allegations listed above, Plaintiff's sole remaining allegation to support his claim that Yelich recklessly disregarded a substantial risk to his safety is his assertion that Yelich failed to install video surveillance equipment at Bare Hill. [7] See Am. Compl. ¶ 75. However, this allegation alone does not plausibly establish Yelich's gross negligence since Plaintiff has failed to allege that (1) Yelich had the authority to unilaterally institute a video surveillance system at Bare Hill, (2) Yelich had sufficient control over, or resources in, the Bare Hill budget to implement such a system, or (3) such a system could have been designed, approved, and installed between Hanson's 2015 misconduct and Plaintiff's April 2016 assault. See Am. Compl. These deficiencies mean that Plaintiff has failed to sufficiently allege that it was Yelich's action (or inaction), and not someone else's, that prevented the installation of surveillance cameras. See Tangreti v. Semple, No. 17-CV-1420, 2019 WL 4958053, at *16 (D. Conn. Oct. 8, 2019) (finding that a supervisor's delay in installing a video surveillance system in a prison did not make the supervisor personally involved in an assault on an inmate where the plaintiff could not establish that the supervisor was solely responsible for the delay); see also Harrell, 2019 WL 3821229, at *7 (noting that a plaintiff must "establish that the supervisor's actions were the proximate cause of the ... constitutional deprivation").

> [7]   Plaintiff cites to several cases in which claims against a supervisory defendant survived a motion to dismiss, but which did not base that decision on the supervisory defendant's failure to install video surveillance equipment in prison. See Mem. at 10–11 (citing Green v. Greene, No. 07-CV-351, 2009 WL 5874308, at *21 (N.D.N.Y. Mar. 10, 2009), report and recommendation adopted by No. 07-CV-351, 2010 WL 455456 (N.D.N.Y. Feb. 2, 2010); Felix-Torres v. Graham, 521 F. Supp. 2d 157, 163 (N.D.N.Y. 2007) (Kahn, J.)). Because Plaintiff's claims against Yelich rely so heavily on this allegation, these cases are of little help to Plaintiff.

And, even if Yelich were responsible for the lack of security cameras at Bare Hill, Yelich's conduct would not necessarily demonstrate he was personally involved in the alleged deprivations of Plaintiff's constitutional rights. See Zielinski

Case 9:21-cv-00135-DNH-TWD Document 79 Filed 02/12/24 Page 209 of 238
Lewis v. Hanson, Not Reported in Fed. Supp. (2020)
2020 WL 1812556

v. Annucci, No. 17-CV-1042, 2019 WL 2870337, at *9 (N.D.N.Y. Mar. 19, 2019) (dismissing claims based on prison superintendents' "refusal to use surveillance cameras and body cameras" for lack of personal involvement), report and recommendation adopted by No. 17-CV-1042, 2019 WL 2869608 (N.D.N.Y. July 3, 2019); Towner v. Lape, No. 08-CV-47, 2009 WL 81221, at *2–3 (N.D.N.Y. Jan. 9, 2009) (dismissing claim against prison superintendent for lack of personal involvement where plaintiff alleged that "defendants failed to protect him by installing fully functional security cameras"); see also Bowman v. Lawrence Cty. Comm'n, No. 08-CV-602, 2009 WL 10688468, at *5 (N.D. Ala. May 4, 2009) (granting county's motion to dismiss where plaintiff alleged that county was deliberately indifferent to high risk of inmate suicide by failing to install video cameras in prison). Plaintiff, tellingly, has cited no cases to the contrary, in which a supervisory defendant's gross negligence was established by allegations that the supervisor failed to install surveillance equipment. See Mem. at 10–12. [8]

[8]   The only cases Plaintiff cites that are arguably related to his video surveillance allegations are Brown v. Artus, 647 F. Supp. 2d 190 (N.D.N.Y. 2009) (Kahn, J.) and Reeder v. Annucci, No. 16-CV-1161, 2018 WL 3121630, at *5 (N.D.N.Y. Jan. 19, 2018), report and recommendation adopted by No. 16-CV-1161, 2018 WL 1444220 (N.D.N.Y. Mar. 22, 2018). See Mem. at 10–11 (citing Brown, 647 F. Supp. 2d at 202; Reeder, 2018 WL 3121630, at *5). However, in Brown—decided on summary judgment—the Court found that evidence of a supervisor defendant expressing interest in having cameras installed demonstrated the supervisor's knowledge of a risk to inmates. See 647 F. Supp. 2d at 202. The Brown court did not address, however, whether any failure to install cameras helped demonstrate that supervisor's gross negligence in supervising his subordinates. See id. Likewise, in Reeder, the court found allegations that a supervisory defendant had "refused to watch available video evidence of ... alleged assaults" plausibly stated the supervisor's personal involvement. See 2018 WL 3121630, at *5. But, whether a supervisor reviews existing video evidence is a wholly separate issue from whether a supervisor institutes an entirely new video surveillance system. Thus, both cases are inapposite and of little help to Plaintiff.

*11   Admittedly, several other courts have allowed claims to proceed in which a plaintiff alleges that a jailer-defendant failed to implement proper video surveillance. See Williams v. Connell, No. 17-CV-750, 2018 WL 3468213, at *5 (N.D.N.Y. July 18, 2018) (denying supervisors' motion to dismiss where plaintiff alleged numerous steps supervisors should have taken to protect inmates in addition to "use of security cameras"); Henderson v. Glanz, No. 12-CV-68, 2012 WL 5931546, at *4 (N.D. Okla. Nov. 27, 2012) (denying motion to dismiss where plaintiff alleged that the defendant sheriff had a "custom of maintaining inadequate supervision ... with respect to known areas that are not monitored via surveillance equipment, or 'blind spots,' within the [j]ail" and that the sheriff "was aware of prior sexual assaults and sexual encounters ... in these 'blind spots' "); cf. Bowen v. City of Manchester, 966 F.2d 13, 21 (1st Cir. 1992) (granting summary judgment to supervisory defendant because plaintiff's assertion that defendant had not "install[ed] more sophisticated monitoring equipment in the lockup" did not establish deliberate indifference, but noting as well that the "evidence establishes that Chief King was perhaps very negligent"). But these cases do not alter the Court's conclusion. In each, more detailed allegations describe misconduct beyond a mere failure to install cameras, and the supervisors had more notice than a single prior incident involving one guard who may or may not have committed misconduct at the facility in question. Without such allegations to more securely "nudge[ ] [his] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570, the Court is reluctant to intrude into an area of prison administration more traditionally reserved to other actors, see Turner v. Safley, 482 U.S. 78, 85 (1987) ("Prison administration is ... a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities."). After all, "[i]f Plaintiff's argument were correct, it would require surveillance cameras to be installed in all areas at every prison where inmates" are at a high risk of suffering unconstitutional misconduct. Peterson v. Mickles, No. 17-CV-1702, 2020 WL 214749, at *10 (D. Or. Jan. 14, 2020). "[T]hat decision [might] be good as a matter of policy," id., but this Court is unlikely to be best positioned to make it, see Turner, 482 U.S. at 85; Jones v. N. Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have ... recognized the wide-ranging deference to be accorded the decisions of prison

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 210 of 238
Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

administrators."). Therefore, the Court finds that Plaintiff has not plausibly alleged that Yelich was grossly negligent by failing to install video surveillance at Bare Hill and grants Yelich's Motion to Dismiss.

### 2. Fourth and Fourteenth Amendments

Preliminarily, Moving Defendants argue that any excessive force claims brought under the Fourth and Fourteenth Amendments must be dismissed because, during the alleged assault and its aftermath, Plaintiff was a convicted prisoner. Mem. at 3. The Court agrees.

Starting with the Fourth Amendment claims, "[w]hile claims of excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment, post-conviction excessive force claims, such as [Plaintiff's] are properly considered under the Eighth Amendment." Bonilla v. Jaronczyk, 354 F. App'x 579, 581 (2d Cir. 2009) (internal citations and quotation mark omitted). When a post-conviction prison inmate brings an excessive force claim under both the Fourth and Eighth Amendments, courts dismiss the Fourth Amendment claim as duplicative. See Lang v. Zurek, No. 18-CV-506, 2018 WL 6069468, at *4 (N.D.N.Y. Oct. 17, 2018) (dismissing Fourth Amendment claim and analyzing excessive force claim under the Eighth Amendment), report and recommendation adopted by No. 18-CV-506, 2018 WL 6068416 (N.D.N.Y. Nov. 20, 2018). Though the Amended Complaint does not state explicitly that Plaintiff was imprisoned at Bare Hill after a conviction, publicly available records indicate that Plaintiff entered the DOCCS prison system on November 8, 2011 and was released from the system on November 16, 2017. See N.Y.S. DOCCS Inmate Information website, *available at* http://nysdoccslookup.doccs.ny.gov (information obtained for DIN# 11-A-4997); Am. Compl. ¶ 11, n.1; *see also* Fine v. ESPN, Inc., 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014) ("In deciding a motion to dismiss, a court may take judicial notice of public records...."). Hence, the Court infers that Plaintiff was a post-conviction prisoner at all relevant times. Additionally, Plaintiff did not object to Defendant's suggestion that Plaintiff was a post-conviction inmate, or to Defendant's argument that Plaintiff's Fourth Amendment excessive force claims must be dismissed. See Opp'n. Therefore, the Court dismisses these claims.

The Court likewise dismisses the Fourteenth Amendment excessive force claims, as they are "subsumed" by Plaintiff's Eighth Amendment claims. See Rodriguez v. Morton, No. 04-CV-3787, 2009 WL 414033, at *9 (S.D.N.Y. Feb. 13, 2009) ("Where, as here, a plaintiff's Eighth Amendment and 14th Amendment ... claims overlap, the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners.") (internal citations and quotation marks omitted). Therefore, the Court dismisses these claims as well. See Felix-Torres, 521 F. Supp. 2d at 164 (dismissing Fourteenth Amendment claims that were subsumed by Eighth Amendment claims based on same factual allegations).

### C. Medical Indifference Claims

**\*12** Moving Defendants ask the Court to dismiss Plaintiff's medical indifference claims against them, arguing that "Plaintiff sets forth no facts supporting a reasonable inference that Defendants Kearney, Kingston, or Yelich was personally involved in a deprivation of Plaintiff's medical care." Mem. at 8. In his Opposition, Plaintiff only contests the Motion to Dismiss as to Yelich. See Opp'n at 16–17. This indicates that Plaintiff has abandoned his medical indifference claims against Kearney and Kingston. See Holmes, 2020 WL 1188026, at *4 ("[A]t the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."). Therefore, the Court dismisses the medical indifference claims against these two defendants. See id. (dismissing abandoned claims).

The Court also dismisses the medical indifference claim against Yelich. As described above, the only allegation Plaintiff makes against Yelich specific to the medical indifference claim is that "Supervisor Defendants are liable as supervisors for the behavior of the other defendants, due to their gross negligence in supervising the staff at Bare Hill." Am. Compl. ¶ 94. Besides this, the sum of the allegations against Yelich are those quoted above in the section discussing Plaintiff's excessive force claim against Yelich. See Am. Compl. ¶¶ 70–76. Since there are no additional allegations, and since Plaintiff's arguments again rely heavily on his assertion that Yelich should have installed surveillance cameras at Bare Hill, see Opp'n at 16–17, the Court dismisses the medical indifference claim against Yelich for the same reasons it dismisses the excessive force claim: namely, Plaintiff has failed to plausibly allege that Yelich was grossly negligent in the supervision of his subordinates.

### D. Retaliation Claims

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 211 of 238

2020 WL 1812556

Moving Defendants urge the Court to dismiss the retaliation claims against them, arguing that the Amended Complaint fails to plausibly allege that they took adverse action against Plaintiff or that any adverse action was motivated by Plaintiff's protected speech. Mem. at 9–13. The Court agrees as to Yelich, but disagrees as to Kearney and Kingston.

To state a claim for First Amendment retaliation, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Kampfer v. Argotsinger, No. 18-CV-7, 2020 WL 906274, at *9 (N.D.N.Y. Feb. 25, 2020) (Kahn, J.). With regard to the third element, the plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). In general, "[c]ourts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted).

*1. Kearney and Kingston*

With regard to the first element, all parties appear to agree that the Cowan Lawsuit constitutes protected activity, and that pursuing the Cowan Lawsuit allegedly precipitated the retaliation. Mem. at 12; Opp'n at 18; Am. Compl. ¶ 24. Because "[t]here is no doubt that the filing of lawsuits ... is constitutionally protected activity," Plaintiff has satisfied the first element of his retaliation claim. See Ford v. Martuscello, No. 14-CV-1566, 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) report and recommendation adopted by No. 14-CV-1566, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016); see also Colon, 58 F.3d at 872 ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.").

**\*13** As for the second element, Moving Defendants argue that "Plaintiff [has] fail[ed] to set forth any facts supporting a reasonable inference that ... Kearney, Kingston, or Yelich took any adverse action against Plaintiff." Mem. at 11. However,

as Plaintiff rightly observes, "the filing of false misbehavior reports with the purpose of retaliation constitutes adverse action for purposes of a retaliation claim." Opp'n at 18 (citing, inter alia, Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (holding that the plaintiff had satisfied the adverse action element of a retaliation claim by alleging "the filing of false misbehavior reports against" him)); see also Burroughs v. Petrone, 138 F. Supp. 3d 182, 206 (N.D.N.Y. 2015) (declining to dismiss the plaintiff's claims against defendants who had "filed false misbehavior reports in retaliation for plaintiff's exercise of his constitutional rights"). Since the Amended Complaint alleges that both Kearney and Kingston participated in filing the false misbehavior reports against Plaintiff, Am. Compl. ¶¶ 46, 50, Plaintiff has satisfied the adverse action requirement as to these two defendants.

Moving to the third element, Kearney and Kingston argue that Plaintiff has failed to plausibly allege a causal connection between their alleged adverse actions and Plaintiff's pursuit of the Cowan Lawsuit. Mem. at 12. Moving Defendants first argue that "Plaintiff cannot plausibly claim that Kearney[ ] [or] Kingston[ ] ... was motivated to retaliate against Plaintiff by a lawsuit Plaintiff filed against a different officer at a different prison." Id. (citing Hare v. Hayden, No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (same)). However, as Plaintiff points out, courts in this Circuit have "declined to dismiss retaliation claims on the basis that the underlying protected activity was directed towards a third party." Opp'n at 18–19 (citing Funches v. Russo, No. 17-CV-1292, 2018 WL 6982087, at *5 (N.D.N.Y. Nov. 2, 2018) (declining to dismiss retaliation claims where protected activity was directed against third party), report and recommendation adopted as modified by No. 17-CV-1292, 2018 WL 6381058 (N.D.N.Y. Dec. 6, 2018) (Kahn, J.); Ford, 2016 WL 5322166, at *5 ("The fact that none of the grievances were alleged to have been filed against defendants King, Williams or Cowan is not dispositive of whether plaintiff has stated a retaliation claim against them."). Therefore, this argument is unavailing.

Kearney and Kingston next argue that "the time gap between Plaintiff's filing of the [Cowan Lawsuit] in June 2015 and the alleged events at Bare Hill ... in April 2016 is too long to support an inference of causation." Mem. at 12 (citing Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

2020 WL 1812556

this circuit recognize as sufficiently proximate to admit of an inference of causation.")) (other citation omitted); see also Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks and citation omitted). However, despite this suggestion by Moving Defendants that three months is the maximum time gap that can support and inference of causation, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (six months not too long). Where, as here, the alleged adverse action occurred in response to ongoing litigation, see Opp'n at 19; Am. Compl. ¶ 24 (stating that the Cowan Lawsuit was "then pending" at the time Plaintiff was assaulted), there is adequate "temporal proximity" to find causation. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding "close temporal proximity" where adverse action occurred during the pendency of the plaintiff's lawsuit); see also Lindner v. Int'l Business Machines Corp., No. 06-CV-4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) (noting that "retaliation claims are rarely dismissed pursuant to Rule 12(b)(6) where the plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct").

**\*14** Thus, the Court finds that Plaintiff's plausible allegations satisfy the elements of a First Amendment retaliation claim against Kearney and Kingston. Before moving on, the Court notes here that, during Plaintiff's assault, Hanson told him that he was "get[ting] the special treatment because he filed a lawsuit against one of our brothers," namely Cowan. Am. Compl. ¶ 23. To the extent that officials at Bare Hill considered themselves part of some sort of "brotherhood" with C.O.s at other correctional facilities, "the filing of grievances [or lawsuits] against other members of the alleged Brotherhood" appears more likely to be "a substantial or motivating factor for the assault." See Ford, 2016 WL 5322166, at *5. Its conclusion so buttressed, the Court denies Kearney and Kingston's Motion to Dismiss the retaliation claim.

### 2. Yelich

As described above, Plaintiff's allegations satisfy the first element of a retaliation claim. However, Plaintiff's retaliation claim against Yelich fails on the second element because Plaintiff has failed to allege that Yelich took any adverse action against him. The closest Plaintiff comes to alleging an adverse action by Yelich is when he asserts that "[h]ad Kingston or *any other supervising officer* performed any sort of investigation ... they would have discovered" that the misbehavior tickets filed against Plaintiff were false. Am. Compl. ¶ 49. But even assuming this allegation refers to Yelich, Plaintiff's claim fails because an "allegation that the defendant conducted an inadequate investigation of ... plaintiff's complaint fail[s] to meet the adverse action requirement." Burroughs, 138 F. Supp. 3d at 207 (internal quotation marks omitted) (citing Islam v. Goord, 05-CV-7502, 2006 WL 2819651, at *5 (S.D.N.Y. Sept. 26, 2006)); see also Matthews v. Barq, No. 18-CV-855, 2019 WL 1025828, at *8 (N.D.N.Y. Mar. 4, 2019) ("[P]laintiff's allegation that defendant Thoms failed to investigate his complaints, without more, does not satisfy the adverse action requirement."). Plaintiff points to no other allegation in the Amended Complaint that might satisfy the adverse action requirement as to Yelich. See Opp'n. Nor, for the reasons described above in the section on excessive force, is Yelich liable for any retaliatory acts committed by his subordinates through his alleged gross negligence. Therefore, the Court grants the Motion to Dismiss Plaintiff's retaliation claim against Yelich.

### E. Leave to Amend

Moving Defendants ask the Court to dismiss the claims against them with prejudice. See Mem. at 1–3, 13. In contrast, Plaintiff asks for leave to replead any dismissed claims. Opp'n at 2. Moving Defendants object to Plaintiff's request, arguing that "Plaintiff has already amended the complaint once," and that "repleading would be futile" anyway. Reply at 6.

"The decision to grant or deny leave to amend ... is within the trial court's discretion." Shi Ming Chen v. Hunan Manor Enter., Inc., No. 17-CV-802, 2020 WL 520854, at *1 (S.D.N.Y. Feb. 3, 2020). Here, the Court believes that Plaintiff's request for leave to amend is premature. See Koehler v. Metro. Transportation Auth., 214 F. Supp. 3d 171, 178 (E.D.N.Y. 2016) ("[A] bare request to amend a pleading contained in a brief, which does not also attach

Lewis v. Hanson, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 213 of 238

2020 WL 1812556

the proposed amended pleading, is improper under Fed. R. Civ. P. 15.”). Neither party has provided more than the most cursory briefing on the issue, nor discussed the various “good reason[s]” for which a Court might deny leave. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (listing reasons); see also Malin v. XL Capital, Ltd., 312 F. App'x 400, 402–03 (2d Cir. 2009) (“[W]e have not required district courts to provide[ ] detailed explanations when denying cursory or boilerplate requests for [requests to amend a complaint], made solely in a memorandum in opposition to a motion to dismiss).” For this reason, the Court denies leave to amend at this time.

**\*15** However, except for the claims against Yelich in his official capacity—which, as noted above, the Court dismisses with prejudice—the Court does not believe that Plaintiff's dismissed claims “suffer from fatal substantive defects” as Moving Defendants assert. See Reply at 6. Therefore, having denied Plaintiff's request for leave to amend, the Court also denies Moving Defendants' request for dismissal with prejudice. See Goode v. Manchester, No. 18-CV-116, 2019 WL 1385762, at \*5 (N.D.N.Y. Mar. 27, 2019) (“[T]he court will dismiss [the plaintiff's] claims ... without prejudice, given that better pleading could cure the problems with them.”).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Moving Defendants' Motion to Dismiss (Dkt. No. 79) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that all claims against Yelich in his official capacity are **DISMISSED with prejudice**; and it is further

**ORDERED**, that the following claims are **DISMISSED without prejudice**: (1) all claims against Yelich in his individual capacity, (2) Plaintiff's medical indifference claims against Kearney and Kingston, and (3) Plaintiff's conspiracy claims, to the extent he has alleged any; and it is further

**ORDERED**, that the following claims may proceed: (1) Eighth Amendment excessive force claims against Kearney and Kingston, and (2) First Amendment retaliation claims against Kearney and Kingston; and it is further

**ORDERED**, that the Clerk shall **TERMINATE** Yelich as a defendant in this action; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1812556

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 214 of 238

Edwards v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1284295

2019 WL 1284295
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William L. EDWARDS, Plaintiff,
v.
Anthony J. ANNUCCI; Karen Bellamy; Ada
Perez; Lt. Henry M. Daniels; Lt. K. Coffey; Sgt. P.
Turso; C.O. Smith; C.O. S. Garcia; C.O. Jackson;
R.N. Nguyen; and C.O. A. Argibay, Defendants.

17 CV 5018 (VB)
|
Signed 03/19/2019
|
Filed 03/20/2019

Copy mailed by Chambers 3-20-19 DH

**Attorneys and Law Firms**

William L. Edwards, Collins, NY, pro se.

Janice Powers, NYS Attorney General, White Plains, NY, for
Defendants.

**OPINION AND ORDER**

Vincent L. Briccetti, United States District Judge

 **\*1** Plaintiff William L. Edwards, proceeding pro se and
in forma pauperis, brings this action pursuant to 42 U.S.C.
§§ 1983, 1985, and 1986 against defendants Anthony J.
Annucci, Acting Commissioner of the New York State
Department of Corrections and Community Supervision
("DOCCS"); Karen Bellamy, Director of the DOCCS Inmate
Grievance Program; Ada Perez, Superintendent ("Supt.") of
Downstate Correctional Facility ("Downstate"); Lieutenant
("Lt.") Henry M. Daniels; Lt. K. Coffey; Sergeant ("Sgt.")
P. Turso; Correction Officer ("C.O.") Smith; C.O. S. Garcia;
C.O. Jackson; Correctional Nurse Nguyen; and C.O. A.
Argibay. Plaintiff asserts claims against (i) Argibay for
excessive force; (ii) Garcia, Turso, Smith, and Jackson for
failure to intervene; (iii) all defendants for conspiracy; and
(iv) Argibay for denying plaintiff access to the courts. Plaintiff
also alleges violations of Title II of the Americans with
Disabilities Act ("ADA"); Article I of the New York State
Constitution; and state law claims for assault and battery

and both negligent and intentional infliction of emotional
distress. [1]

[1]     The amended complaint also invokes the Fifth
        and Ninth Amendments. (See Am. Compl. at
        39). The Fifth Amendment applies to the federal
        government, not New York State, and the Ninth
        Amendment plainly has no application in this
        case. Thus, the Court dismisses any Fifth or Ninth
        Amendment claims the amended complaint may be
        liberally construed to assert.

Now pending is defendants' partial motion to dismiss the
amended complaint pursuant to Rules 8(a)(2), 10(b), and
12(b)(6) of the Federal Rules of Civil Procedure. (Doc. #67).

For the following reasons, the motion is GRANTED IN PART
and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. §§
1331 and 1367.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded factual allegations in the
amended complaint and its exhibits and draws all reasonable
inferences in plaintiff's favor, as summarized below.

Plaintiff was a convicted inmate at Downstate at all relevant
times. He alleges he is physically disabled, having "a short,
deformed right arm with a drop wrist from nerve damage from
previous physical trauma." (Am. Compl. at 9). [2]

[2]     Citations to "Am. Compl. at ___" reference page
        numbers assigned by the Court's Electronic Case
        Filing system.

I. Plaintiff's Alleged Conflict with C.O. Argibay and
Alleged Beating
Plaintiff claims defendants conspired to use, used, and then
covered up the use of excessive force to retaliate against
plaintiff for saying he planned to file a grievance against
C.O. Argibay, who allegedly lied to plaintiff about a policy
governing access to Downstate's law library. Specifically,
plaintiff claims Argibay enforced "an unwritten, and false
rule, regulation, policy, procedure, directive and corrections

law" barring inmates from accessing Downstate's law library until five business days after their arrival. (Am. Compl. at 5). Plaintiff alleges such a regulation either did not exist or existed but Argibay misinterpreted it.

 **\*2** On June 26, 2014, plaintiff alleges C.O. Garcia eavesdropped on a conversation during which plaintiff told another prisoner he planned to file a grievance against Argibay for denying plaintiff access to the law library. Plaintiff claims Garcia told Argibay about plaintiff's remark, allegedly knowing Argibay would physically abuse plaintiff in response. Moreover, plaintiff alleges Garcia admitted to eavesdropping on plaintiff and knowing about his plan to grieve Argibay—at around 11:30 a.m. that day, Garcia allegedly warned plaintiff, "Hey Edwards, you talk to[o] loud, you should have kept it to yourself." (Id. at 20).

A short time later, plaintiff allegedly heard Argibay tell Garcia, "I'm going to straighten that motherfucker out, watch and see." (Am. Compl. at 5). Argibay also allegedly told Garcia he would show Garcia "how to straighten a fucking asshole out the old school way," and to "watch [Argibay's] back for other inmate[s] and white shirts" while he did so. (Id. at 6). Plaintiff claims he also overheard Argibay tell Sgt. Turso on the phone, "Hey Sarge, I got a fucking asshole, whose a old timer who wants to fucking grieve me about me lying to him about the fucking law library. I want to straighten his fucking ass out the old school way, you don't grieve [officers] or else you get this." (Id. at 5–6).

At around 12:25 p.m. that day, plaintiff alleges Turso "orchestrat[ed] a frivolous [block-wide] pat-frisk to separate and isolate the plaintiff" in a secluded area away from other prisoners and employees. (Am. Compl. at 22). Plaintiff alleges Turso then ordered C.O. Smith and C.O. Jackson "to stand security guard for" Turso and Argibay. (Id. at 7).

Plaintiff alleges an officer ordered plaintiff to stand against a wall while the officer patted down an inmate standing next to plaintiff. When plaintiff assumed "the pat-frisk stance as directed," Argibay allegedly grabbed the back of plaintiff's shirt "without being provoke[d]" and "viciously drove the plaintiff into the wall," repeatedly slamming his body and the right side of his head into the wall. (Id. at 6–7). Argibay allegedly said, "You got something to say, motherfucker? Say something now, motherfucker! Are you going to file a grievance against me, motherfucker?" (Id. at 7). Argibay then purportedly "use[d] his left fore-arm to hold the plaintiff in place, while he ... punched the plaintiff

in the face approximately three to four times with a closed, right-hand fist on the plaintiff's left jaw area," yelling, "You are the trouble maker of the block ...! You like grieving, motherfucker? You've been through here numerous of times and you still haven't learned! You don't grieve [officers] or else you get this! I'm the motherfucker who runs the block, that's who I am, and the motherfucker [who's] going to straighten your ass out." (Id. at 7–8).

Turso, who allegedly "masterminded" the incident (Am. Compl. at 22), then "tapped ... Argibay's left elbow, and said, 'That's enough' " (id. at 9).

Plaintiff alleges no defendant present "tr[ied] to intervene, stop, or prevent [the] physical attack from happening," and that defendants conspired to harm plaintiff and were complicit in his beating. (Am. Compl. at 8). Specifically, plaintiff alleges Turso witnessed the incident while laughing to himself, taking no action to stop it; Garcia laughed while watching the incident and did nothing to intervene; and Smith and Jackson witnessed the attack but did not get involved, despite that Jackson was standing "[two] to four feet away." (Pl. Opp. Br. at 11). Plaintiff also claims Smith and Jackson "just stood idly while the plaintiff was being physically abuse[d] in their [presence]" (id. at 11), and that Garcia also "stood idle" throughout (id. at 40).

 **\*3** After the alleged assault, plaintiff claims Argibay said twice, "Nothing happened here. Right, Edwards?" (Am. Compl. at 9). Plaintiff says he interpreted these comments as warnings not to tell anyone about the beating.

Plaintiff allegedly asked Turso to take plaintiff to the Downstate medical clinic after the beating. Turso allegedly responded, "Well kid, suck it up it happens, you shouldn't grieve him, but that's between you and him." (Am. Compl. at 11). Plaintiff also asserts he gave a sick call slip to a non-party correction officer who refused to submit it. (Id. at 32). Plaintiff claims Turso denied plaintiff's requests for medical care a second time before eventually bringing plaintiff to the clinic.

At the clinic, Turso allegedly told Nurse Nguyen "in front of the plaintiff not to medically document the plaintiff's physical injuries ... and to cover-up" the alleged assault. (Am. Compl. at 10). An "Inmate Injury Report," dated June 26, 2014, and apparently signed by Nurse Nguyen, states, "No visual injury noted. No swelling – no bleeding noted. Inmate able to talk.

2019 WL 1284295

No limitation." (Pl. Opp. Br. at 60). Plaintiff claims Turso and Nguyen conspired to conceal the assault.

Plaintiff alleges he refused to return to his housing block after the assault and told Turso plaintiff's "life [was] in danger"; he "fear[ed] for his life, safety, and physical well being" around Turso, Garcia, and Argibay; and he would rather be in protective custody than return to his housing block. (Am. Compl. at 11). In response, Turso, with Lt. Daniels's authorization, transferred plaintiff to a new housing block that day. Plaintiff asserts Turso and Daniels agreed to transfer plaintiff because Argibay "in fact physically abuse[d]" him. (Pl. Opp. Br. at 13).

II. Plaintiff's Grievance and Complaints
Plaintiff alleges he sent Supt. Perez a "complaint letter" describing the assault. (Pl. Opp. Br. at 16). Perez allegedly forwarded the letter to a non-party investigator without sending plaintiff a response.

Plaintiff also allegedly submitted a formal grievance to Perez complaining of Turso, Garcia, and Argibay's misconduct. Plaintiff accuses Argibay, Garcia, Turso, and Daniels of responding to that grievance by submitting memoranda containing false denials and other false information about the incident. Among other things, plaintiff alleges Garcia lied that she did not know plaintiff planned to grieve Argibay, despite that plaintiff told Garcia before the assault that plaintiff planned to file a grievance, and that Garcia documented in a log book plaintiff's visit to the grievance committee on the morning of the assault. Plaintiff also claims Coffey falsely reported that a witness to the assault told Coffey the "witness didn't see anything because he was facing the wall[,] but he heard someone yelling," when in fact the witness both saw and heard the assault. (Pl. Opp. Br. at 14). Plaintiff further alleges Coffey participated in the conspiracy to cover up the beating by receiving other defendants' "false [documents]." (Am. Compl. at 26).

Perez denied plaintiff's grievance. In so doing, she allegedly failed to discipline Turso, Garcia, and Argibay and "condoned and sanction[ed]" their use of excessive force. (Id. at 16). Plaintiff claims Perez's denial of the grievance indicates she conspired with other defendants to cover up the beating.

*4 Plaintiff appealed the grievance denial to the inmate grievance program's Central Office Review Committee ("CORC"). In a decision allegedly signed by defendant Bellamy, CORC substantively upheld Perez's denial of the

grievance. Plaintiff then allegedly wrote a letter to Annucci concerning the processing of plaintiff's grievance. Bellamy responded in a letter explaining "CORC is the final appellate level of the inmate grievance program." (Am. Compl. at 36).

Plaintiff also alleges he sent complaint letters to Annucci and Bellamy, but neither Annucci nor Bellamy took any action in response.

In July 2015, plaintiff mailed a letter to the superintendent of the New York State Police. The superintendent forwarded plaintiff's letter to the Inspector General's office. (See Pl. Opp. Br. at 83). Plaintiff alleges an "office of special investigation" eventually opened an investigation in November 2016 that remained ongoing when plaintiff filed the amended complaint. (Am. Compl. at 34).

III. Alleged Practices or Policies
Plaintiff alleges two unconstitutional practices or policies at Downstate.

The first is a five-day waiting period for newly arrived inmates to access Downstate's law library, allegedly aimed at denying inmates access to the courts. Plaintiff claims this policy is unwritten and "not posted within the facility as it should be." (Am. Compl. at 8). At the same time, the amended complaint alleges the existence of a written policy—Directive #4009, Section VII.C—which allegedly states, "An inmate, new arrived at a correctional facility, will not be permitted out-of-[cell] activities, until it is [reasonably] concluded that he/she has no known enemies at the facility. This restriction shall not exceed five (5) days, unless extenuating circumstances exist." (Id. at 31–32).

The second alleged policy—what plaintiff calls the " 'blue wall' policy" (Am. Compl. at 28)—purportedly is an "unwritten policy to utilize unjustified and unnecessary excessive ... physical force against [prisoners] who utilize the grievance mechanism against any security personnel within the prison." (Id. at 21). Plaintiff claims Annucci was "fully aware of" and failed to investigate "the brutal and barbaric physical force" used by "security personnel" pursuant to this alleged policy. (Id. at 17). Plaintiff further alleges Perez "allow[ed] her security personnel to [uphold] the unwritten ... 'blue wall' policy" (id. at 28), and that Turso permitted Argibay to uphold "a tradition" at Downstate of physically retaliating against prisoners who file grievances against correction officers (id. at 17).

Edwards v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1284295

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 217 of 238

## DISCUSSION

### I. Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

**\*5** The Court must liberally construe a pro se litigant's submissions and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges a civil rights violation. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

### II. Rules 8(a)(2) and 10(b)

Defendants argue the Court should dismiss the amended complaint for failure to comply with Rules 8(a)(2) and 10(b).

The Court disagrees.

Rule 8(a)(2) requires "[a] pleading that states a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 also states "[n]o technical form is required," Fed. R. Civ. P. 8(d)(1), and instructs that "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e). The statement of the claim must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). The statement should be plain "so as to enable [the adversary] to answer and prepare for trial." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Dismissal for failure to comply with Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id.

Rule 10(b) requires a party to "state its claims ... in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). "Where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." Phillips v. Girdich, 408 F.3d 124, 128 (2d Cir. 2005). Moreover, "even where a violation of Rule 10(b) is not harmless, dismissal is not typically the appropriate course of action." Id.

While plaintiff's forty-one-page amended complaint is wordy and verbose, its length and structure does not render it incomprehensible or otherwise prejudice defendants such that dismissal is appropriate. Rather, affording plaintiff the special solicitude due pro se litigants, the complaint narrates defendants' alleged actions with sufficient clarity for the reader to understand plaintiffs' factual allegations and legal claims. Although the pleading's numbered paragraphs are long and unwieldy, often spanning multiple pages, this defect does not meaningfully prevent defendants from "answer[ing] or prepar[ing] for trial" in this case. Salahuddin v. Cuomo, 861 F.2d at 42.

Accordingly, the Court declines to dismiss the amended complaint for failure to comply with Rule 8(a)(2) or Rule 10(b).

### III. Official Capacity Claims

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 218 of 238
Edwards v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 1284295

Defendants argue plaintiff's claims against defendants in their official capacities are barred by the Eleventh Amendment.

The Court agrees.

The Eleventh Amendment bars claims for money damages against individual state actors acting in their official capacities. See Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993). Accordingly, plaintiff's official-capacity claims for money damages are dismissed.

IV. Personal Involvement

**\*6** Defendants argue plaintiff's Section 1983 claims against Annucci, Bellamy, Perez, Coffey, Daniels, Garcia, Jackson, and Smith must be dismissed for failure plausibly to allege those defendants' personal involvement in a violation of plaintiff's constitutional rights.

The Court agrees as to Annucci, Bellamy, and Perez, but disagrees as to Coffey, Daniels, Garcia, Jackson, and Smith.

A defendant's personal involvement in an alleged constitutional deprivation "is a prerequisite to an award of damages under § 1983." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (internal citation omitted). Section 1983 liability thus cannot be predicated on a theory of respondeat superior alone. See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

A. Annucci

Plaintiff fails plausibly to allege Annucci's personal involvement.

"The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995). Rather, to state a supervisory liability claim under Section 1983, a plaintiff must adequately plead "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," created a policy or custom under which a constitutional violation occurred, acted with gross negligence in supervising subordinates, or "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Id. at 873. [3]

[3]
District courts within this circuit are divided as to whether claims alleging personal involvement under some of these factors remain viable. See, e.g., Doe v. New York, 97 F. Supp. 3d 5, 11–12 (E.D.N.Y. 2015) (collecting cases). The Second Circuit has yet to resolve this dispute. Id.

To adequately plead a policy or custom, a plaintiff must allege more than one instance of a constitutional violation. See DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ). A plaintiff typically must also adequately plead similar incidents involving others. See, e.g., Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 14 (2d Cir. 2015) (summary order) (affirming dismissal of Monell claim and noting, "other than the plaintiff, the amended complaint provides only one additional example of a similar incident"). [4]

[4]
Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Plaintiff predicates Annucci's personal involvement on his supervisory role at Downstate, alleging Annucci did not respond to plaintiff's letters notifying Annucci of constitutional violations, failed to act on information indicating that unconstitutional acts were occurring, and created or countenanced a policy or custom under which constitutional violations occurred.

These allegations do not plausibly support Annucci's personal involvement in a constitutional violation. First, "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013) (collecting cases). Second, a supervisor cannot be held personally responsible for failing to remedy a constitutional violation that had already occurred, and was no longer ongoing, when the supervisor learned of it. See, e.g., Hayes v. Dahkle, 2017 WL 9511178, at \*14 (N.D.N.Y. Oct. 30, 2017); Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008). And third, plaintiff fails to plead any specific facts supporting an alleged "blue wall" policy at DOCCS: he does not allege any other instance in which he or any other DOCCS inmate was subjected to excessive force in retaliation for seeking to file a grievance.

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 219 of 238

Edwards v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1284295

**\*7** Accordingly, the Court dismisses plaintiff's Section 1983 claims against Annucci for failure plausibly to allege Annucci's personal involvement.


B. Bellamy and Perez

Plaintiff likewise fails adequately to plead the personal involvement of Bellamy and Perez, both of whom allegedly denied plaintiff's grievance.

Plaintiff filed his grievance after the alleged assault took place. Thus, the grievance did not complain of a constitutional violation that remained ongoing when Bellamy or Perez denied the grievance. Because a supervisor cannot be held liable for failing to remedy a constitutional violation that no longer is occurring when the supervisor learns of it, plaintiff's claims against Bellamy and Perez fail as a matter of law. See Hayes v. Dahkle, 2017 WL 9511178, at *14; Harnett v. Barr, 538 F. Supp. 2d at 524.

Further, to the extent plaintiff's claims against Bellamy and Perez are based on those defendants' alleged failure to answer plaintiff's letters, a prison official's alleged failure to respond to an inmate's letter does not give rise to liability under Section 1983. See Randle v. Alexander, 960 F. Supp. 2d at 478.

For all these reasons, the Court dismisses plaintiff's claims against Bellamy and Perez for failure to adequately plead those defendants' personal involvement.


C. Coffey, Daniels, and Garcia

Plaintiff plausibly alleges Coffey, Daniels, and Garcia's personal involvement.

A prisoner's well-pleaded allegation that a defendant "fil[ed] a false report to his supervisors in order to cover up" constitutional violations will "give rise to a plausible inference" that the defendant "was personally involved in the purported constitutional violations." Randle v. Alexander, 960 F. Supp. 2d at 478.

Plaintiff alleges Coffey wrote and submitted a memorandum in response to plaintiff's grievance in which Coffey falsely reported that a witness to the assault did not see anything, and that Coffey "lied that he sp[oke] with all named staff." (Pl. Opp. Br. at 14). As for Daniels, plaintiff alleges Daniels falsely claimed in a memorandum responding to plaintiff's grievance that Daniels ordered plaintiff be seen by medical staff "within an hour of the alleged incident." (Am. Compl. at 29). And as to Garcia, plaintiff claims Garcia falsely stated in a memorandum that she did not know plaintiff planned to grieve Argibay. Plaintiff explicitly accuses Coffey, Daniels, and Garcia of filing these allegedly false reports in an effort to cover up the beating. (Pl. Opp. Br. at 12, 15).

Taking these allegations as true, as the Court must at this stage of the case, they suffice plausibly to allege Coffey, Daniels, and Garcia filed false reports in hopes of concealing the alleged assault.

Accordingly, plaintiff adequately pleads Coffey, Daniels, and Garcia's personal involvement.


D. Jackson and Smith

Plaintiff adequately pleads Jackson and Smith's personal involvement.

Plaintiff alleges Jackson and Smith were present during the pat frisk on June 26, 2014, and, at Turso's direction, served as lookouts for Argibay by "stand[ing] security guard" while Argibay repeatedly slammed plaintiff into a wall. (Am. Compl. at 7). Plaintiff further alleges the beating "transpired in [Jackson and Smith's] physical presence," yet Jackson and Smith failed to stop or prevent it. (Id.).

**\*8** Again assuming, for purposes of the instant motion, that plaintiff's allegations are true, Jackson and Smith's presence throughout the alleged beating, and their roles as lookouts while it occurred, adequately support their personal involvement. Cf. Bhuiyan v. Wright, 2009 WL 3123484, at *7 (N.D.N.Y. Sept. 29, 2009) ("The fact that defendant ... was not in the room, but was acting as a 'lookout' so that no came into the room while plaintiff was being beaten, would not absolve him from liability for the assault."); see Groves v. Davis, 2012 WL 651919, at *4 (N.D.N.Y. Feb. 28, 2012).

Thus, the Court declines to dismiss plaintiff's claims against Jackson and Smith for failure plausibly to allege their personal involvement.

V. Failure to Intervene

Defendants argue plaintiff's failure to intervene claims against Jackson and Smith must be dismissed because they were "engaged in securing other inmates" when the beating allegedly occurred. (Def. Reply Br. at 3).

2019 WL 1284295

The Court disagrees.

"[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." Figueroa v. Mazza, 825 F.3d 89, 107 (2d Cir. 2016). Because no single factor is dispositive, "[t]he essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." Id. at 107–08. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted).

The amended complaint explicitly alleges Jackson and Smith stood near to and observed the beating while keeping watch for passers-by, and that Jackson and Smith "just stood idly while the plaintiff was being physically [abused] in their [presence]." (Pl. Opp. Br. at 11). Those allegations are enough to state a claim against Jackson and Smith for failure to intervene. See, e.g., Salgado v. NYS Dep't of Corr. & Cmty. Supervision, 2016 WL 6311296, at *12 (W.D.N.Y. Sept. 15, 2016) ("[P]laintiff's allegations that [a defendant] watched while plaintiff was being beaten and did nothing to stop the other officers are sufficient to state a claim for a constitutional violation."). Contrary to defendants' contention, the amended complaint's description of a pat frisk involving multiple prisoners does not preclude plaintiff's failure to intervene claim against Jackson and Smith. [5]

[5]    Defendants argue "the duty [to intervene] does not extend when Officers are engaged in securing other inmates." (Def. Reply Br. at 3). Their lone supporting citation, Heyliger v. Krygier, 335 F. Supp. 3d 482 (W.D.N.Y. 2018), does not stand for the proposition asserted. See id. at 498 (finding no reasonable opportunity to intervene "[b]ased on the suddenness and brief duration of the claimed assault"). In any case, the amended complaint does not allege Jackson and Smith were busy frisking other inmates while the assault allegedly occurred.

Accordingly, the Court declines to dismiss plaintiff's claims against Jackson and Smith for failure to intervene.

VI. Conspiracy

*9  Defendants argue plaintiff's conspiracy claim must be dismissed pursuant to the intracorporate conspiracy doctrine.

The Court disagrees.

To survive a motion to dismiss a conspiracy claim, a plaintiff must allege (i) "an agreement between two or more state actors or between a state actor and a private entity"; (ii) "to act in concert to inflict an unconstitutional injury"; and (iii) "an overt act done in furtherance of that goal[,] causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). Although "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy ... the pleadings must present facts tending to show agreement and concerted action." Concepcion v. City of New York, 2008 WL 2020363, at *3 (S.D.N.Y. May 7, 2008) (internal quotation omitted) (alterations in original). "[C]onclusory allegations of a § 1983 conspiracy are insufficient." Pangburn v. Culbertson, 200 F.3d at 72 (internal quotation omitted).

"[U]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (citing Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) ). However, "[a]n exception to the doctrine exists where a plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity." Harris v. City of Newburgh, 2017 WL 4334141, at *8 (S.D.N.Y. Sept. 27, 2017) (internal quotation marks omitted). For that exception to apply, a plaintiff must plausibly allege the defendants "acted other than in the normal course of their corporate duties," id. (quoting Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 72 (2d Cir. 1976) ), "maintain[ing] the pretense of serving the state while in fact pursuing their own ends to avoid liability," Alvarez v. City of New York, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012).

Here, plaintiff plausibly alleges defendants acted outside "the normal course of their corporate duties" by agreeing to use excessive force in retaliation for plaintiff's plan to grieve Argibay, and then by falsifying reports and other documents to cover up the alleged beating. Harris v. City of Newburgh, 2017 WL 4334141, at *8 (quoting Girard v. 94th St. & Fifth

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 221 of 238

Edwards v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1284295

Ave. Corp., 530 F.2d at 72). Employing excessive force and falsifying documents are not core functions performed in the normal course of a correction officer's duties. Further, plaintiff alleges a plausible "personal interest" for defendants' alleged conspiratorial conduct—covering up their involvement in the alleged incident—plausibly indicating they acted in their personal interests, not Downstate's or DOCCS's. Lewis v. Havernack, 2013 WL 1294606, at *13 (N.D.N.Y. Mar. 28, 2013).

Thus, accepting plaintiff's allegations as true for purposes of deciding this motion, plaintiff adequately pleads defendants acted outside the scope of their employment and in their own personal interest when they allegedly tried to cover up the beating, rendering the intracorporate conspiracy doctrine inapplicable. See Lewis v. Havernack, 2013 WL 1294606, at *13 (finding intracorporate conspiracy doctrine inapplicable because prison official defendants allegedly covered up excessive force); Hill v. City of New York, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (finding intracorporate conspiracy doctrine inapplicable because police officer defendants allegedly covered up excessive force).

**\*10** The Court therefore declines to dismiss plaintiff's conspiracy claims.

## VII. ADA Claims
Defendants argue plaintiff fails plausibly to allege a claim under the ADA.

The Court agrees.

To state an ADA claim, a plaintiff must adequately plead "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." Hargrave v. Vermont, 340 F.3d 27, 34–35 (2d Cir. 2003). Importantly, plaintiff must allege his mistreatment " 'was motivated by either discriminatory animus or ill will due to disability.' " Elbert v. N.Y. State Dep't of Corr. Servs., 751 F. Supp. 2d 590, 594–95 (S.D.N.Y. 2010) (quoting Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 112 (2d Cir. 2001) ).

Plaintiff fails to allege defendants discriminated against him because of his "short, deformed right arm with a drop

wrist." (Am. Compl. at 9). Indeed, the amended complaint does not allege any defendant acted with "discriminatory animus or ill will due to" plaintiff's disability. Elbert v. N.Y. State Dep't of Corr. Servs., 751 F. Supp. 2d at 594–95 (quoting Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d at 112). Plaintiff merely asserts he was a disabled person when the incident occurred—not that he was attacked because of his disability.

Thus, plaintiff's ADA claims are dismissed.

## VIII. Access to Courts Claim
Liberally construed, the amended complaint asserts a claim against Argibay for denying plaintiff access to Downstate's law library in violation of plaintiff's First Amendment right to access the courts.

The Court dismisses that claim sua sponte.

To state a constitutional claim for denial of access to the courts, plaintiff must plausibly allege a defendant, acting deliberately or with malice, "took or was responsible for actions that hindered ... plaintiff's efforts to pursue a legal claim," causing plaintiff to suffer "actual injury." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (internal quotation and citations omitted).

The amended complaint fails adequately to plead plaintiff suffered an "actual injury." For example, plaintiff does not allege he was prevented from bringing a legal claim, or that any existing legal claim would have succeeded but irreparably was harmed by Argibay's alleged conduct. Because plaintiff does not allege Argibay's actions caused plaintiff actual injury, plaintiff's denial of access to the courts claim is dismissed. See 28 U.S.C. § 1915(e)(2)(B)(ii); see also Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007).

## IX. New York State Constitutional Claims
Defendants argue plaintiff's causes of action under the New York State Constitution must be dismissed for failure to state a claim.

The Court agrees.

First, plaintiff invokes several sections of Article I of the New York State Constitution—namely, provisions governing disenfranchisement violations, see N.Y. Const. Art. I § 1; the right to petition the government, see id. § 9; equal protection,

Case 9:21-cv-00135-DNH-TWD   Document 79   Filed 02/12/24   Page 222 of 238

Edwards v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1284295

see id. § 11; and unlawful searches and seizures, see id. §
12. The amended complaint plainly fails to allege any facts
suggesting a defendant may have violated these provisions.

 **\*11** Second, as for plaintiff's state-law claim for excessive
force, because plaintiff "has stated a claim for excessive force
pursuant to § 1983, his claim for excessive force [cannot lie]
under the New York State Constitution." See Clayton v. City
of Poughkeepsie, 2007 WL 2154196, at \*7 (S.D.N.Y. June
21, 2007).

The Court therefore dismisses plaintiff's New York State
constitutional claims.


X. Assault and Battery
The Court liberally construes the amended complaint as
asserting state law claims for assault and battery against
defendants in their individual capacities.

The Court dismisses those claims sua sponte.

Section 24 of the New York Correction Law "confer[s] upon
[DOCCS employees] an immunity from liability for activities
that fall within the scope of the statute." Baker v. Coughlin,
77 F.3d 12, 15 (2d Cir. 1996). Accordingly, "[c]ourts in the
Second Circuit have long held that Section 24 precludes a
plaintiff from raising state law claims in federal court against
state employees in their personal capacities for actions arising
within the scope of their employment." Davis v. McCready,
283 F. Supp. 3d 108, 123 (S.D.N.Y. 2017).

Courts consider a variety of factors when determining a
correction officer's scope of employment, including "the
connection between the time, place and occasion for the act; ...
whether the act is one commonly done by any employee; the
extent of the departure from normal methods of performance;
and whether the specific act was one that the employer
could reasonably have anticipated." Degrafinreid v. Ricks,
452 F. Supp. 2d 328, 332–33 (S.D.N.Y. 2006) (quoting
Riviello v. Waldron, 47 N.Y. 2d 297, 303 (1979) ). Moreover,
"an employee will be considered within the scope of his
employment so long as he is discharging his duties, 'no matter
how irregularly, or with what disregard of instructions.' "
Degrafinreid v. Ricks, 452 F. Supp. 2d 328, 333 (S.D.N.Y.
2006) (quoting Cepeda v. Coughlin, 128 A.D.2d 995, 996 (3d
Dep't 1987) ). Thus, "correction[ ] officers accused of using
excessive force against inmates while transporting them [are]
entitled to immunity under section 24 on the grounds that they

were acting within the scope of their employment." Id. (citing
Cepeda v. Coughlin, 128 A.D.2d at 996).

Here, defendants plainly were DOCCS employees
performing their duties at Downstate when the alleged
constitutional violations occurred. See, e.g., Heyliger v.
Gebler, 496 F. Supp. 2d 250, 253 (W.D.N.Y. 2007). Section
24 of the Correction Law therefore shields defendants from
plaintiff's state law claims against them in their personal
capacities.

Accordingly, plaintiff's assault and battery claims are
dismissed for failure to state a claim. See 28 U.S.C. § 1915(e)
(2)(B)(ii); see also Abbas v. Dixon, 480 F.3d at 639.


XI. Negligent Infliction of Emotional Distress
Finally, because plaintiff's claims for negligent infliction of
emotional distress are "premised on [defendants'] intentional
conduct," those claims fail as a matter of law. See Naccarato
v. Scarselli, 124 F. Supp. 2d 36, 45 (N.D.N.Y. 2000) (citations
omitted); see also Mazurkiewicz v. N.Y.C. Transit Auth., 810
F. Supp. 563, 570–71 (S.D.N.Y. 1993) ("Plaintiff cannot argue
that defendants engaged in intentional conduct that forms the
basis of an assault and § 1983 excessive force claim and also
argue that defendants were negligent."). The Court therefore
dismisses this claim sua sponte. See 28 U.S.C. § 1915(e)(2)
(B)(ii); see also Abbas v. Dixon, 480 F.3d at 639.


**CONCLUSION**

 **\*12** The motion to dismiss is GRANTED IN PART and
DENIED IN PART.

The following claims shall proceed:

1. Plaintiff's excessive force claim against C.O. Argibay.

2. Plaintiff's failure to intervene claims against Sgt. Turso,
C.O. Garcia, C.O. Smith, and C.O. Jackson.

3. Plaintiff's conspiracy claims against Lt. Daniels, Lt. Coffey,
Sgt. Turso, C.O. Argibay, C.O. Smith, C.O. Garcia, C.O.
Jackson, and Correctional Nurse Nguyen.

4. Plaintiff's state law intentional infliction of emotional
distress claims against Lt. Daniels, Lt. Coffey, Sgt. Turso,

Case 9:21-cv-00135-DNH-TWD    Document 79    Filed 02/12/24    Page 223 of 238
Edwards v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 1284295

C.O. Argibay, C.O. Smith, C.O. Garcia, C.O. Jackson, and Correctional Nurse Nguyen.

All other claims are dismissed.

The Clerk is instructed to (i) terminate the motion (Doc. #67), and (ii) terminate defendants Anthony J. Annucci, Karen Bellamy, and Ada Perez.

By April 2, 2019, the remaining defendants shall file an answer to the surviving claims in the amended complaint.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1284295

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4905240
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary GILLARD, Plaintiff,

v.

Michael ROVELLI, et al., Defendants.

No. 9:09–CV–0860 (NAM/GHL).
|
Sept. 29, 2010.

**Attorneys and Law Firms**

Gary Gillard, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Roger W. Kinsey, Esq., of Counsel, Albany, Ny,
for Defendants.

*REPORT–RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1**  This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Norman A.
Mordue, Chief United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Gary Gillard
alleges that Defendants subjected him to excessive force,
threatened to tamper with his food and interfered with the
delivery of sealed meals, denied him adequate medical care,
and failed to properly respond to his grievances. Currently
pending before the Court are Defendants' motion to vacate the
text order entered March 10, 2010, (Dkt. No. 52), Plaintiff's
objection to that request (Dkt. No. 55), Defendants' motion to
dismiss for failure to state a claim pursuant to Federal Rule of
Civil Procedure 12(b)(6) (Dkt. No. 42), and Plaintiff's cross-
motion for summary judgment (Dkt. Nos. 72 and 77). For the
reasons that follow, I order that Defendants' request to vacate
the text order be granted, order that Plaintiff's objection to
Defendants' request be denied, recommend that Defendants'
motion to dismiss be granted in part and denied in part,
and recommend that Plaintiff's cross-motion for summary
judgment be denied.

**I. BACKGROUND**

In broad terms, Plaintiff's complaint involves four issues:
the use of excessive force against him by inmate Perez and
several DOCS employees, the denial of medical care for
ailments he suffered prior to the excessive force incident
and injuries he sustained as a result of the excessive force
incident, Defendants' threats to tamper with Plaintiff's food,
and the handling of grievances Plaintiff filed as a result of
these issues.

 **A. Excessive Force, Associated Grievances, and
 Associated Medical Care.**
On December 24, 2008, Plaintiff wrote to Defendants
David Rock (Superintendent of Great Meadow Correctional
Facility), P. Heath (First Deputy Superintendent), and C.F.
Kelly (Deputy of Security) advising them that there was a
conspiracy between Defendant Correction Officer Michael
Rovelli and other correctional officers to arrange a vigilante
gang assault on or murder of Plaintiff. (Dkt. No. 1 ¶ 36.)
On December 26, 2008, Plaintiff received a letter from a
correctional facility specialist stating that his letter had been
forwarded to Defendant David Rock. *Id.* ¶ 38. On January
3, 2009, Plaintiff received a letter from Captain Eastman
acknowledging receipt of Plaintiff's complaint. (Dkt. No. 1 ¶
40.)

On January 6, 2009, Plaintiff wrote a letter to Defendant
Richard Roy of the Inspector General's office describing
Defendant Rovelli's continued threats and harassment and
expressing fear about what would happen to him when he
was released from keeplock on January 10, 2009. *Id.* ¶
41. On January 8, 2009, Vernon Fonda of the Inspector
General's office informed Plaintiff that his grievance was
being forwarded to Defendant David Rock for further action.
*Id.* ¶ 42.

Plaintiff alleges that on February 4, 2009, an inmate "cut
the plaintiff in the hearing room on behalf of Michael
Rovelli." (Dkt. No. 1.¶ 43.)

 **\*2**  On February 5, 2009, Defendant Rovelli told Plaintiff
that "it's not over yet mother fucker, go tell you rat bitch
mother fucker remember it[']s not over." *Id.* Later that day,
Defendant Rovelli shouted at Plaintiff "go rat [,] Gary you
fuck[i]n' rat." *Id.* ¶ 44.

On February 11, 2009, Defendant Rovelli came to Plaintiff's
cell and said "I have the power not you. I brought you back.
It's not over yet and the next one will be better[,] you piece of
shit." *Id.* ¶ 45. Thereafter, Defendant Rovelli had Defendant

Correction Officer M. Rock assist him in denying food to Plaintiff in order to "keep him weak so he could not defend himself against the setup contract [h]it." *Id.* ¶ 46.

On April 25, 2009, Plaintiff went to the big recreation yard for the first time in about two months. *Id.* ¶ 47. Two inmates informed him that Defendant M. Rock had told Defendant Rovelli that Plaintiff was in the yard and that "today was a good day to get him ." *Id.* As Plaintiff walked around the yard, he noticed Defendant Rovelli glaring at him. *Id.* ¶ 48. Defendant Rovelli went to a table where Defendant inmate Eric Perez was sitting. *Id.* Shortly thereafter, Defendant Perez attacked Plaintiff without warning. *Id.* Plaintiff attempted to defend himself and hoped the officers would stop the attack. (Dkt. No. 1 ¶ 49.) Instead, Defendant Rovelli forced his knee into Plaintiff's head and said "I told you I would get you[.] You just got beat by a fagg[o]t[,] you can't fight." *Id.* Defendant Rovelli then instructed Defendant Corrections Officer Frank Flores to take Plaintiff "into beat up Room # 1[,] I'll be right there." *Id.* ¶ 50.

Once in the room, Plaintiff was placed with his toes and face to the wall. *Id.* ¶ 51. Defendant Sergeant Nicholas Deluca entered the room and said "Perez should have put [six] inches of ste[e]l into you, you piece of shit, but we will finish what he started." *Id.* ¶ 52. Then Defendant Rovelli came in, said "you can't fight, you got beat by a fagg[o]t," and slammed Plaintiff's face into the wall twice. *Id.* ¶ 53. Plaintiff's "lights went out" and he "could not see for a few seconds but heard [Defendant] Rovelli state his face was bleeding as well as the plaintiff[']s." *Id.* Plaintiff was then "beaten to the flo[or]" by Defendants Deluca and Flores and Defendant Correction Officer Shattuck as blood ran nonstop from two cuts around Plaintiff's right eye. *Id.* ¶ 54. Plaintiff tried to "cover up onto the wall to stop the blows from reaching [his] face," but Defendant Rovelli grabbed the hood of Plaintiff's sweat suit and exposed his face so that Defendant Rovelli and Defendants Deluca, Flores, and Shattuck could hit it. *Id.* ¶ 55. This continued for fifteen or twenty minutes. *Id.* Plaintiff's hands were cuffed behind his back the entire time. *Id.* Defendant Sergeant Colin Fraser, Defendant Sergeant Michael Hoy, and Defendant Correction Officer H. Foster joined in by kicking Plaintiff in the back, head, buttocks, legs, spine, and shoulders. *Id.* ¶ 56.

**\*3** Defendants Deluca and Shattuck forced Plaintiff onto his feet "due to the large amount of blood all over the floor and [P]laintiff' s clothing" and took him to a different room. *Id.* ¶ 57. There, Defendant Shattuck pinned Plaintiff against a sink

and punched Plaintiff in the ribs and back while Defendant Deluca hit Plaintiff in the face, eyes, nose, and jaw. (Dkt. No. 1 ¶ 57.)

Once the blood was cleaned up in the first room, Defendants Deluca and Shattuck returned Plaintiff there and punched him in the face, knocking him to the floor. *Id.* ¶ 58. Defendants Deluca and Shattuck continued to kick and stomp Plaintiff's legs, ankles, ribs, and chest. *Id.* As this was happening, Defendant Fisher Nesmith opened the door and said "[A]re you done yet[?] If not, take your time." *Id.* ¶ 59. Defendant Nesmith then slammed the steel door into Plaintiff's head as he lay "on the floor bloody and broken up." *Id.*

After the beating was over, Plaintiff was taken to an examination room. There, Defendant J. Leos "did a vis[ua]l inspection" of Plaintiff and documented some of Plaintiff's injuries. *Id.* ¶ 60. Plaintiff alleges that these injuries included broken ribs, broken left hand, and broken eardrum. *Id.* ¶ 62. Defendant Leos did not say anything or ask any questions. *Id.* ¶ 60. He did not give Plaintiff any medical assistance other than to wash the blood off of Plaintiff's face and head. *Id.* Defendant Leos entered a false time on his report to "cover up for beating." *Id.* Defendant Nesmith then attempted to stitch the cuts around Plaintiff's eye, but Plaintiff refused treatment because Defendant Nesmith had participated in the use of excessive force. *Id.* ¶ 61.

Pictures were taken of Plaintiff's injuries. *Id.* ¶ 63. Defendant Foster and Defendant Sergeant Nabozny then escorted Plaintiff to the Special Housing Unit ("SHU"). *Id.*

After the beating, Plaintiff saw Defendant Counselor Brian McAllister. *Id.* ¶ 65. Plaintiff asked Defendant McAllister to contact Plaintiff's family and inform them of his injuries. *Id.* Later, Plaintiff's family contacted the prison and Defendant McAllister refused to give them any information. *Id.* ¶ 66.

Sometime after the alleged use of excessive force, Plaintiff was taken to the medical unit, where he was seen by Defendant Janet Collins. (Dkt. No. 1 ¶ 70.) She informed him that his "left eardrum had a hole in it but it should heal in time" and gave him ibuprofen for pain. *Id.* Plaintiff asked for x-rays of his face, neck, back, and left hand and an H.I.V. test due to the "cutting" on February 4, 2009. *Id.* Defendant Collins told Plaintiff that the pain "was from getting old" and denied his request for x-rays. *Id.*

Plaintiff alleges that in order to cover up the use of excessive force, Defendant Lieutenant K.H. Smith, Defendant Lieutenant Peter Besson, and Defendants Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca filed false misbehavior reports charging Plaintiff with fighting, violent conduct, refusing a direct order, and assault on staff. *Id.* ¶ 67.

**\*4** Plaintiff filed three grievances regarding the use of excessive force and the medical care he received thereafter. *Id.* ¶ 68. No one responded. *Id.*

### B. Medical Issues Predating the Alleged Use of Excessive Force

On October 20, 2008, Plaintiff filed a grievance because he was denied access to sick call. (Dkt. No. 1 ¶ 83.) Plaintiff alleges that his grievance was denied "at all levels of [a]ppeal." *Id.*

On March 26 and 29, 2009, Plaintiff submitted requests to be seen at sick call to receive medication and an AIDS/HIV test due to being cut by an inmate. *Id.* ¶¶ 84, 85.

On April 8, 2009 Plaintiff filed another grievance. *Id.* ¶ 86.

On April 10, 2009, Plaintiff was seen by Defendant Silverberg but was told it was a "[five] year physical" rather than an appointment to address Plaintiff's concerns. *Id.* ¶ 87. Plaintiff then refused treatment. *Id.* Afterward, Plaintiff filed another grievance regarding the denial of treatment for his medical concerns. (Dkt. No. 1 ¶ 88.)

On April 14, 2009, Plaintiff was seen by Defendant Lindemann who informed Plaintiff that because he refused the five year physical he would receive no more treatment. *Id.* ¶ 89. At Plaintiff's request Defendant Lindemann checked Plaintiff's throat but found nothing. *Id.* Plaintiff claims he had been "hacking all day every day" for "over [one] year." *Id.* Afterward, Plaintiff filed another grievance regarding medical care. *Id.* ¶ 90.

On April 17, 2009, Plaintiff received a response from the Superintendent's office stating that after a review of Plaintiff's medical records, Plaintiff had received the opportunity to address his concerns and had received "[a]dequate medical care as well as medication." *Id.* ¶ 93.

Plaintiff alleges that he was called to see Defendant Silverberg on April 24, 2009, but that he was "forced to sit 20 minutes" after the Defendant Nurse Labrum took his vitals by Defendant Silverberg, who "was in a room doing nothing just to make the plaintiff suffer." (Dkt. No. 1 ¶ 95.) When Defendant Silverberg "finally" called Plaintiff into the examination room, he said "so, we are going to look at your throat today." *Id.* ¶ 96. When Plaintiff asked "what about the ears, headaches, and HIV test," Defendant Silverberg said "only the throat[,] one thing at a time." *Id.* Plaintiff "objected and stated it's been over 1 year and every time is denied the review of issues and concern[ ]s of matters that are not getting check out ever." *Id.* Defendant Silverberg then looked into Plaintiff's throat and said he did not see anything. *Id.* ¶ 97. Plaintiff asked him to get "the stix" and look at the back of his throat. *Id.* Without putting on a glove, Defendant Silverberg grabbed a "stix," handled it from "one end to the other" and told Plaintiff to open his mouth. *Id* . When Plaintiff objected "to this unhygienic act," Defendant Silverberg "threw the stix to the floor and said do not come [b]ack ever to sick call." *Id.*

**\*5** Plaintiff alleges that Defendant David Rock was "continuously ... informed of the medical needs of the [P]laintiff and the deliberate black balling by [the] medical department, [but] has refused to stop, correct or grant any medical relief and continued to file false response[s] to all matters of concern thus causing the [P]laintiff to live in continued pain day and night without relief." (Dkt. No. 1 ¶ 98.)

### C. Issues with Plaintiff's Food

After the use of excessive force, Defendant Deluca told Plaintiff that he should not eat prison food because "we control everything[,] even the inmates who make your food." *Id.* ¶ 64. Plaintiff went on a hunger strike because of this threat concerning his food. *Id.* ¶¶ 69, 78, 79. In response, Defendant Heath ordered that Plaintiff receive sealed kosher meals. *Id.* ¶ 69. On May 1, 2009, "the meals w[ ]ere stopped by someone overriding that order" and Plaintiff went back on hunger strike. *Id.* ¶ 71.

Defendant David Lindemann came to Plaintiff's cell on May 5, 2009, "threatening the plaintiff and demanding the plaintiff come to the gate or he will have the plaintiff [d]ragged to the [h]ospital to be force[ ] fe[ ]d." (Dkt. No. 1 ¶ 72.) A few minutes later, four officers and a sergeant ordered Plaintiff out of his cell and force-walked him to the medical unit. *Id.* Plaintiff was "force[d]" to see Defendant Doctor Howard Silverberg, who "has continued to file false information into plaintiff's medical file, refuse to give medical treatment or medication for [i]llness.... Silverberg ask[ed] [whether] I[was] going to eat the food I stated no he said Good we get to

force feed you, you will not enjoy that I assure you and walked out ordering staff to place me in Isolation Room # 2." (Dkt. No. 1 ¶ 73.) Defendant Deluca came into the room. *Id.* ¶ 74. He said he hated Plaintiff and hoped that he would die. *Id.* He also informed Plaintiff that he "can't wait to force feeding as he will be there two times a day to put shit down the plaintiff's throat." (Dkt. No. 1 ¶ 74.) Defendant Heath came to the hospital "seeking to resolve the [h]unger [s]trike [i]ssue and state[d] what[ ]ever the doctor states will be the outcome if he orders medical meal then you will get it." *Id.* ¶ 75.

On "May 7, 2009, Doctor Carandy came to talk to plaintiff with ... other officers [and] stated he would give [d]iet meal sealed exrays (sic) and medication for pain ... Carandy stated if we don[']t give him the meal it will only start the hunger strike all over again." (Dkt. No. 1 ¶ 76.)

On May 8, 2009, Defendant Nurse Terry "in retaliation stated the plaintiff refused [x-rays] and threatened him he would be out of there that day." *Id.* ¶ 77. Plaintiff was ultimately given sealed diet meals three times a day but was "forced to eat it with a tube of toothpaste due to officers refusing to give a spoon in [r]etaliation." *Id.* ¶ 78.

 **\*6** On May 11, 2009, Plaintiff was returned to the SHU. *Id.* ¶ 79. Once Plaintiff was returned to the SHU, Defendant Deluca and Defendant Terry stopped deliveries of Plaintiff's special meals. *Id.* ¶ 76. Plaintiff "lived on water [,] milk[,] sugar and sealed [i]tems that came with different meals starving in fear of being poisoned." *Id.*

## II. DEFENDANTS' MOTION TO VACATE THE COURT'S MARCH 10, 2010, ORDER

On February 5, 2010, Plaintiff requested the entry of default against Defendants Shattuck, Poirier, Fischer, Nesmith, Lindemann, Labrum, Kelly, Flores, and Aubin. (Dkt. No. 47.) On March 10, 2010, I granted Plaintiff's request in part and denied it in part. (Text Order of Mar. 10, 2010.) Noting that Defendants Kelly, Nesmith, Lindemann, Fischer, and Labrum are explicitly mentioned in Defendants' memorandum of law regarding motion to dismiss, I denied the request as to those Defendants. *Id.* However, I granted the request as to Defendants Flores, Shattuck, Aubin, and Poirier because they had not answered the complaint and were not mentioned in Defendants' notice of motion to dismiss (Dkt. No. 42), the proof of service of the motion to dismiss (Dkt. No. 42), or anywhere in Defendants' memorandum of law filed in support of the motion to dismiss (Dkt. No. 42–1). (Text Order of

Mar. 10, 2010.) It was therefore "unclear whether [they] are included in the motion to dismiss." *Id.*

On March 12, 2010, Defendants filed a request to set aside the default. (Dkt. No. 52.) In that letter, defense counsel stated:

> I had thought that by specifically indicating that the motion was being made on their behalf by expressly stating as much with the Court's electronic filing system, that it would be clear the motion was being made on behalf of all the persons I so designated ... I verily believed that by using the Court-supplied filing system and expressly indicating therein that I was filing the motion on behalf of all these 28 clients ... that those contemplating the motion would realize that the motion to dismiss was being made on behalf of all 28 of the individuals indicated. I did not realize that by expressly indicating that the motion was being filed on their behalf with the electric filing system that there could be confusion as to on whose behalf I was making the application.

*Id.* at 1.

The twenty-eight names that counsel listed in the entry on the Court's electronic filing system included two defendants (M. Rock [1] and Brian Fischer [2]) who have never been served. The list also included one Defendant (David Rock) for whom the Court did not receive an acknowledgment of service form until six weeks after the motion to dismiss was filed. (Dkt. No. 58.) Moreover, the list did not include one Defendant (Terry), who has not been served [3] but about whom defense counsel asserted arguments in the memorandum of law. (Dkt. No. 42–1 at 11.) Thus, the list that defense counsel cites as being "clear" was inaccurate and, thus, unreliable.

1    When Plaintiff completed USM–285 forms for service of the complaint, he indicated that Defendant M. Rock's true name is Todd Martineau.

2010 WL 4905240

(Dkt. No. 11.) The Clerk advised Plaintiff that he would need to amend his complaint to substitute Todd Martineau's name before he could be served with the complaint. *Id.* To date, Plaintiff has not amended his complaint to name "Todd Martineau" or filed any forms requesting service on "M. Rock." Therefore, Defendant "M. Rock" has not been served and has not appeared in the action.

2          The summons for Defendant Fischer was returned unexecuted, accompanied by a note from the United States Marshal for the Northern District of New York indicating that Defendant Fischer had not returned the Acknowledgment of Receipt of Summons and Complaint by Mail form within thirty days of the initial mailing of the summons. (Dkt. No. 62.) The note instructed Plaintiff to submit a new summons and complaint form to serve Defendant Fischer and warned that failure to do so could result in dismissal of the complaint against Defendant Fischer. *Id.*

3          The summons for Defendant Terry was returned unexecuted, accompanied by a note from the Inmate Records Coordinator stating that she was unable to identify Nurse Terry and would need more information. (Dkt. No. 29.) On February 3, 2010, the Clerk forwarded a copy of the note to Plaintiff and asked him to provide any additional information about the defendant to the Court. (Dkt. No. 46.)

*7 In light of this ambiguity, before granting the request for entry of default, the Court thoroughly reviewed Defendants' memorandum of law and found no mention of Defendants Flores, Shattuck, Aubin, or Poirier. The Court found this omission particularly striking in the case of Defendants Aubin and Poirier, who easily could have been included (as discussed more fully below) in the section of the memorandum of law discussing lack of personal involvement. Further, it appeared to the Court that Defendants' motion, despite not being labeled as such, was only a partial motion to dismiss because it did not assert any reasons for dismissing Plaintiff's excessive force claims. Thus, it was reasonable to conclude that perhaps the motion had not been filed on behalf of every Defendant. Based on this ambiguity, and the apparent confusion it caused Plaintiff (a *pro se* civil rights litigant, to whom I must grant special solicitude), entry of default was appropriate as of March 10, 2010.

However, I now grant Defendants' motion to set aside the default. Pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, "[t]he court may set aside an entry of default for good cause ..."[4] It is well-settled in the Second Circuit that defaults are not favored, and that there is a strong preference for resolving disputes on their merits. *See Brien v. Kullman Indus., Inc.,* 71 F.3d 1073, 1077 (2d Cir.1995); *Traguth v. Zuck,* 710 F.2d 90, 94 (2d Cir.1983). In light of Defendants' clarification of their ambiguous motion, I find that they have established good cause to set aside the default, and I therefore order the Clerk to vacate the text order of March 10, 2010, and the entry of default (Dkt. No. 51).

4          Rule 60(b) provides, *inter alia,* that in the case of "mistake, inadvertence, surprise or excusable neglect," a court may relieve a party from a final judgment, order or proceeding. Fed.R.Civ.P. 60(b).

## III. DEFENDANTS' MOTION TO DISMISS

### A. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim on which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

*8 "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court

must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**B. Medical Care**

Plaintiff alleges that Defendants Silverberg, Nesmith, Lindemann, Labrum, Leos, and Collins violated his Eighth Amendment rights by failing to provide him with adequate medical care.[5] (Dkt. No. 1 ¶¶ 60, 61, 68, 70, 72–73, 76–77, 87–89, 94–98.) Plaintiff's claims against Defendants Leos, Nesmith, and Collins relate to medical care for injuries sustained as a result of the alleged use of excessive force. Plaintiff's claims against Defendants Silverberg, Lindemann, and Labrum relate to medical care prior to the incident. Defendants argue that Plaintiff has failed to state an Eighth Amendment claim.[6] (Dkt. No. 42–1 at 5–11.)

[5]   Defendants' motion to dismiss does not explicitly address the Eighth Amendment medical claims against Defendants Labrum or Nesmith.

[6]   Defendants assert that the complaint also alleges that Defendants McAllister, Deluca, Heath, and Holland violated Plaintiff's Eighth Amendment right to adequate medical care. (Dkt. No. 42–1 at 11.) The complaint does not appear to allege that Defendant McAllister was involved in Plaintiff's medical care. Rather, it alleges that Defendant McAllister was a corrections counselor (Dkt. No. 1 ¶ 31) who failed to inform Plaintiff's family about his injuries. (Dkt. No. 1 ¶¶ 65–66.) The complaint does not appear to allege that Defendant Deluca was involved in Plaintiff's medical care. Although allegations about him appear in a section of the complaint titled "Statement of Facts, Misuse of Force, Denial of Medical Care," those allegations involve excessive force, threats, false misbehavior reports, and issues with Plaintiff's food. (Dkt. No. 1 ¶¶ 52, 54–55, 57–58, 64, 67, 69, 74, 76.) The complaint does not appear to allege that Defendant Heath was involved in Plaintiff's medical care. Rather it alleges that he was informed about Defendant Rovelli's threats against Plaintiff and was involved in issues regarding Plaintiff's food. (Dkt. No. 1 ¶¶ 36, 39, 69, 75.) Regarding Defendant Holland, the complaint alleges only that

he failed to investigate the "setup, [b]eating[,] and complaints." (Dkt. No. 1 ¶ 80.)

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)). There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). Defendants argue that Plaintiff has not stated a claim as to either element. (Dkt. No. 42–1 at 10–11.) I will address Plaintiff's pre-excessive force claims and post-excessive force claims separately.

*1. Medical Care for Injuries Sustained in Alleged Excessive Force Incident*

Plaintiff alleges that Defendants Leos, Nesmith, and Collins were deliberately indifferent to the following injuries that Plaintiff sustained in the alleged excessive force incident: (1) a loss of consciousness that lasted for a few seconds; (2) two cuts around his right eye, which bled profusely; (3) broken ribs; (4) broken hand; and (5) broken ear drum. (Dkt. No. 1 ¶¶ 53, 54, 62, 70.)

**\*9** Defendants argue that the complaint fails to satisfy the objective prong of the Eighth Amendment inquiry because Plaintiff "fails to articulate a serious medical need." (Dkt. No. 42–1 at 10.) A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly

2010 WL 4905240

affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Defendants address only Plaintiff's allegation that he suffered two cuts around his eye, arguing without citation to authority that the allegation does not "present or describe a serious medical need ." (Dkt. No. 42–1 at 10.) I find that the complaint alleges facts plausibly suggesting that Plaintiff suffered injuries that could "produce death, degeneration, or extreme pain" as a result of the alleged use of excessive force. *See Jackson v. Johnson,* 118 F.Supp.2d 278, 291 (N.D.N.Y.2000) (loss of consciousness is a serious medical condition); *Ellis v. Guarino,* No. 03 Civ. 6562, 2004 U.S. Dist. LEXIS 16748, at*33–34, 2004 WL 1879834, at *11 (S.D.N.Y. Aug. 24, 2004) ("When Plaintiff arrived at the SHU followed the alleged attacks ... he allegedly had swelling on his face, contusions in both ears and on his forehead, abrasions on his shoulder, a one millimeter laceration in his right eye, and suffered from blurred vision, headaches, dizziness and ringing in his ears, the latter two of which continued for several days thereafter.... Such injuries clearly constitute a serious medical condition for Eighth Amendment purposes."); *Griffin v. Donelli,* No. 05–CV–1072 (TJM/DRH), 2010 U.S. Dist. LEXIS 125271, at *22, 2010 WL 681394, at *8 (N.D.N.Y. Feb. 24, 2010) (*citing Torres v. New York City Dep't of Corrs.,* No. 93–CV–6296 (MBM), 1995 U.S. Dist. LEXIS 1698, at *4, 1995 WL 63159, at *1 (S.D.N.Y. Feb. 15, 1995)) (stating that a broken rib "could present a serious medical need" if treatment was not properly administered); *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir.1998) (broken hand is a serious medical condition); *Odom v. Kerns,* No. 99–CV–10668, 2008 U.S. Dist. LEXIS 47336, at *27–28, 2008 WL 2463890, at * 8 (S.D.N.Y. June 18, 2008) (ruptured eardrum is a serious medical condition).

Defendants argue that Plaintiff's complaint does not state a claim as to the subjective Eighth Amendment prong because the "shear number of examinations, discussions and attempts to aid [P]laintiff forecloses any allegation of indifference, deliberate or otherwise...." (Dkt. No. 42–1 at 11.)

**\*10** Medical mistreatment rises to the level of deliberate indifference where it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that

the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976). Moreover, a complaint that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

I find that Plaintiff has alleged facts plausibly suggesting that Defendant Leos was deliberately indifferent to his serious medical needs. Plaintiff alleges that "[a]fter the beating was over the plaintiff was ... taken to [an] exam room where J. Leos did a visual inspection of the plaintiff[']s body documenting some of the injur[ie]s not saying anything of asking any questions and gave no medical assistance other than wash the blood off the face and head of the plaintiff." (Dkt. No. 1 ¶ 60.) Plaintiff alleges that Defendant Leos entered a false time on his medical note in order to cover up the beating. *Id.* Accepting Plaintiff's allegations that his ribs, hand, and eardrum were broken as a result of the alleged excessive force incident as true, as I must for the purposes of this motion, the complaint plausibly suggests that Defendant Leos was aware of facts from which he could have drawn the inference that Plaintiff had a serious medical need, actually drew that inference, and ignored that medical need. Therefore, I recommend that the Court deny Defendants' motion to dismiss the Eighth Amendment medical claim against Defendant Leos.

Plaintiff has not stated an Eighth Amendment medical claim against Defendant Nesmith or Defendant Collins. Plaintiff admits that he refused treatment when Defendant Nesmith attempted to stitch the cuts around Plaintiff's eye. (Dkt. No. 1 ¶ 61.) Given Plaintiff's allegations about Defendant Nesmith's earlier conduct, Plaintiff's refusal is understandable. However, it negates his allegation that Defendant Nesmith was deliberately indifferent to his serious medical needs. *See Rivera v. Goord,* 253 F.Supp.2d

735, 756 (S.D.N.Y.2003). Plaintiff's allegations regarding Defendant Collins amount to mere disagreement regarding proper treatment, which is insufficient to establish deliberate indifference. *Estelle,* 429 U.S. at 107 ("[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice...."). Therefore, I recommend that the Court grant Defendants' motion to dismiss the Eighth Amendment medical claim against Collins and that the Court *sua sponte* dismiss the Eighth Amendment medical care claim against Defendant Nesmith.

**\*11**  Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Because Plaintiff has admitted that he refused care from Defendant Nesmith, I recommend that the Court dismiss the Eighth Amendment medical claim against Defendant Nesmith without leave to amend. However, I recommend that the medical claim against Defendant Collins be dismissed without prejudice.

### 2. *Medical Care For Conditions That Pre–Dated the Alleged Use of Excessive Force*

Plaintiff alleges that Defendants Silverberg, Lindemann, and Labrum were deliberately indifferent to medical conditions that predated the alleged use of excessive force. (Dkt. No. 1 ¶¶ 70, 87, 89, 95–97.) Those conditions were: (1) a need for H.I.V. testing "due to cutting on February 4, 2009"; (2) a need for asthma medication; (3) a "cough in throat due to bum[p]s growing in throat area" that lasted over a year; (4) a rash on his face; (5) a need for nose spray; (6) elbow pain that lasted for five years; (7) lower back and spine pain; (8) left ankle pain; and (9) a need for glasses. (Dkt. No. 1 ¶¶ 84–85, 89, 92.)

Defendants argue that these claims should be dismissed because Plaintiff has not sufficiently alleged any serious medical need or deliberate indifference. (Dkt. No. 42–1 at 5–11.) Defendants are correct. Plaintiff has not alleged facts plausibly suggesting that any of these conditions were injuries that a reasonable doctor or patient would find important

and worthy of comment or treatment, that they affected his daily activities, or that they caused chronic and substantial pain. *Chance,* 143 F.3d at 702–03; *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) (asthma not a serious medical condition); *Lewal v. Wiley,* 29 Fed. App'x 26, 29 (2d Cir.2002) (persistent rash is not a serious medical condition); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522–26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

Even if Plaintiff had alleged facts plausibly suggesting the existence of a severe medical condition, I would recommend dismissing the claims against Defendants Lindemann, Labrum, and Silverberg because Plaintiff has not sufficiently alleged deliberate indifference. Plaintiff alleges merely that at his request, Defendant Lindemann checked his throat and found nothing. Although he told Plaintiff that Plaintiff could not receive further treatment, Plaintiff did in fact see a doctor again only ten days later. Regarding Defendant Labrum, Plaintiff alleges only that she took his vital signs and had him wait twenty minutes to see Defendant Silverberg. Although Plaintiff alleges that Defendant Silverberg behaved somewhat unprofessionally, these allegations as currently pleaded do not rise to the level of deliberate indifference. Therefore, I recommend that the Court dismiss the Eighth Amendment medical claims against Defendants Lindemann, Labrum, and Silverberg without prejudice.

### C. Personal Involvement

**\*12**  Defendants argue that the complaint does not plausibly allege that Defendants Fischer [7], Roy, David Rock, Heath, Nabozny, or Kelly [8] were personally involved in any alleged constitutional violation. (Dkt. No. 42–1 at 12–14.) With the exception of Defendant Kelly, Defendants are correct.

7    As noted above, according to the Court's records Defendant Fischer has not been served in this action. (Dkt. No. 62.)

8    Defendants also argue that "Plaintiff has merely alleged *respondeat superior* liability" against

Defendant Collins and that Plaintiff "names Defendant Labrum but makes no further allegation." (Dkt. No. 42–1 at 12–13.) This is inaccurate. As discussed above, Plaintiff claims that each of these Defendants violated his Eighth Amendment right to adequate medical care.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U .S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[9]

[9]    The Supreme Court's decision in *Ashcroft v. Iqbal,* ––– U.S. –––, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The complaint does not include any allegations about Defendants Fischer, Aubin, or Poirier.[10] Therefore, I recommend that the claims against these Defendants be dismissed for lack of personal involvement.

[10]    As discussed above, Defendants did not explicitly argue that the action against Defendants Aubin and Poirier should be dismissed. Moreeover, although Defendants argue that Defendant Fischer was not personally involved, Defendant Fischer has not yet been served in this action. (Dkt. No. 62.) I recommend that the Court dismiss these Defendants *sua sponte* without prejudice.

Regarding Defendants Roy and Heath, the complaint alleges only that they failed to respond to Plaintiff's letters and grievances. (Dkt. No. 1 ¶¶ 36, 39, 41, 69, 75.) A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (quoting *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, at *11, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19, 1995)). Therefore, I recommend the claims against Defendants Roy and Heath be dismissed for lack of personal involvement.

**\*13** The complaint alleges that Defendant David Rock ignored several grievances (Dkt. No. 1 ¶¶ 36, 39) and that his response to a grievance regarding medical care pre-dating the excessive force incident was unsatisfactory (Dkt. No. 1 ¶ 93). As discussed in the previous paragraph, the allegation that Defendant David Rock failed to respond to grievances is insufficient to plausibly suggest that he was personally involved in any constitutional violation. As discussed above in Section III(B)(2), Plaintiff has not stated an Eighth Amendment claim regarding medical care pre-dating the excessive force incident. Thus, Defendant David Rock was not made aware of an Eighth Amendment medical violation and was not personally involved with any constitutional violation. Therefore, I recommend that the Court dismiss the claims against Defendant David Rock without prejudice.

Regarding Defendant Nabozny, the complaint alleges, in full, that "Pictures were taken of the plaintiff's injuries with 2

different cameras as the visual inspection and pictures being take[n] w[ ]ere all on video the the (sic) video escorted the plaintiff to ... Special Housing Unit by Defendant Foster and Defendant Nabozny." (Dkt. No. 1 ¶ 63) (syntax in original). This is insufficient to allege Defendant Nabozny's personal involvement in any constitutional violation and I therefore recommend that Defendants' motion to dismiss the claim against Defendant Nabozny be granted. Defendants argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Kelly. (Dkt. No. 42–1 at 13.) This is not accurate. The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. (Dkt. No. 1 ¶ 67.) This allegation is potentially sufficient to state a claim against Defendant Kelly for retaliation. *See Snyder v. McGinnis,* No. 03–CV–0909, 2004 U .S. Dist. LEXIS 17976, at *24–26, 2004 WL 1949472, at *8 (W.D.N.Y. Aug. 31, 2004). Therefore, I recommend that the Court deny Defendants' motion to dismiss the claim against Defendant Kelly for lack of personal involvement.

### D. Claim Against Defendant McAllister

Plaintiff alleges that Defendant McAllister violated his legal rights by failing to communicate with his family regarding his injuries. (Dkt. No. 1 ¶ ¶ 65–66.) Defendants move to dismiss this claim, arguing that "[v]iolations of state law or regulations in themselves do not state a viable section 1983 claim." (Dkt. No. 42–1 at 14.) Neither Plaintiff nor Defendants have identified what policy Defendant McAllister's actions may have violated. In any case, I find that the complaint does not plausibly suggest that Defendant McAllister violated any constitutional right and therefore recommend that the Court grant Defendants' motion to dismiss the claim.

### E. Threats

Plaintiff alleges that, at various times, Defendants Rovelli, Deluca, Lindemann, and Silverberg threatened him. (Dkt. No. 1 ¶¶ 43–45, 64, 72–74.) Defendants argue that Plaintiff's allegations that Defendants Deluca, Lindemann, and Silverberg threatened him do not state a constitutional claim. [11] (Dkt. No. 42–1 at 14–16.) Defendants' motion does not address the allegations that Defendant Rovelli threatened Plaintiff.

[11]  Defendants also characterize the allegations in Paragraph 75 of the complaint regarding Defendant

Heath's statement that "what ever the doctor states will be the outcome if he orders medical meal you will get it" as an allegation that Defendant Heath threatened Plaintiff. (Dkt. No. 42–1 at 15.) It does not appear to the undersigned that Plaintiff alleges that Defendant Heath threatened him. However, to the extent that the complaint can be read to assert such a claim, I recommend that it be dismissed with prejudice.

*14  "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, to the extent that Plaintiff alleges that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated his constitutional rights simply by threatening him, I recommend that the Court dismiss those claims with prejudice.

### F. Claim Against Defendant Holland

The complaint alleges that Defendant Holland [12] was "allegedly investigating the setup, [b]eating and complaints which was not the fact at all." (Dkt. No. 1 ¶ 80.) Prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003).

[12]  Defendant Holland is listed in the complaint as "Hollin." Defendants note that "Holland" is the correct spelling. (Dkt. No. 42–1 at 13 n. 2.)

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001).* If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at

2010 WL 4905240

*3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court dismiss the claim against Defendant Holland.

**G. Eleventh Amendment**

Plaintiff sues Defendants "in [their] individual and official capacities." (Dkt. No. 1 at 1–3.) Defendants move to dismiss the official-capacity claims, arguing that any claims for damages against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–1 at 16–17.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47 (1993); *Pennhurst State Sch. & Hosp.,* 465 U.S. at 101–06.

**\*15** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[13] All DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. New York State Corr. Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

[13]   *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is

deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05–CV–0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) (citing cases).

**H. Conspiracy**

Plaintiff alleges that Defendants Rovelli, M. Rock, Perez, Flores, and Deluca conspired to use excessive force against him. (Dkt. No.1 ¶¶ 36, 41, 43–46, 48, 50, 52.) Defendants move to dismiss Plaintiff's conspiracy claims, arguing that they are barred by the intracorporate conspiracy doctrine. (Dkt. No. 42–1 at 19–20.) Defendants are correct.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U .S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). There is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d

153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. App'x 217 (2d Cir. Sept. 28, 2007). "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E .D.N.Y.2002) (quoting *Bond,* 1999 WL 151702, at *2). However, in an unrelated action, I have found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).

Here, Plaintiff has not alleged what motivated Defendants to conspire against him. "[A] complaint that does not set forth factual allegations showing that any of the individual defendants acted with independent motives is subject to dismissal for failure to state a claim." *Freeman v. Santos,* No. 9:09–CV–0414, 2010 U .S. Dist. LEXIS 23742, at *8, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010) (quoting *Perrin v. Canandaigua City Sch. Dist.,* No. 09–CV–6153, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241, at *2 (W.D .N.Y. Nov. 21, 2008)). [14] Therefore, I recommend that the Court dismiss Plaintiff's conspiracy claims without prejudice.

[14]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

### I. Pendent State Claims

**\*16**  Defendants argue that Plaintiff's state law claims should be dismissed pursuant to Section 24 of New York's Correction Law. (Dkt. No. 42–1 at 21–22.) Defendants are correct. That section provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope

of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24(1)-(2). Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in New York state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997 (N.Y.App.Div.3d Dept.1987). This bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker,* 77 F.3d at 15.

In 2009, the United States Supreme Court held that section 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* —— U.S. ——, 129 S.Ct. 2108 (2009). However, at least two judges in this District have observed that because *Haywood* 's focus is on civil rights claims, the decision "does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at *18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli,* No. 9:06–CV–437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. and Treece, M.J.). [15] Therefore, I recommend that the Court dismiss Plaintiff's pendent state law claims.

[15]    The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

### J. Claims Not Addressed by Defendants

Defendants' motion to dismiss does not address Plaintiff's excessive force claims, retaliation claims, or Eighth Amendment conditions of confinement claims regarding the provision of food. I find that those claims are sufficient to

survive *sua sponte* review and therefore recommend that Defendants be directed to answer those claims.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**\*17** In his opposition to Defendants' motion to dismiss, Plaintiff purports to move for summary judgment against both the State Defendants and Defendant inmate Perez. (Dkt. Nos. 72 and 77.) As the state Defendants note (Dkt. No. 75), Plaintiff's "motion" is not accompanied by a notice of motion, a statement of material facts, or a memorandum of law. In addition, Plaintiff did not serve the exhibits to his "motion" on Defendants. Therefore, I recommend that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' request (Dkt. No. 52) to vacate the text order of March 10, 2010, is **GRANTED.** The Clerk is directed to vacate the text order and the entry of default (Dkt. No. 51); and it is further

**ORDERED** that Plaintiff's objection (Dkt. No. 55) to Defendants' request is **DENIED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Freeman v. Santos,* No. 9:09–CV–0414, 2010 U.S. Dist. LEXIS 23742, 2010 WL 982893, at \*3 (N.D.N.Y. Mar. 15, 2010); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 U.S. Dist. LEXIS 10799, at \*61, 2010 WL 502762, at\* 18 (N.D.N.Y. Feb. 8, 2010); and *May v. Donneli,* No. 9:06–CV–437, 2009 U.S. Dist. LEXIS 85495, at \*13, 2009 WL 3049613, at \*5 (N.D.N.Y. Sept. 18, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be **GRANTED IN PART AND DENIED IN PART.** I recommend that the following claims be dismissed with prejudice: (1) the Eighth Amendment medical claim against Defendant Nesmith; (2) the claim against Defendant McAllister; (3) any claim that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated Plaintiff's constitutional rights simply by threatening him; (4) the claim against Defendant Holland; (5) any claims for damages against Defendants in their official capacities; and (6) the pendent state law claims. I recommend that the following claims be dismissed without prejudice: (1) the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; (2) the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and (3) the conspiracy claims. I recommend that Defendants be directed to answer the Eighth Amendment medical care claim against Defendant Leos; and it is further

**RECOMMENDED** that Defendants be directed to answer the following claims not addressed by their motion to dismiss: (1) the retaliation claims against Defendants Smith, Besson, Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca; (2) the excessive force claim against Defendants Rovelli, Deluca, Flores, Shattuck, Fraser, Hoy, Foster, and Nesmith; and (3) the Eighth Amendment conditions of confinement claims regarding issues with Plaintiff's food; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be **DENIED.**

**\*18** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

## All Citations

Not Reported in F.Supp.2d, 2010 WL 4905240

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4945770
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary GILLARD, Plaintiff,

v.

Michael ROVELLI, et al., Defendants.

No. 9:09–CV–0860.
|
Nov. 24, 2010.

**Attorneys and Law Firms**

Gary Gillard, Attica, NY, pro se.

Hon. Andrew Cuomo, Attorney General of the State of New York, Roger W. Kinsey, Esq., Assistant Attorney General, Albany, NY, for Defendants.

**ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to this Court following a Report–Recommendation (Dkt. No. 82) by Magistrate Judge George H. Lowe, duly filed on the 29th day of September 2010. On October 18, 2010, the Court granted plaintiff's letter motion (Dkt. No. 83) and extended plaintiff's time to object until November 18, 2010. No objection has been submitted. After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is hereby

ORDERED that the Report–Recommendation (Dkt. No. 82) is hereby adopted in its entirety;

ORDERED that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) is GRANTED IN PART AND DENIED IN PART; and it is further

ORDERED that the following claims are dismissed with prejudice: (1) the Eighth Amendment medical claim against Defendant Nesmith; (2) the claim against Defendant McAllister; (3) any claim that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated Plaintiff's constitutional rights simply by threatening him; (4) the claim against

Defendant Holland; (5) any claims for damages against Defendants in their official capacities; and (6) the pendent state law claims; and it is further

ORDERED that Defendants McAllister and Holland are hereby terminated as Defendants; and it is further

ORDERED that the following claims are dismissed without prejudice: (1) the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; (2) the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and (3) the conspiracy claims; and it is further

ORDERED that if plaintiff wishes to amend his complaint as to the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and the conspiracy claims, he may do so by serving and filing an amended complaint within 60 days, that is, on or before January 24 2011, and if he does not do so, such claims will automatically be dismissed without further order of the Court, and Defendants Collins, Lindemann, Labrum, Silverberg, Fischer, Roy, David Rock, Heath, and Nabozny will be terminated as Defendants; and it is further

ORDERED that if plaintiff amends his complaint, the amended complaint will completely replace the initial complaint, and any claims from the initial complaint that are not set forth in the amended complaint will be deemed abandoned; and it is further

ORDERED that on March 25, 2011, or within 60 days of receipt of an amended complaint, whichever first occurs, Defendants shall serve an answer as follows: answering the amended complaint if one is served; or if no amended complaint is served, answering the remaining claims of the initial complaint, that is, (1) the Eighth Amendment medical care claim against Defendant Leos, and (2) the following claims, which were not addressed by the motion to dismiss: (a) the retaliation claims against Defendants Smith, Besson, Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca; (b) the excessive force claim against Defendants Rovelli, Deluca, Flores, Shattuck, Fraser, Hoy, Foster, and Nesmith; and (c) the Eighth Amendment conditions of confinement claims regarding issues with Plaintiff's food; and it is further

**\*2** ORDERED that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) is DENIED.

2010 WL 4945770

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4945770

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.